IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| HERITAGE REALTY MANAGEMENT, INC., <br><br> Plaintiff <br><br> vs. <br><br> JOHN ALLIN d/b/a ALLIN COMPANIES, and SNOW MANAGEMENT GROUP, <br><br> Defendant | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) CASE NO. CA 04-333 ERIE <br> ) <br> ) JUDGE SEAN MCLAUGHLIN <br> ) |

## AMENDED COMPLAINT

AND NOW, comes the plaintiff, Heritage Realty Management, Inc., by and through its counsel, Knox McLaughlin Gornall & Sennett, P.C., and files the following as its Amended Complaint:

### PARTIES

1. Heritage Realty Management, Inc., ("Heritage") is a Maryland corporation with it principal office located at 131 Dartmouth Street, Boston, Massachusetts 02116, and is a citizen of the Commonwealth of Massachusetts.

2. John Allin is an individual doing business as Allin Companies and Snow Management Group ("Allin"), who resides at 2319 South Shore Drive, Erie, Pennsylvania 16505, and is a citizen of the Commonwealth of Pennsylvania.

### JURISDICTION

3. Jurisdiction of this matter is based on diversity of citizenship between the parties and an amount in controversy in excess of $75,000.00 exclusive of interest and costs of suit, pursuant to 28 U.S.C. § 1332.



## FACTS

4. On October 12, 2004, Heritage and Allin entered into a contract pursuant to which Allin was to provide snow and ice removal services at Heritage's properties. (the "Contract")  A copy of the Contract, without exhibits, is attached hereto as Exhibit "A" and incorporated herein by reference.

5. Allin held itself out as "an experienced and professional organization that specializes in the management and supervision of snow and ice removal services for commercial properties provided under subcontracts with reputable commercial snow removal contractors." (Contract, Description of Services)

6. On October 15, 2004, in anticipation of work that Allin was to perform under the Contract, and pursuant to the Contract's terms, Heritage made an initial payment to Allin of $340,482.90.

7. Pursuant to the terms of the Contract, Heritage had the right "to terminate [the Contract] by giving [Allin] ten (10) days written notice in the following events: . . . (c) without any cause whatsoever, provided, in all such events, Heritage shall pay [Allin] for all work or services performed and equipment and materials supplied to the date of termination." (Contract, ¶ 17).

8. On November 12, 2004, Hertiage gave Allin written notice of its termination of the Contract pursuant to its termination provision.

9. As of November 12, 2004, Allin had not performed any work or services or supplied any equipment or materials under the Contract.

10. Within its November 12, 2004 letter, Heritage also demanded the return of the $340,482.90 initial payment.

11. Allin refused and has continued to refuse to return this payment.

## COUNT I
## Breach of Contract

12. Heritage incorporates paragraphs 1 through 11 of this Amended Complaint.

13. Pursuant to paragraph 17 of the Contract, Heritage had the right to terminate the Contract for any reason.

14. In the event of such a termination, Allin was only entitled to payment for "work or services performed and equipment and materials supplied to the date of termination."

15. On November 12, 2004, Heritage gave Allin notice of its termination of the Contract.

16. As of November 12, 2004, Allin had not performed any work or services and had not supplied any equipment or materials.

17. Therefore, Allin is not entitled to any payment and must return Heritage's initial payment of $340,482.90.

18. Allin's refusal to return this payment is a breach of its obligations under the Contract.

WHEREFORE, Heritage Realty Management, Inc., respectfully requests that this Court enter judgment in its favor and against John Allin d/b/a Allin Companies and Snow Management Group in the amount of $340,482.90, plus interest and costs of suit.

Respectfully submitted,

KNOX McLAUGHLIN GORNALL &
SENNETT, P.C.


By:_____
      Richard A. Lanzillo
      Neal R. Devlin
      120 West Tenth Street
      Erie, PA  16501-1461
      (814) 459-2800

      Attorneys for plaintiff,
      Heritage Realty Management, Inc.

624418

Contract dated *October 12, 2004* between Heritage Realty Management, Inc.
(the "Owner")
and John Allin, d/b/a Allin Companies, d/b/a Snow Management Group (the "Contractor")

PROPERTIES: The properties (hereinafter referred to as "Properties"), property addresses and fixed annual snow removal fees are enumerated on Exhibit A attached to this Contract.

OWNERS AND GENERAL PARTNERS OF OWNERS: The Owners and General Partners of Owners are enumerated on Exhibit B attached to this Contract (hereinafter referred to as "Owner" or "Owners and General Partners").

MANAGING AGENT: Heritage Realty Management, Inc. (hereinafter referred to as "Heritage"), a Maryland corporation.

ADDRESS:    131 Dartmouth Street, 6th Floor
            Boston, MA 02116-5134

CONTRACTOR: John Allin, d/b/a Allin Companies, d/b/a Snow Management Group (hereinafter collectively referred to as "Contractor").

ADDRESS:    1406 West 21st Street
            Erie, PA 16502

DESCRIPTION OF OPERATIONS: Contractor is an experienced and professional organization that specializes in the management and supervision of snow and ice removal services for commercial properties provided under subcontracts with reputable commercial snow removal contractors (the "Subcontractors"). The Contractor shall provide all services required to manage, supervise and assure that Contractor or the Subcontractors shall accomplish the following at the Properties covered by this Agreement: Snow and ice plowing, snow blowing, shoveling, salting, sanding and snow and ice removal operations in accordance with this Contract, including the attached Exhibit C. Snow and ice plowing, snow blowing, shoveling, salting, sanding and snow and ice removal operations (hauling operations are only included if specified on Exhibit D), including all labor, machinery, materials, services, equipment and supervision provided in connection therewith, are hereinafter referred to, individually and collectively, as "Operations." Additional specifications, if any, for each of the Properties, shall be agreed upon by Contractor and Heritage and attached hereto as Exhibit D within thirty (30) days of the date of this Agreement.

In consideration of the mutual covenants contained in this Contract, Heritage and Contractor agree as follows:

1.   ACCEPTANCE OF CONTRACT: This contract must be accepted and executed by both parties within fifteen (15) days of the date of this Contract.

EXHIBIT A

RECEIVED
SEP 30 2004

2.     CONTRACT DOCUMENTS: The Contract documents consist of this Contract which includes the Exhibits and Addenda referred to herein and attached hereto, all of which are incorporated herein by reference and form this Contract. This Contract represents the entire and integrated agreement between Heritage and Contractor and supersedes all prior negotiations, representations or agreements, either written or oral.

3.     THE OPERATIONS: Contractor shall perform or cause the Subcontractors to perform the Operations, as described in this Contract, in a good workmanlike and expeditious manner and in compliance with all laws, codes and ordinances. Contractor shall obtain all required permits and approvals to perform the Operations.

4.     SUBCONTRACTS: Contractor shall retain Subcontractors to perform the Operations with respect to each of the Properties and shall enter into subcontracts in the form of Exhibit E attached hereto and incorporated herein by reference (the "Subcontracts"). Contractor shall deliver copies of the signed Subcontracts for each Property to Owner prior to October 31, 2004. Contractor may redact the payment amount and terms of any Subcontract prior to delivering copies to Owner. However, in the event Owner becomes the assignee of any Subcontract provided in this Agreement, Contractor shall immediately provide Owner with an unredacted copy of any Subcontract, including the payment amount and terms. All portions of the Operations that Contractor does not perform directly shall be performed under the Subcontracts by Subcontractors approved in advance by Heritage, which approval shall not be unreasonably withheld or delayed. Contractor shall be responsible for the management and payment of the Subcontractors and shall comply with all of its obligations under the Subcontracts. Contractor shall remain fully responsible for any and all of its obligations and responsibilities under this Contract and shall not be relieved of any such obligations and responsibilities in the event that any Operations are subcontracted.

5.     TERM: The initial term of this Contract shall be five (5) years commencing on October 1, 2004 and terminating on September 30, 2009 (the "Initial Term"). Following the Initial Term, if Contractor is not in default of any terms of the Contract and this Contract has not been terminated by Heritage, the term of the Contract will be extended on a month-to-month basis until cancelled by either party given thirty (30) days written notice of cancellation to the other party.

6.     CONTRACT PRICE AND PAYMENT: The annual contract price for the Operations is a fixed annual price itemized on a per property basis for each year of the term of this Contract, as shown on Exhibit A. Contractor acknowledges that Heritage reserves the right to review the annual contract amounts on an annual basis, specifically with respect to Colonial Commons and Long Meadow Shopping Centers, which are recent acquisitions and for any Properties affected by material changes in size, tenant obligations or otherwise. In the event Heritage's analysis indicates support for an adjustment in the annual contract amounts for the years two through five of this Agreement, Contractor agrees to negotiate in good faith in an effort to agree upon equitable annual amounts for the Properties under review. Payments shall be made by Heritage to Contractor according to the following procedure:

(a) Contractor shall submit written invoices to Owner for payment by the first day of the month in which the payment is due, with separate invoices for each Property and a summary invoice for each billing period and Heritage shall deliver payment to Contractor, on the following dates and in the following amounts:

    (i) October 15: 10% of the fixed annual amount due for each Property;

    (ii) November 15: 10% of the fixed annual amount due for each Property

    (iii) December 15: 15% of the fixed annual amount due for each Property;

    (iv) January 15: 20% of the fixed annual amount due for each Property;

    (v) February 15: 20% of the fixed annual amount due for each Property;

    (vi) March 15: 15% of the fixed annual amount due for each Property; and

    (vii) May 15: 10% of the fixed annual amount due for each Property.

(b) Contractor's invoices, subsequent to the commencement of the Operations, shall include the following:

    (i) signed original mechanic's lien waivers or affidavits from the Subcontractors, certifying that all amounts due to the Subcontractors for performance of the Operations have been paid in full through the invoice date and final lien waivers prior to Owner releasing the final annual payment (notwithstanding the foregoing, Owner may elect to waive the requirement of partial mechanic's lien waivers or affidavits from any subcontractors in the event of a dispute between Contractor and Subcontractor if Contractor provides adequate assurance that the dispute will be resolved and the mechanic's lien waiver will be issued on a timely basis); and

    (ii) Contractor's affidavit certifying that all the Subcontractors have been paid in full for the Operations performed by the Subcontractors through the invoice date.

If Heritage fails to pay Contractor in a timely manner, and Contractor has given Heritage ten (10) days written notice of such late payment, then Contractor may charge a finance charge of one percent (1%) per month with an annual rate of twelve percent (12%) on any past due balances.

7. INSURANCE: Contractor shall purchase and maintain such insurance as will protect Contractor, Heritage, Heritage Property Investment Trust, Inc., Owner(s), General Partner(s) of the Owners and the tenants at the Property(ies) from the claims set forth below which may arise out of or result from Operations, attempted Operations or failure to perform Operations under the Contract, whether such Operations are performed or attempted by Contractor or by any Subcontractor or by anyone directly or indirectly employed by any of them or by anyone else for whose acts any of them may be liable.

(a) Claims under Worker's or Workmen's Compensation Benefits, Disability Benefits and other employee benefit acts;

(b) Claims for damages because of bodily injury, occupational sickness or disease or death of any person employed by Contractor;

(c) Claims for damages because of bodily injury, sickness or disease, or death of any person other than a person employed by Contractor;

(d) Claims for damages, other than to Contractor's work itself because of injury to or destruction of property, including loss of use resulting there from;

(e) Claims from damages because of bodily injury or death of any person or persons or property damage arising out of the ownership, maintenance, use, loading or unloading of any motor vehicle;

(f) Claims involving contractual liability applicable to Contractor's obligations under the Contract;

(g) Claims which include the foregoing (a) though (f), but not limited thereto, which may occur while Operations are being performed or while Operations are being attempted which may occur as a result of the failure to perform Operations and claims which may occur after Operations are completed.

The limits of liability and coverage shall be as required by law, but not less than as set forth on the attached Insurance Requirements Schedule attached hereto as Exhibit F. Contractor shall supply a current Certificate of Insurance and certified copies of its insurance policies, if requested by Owner, prior to the execution of this Contract. Insurance coverages must be provided by an insurance company or companies acceptable to Heritage and in a format acceptable to Heritage. Heritage, Heritage Property Investment Trust, Inc., Owner(s), General Partner(s) of the Owner(s), and the tenants at the Property(ies) must be included as insureds on Contractor's liability policies. The minimum limits of liability insurance required pursuant to this Contract shall in no way limit or diminish Contractor's liability under this Contract, including Contractor's indemnification obligations.

Notwithstanding anything to the contrary in this Agreement, although Contractor shall be obligated to obtain Umbrella/Excess Liability Insurance ("Excess Coverage") with limits of up to $50,000,000 general aggregate and $50,000,000 per occurrence, Contractor

4

shall only be required to pay the premiums for the Excess Coverage in the amount of $5,000,000 general aggregate and $5,000,000 per occurrence. Based upon Exhibit G attached hereto, Heritage and Contractor acknowledge that the additional premium to increase the Excess Coverage to $50,000,000 from $5,000,000 for the period October 1, 2004 through April 27, 2005 is $40,500. ~~Contractor agrees to pay the additional premium on or before the due date and~~ Heritage agrees to reimburse Contractor within ten (10) days of receipt of Contractor's annual premium invoice. Based upon Exhibit G, Heritage and Contractor anticipate that the renewal premium commencing April 28, 2005 will not exceed $54,500 and Heritage agrees to reimburse Contractor for such additional premium within ten (10) days after receipt of Contractor's invoice evidencing payment of the additional premium to cover the period from April 28, 2005 through September 30, 2005. With respect to years two through five of this Agreement, Contractor, through its professional insurance consultants and brokers (subject to the reasonable approval of Heritage), shall competitively bid for the Excess Coverage under this Agreement and provide copies of the competitive bids to Heritage at least twenty (20) days prior to the commencement of each year. The bids shall include Excess Coverage in increments of $5,000,000 from $10,000,000 to $50,000,000, together with premium quotes for each level of insurance. Heritage shall have the option of selecting the amount of Excess Coverage for each year of this Agreement by written notice to Contractor. Heritage shall reimburse Contractor for the corresponding premium in accordance with the terms of this Article 7

8.      INDEMNIFICATION: To the fullest extent permitted by law, Contractor shall indemnify, defend and hold harmless Heritage, Heritage Property Investment Trust, Inc., Owner(s), General Partner(s) of the Owner(s), and their respective agents, officers, trustees, shareholders, employees, servants, members, partners, tenants, successors and assigns from and against any and all claims, demands, suits, proceedings, liabilities, judgments, awards, losses, damages, costs and expenses, including reasonable attorneys fees, investigative fees and consulting fees on account of bodily injury, sickness, disease, or death sustained or alleged by any person or persons, personal injury sustained or alleged by any person or persons and/or damage to or destruction or any property (including loss of use thereof) directly or indirectly arising out of or resulting from or in any way connected with or related to Operations, attempted Operations, failure to perform Operations, completed Operations or the work of any Subcontractor, whether or not due or claimed to be due in whole or in part to the active, passive or concurrent negligence or fault of a party indemnified hereunder and/or any other person or persons, and whether or not the performance of Operations, attempted performance of Operations or failure to perform Operations shall be in accordance with or in violation of the provisions of this Contract and/or the obligations with respect to Operations and whether or not such claims, demands, suits or proceedings are just, unjust, groundless, false or fraudulent; and Contractor shall and does hereby assume and agrees to pay for the defense of all such claims, demands, suits and proceedings, provided, however, that the Contractor shall not be required to indemnify Heritage, Heritage Property Investment Trust, Inc., Owner(s), General Partner(s) of the Owner(s), their respective agents, officers, directors, trustees, shareholders, employees, servants, members, partners, tenants, successors, and assigns against any such damages occasioned solely by the negligent acts or omissions of Heritage, Heritage Property

5

Investment Trust, Inc., Owner(s), or General Partner(s) of the Owner(s). If any action or proceeding is brought against any party indemnified hereunder by reason of any such claim, demand, suit or proceeding, Contractor, upon notice, shall at Contractor's expense, resist or defend such claim, demand, action, suit or proceeding by counsel reasonably acceptable to the indemnified party.

If for any reason any part of this Indemnification shall be in contravention of any statute, ordinance, regulation or rule, or any decision of any court or ad judicatory body, then this Indemnification provision shall survive to the fullest extent permitted thereby.

Contractor hereby acknowledges its obligations under the foregoing paragraph to assume the cost of defending, indemnifying and holding harmless Heritage, Heritage Property Investment Trust, Inc., Owner(s), General Partner(s) of the Owner(s) and their respective agents, officers, directors, trustees, shareholders, employees, servants, members, partners, tenants, successors and assigns from and against all claims, demands, suits and proceedings as described in this Indemnification. It is understood and agreed that Contractor is an independent contractor. Contractor agrees to indemnify and hold Heritage, Heritage Property Investment Trust, Inc., Owner(s), General Partner(s) of the Owner(s) and their respective agents, officers, directors, trustees, shareholders, employees, servants, members, partners, tenants, successors and assigns harmless from any and all liability whatsoever in any connection with Operations performed or to be performed, regardless of fault, and Contractor shall be solely responsible for any such claims.

Contractor acknowledges receipt of consideration for the undertakings in this Contract, including this Section 8.

9. CHANGES IN OPERATIONS: Heritage may order Changes in Operations within the general scope of this Contract consisting of additions, deletions or other revisions. The Contract Price shall be adjusted after a written Change Order is approved and signed by Heritage and Contractor.

10. CONFLICTS: In the event of a conflict between the terms of the Contract and the terms of any acceptance order issued by Contractor and/or Contractor's bid proposal or any other documents, the terms and conditions of this Contract shall control.

11. CONTRACTOR'S ACKNOWLEDGMENT: Contractor expressly agrees that in the event of any claims by an employee of Contractor, an employee of Contractor's Subcontractors or Suppliers, anyone directly or indirectly employed by any of them or anyone for whose acts any of them may be liable against Heritage, Heritage Property Investment Trust, Inc., Owner(s), General Partner(s) of the Owner(s) and/or any parent, affiliated or subsidiary entity, company, corporation, partnership, limited partnership, limited liability company, partners, officers, directors, trustees, shareholders, employees, members, agents, tenants, successors and/or assigns (hereinafter referred to in this paragraph collectively as "HERITAGE"), Contractor acknowledges that its indemnification and contribution obligations, pursuant to the Contract or otherwise, shall not be limited in any way by any amount or type of damages, compensation or benefits

to in this paragraph collectively as "HERITAGE"), Contractor acknowledges that its indemnification and contribution obligations, pursuant to the Contract or otherwise, shall not be limited in any way by any amount or type of damages, compensation or benefits payable by or for Contractor, its Insurer(s) or any of its Subcontractors or Suppliers or their Insurer(s) under workers' compensation acts, disability benefit acts or other employee benefit acts. Contractor further expressly agrees that in the event of a claim by an employee of Contractor or an employee of Contractor's Subcontractors or Contractor's Suppliers against HERITAGE, Contractor acknowledges that, notwithstanding any federal, state or local laws, ordinances, acts, including worker's compensation acts, including the New York Omnibus Worker's Compensation Reform Act signed into law on September 16, 1996, disability acts, employee benefits acts or otherwise, Contractor expressly aggress to permit a claim for contribution and/or indemnification by HERITAGE against Contractor.

Contractor acknowledges receipt of consideration for the undertakings in this Contract, including this Section 11.

12.  CONTRACTOR'S INSPECTON: By submitting a bid, Contractor acknowledges that Contractor has examined the Property(ies), including all areas outlined in Paragraph VI of Exhibit C of this Contract and found the Property(ies) in good order and condition and that there are no special conditions or defects of any kind which would prevent the property and complete performance of Operations and obligations under this Contract.

13.  ASSIGNMENT: Contractor agrees not to assign or otherwise convey any interest or rights under this Contract without the prior written consent of Heritage which may be withheld in its sole discretion.

14.  TAXES AND LICENSES: Contractor shall pay all governmental taxes, excises and/or any other charges and license fees that are required to be paid in connection with Operations.

15.  TITLE AND WARRANTY: Contractor warrants that all material, equipment and services to be provided by Contractor under this Contract shall be free from defects in title, labor, material or fabrication; conform to applicable specifications, drawings, samples or other descriptions given; be suitable for the purpose intended; be of merchantable quality and free from defects in design. Contractor warrants that the materials and equipment supplied under this Contract are fit for the purposes for which they are intended to be used and otherwise conform to the specifications required by this Contract. Contractor, at its sole cost and expense, agrees to replace, install or correct promptly any material, equipment or services not conforming to the foregoing requirement upon receipt of notice from Heritage. In the event Contractor fails to correct or replace any material, equipment or services as required, Heritage may correct any such deficiency and charge Contractor the costs thereof or deduct the cost thereof from payments that would otherwise be due to Contractor.

17.    TERMINATION: Heritage shall have the right to terminate this Agreement by giving Contractor ten (10) days written notice in the following events: (a) Contractor is in default with respect to any of its obligations under this Agreement; (b) if any property or properties covered by this Contract are scheduled to be sold; (c) without any cause whatsoever, provided, in all such events, Heritage shall pay Contractor for all work or services performed and equipment and materials supplied to the date of termination. In the event Heritage terminates this Agreement for cause as set forth in subsection (a), Contractor hereby automatically assigns and conveys its interest under all Subcontracts to Heritage and Heritage shall have the right to assume Contractor's position with respect to all Subcontracts and to require performance of the Subcontracts by the Subcontractors, in accordance with the provisions of each of the Subcontracts. Contractor agrees not to modify Section 44 of the Subcontract or any of the terms of the Subcontracts in any way which would diminish Heritage's rights thereunder.

AGREED AND ACCEPTED BY:

HERITAGE REALTY MANAGEMENT, INC.
Managing Agent

By: _LOUIS G. ZIGHT, VICE PRESIDENT_

Title: _____

Date: _10/12/04_


CONTRACTOR:
JOHN ALLIN, d/b/a ALLIN COMPANIES, d/b/a SNOW MANAGEMENT GROUP

JOHN ALLIN

Date: _John A. Allin  10-4-04_
           _WITH CHANGES IN RED_

8