IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| HERITAGE REALTY MANAGEMENT, INC., | ) Docket No.  04-333 ERIE |
| | ) (Judge Sean J. McLaughlin) |
| | ) |
| Plaintiff | ) ELECTRONICALLY FILED PLEADING |
| | ) |
| vs. | ) MEMORANDUM IN SUPPORT OF |
| | ) PLAINTIFF'S MOTION FOR SUMMARY |
| JOHN ALLIN d/b/a ALLIN | ) JUDGMENT |
| COMPANIES and SNOW | ) |
| MANAGEMENT GROUP, | ) Filed on behalf of:  Plaintiff, Heritage Realty |
| | ) Management, Inc. |
| Defendant | ) |
| | ) Counsel of record for this party: |
| | ) |
| | ) Richard A. Lanzillo, Esq. |
| | ) Knox McLaughlin Gornall |
| | ) & Sennett, P.C. |
| | ) 120 West 10th Street |
| | ) Erie, PA 16501 |
| | ) Telephone (814) 459-2800 |
| | ) Facsimile (814) 453-4530 |
| | ) Email rlanzillo@kmgslaw.com |
| | PA53811 |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT**

## I.   INTRODUCTION

Pursuant to a written contract, plaintiff, Heritage Realty Management, Inc.

("Heritage"), paid defendant, John Allin d/b/a Allin Companies and Snow Management Group

("Allin"), the sum of $340,482.90 as an initial installment for snow removal services that Allin

agreed to provide at several locations owned or managed by Heritage.  Allin could not assign his

rights or obligations under this contract except with Heritage's written consent.  Shortly after he

entered into the contract with Heritage, Allin sold all of the assets he needed to perform his

obligations with Heritage to an unrelated third party and executed a covenant not to compete that legally precluded him from performing those obligations.

The contract between Heritage and Allin authorized Heritage to terminate the contract with or without cause.  Heritage exercised this right before Allin had provided any work or services under the contract.  The contract further provided that, upon termination, Allin would be paid only for actual work performed under the contract.  Because Allin performed no work or services under the contract, Heritage is entitled to recover the full amount of its prepayment in the amount of $340,482.90.  Moreover, as a separate and independent basis for recovery, Allin materially breached the contract when he entered into an agreement with a third party that rendered him both physically and legally incapable of performing his obligations under the contract with Heritage.

## II.    MATERIAL FACTS

### A.    The Snow Removal Contract between Heritage and Allin

Heritage, a publicly traded company, is primarily engaged in the ownership and management of commercial real estate and owns properties throughout the United States. (Deposition of Louis C. Zicht ("Zicht Depo."), p. 4, attached to Heritage's Concise Statement of Material Facts as Exhibit "A"; October 12, 2004 Contract (the "Contract"), p. 1, attached to Heritage's Concise Statement of Material Facts as Exhibit "C").   Historically, Heritage managed snow removal operations at its various properties by contracting directly with local subcontractors.  (Zicht Depo. pp. 8-9).  In early 2004, Heritage was approached by a salesperson employed by Allin regarding Allin's expertise and experience in the management of large-scale snow removal operations and the possibility of doing business with Heritage.  (Deposition of

Robert G. Prendergast ("Prendergast Depo."), pp. 4-5, attached to Heritage's Concise Statement of Material Facts as Exhibit "D").

Serious negotiations concerning a possible contract between Heritage and Allin commenced sometime between May and August of 2004.  (Id. at pp. 5-7).  These negotiations ultimately resulted in the parties' execution of a written contract dated October 12, 2004 (the "Contract").  In the Contract, Allin represented and warranted that he was "an experienced and professional organization that specializes in the management and supervision of snow and ice removal services for commercial properties provided under subcontractors with reputable commercial snow removal contractors."  (Contract, Description of Services).  Under the Contract, Allin agreed to "provide all services required to manage, supervise and assure" the performance of all "snow and ice plowing, snow blowing, shoveling, salting, sanding and snow and ice removal operations" at each of the properties owned or managed by Heritage and identified pursuant to the Contract.  (Contract, Description of Services).

Section 13 of the Contract expressly prohibited Allin's assignment of his rights and interests under the Contract without Heritage's prior written consent.  (Contract, §13).  This provision was particularly important to Heritage because Heritage had contracted with Allin based upon the locally controlled-nature of Allin's business and the representations of Allin and his employees concerning the stability and expertise of his snow removal business.

In consideration of Allin's services under the Contract, Allin was to be paid an annual fee in seven installments payable each month from October through May of each contract year.  (Contract, §6).  On October 13, 2004, in anticipation of work that Allin was to perform under the Contract, Heritage paid an initial deposit to Allin in the amount of $340,482.90.

Section 17 of the Contract authorized Heritage "to terminate [the Contract] by giving [Allin] ten (10) days written notice …".  (Contract, §17).  Heritage had the right to terminate the contract if Allin was "in default with respect to any of its obligations under [the Contract]" or "without any cause whatsoever …"  Id.  In the event of a termination, Allin was entitled to be paid "for all work or services performed and equipment and materials supplied to the date of termination."  (Id. §17).

**B.    The undisclosed financial distress of Allin's snow removal business and its ultimate sale to Symbiot.**

Unbeknownst to Heritage at the time, Allin's business was not a stable and professional organization as had been represented to Heritage during negotiations and in the express terms of the Contract.  Indeed, prior to the parties' execution of the Contract, Allin had failed to pay his snow removal subcontractors obligations totaling approximately $3,600,000.00. (Deposition of John ("Allin Depo."), pp. 33-34, attached to Heritage's Concise Statement of Material Facts as Exhibit "B").  Allin's business had also experienced severe internal accounting problems.  During the months preceding his execution of the Contract, the economic difficulties of Allin's Snow Management Group exacerbated to such an extent that he was forced to engage a "work-out" firm to seek a capital infusion for the company and to negotiate with his unpaid subcontractors.  (Allin Depo., pp. 33-34, 49-51).

By no later than September 2004, Allin was engaged in serious negotiations to sell his snow removal business to an entity known as Symbiot Business Group ("Symbiot"). (Allin Depo., p. 30).  Although his negotiations with Symbiot were occurring simultaneously with the negotiation and ultimate execution of the Contract with Heritage, Allin did not disclose any information to Heritage regarding his precarious financial condition, his search for a capital

infusion or strategic buyer for his snow removal business, or his negotiations with Symbiot. (Allin Depo., p. 55).

In October, 2004, shortly after executing the Contract with Heritage, Allin concluded a formal agreement to sell his snow removal business to Symbiot. (Allin Depo., p. 79). Under this agreement, Allin transferred all of the assets of his business that would have been required to perform his obligations to Heritage under the Contract. (Allin Depo., pp. 30, 38, 55). Thus, Allin's sale of assets to Symbiot rendered him physically incapable of performing his obligations to Heritage under the Contract. (Allin Depo., pp. 30, 55, 79). In addition, as part of his agreement with Symbiot, Allin executed a restrictive covenant that precluded him from engaging in any snow removal activities. (Allin Depo., pp. 56, 78-79). By executing this covenant, Allin voluntarily deprived himself of the legal right and capacity to perform his obligations to Heritage under the Contract. (Allin Depo., pp. 56, 78-79).

Allin never obtained or even requested Heritage's consent to any assignment of the Contract to Symbiot. (Allin Depo., p. 55; see Prendergast Depo., pp. 25-27).

**C.    Heritage's termination of the Contract and demand for return of its money.**

On November 3, 2004, Heritage issued written notice to Allin that it was terminating the Contract and demanding the return of the $340,482.90 that Heritage had paid to Allin. (November 3, 2004 Letter of Termination, attached to Heritage's Concise Statement of Material Facts as Exhibit "E"). Under the Contract, Heritage's termination was effective no later than ten (10) days after written notice. As of November 13, 2004, Allin had performed no services and provided no materials under the Contract.

III.    **ARGUMENT**

   A.    **Heritage is entitled to recover its entire payment of $340.482.90 without setoff or deduction.**

      i.    **Heritage properly terminated the Contract pursuant to its terms.**

   Section 17 of the Contract expressly authorized Heritage to terminate the Contract with or without cause.  Section 17 states in relevant part:

> TERMINATION:  Heritage shall have the right to terminate this agreement by giving Contractor ten (10) days written notice in the following events:  (a) Contractor is in default with respect to any of its obligations under this agreement; (b) if any property or properties covered by this Contractor scheduled to be sold; (c) without any cause whatsoever, provided, in all such events, Heritage shall pay Contractor for all work or services performed and equipment and materials supplied to the date of termination.

(Contract, §17).

   In addition to granting Heritage the right to terminate the Contract, it also specified the amount that Allin would be entitled to recover in the event of termination.  Upon termination, Heritage was required to pay Allin only for the work or services performed and the equipment and materials supplied to the date of termination.  This provision is clear and unambiguous and, therefore, must be enforced as written.  Bohler-Uddeholm America, Inc. v. Ellwood Group, Inc., 247 F.3d 79, 91-92 (3d Cir. 2001).

      ii.    **Allin did not perform any services or supply any materials or equipment under the Contract; in fact, by no later than October of 2004, Allin had rendered such performance legally and physically impossible.**

   The ink on the Contract was barely dry when Allin materially breached his obligations under the Contract.  Allin was already negotiating with Symbiot in September of 2004 to sell the snow management assets that Allin required to perform his obligations under the

Contract. (Allin Depo., p. 41). By October of 2004, and possibly even before Allin had signed the Contract with Heritage, Allin had entered into a letter of intent to sell these assets to Symbiot. (Allin Depo., p. 41).

In his deposition, Allin admitted that his agreement with Symbiot stripped him of both the physical and legal ability to perform his obligations to Heritage under the Contract:

> Q.    Did you discuss Symbiot with anyone from Heritage prior to the execution of the agreement?
>
> A.    No. But we didn't discuss Symbiot with any of our customers.
>
> Q.    Okay. With the sale of substantially all of SMG's [Snow Management Group] assets to Symbiot, the snow removal assets, would it be fair to say that Allin and Companies did not retain any significant snow removal capacity after that transaction?
>
> A.    That would be accurate.
>
> Q.    So then the only way that Heritage contract could be serviced would have been through Symbiot after the SMG part of the business was sold to Symbiot?
>
> A.    That would be accurate.
>
> Q.    In other words, there was no way you were going to be able to do that business as John Allin d/b/a Allin Companies and Snow Management Group after you sold the snow removal business to Symbiot?
>
> A.    I was contractually obligated not to compete with the acquired company, with Symbiot.
>
> Q.    So not only did you not retain the capacity, the equipment or the ability to perform that contract, the arrangement that you entered into with Symbiot expressly precluded you from doing so?
>
> A.    On my own, correct.

(Allin Depo., pp. 55-56).

Thus, before the first flake of snow had hit the ground following the parties' execution of the Contract, Allin had rendered his own performance under the Contract both physically and legally impossible.  In the face of this admission, Allin cannot seriously contend that he performed "work or services" or supplied "equipment and materials" under the Contract. In fact, as of the date of the termination of the Contract, Allin had not received a signed subcontract from even a single subcontractor regarding any property owned or managed by Heritage.  (Allin Depo., p.65).  According to Allin, 99% of his snow removal work was performed by subcontractors.  (Allin Depo., 23).

While Allin may argue that he could have assigned his obligations under the Contract to Symbiot and that Symbiot could have performed those obligations in his stead, this argument would fail as a matter of law under the unambiguous terms of the Contract.  Section 13 of the Contract states:

> ASSIGNMENT:  Contractor agrees not to assign or otherwise convey any interest or rights under this Contract without the prior written consent of Heritage which may be withheld in its sole discretion.

(Contract, §13).  In his deposition, Allin acknowledged that he never received, or even requested, Heritage's consent to any assignment of his rights or obligations under the Contract.

During discovery, the Court ordered Allin to produce all records that support his claim that he had incurred any expenses under the Contract which he proposed to off-set against the $340,482.90 that he received from Allin.  In response, Allin supplied only unsupported, self-serving documents that were generated for purposes of the litigation and concerning which he had no personal knowledge.  (See Allin Deposition Exhibit 6; Allin Depo., pp. 53-54, 56-57). Almost all of the activities and expenses that Allin is claiming as a set-off pre-date the execution

of the Contract and, by their very nature, could not have been performed or incurred under the Contract. (Id.).

Allin has failed to produce any evidence to support a valid set-off against Heritage's claim. Therefore, under §17 of the Contract, Heritage is entitled to recover its entire initial payment to Allin in the amount of $340,482.90.

### iii. Heritage is also entitled to recover its full payment because, by no later than October of 2004, Allin had rendered its own performance under the Contract legally and physically impossible.

Anticipatory breach or repudiation occurs when an obligor engages in "a voluntary affirmative act which renders the obligor unable or apparently unable to perform . . ." Jonnet Development Corp. v. Dietrich Indus., 463 A.2d 1026, 1031 (Pa. Super. Ct. 1981) (quoting Restatement (Second) of Contracts § 250 (the "Restatement")). Where an obligor renders its own performance impossible, such action constitutes a breach of contact actionable by the obligee. Id. Most anticipatory repudiation cases involve an obligor declaring, with varying degrees of certainty, its refusal to honor its contractual obligations. In such cases, the primary question to be answered by the court normally involves the definitiveness of the obligor's statement. See 2401 Pennsylvania Avenue Corp.v. Federation of Jewish Agencies of Greater Pittsburgh, 489 A.2d 733, 736 (Pa. 1985) (observing that the requisite elements of an anticipatory breach are "an absolute and unequivocal refusal to perform or a distinct and positive statement of an inability to do so"(internal citations and quotation marks omitted)). In this case, however, there is no question regarding the certainty of Allin's repudiation and breach. In late October of 2004, Allin sold all of his snow removal equipment and assets and thereby rendered himself physically incapable of performing the snow removal operations required under the Contract. Allin also signed a restrictive covenant that precluded him from engaging in any snow

management other than through Symbiot.  Coupled with the notice Heritage received regarding Allin's business problems and his failure to provide timely subcontractor agreements, Allin clearly engaged in "voluntary affirmative act[s] which render[ed him] unable or apparently unable to perform [his obligations under the Contract]."  Restatement (Second) of Contracts § 250.

Thus, while Heritage had the right to terminate the Contract without cause and to recover its initial payment, it also has an independent cause of action to recover its payment based upon Allin's material breach of the Contract.

**B.     Allin's promissory estoppel counterclaim fails both as a matter of law and based on the uncontroverted facts of this case.**

Allin has raised a counterclaim against Heritage in which he alleges that, based on a theory of promissory estoppel, he is entitled to compensation for pre-contract activities related to the Contract.   This claim fails as a matter of law.  A claim for promissory estoppel cannot succeed in the face of a relevant, express contract.  <u>Carlson v. Arnot-Ogden Memorial Hosp.</u>, 918 F.2d 411, 416 (3d Cir. 1990); <u>Linden v. SAP America, Inc.</u>, No. Civ. A. 03-3125, 2004 WL 1047719, *7 (E.D. Pa.) (holding that where a contract exists between two parties a claim under a theory of promissory estoppel is precluded).  Here, the Contract is fully integrated and was the result of substantial negotiations between sophisticated entities.  Any and all payments due to Allin under the Contract are identified therein.   Therefore, his promissory estoppel claim seeking payment for his own due diligence and pre-Contract work fails as a matter of law.

In addition to its legal insufficiency, Allin's counterclaim is also unsupported by the facts of this case.  Prior to October 12, 2004, the effective date of the Contract, Allin and Heritage engaged in typical negotiations for services in which issues such as insurance coverage and payment terms were discussed.  (Zicht Depo., pp. 15-17).   At no point during the

negotiations did either party enter into any binding commitment with the other.  In fact, on August 13, 2004, Heritage provided Allin with a non-binding letter of intent that expressly provided that "neither Heritage nor [Allin] are obligated in any way unless and until such time as the contract is signed by both parties."  (Allin Depo., p. 47; Exhibit 1 to Allin Depo.)  Allin's promissory estoppel claim directly contradicts the parties' express understanding as set forth in their non-binding letter of intent and the Contract.  Allin has come forward with no evidence to support an obligation on the part of Heritage to pay Allin for any of its pre-Contract due diligence.  Further, the facts of this case establish that Allin did not provide any services or work to Heritage under the Contract.  Instead, he took Heritage's initial installment payment and promptly rendered himself legally and physically incapable of performing the services for which Heritage paid him.  Allin's request for equitable relief in the face of these facts is meritless, and Heritage is entitled to judgment as a matter of law on his counterclaim.

IV.    <u>**CONCLUSION**</u>

Based upon the record and the foregoing analysis, plaintiff, Heritage Realty Management, Inc. respectfully requests that the Court enter summary judgment in its favor and against defendant, John Allin, in the amount of $340,482.90, plus interest from October 13, 2004, and costs of suit.  No genuine issue of material fact remains for trial and Heritage is entitled to judgment as a matter of law.

Respectfully submitted,

KNOX McLAUGHLIN GORNALL & SENNETT, P.C.

BY: <u>/s/ Richard A. Lanzillo, Esq.</u>
    Richard A. Lanzillo
    Neal R. Devlin
    120 West Tenth Street
    Erie, PA  16501-1461
    (814) 459-2800

    Attorneys for plaintiff,
    Heritage Realty Management, Inc.

# 660700