IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| HERITAGE REALTY MANAGEMENT, INC., | ) Docket No. 04-333 ERIE |
| | ) (Judge Sean J. McLaughlin) |
| Plaintiff | ) ELECTRONICALLY FILED PLEADING |
| vs. | ) PLAINTIFF'S CONCISE STATEMENT OF |
| | ) MATERIAL FACTS IN SUPPORT OF |
| JOHN ALLIN d/b/a ALLIN COMPANIES and SNOW MANAGEMENT GROUP, | ) MOTION FOR SUMMARY JUDGMENT |
| | ) Filed on behalf of: Plaintiff, Heritage Realty |
| | ) Management, Inc. |
| Defendant | ) |
| | ) Counsel of record for this party: |
| | ) Richard A. Lanzillo, Esq. |
| | ) Knox McLaughlin Gornall |
| | ) & Sennett, P.C. |
| | ) 120 West 10th Street |
| | ) Erie, PA 16501 |
| | ) Telephone (814) 459-2800 |
| | ) Facsimile (814) 453-4530 |
| | ) Email rlanzillo@kmgslaw.com |
| | PA53811 |

## PLAINTIFF'S CONCISE STATEMENT OF MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

**A.     The Parties**

1.     Plaintiff, Heritage Realty Management, Inc. ("Heritage"), is a Maryland corporation with it principal office located at 131 Dartmouth Street, Boston, Massachusetts 02116, and is a citizen of the Commonwealth of Massachusetts. (Deposition of Louis C. Zicht ("Zicht Depo."), p. 4, attached hereto as Exhibit "A").

2.     Defendant, John Allin, is an individual doing business as Allin Companies and Snow Management Group ("Allin"), and resides at 2319 South Shore Drive, Erie,

Pennsylvania 16505. (Deposition of John Allin, ("Allin Depo."), pp. 5-7, attached hereto as Exhibit "B").

**B.     The Snow Removal Contract between Heritage and Allin**

3.     Heritage, a publicly traded company, is primarily engaged in the ownership and management of commercial real estate and owns properties throughout the United States. (October 12, 2004 Contract ("Contract"), p.1, attached hereto as Exhibit "C").

4.     Historically, Heritage managed snow removal operations at its various properties by contracting directly with local subcontractors. (Zicht Depo., pp. 8-9).

5.     In early 2004, Heritage was approached by a salesperson employed by Allin regarding Allin's expertise and experience in the management of large-scale snow removal operations and the possibility of doing business with Heritage. (Deposition of Robert G. Prendergast ("Prendergast Depo."), pp. 4-5, attached hereto as Exhibit "D").

6.     Serious negotiations concerning a possible contract between Heritage and Allin commenced between May and August of 2004. (Prendergast Depo., pp. 5-7). These negotiations ultimately resulted in the parties' execution of a written contract dated October 12, 2004 (the "Contract"). (Exhibit C).

7.     In the Contract, Allin represented and warranted that he was "an experienced and professional organization that specializes in the management and supervision of snow and ice removal services for commercial properties provided under subcontractors with reputable commercial snow removal contractors." (Contract, Description of Services).

8.     Under the Contract, Allin agreed to "provide all services required to manage, supervise and assure" the performance of all "snow and ice plowing, snow blowing, shoveling, salting, sanding and snow and ice removal operations" at each of the properties owned

or managed by Heritage and identified pursuant to the Contract. (Contract, Description of Services).

9. Section 13 of the Contract expressly prohibited Allin's assignment of his rights and interests under the Contract without Heritage's prior written consent. (Contract, §13). This provision was particularly important to Heritage because Heritage had contracted with Allin based upon the locally controlled-nature of Allin's business and the representations of Allin and his employees concerning the stability and expertise of his snow removal business.

10. In consideration of Allin's services under the Contract, Allin was to be paid an annual fee in seven installments payable each month from October through May of each contract year. (Contract, §6).

11. On October 13, 2004, in anticipation of work that Allin was to perform under the Contract, Heritage paid an initial installment to Allin in the amount of $340,482.90. (November 3, 2004 Termination Letter ("Termination Letter"), p. 2, attached hereto as Exhibit "E").

12. Section 17 of the Contract authorized Heritage "to terminate [the Contract] by giving [Allin] ten (10) days written notice …". (Contract, §17). Heritage had the right to terminate the contract if Allin was "in default with respect to any of its obligations under [the Contract]" or "without any cause whatsoever …". (Id.)

13. In the event of a termination, Allin was entitled to be paid "for all work or services performed and equipment and materials supplied to the date of termination." (Id.).

**C.     The undisclosed financial distress of Allin's snow removal business and its ultimate sale to Symbiot.**

14.     Unbeknownst to Heritage at the time, Allin's business was not a stable and professional organization as had been represented to Heritage during negotiations and in the express terms of the Contract. Prior to the parties' execution of the Contract, Allin had failed to pay his snow removal subcontractors obligations totaling approximately $3,600,000.00. (Allin Depo., pp. 33-34).

15.     Allin's business had also experienced severe internal accounting problems. During the months preceding his execution of the Contract, the economic difficulties of Allin's Snow Management Group exacerbated to such an extent that he was forced to engage a "work-out" firm to seek a capital infusion for the company and to negotiate with his unpaid subcontractors. (Allin Depo., pp. 33-34, 49-51).

16.     By no later than September 2006, Allin was engaged in serious negotiations to sell his snow removal business to an entity known as Symbiot Business Group ("Symbiot"). (Allin Depo., p. 30).

17.     Although his negotiations with Symbiot were occurring simultaneously with the negotiation and ultimate execution of the Contract with Heritage, Allin did not disclose any information to Heritage regarding his precarious financial condition, his search for a capital infusion or strategic buyer for his snow removal business, or his negotiations with Symbiot. (Allin Depo., p. 55).

18.     In October, 2004, shortly after executing the Contract with Heritage, Allin concluded a formal agreement to sell his snow removal business to Symbiot. (Allin Depo., p. 79).

19. Under this agreement, Allin transferred all of the assets of his business that would have been required to perform his obligations to Heritage under the Contract. (Allin Depo., pp. 30, 38, 55). Thus, Allin's sale of assets to Symbiot rendered him physically incapable of performing his obligations to Heritage under the Contract. (Allin Depo., pp. 30, 55, 79).

20. In addition, as part of his agreement with Symbiot, Allin executed a restrictive covenant that precluded him from engaging in any snow removal activities. (Allin Depo., pp. 56, 78-79).

21. By executing this covenant, Allin voluntarily deprived himself of the legal right and capacity to perform his obligations to Heritage under the Contract. (Allin Depo., pp. 56, 78-79).

22. Allin never obtained or even requested Heritage's consent to any assignment of the Contract to Symbiot. (Allin Depo., p. 55, See Prendergast Deposition, pp. 25-27).

**D.    Heritage's termination of the Contract and demand for return of its money.**

23. On November 3, 2004, Heritage issued written notice to Allin that it was terminating the Contract and demanding the return of the $340,482.90 that Heritage had paid to Allin. (Letter of Termination, Exhibit D). Under §17 of the Contract, Heritage's termination was effective no later than ten (10) days after written notice. (Contract, §17).

24. As of November 13, 2004, Allin had performed no services and provided no materials under the Contract. (Zicht Depo., pp. 21, 36-31).

25. As of the date of the termination of the Contract, Allin had not received a signed subcontract from even a single subcontractor regarding any property owned or managed

5

by Heritage. (Allin Depo., p.65; See Prendergast Depo., p. 8). Ninety-nine percent (99%) of Allin's snow removal work was performed by subcontractors. (Allin Depo., 23)

            Respectfully submitted,

            KNOX McLAUGHLIN GORNALL &
            SENNETT, P.C.

          BY: /s/ Richard A. Lanzillo, Esq.
            Richard A. Lanzillo
            Neal R. Devlin
            120 West Tenth Street
            Erie, PA 16501-1461
            (814) 459-2800

            Attorneys for plaintiff,
            Heritage Realty Management, Inc.

# 660704