1              IN THE UNITED STATES DISTRICT COURT
         FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2

HERITAGE REALTY MANAGEMENT, INC.,    :
3               Plaintiff                 :
                                          :
4          v.                             : Case No. 04-333 Erie
                                          :
5    JOHN ALLIN d/b/a ALLIN COMPANIES,    :
                Defendant                 :
6

7          Deposition of LOUIS C. ZICHT, taken before

8      and by Sondra A. Black, Notary Public in and for the

9      Commonwealth of Pennsylvania, on Friday, January

10     20, 2000, commencing at 1:06 p.m., at the offices of

11     the Erie County Bar Association, 302 West Ninth Street,

12     Erie, Pennsylvania 16502.

13

14   For the Plaintiff:

15       Neal R. Devlin, Esquire
         Knox McLaughlin Gornall & Sennett, PC
16       120 West Tenth Street
         Erie, PA 16501
17
         Edward W. Valanzola, Esquire
18       Net Properties Management, Inc.
         535 Boylston Street
19       Boston, MA 02116

20   For the Defendant:

21       Craig A. Markham, Esquire
         Elderkin Martin Kelly & Messina
22       150 East Eighth Street
         Erie, PA 16501
23

24              Reported by Sondra A. Black
25            Ferguson & Holdnack Reporting, Inc.

**EXHIBIT**

A

1

1                               I N D E X

2

3    LOUIS C. ZICHT

4         Direct Examination by Mr. Markham.......................3

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              L O U I S   C.   Z I C H T, first having

 2              been duly sworn, testified as follows:

 3

 4                      DIRECT EXAMINATION

 5     BY MR. MARKHAM:

 6

 7        Q.    Mr. Zicht, my name is Craig Markham.  I represent

 8     Mr. Allin in this lawsuit and have some questions for you

 9     this afternoon.  Of course we're doing this by video

10     conference, so if there's any difficulty hearing or

11     understanding me or if the transmission is interrupted in

12     some way, please stop me and let me know, we'll make sure

13     that you hear and understand the question.  Okay?

14        A.    Yes.

15        Q.    Tell us your full name, please.

16        A.    It's Louis C. Zicht.

17        Q.    And where do you live?

18        A.    I live in Boston, Massachusetts.

19        Q.    What's the address?

20        A.    505 Treemont Street.

21        Q.    How old are you?

22        A.    56.

23        Q.    Where do you work?

24        A.    I work at Heritage Property Investment Trust in

25     Boston.
```

1       Q.    What do you do for that company?

2       A.    I am vice president and general counsel.  I -- I'm

3    involved with many of the company's contracts, acquisitions,

4    sales, leases, and general real estate matters.

5       Q.    How long have you worked for Heritage?

6       A.    For Heritage, since it was formed in 1999.

7       Q.    What jobs or positions have you held with Heritage?

8       A.    I've been vice president, general counsel since

9    1999.

10      Q.    Do you have any ownership interest in the company?

11      A.    It's a publicly traded company, and I do have some

12   shares.

13      Q.    Who do you report to?

14      A.    I report to Bob Prendergast.

15      Q.    What's his position?

16      A.    He is chief operating officer.

17      Q.    What did you do in terms of employment before

18   working for Heritage?

19      A.    I worked for a company called Net Properties

20   Management, Inc.

21      Q.    What did you do for them?

22      A.    I was vice president and general counsel.

23      Q.    For what period of time did you work for that

24   company?

25      A.    From 1974 till 1999.

```
 1        Q.    Do you have a law degree?

 2        A.    Yes.

 3        Q.    When did you attain that, and from what law school?

 4        A.    May of '74 I graduated from Boston College Law

 5   School.

 6        Q.    With regard to the contract with Mr. Allin, can you

 7   tell me just in general terms, and then we'll get into

 8   specifics -- but generally speaking, what was your

 9   involvement with that contract?

10        A.    Yes.  Bob asked me to attend a meeting as a

11   conference call to take notes and to ask questions and to

12   ultimately prepare a contract with Snow Management.

13        Q.    Can you tell me when that occurred.  This conference

14   call.

15        A.    Yeah.  That was August of 2004.

16        Q.    Was that your first involvement with Mr. Allin?

17        A.    I don't believe I was -- Mr. Allin was involved.

18        Q.    Or with his company?

19        A.    Yes.

20        Q.    Who was on the conference call?

21        A.    Bob Prendergast, Mark Bush, and there may have been

22   another person for our company, I can't recall exactly who

23   was -- who else was in the room, and Jeff Vernon I believe

24   his name was.

25        Q.    Mr. Vernon worked for Mr. Allin?
```

1      A.   Yes.

2      Q.   Can you tell me more specifically what was discussed

3  in this call.

4      A.   What we talked about, the contract commencement

5  dates, what the duties of Snow Management would be, what the

6  contract price would be.  We talked about a number of

7  different issues, insurance, indemnification, not in a lot of

8  detail, but we covered a number of issues that were going to

9  be incorporated into the contract.

10     Q.   Before this conference call was held, did you get

11 any information about the nature or the substance of this

12 proposed agreement?

13     A.   No.

14     Q.   So you went into the call basically without much

15 knowledge of what was going to be discussed?

16     A.   Well, I knew that -- that this Snow Management

17 provided snow removal management services, and that we were

18 going to try to work a deal with them where they would manage

19 our snow removal of all of our properties.  That was

20 basically what I knew.

21     Q.   Do you know the date in August this occurred?

22     A.   No.  I don't remember the exact date.

23     Q.   Did you make any notes during this call?

24     A.   Yes.

25     Q.   Do they still exist?

1       A.    I'm not sure.

2       Q.    Have you looked for them since this lawsuit was

3    filed?

4       A.    No.

5       Q.    Do you maintain or does the office maintain a file

6    dealing with this controversy?

7            MR. VALANZOLA:  Objection as to form, but he can

8            answer.

9       A.    Yes.

10      Q.    Is that where you would look to find these notes if

11   they exist?

12      A.    Yes.

13      Q.    I'd make a request that sometime in the next couple

14   days that he do that -- if you could do that and report back

15   to your counsel.

16      A.    Okay.

17      Q.    By the end of this conference call was it your

18   understanding that an agreement in principal had been reached

19   with Snow Management Group or Mr. Allin's company?

20           MR. VALANZOLA:  Again, I'll object to the form, but

21           he can answer it.

22      A.    I don't -- no.  That was not my understanding.

23      Q.    What was your understanding then?

24      A.    That we were working towards a contract, that there

25   were -- I was going to prepare it, and they were going to

1    review it and get back with their comments, and we were going

2    to see if we could strike a deal.

3        Q.    Had any of the details for this work been agreed to

4    between the parties up to that point?

5        A.    There was no agreement at that point.

6        Q.    Was there any price discussed during this

7    conference?

8        A.    There were schedules that were being worked on, but

9    no -- no specifics.

10       Q.    Just so it's clear, generally can you state or

11   describe the scope of the work that was going to be

12   undertaken by Mr. Allin.

13       A.    Snow Management was going -- was going to retain

14   subcontractors in the different areas where we own shopping

15   centers, and they were going to enter into subcontracts under

16   which the snow and ice removal operations would be conducted

17   at our properties for the winter of '04/'05, and subsequent

18   years.  And Snow Management would make all the arrangements

19   with the subcontractors to have all the work performed, and

20   it was going to be their responsibility to make sure it was

21   performed properly and to report to us.

22       Q.    It's my understanding that there were more than 100

23   sites involved.

24       A.    Yes.

25       Q.    And approximately 15 states?

1    A.    I'm not aware of the exact number of states.

2    Q.    But it's more than just a couple?

3    A.    Yes.

4    Q.    Do you know who did this type of work for you in the

5    season '03/'04?

6    A.    We had contracts with actual snow removal service

7    companies on all these properties.  We did not have one

8    contract.

9    Q.    So Heritage managed the snow removal itself?

10   A.    Yes.

11   Q.    At this conference did Mr. Vernon, or anyone else,

12   indicate what the status of their review of the issues was?

13   A.    I'm not sure I understand the question.

14   Q.    Let me try again.  Did Mr. Vernon, or anyone at this

15   conference, indicate or explain how much investigation or

16   review Snow Management had undertaken to discuss preparing or

17   agreeing to a contract?

18   A.    I generally knew that they were -- that they were

19   looking at the site plans and the locations of the properties

20   to -- to figure out pricing and other items which we would

21   need for the contract.

22   Q.    Was there any indication as to whether they were

23   already communicating with local plow operators?

24   A.    No.  I didn't hear anything about that during that

25   call.

1     Q.  Was there any indication during that call whether

2    they had hired people or entered into agreements with

3    employees to manage the various sites?

4     A.  I think that was mentioned, that Snow Management was

5    hire -- was maybe looking to hire some people to perform the

6    functions they would have to perform under the agreement.

7     Q.  Was there any indication that you can recall about

8    what the status of that hiring was?

9     A.  No.

10    Q.  Up to that point in time were you aware of any

11   requests from Heritage that Snow Management begin that

12   process of getting people in place to manage the various

13   sites?

14    A.  During that call I was aware that -- that that was

15   something that had to be done.  Not before the call.

16    Q.  So your awareness of that first developed during

17   that call?

18    A.  Yes.

19    Q.  Do you know whether Heritage had requested or

20   directed Snow Management to do that?

21    MR. VALANZOLA:  Objection.  Go ahead.

22    A.  No, I don't.

23    Q.  During the call were there any discussions about the

24   actual substance of the written agreement that was going to

25   be submitted?

1     A.    No.  We didn't discuss the contract in a lot of

2     detail.  It was understood I was going to prepare something

3     for everyone to review.

4     Q.    Other than you and Mr. Prendergast, who else was

5     there from Heritage?

6     A.    Mark Bush.

7     Q.    What's his job function?

8     A.    He's regional property manager or senior property

9     manager.

10    Q.    Are you aware of what his involvement was in this

11    contract?

12    A.    He was involved in the negotiations with Bob and

13    myself for Heritage.

14    Q.    Other than Mr. Vernon, was there somebody else

15    participating in the call?

16    A.    I don't -- I don't recall.  There could -- I'm not

17    sure.

18    Q.    I didn't write down the names when you first gave

19    them to us, so I wasn't sure whether there was someone else.

20    A.    No.  I don't remember if there was anyone else.

21    Jeff's the only one I can remember being on for Snow

22    Management.

23    Q.    Were there any minutes or memoranda circulated after

24    the meeting regarding what was discussed at this conference?

25    A.    No.

1     Q.   Can you give me an estimate of how long the call

2   lasted?

3     A.   I think it was probably in the half hour to hour

4   range.   Probably no more than an hour.

5     Q.   You've told us that by the end of the conference

6   your task was to prepare a draft agreement.

7     A.   Yes.

8     Q.   Did any of the other participants have things that

9   they were going to do?

10    A.   Yes.   There was schedules that had to be attached to

11  the contract, and other people were working on putting those

12  together.

13    Q.   Who else was involved, to your knowledge?

14    A.   Mark Bush, Bob Prendergast overseeing, and I know

15  Jeff Vernon for Snow Management.   And he may have been

16  involving other people as well, but I don't know any other

17  names.

18    Q.   After this conference call concluded, what happened

19  next in terms of your involvement?

20    A.   I worked pretty closely with Mark Bush, and he was

21  working with Jeff to get -- put together information we

22  needed and answer questions I had so that I could put

23  together the draft of the contract, which I did within -- I

24  think within the next -- you know, during the following week.

25    Q.   Was there any discussion with Jeff Vernon in this

1    telephone call relating to the efforts that Snow Management

2    was undertaking to get ready to perform under the contract?

3              MR. VALANZOLA:  Objection.  Go ahead.

4         A.    Yeah, I believe there was.

5         Q.    What do you recall about that?

6         A.    That they were working on putting together the

7    pricing schedules and specifications on a per-property basis

8    that would be needed to finalize the contract.

9         Q.    What about in terms of actually performing under the

10   contract, did he mention anything about what they were doing,

11   if anything, to get ready to perform?

12        A.    Yeah.  They were going to have to hire some people

13   to run the management once -- once the contract was signed

14   and the snow removal season actually started.

15        Q.    Did he indicate what the status of those efforts

16   were?

17        A.    No.  I don't recall.

18        Q.    Was a timetable or some kind of deadline suggested

19   for that aspect of the preparation?

20        A.    Not to my recollection, no.

21        Q.    To your knowledge, did anyone from Heritage ask that

22   Snow Management undertake any efforts to get ready to

23   perform?

24              MR. VALANZOLA:  Objection.  Go ahead, if you

25              understand the question.

1      A.    I think you kind of asked me the same question in a

2  different way.  I don't recall specifically, no.

3      Q.    Now, I have a copy of a letter from you to

4  Mr. Vernon dated August 13, 2004, which indicates that you

5  were enclosing the first draft of the proposed contract.

6  Does that sound about right in terms of the time frame?

7      A.    Yes.

8      Q.    Before your deposition today, did you have a chance

9  to look at any documents to kind of refresh your memory about

10  some of the events?

11      A.    Yes.

12      Q.    What types of things did you review?

13      A.    I looked at that letter, I looked at the contract.

14      Q.    Anything else?

15      A.    Not -- no.  I looked at the Complaint a little bit,

16  but just briefly.

17      Q.    After you sent the proposed contract to Mr. Vernon,

18  what was the next communication you had from Snow Management?

19      A.    I can't recall.

20      Q.    What is the next event that you do recall which

21  involved you?

22      A.    Well, at some point we got some comments to the

23  contract, which I reviewed.

24      Q.    Do you know when you received those?

25      A.    No.

1      Q.    Did you receive them directly?

2      A.    I don't remember.

3      Q.    Do you remember what the comments were?

4      A.    No.  Not -- not with any specificity.  I know we

5  made some modifications to the contract because I know I

6  worked on re -- at least one or two redrafts after the

7  initial version.

8      Q.    And you don't recall the provisions which were

9  redrafted?

10     A.    I recall a few.  I know the insurance was -- was a

11  tough issue because Snow Management was having difficulty

12  obtaining the insurance we felt was important for us to have

13  for this contract.  There were other changes made to the

14  payment terms.  Those are the two main ones I recall.  And

15  there may have been smaller changes, too.

16     Q.    What do you recall about the payment terms in terms

17  of the changes?

18     A.    The dates and the percentages were adjusted once or

19  twice.

20     Q.    Eventually a draft of the contract was submitted

21  which was acceptable to Snow Management Group?

22            MR. VALANZOLA:  Objection.  Go ahead.

23     A.    A contract was eventually signed.

24     Q.    Between this first conference you told us about and

25  the signing of the contract, did you have any other

1    communications that you can recall with Jeff Vernon?

2        A.    I think I did speak to him on the telephone once or

3    twice.

4        Q.    Can you recall when those calls were made?

5        A.    Not the specific dates, no.

6        Q.    Can you give us some type of time frame?

7        A.    It would have been sometime after August 13th and

8    before the contract was signed.

9        Q.    Do you recall what the substance of those calls

10    were?

11        A.    The only thing I can recall specifically was the

12    insurance.  Was trying to work out the details of how they

13    were going to provide the insurance we were requesting.

14        Q.    What was the difficulty with the insurance as it was

15    explained to you?

16        A.    They were having trouble getting the limits we

17    wanted at a price that they wanted to pay.

18        Q.    Was the signed contract sent to you?

19        A.    Yes, I believe it was.

20        Q.    And then you signed the contract yourself on behalf

21    of Heritage?

22        A.    Yes.

23        Q.    Did Mr. Allin or his company submit for your

24    consideration any specific language to be included in the

25    contract?

1     A.   Yes.

2     Q.   What do you recall about that?

3     A.   Nothing specifically, other than what I have already

4   told you.

5     Q.   Something to do with the insurance and the payment

6   terms?

7     A.   And there were other -- I know there were a number

8   of changes.  I can't recall with any specificity all the

9   others without looking at all the drafts.

10     Q.   Can you tell me if any of the suggested language

11   from Mr. Allin was actually incorporated in the contract

12   which was signed?

13      MR. VALANZOLA:  Objection to form.  Go ahead.

14     A.   Yes.  Some of it was.

15     Q.   Would that be language dealing with the insurance or

16   the payment terms?

17     A.   I don't know if that came from Mr. Allin or

18   Mr. Vernon, but there -- some from Snow Management, yes,

19   somewhere we made changes that were requested.  Yes.

20     Q.   Do you recall what they were?

21     A.   Not other than what I've already told you.

22     Q.   By that you're referring to the insurance and the

23   terms of payment?

24     A.   No.  You're -- that's not what I said.

25     Q.   I'm sorry.

1      A.    I said there were other changes that were made, and

2    if I had the drafts in front of me I could tell you what they

3    were, but without them I don't have specific recollection

4    what that were they were.

5      Q.    Do you have any general recollection?

6      A.    That there were other changes made, yes.

7      Q.    But you don't remember generally what they were?

8      A.    I remember generally there were other changes made,

9    yes.

10      Q.    Do you recall anything about these other changes?

11          MR. VALANZOLA:   I think he's answered this

12          question -- this line of questioning sufficiently

13          at this point.  Would you try to move on.  You're

14          asking the same question just a different way.

15          We're really not making any progress in this.

16          MR. MARKHAM:   I'm not sure he's answered the

17          question, I guess.  If he doesn't remember --

18          MR. VALANZOLA:   I think he's answered it to the

19          best of his ability.  And by rephrasing it several

20          times I'm not sure that's going to make him recall

21          any better.

22          MR. MARKHAM:   It may not.  I just want to make sure

23          I understand his answer, though.  What I'm taking

24          from his answer is he has no recollection of

25          anything specifically or generally about these

1          other changes.

2     Q.   Am I correct?

3     A.   I remember there were other changes, and I don't

4  remember exactly what they were, and I would have to look at

5  the drafts to tell you.

6     Q.   Did any of these changes have anything to do with

7  the termination of the contract?

8          MR. VALANZOLA:  Objection.  Go ahead.

9     A.   I don't recall.

10    Q.   Did you draft the provision of the contract,

11 Paragraph 17, that deals with termination?

12    A.   I drafted the contract.

13    Q.   So it would include that paragraph, too?

14    A.   Yes.

15    Q.   Did you have any communication with any of the local

16 plow operators regarding Mr. Allin's company being involved

17 in the management?

18    A.   No.

19    Q.   Are you aware of anyone else at Heritage

20 communicating with the local plow operators about Mr. Allin

21 taking over?

22    A.   No.

23    Q.   At any time between this first conference we've

24 talked about in August and the signing of the contract in

25 October are you aware of anyone at Heritage requesting that

1    Mr. Allin or his company do any work to get ready to perform

2    under the contract?

3              MR. VALANZOLA:  Objection as to form.  You can

4              answer.

5        A.   To the extent it affected my drafting of the

6    contract, I was aware we were -- that we were working with

7    them to get the schedules per property and the site plans and

8    the pricing schedules done, and I knew they were working on

9    those items.

10       Q.   When you talk about the schedules, what are you

11   referring to?

12       A.   As I recall, there was a schedule that had all of

13   the properties that they were going to be managing the snow

14   removal at, and it gave different information about the

15   properties, and it had the price per -- I believe the price

16   per property was on that schedule as well.

17       Q.   The site plans would be maps of the locations?

18       A.   Yeah.  Site plans showing the parking areas, yes,

19   and the buildings.

20       Q.   After the first telephone conference in August, did

21   you become aware of any other work being performed to get

22   ready under the contract?

23             MR. VALANZOLA:  Objection as to form.

24       A.   No.

25       Q.   Before being involved in this contract, as part of

1    your job had you been involved in snow removal work?

2        A.    I'm not sure I understand the question.

3        Q.    In your position as vice president and general

4    counsel, had you previously been involved on behalf of

5    Heritage in their snow removal work?

6              MR. VALANZOLA:   Objection.  Go ahead.

7        A.    In snow removal work, no.

8        Q.    In any type of work dealing with snow?

9        A.    I worked on contracts.

10       Q.    That dealt with?

11       A.    Snow removal.

12       Q.    And those would be contracts with the local

13   operators?

14       A.    Yes.

15       Q.    Other than what we've talked about in terms of the

16   schedules and the site plans, were you aware of what other

17   activities Mr. Allin would have to engage in order to get

18   ready for the '04 snow season?

19       A.    No.

20       Q.    After the contract was signed in October of '04, did

21   you become aware of any work that Mr. Allin companies --

22   Mr. Allin companies performed under the contract?

23       A.    No.

24       Q.    After the contract was signed, what was the next

25   event in this matter which involved you?

1          MR. VALANZOLA:  Objection.  Go ahead.

2     A.   The next thing I recall was that we received some

3 information that Snow Management had not been paying their

4 vendors and had some financial difficulties.

5     Q.   Do you know when you received that information?

6     A.   Not too long after the contract was signed.  Within

7 several weeks is my recollection.

8     Q.   The date line under your signature on the contract

9 is October 12th.  Are you talking within several weeks of

10 that date?

11     A.   That's what I recall, yes.

12     Q.   Was it still in October?

13     A.   I think so.

14     Q.   What was the nature of the information you received?

15 I mean, was it something that someone told you or a written

16 document?  What was it?

17     A.   I think at first I heard about it verbally, and I

18 think eventually there were some written documents.

19     Q.   Who told you about it?

20     A.   I don't recall.

21     Q.   After you first heard about it, what, if anything,

22 was Heritage doing in response?

23          MR. VALANZOLA:  Objection.

24     A.   We were concerned about the ability of Snow

25 Management to perform, and we discussed what our next step

 1   would be.

 2       Q.   Who was involved in those discussions?

 3       A.   Bob Prendergast, Mark Bush, Ed Valanzola.  Those are

 4   the ones I can recall.  And myself.

 5       Q.   What, if anything, was done to determine whether

 6   this information was accurate?

 7            MR. VALANZOLA:  Objection.

 8       A.   I didn't do anything.

 9       Q.   Do you know if anyone else did?

10       A.   No, I don't know.

11       Q.   What documents did you see which indicated that

12   Mr. Allin's company was having difficulties?

13            MR. VALANZOLA:  Objection.  Go ahead.

14       A.   I recall a letter which set forth that there were a

15   number of vendors who were not receiving payment, and I also

16   recall a letter, I think, from Snow Management which was

17   trying to address the issues that -- with the vendors.

18       Q.   Do you know if anyone communicated with Snow

19   Management about this issue?

20       A.   Yes.

21       Q.   Who was that?

22       A.   Ed Valanzola.

23       Q.   Do you know who he --

24       A.   There may have been others.

25       Q.   I'm sorry?

1      A.    Ed Valanzola, and there may have been others.

2      Q.    Do you know who he talked to?

3      A.    I'm not sure if he talked to anybody.

4      Q.    His communication was a written form then?

5      A.    Yes.

6      Q.    Was this the termination letter?

7      A.    Yes.

8      Q.    Before the termination letter, I'm assuming --

9            MR. VALANZOLA:  Excuse me, Craig.  Do you want to

10           identify the letter you're talking about when you

11           say "termination letter".

12           MR. MARKHAM:  Sure.  It's the letter of November 3,

13           2004.

14     Q.    Do you know which letter I'm talking about,

15    Mr. Zicht?

16     A.    I don't know the date, but I know there was a letter

17    terminating the agreement, yes.

18     Q.    Do you know where the information came from that

19    dealt with the issue of whether Snow Management was having

20    financial problems?

21           MR. VALANZOLA:  Objection.  Go ahead.

22     A.    No, I don't.

23     Q.    Tell me what you can recall about these discussions

24    you had in response to receiving this information.

25     A.    We were concerned about Snow Management's ability to

1  perform since they were in financial difficulty, and we --

2  snow removal is a critical part of our business, which has to

3  be done properly or our tenants can't do business.  So we

4  were unwilling to proceed with that kind of arrangement.  We

5  had to take immediate steps to make sure that our properties

6  would have proper snow removal arrangements.  So we went and

7  entered into agreements with all the vendors to do it

8  directly the way we had in prior years, and we notified Snow

9  Management we were terminating their agreement.

10      Q.   How soon before the issuance of this termination

11  letter had Heritage reached that decision?

12      A.   I don't think there was much delay in sending the

13  letter.  I can't recall exactly.

14      Q.   Before entering into the contract with Mr. Allin, do

15  you know if Heritage did any investigation into his financial

16  situation?

17      A.   I believe the -- that we did, yes.

18      Q.   Do you recall what the results of that investigation

19  were?

20      A.   I never looked at the report that we got, but I

21  don't recall it showing any major difficulties.  At least

22  that's what I was told.

23      Q.   Who told you that?

24      A.   Bob Prendergast.

25      Q.   Do you know who the report was from?

1          A.   I believe it was from Dunn & Bradstreet.

2          Q.   And this was before the contract was signed?

3          A.   I wasn't aware of it at that time, no.

4          Q.   But the generation of the report predates the

5     signing of the contract?

6          A.   I don't recall the date.

7          Q.   Do you know, before the contract was signed, if

8     Heritage asked Mr. Allin for any financial information?

9          A.   No, I don't.

10         Q.   Do you know, before the contract was signed, whether

11    Mr. Allin actually provided any financial information?

12         A.   No, I don't.

13         Q.   After this letter of November 3, 2004 was sent out,

14    did you have any communication with anyone from Mr. Allin's

15    company?

16         A.   No.

17         Q.   At any point before the contract was signed, did you

18    have any discussions or communications with Mr. Allin or

19    anyone from his company dealing with the issue of what would

20    happen if the contract was terminated?

21         A.   I don't recall any.

22         Q.   Was there any discussion among the people at

23    Heritage dealing with the termination provision of the

24    contract?  I'm talking about --

25              MR. VALANZOLA:  At what point are you at?

1          MR. MARKHAM:  I'm talking about before it was
2          signed.
3     A.   I don't recall anything specifically, no.
4     Q.   In the termination paragraph of the contract, that's
5     Paragraph 17, it states, in part, that it can be terminated
6     without cause.  It also states, "Heritage shall pay
7     contractor for all work or services performed and equipment
8     and materials supplied to the date of the termination."  And
9     my question is, can you define or explain what is meant by
10    "all work or services performed and equipment and materials
11    supplied."
12         MR. VALANZOLA:  Objection.  Go ahead if you want.
13    A.   Yes.  To me that meant the work of the contract,
14    which was snow removal, salting, sanding, packing snow,
15    whatever was involved in the actual snow removal operations.
16    Q.   Would that include -- in your understanding of those
17    terms, would that include the work that was undertaken after
18    the contract was signed to get people in place, get equipment
19    in place, to prepare for the snowfall?
20         MR. VALANZOLA:  Objection.  Go ahead.
21    A.   No.
22    Q.   Those terms that we've just talked about, services
23    and equipment and materials, are they defined somewhere in
24    the contract?
25    A.   I believe they are, yes.

 1     Q.    Where would they be at?  Do you know?

 2     A.    They're in the contract somewhere.  In one of  the

 3   early sections there's a description of the snow removal

 4   operations.

 5     Q.    There's a paragraph -- well, Paragraph No. 3

 6   entitled, "The Operations."  Is that what you're talking

 7   about?

 8     A.    I believe so, yes.

 9           MR. DEVLIN:  Can we go off the record for one

10           second?

11           MR. MARKHAM:  Yes.  Neal wants to go off the record

12           for a second.

13           (Discussion held off the record.)

14     Q.    During the course of my questioning here, the

15   witness does not have in front of him a copy of the contract

16   or really any documents; is that correct?

17     A.    That's correct.

18     Q.    Do you have a copy of the contract with you?

19     A.    No.

20           MR. MARKHAM:  Does anybody have one there?

21           MR. VALANZOLA:  I don't believe so.  Typically

22           it's -- we expected that you would have some

23           documents here that you wanted to question him

24           about.

25     Q.    The contract also provides this is a fixed fee

1    contract?

2         MR. VALANZOLA:  Objection.  If you understand.

3    A.    I believe that's a fixed amount.  Yes, it does say

4    that.

5    Q.    And the payments are spread out over seven

6    installments?

7    A.    If that's what you're reading.

8    Q.    And the first installment was due October 15th?

9    A.    You're telling me.

10   Q.    Would it help you if I sent you a copy of the

11   contract?

12   A.    If you want to ask me specific questions about it, I

13   think it's obvious, yes.

14   Q.    All right.  Hang on.

15        (Pause in the proceedings.)

16        MR. VALANZOLA:  We do have a copy of the contract,

17             which contains eight pages, but none of the

18             exhibits.

19        MR. MARKHAM:  That's correct.  That's what we sent.

20   Q.    Before we had our break, I was asking questions

21   about the meaning of the provisions in Paragraph 17.

22   Specifically, the meaning or definition of the phrase, "All

23   work or services performed and equipment and materials

24   supplied."  And I think you were indicating that somewhere in

25   the contract that phrase is defined in some way.  Am I

1    correct?

2      A.   Yes.

3      Q.   Can you take a look at what we sent to you then.  Is

4 what we sent to you the provisions of the contract which you

5 believe define that?

6      A.   Yes.

7      Q.   Can you tell me, specifically, what you're referring

8 to.  What provisions you're referring to.

9      A.   The description of operations section.

10      Q.   That's on the first page?

11      A.   Yes.

12      Q.   Are there any others?

13      A.   That's also referenced in Section 3.  There are

14 other references in the contract to operations, which are

15 defined in the description of operations section.

16      Q.   So there are other references in the contract that

17 refer back to the description of operations?

18      A.   Refers to operations, which is a defined term.

19      Q.   And it's defined in the first page on the

20 description of operations, and on the second page under

21 Paragraph No. 3?

22      A.   Well, the definitions are really on the first page.

23      Q.   Can you tell me, under your definition of these

24 terms, whether Allin Companies provided any services,

25 equipment, or materials before the date of termination?

1              MR. VALANZOLA:  Objection.  If you understand, go

2         ahead.

3     A.   He did not provide any services that would have been

4    included under the definition of operations.

5     Q.   How do you know that?

6     A.   I know it didn't snow in October.

7     Q.   Did you have any discussions with anyone from

8    Mr. Allin's company as to -- strike that.  Let me approach it

9    this way:  On Page 3 of the agreement the payment terms are

10   spelled out, and it provides for seven installment payments.

11   Do you see where I'm at?

12    A.   Yes.

13    Q.   Can you give me the history of how you arrived at

14   having seven installments.  Was there any discussion about

15   that?  Was that negotiated?  How did that come about?

16    A.   Yes --

17              MR. VALANZOLA:  Objection.  Go ahead.

18    A.   Yes, it was negotiated.

19    Q.   Did Mr. Allin explain what his preference was in

20   terms of payment?

21    A.   I never spoke to Mr. Allin.

22    Q.   Or Mr. Vernon?

23    A.   I -- there were negotiations.  I can't remember

24   specifically who handled them, but I know I changed -- this

25   was changed once or twice.

```
 1        Q.   I take it it was Heritage's preference to pay
 2   installments?
 3             MR. VALANZOLA:  Objection.  Go ahead.
 4        A.   I -- we signed the contract, so we accepted the
 5   terms that are in here.
 6        Q.   Did Mr. Allin's company propose seven installments?
 7        A.   I don't recall how we got to the seven.
 8        Q.   Do you know what the first payment was to represent
 9   in terms of work performed?
10             MR. VALANZOLA:  Objection.  The contract speaks for
11             itself on it, but if he understands what you mean,
12             he can try to answer the question.
13        A.   I don't think that the payments are linked to when
14   the work is performed, specifically.
15        Q.   Do you have any recollection as to how it was
16   eventually set up this way?
17        A.   There was negotiated -- I know I changed it once or
18   twice, and I don't recall exactly how it got to be the way it
19   is, other than that.
20             MR. MARKHAM:  That is all the questions I have for
21             you today.  Appreciate you coming in.
22             THE WITNESS:  Thank you.
23             MR. VALANZOLA:  Thank you.  We have no questions.
24
25             (Deposition concluded at 2:17 p.m.)
```

'03/'04
[1] 9:5
'04
[2] 21:18 21:20
'04/'05
[1] 8:17
'74
[1] 5:4

## 0

02116
[1] 1:19
04-333
[1] 1:4

## 1

100
[1] 8:22
120
[1] 1:16
12th
[1] 22:9
13
[1] 14:4
13th
[1] 16:7
15
[1] 8:25
150
[1] 1:22
15th
[1] 29:8
16501
[2] 1:17 1:23
16502
[1] 1:12
17
[3] 19:11 27:5 29:21
1974
[1] 4:25
1999
[3] 4:6 4:9 4:25
1:06
[1] 1:10

## 2

20
[1] 1:10
2000
[1] 1:10
2004
[4] 5:15 14:4 24:13 26:13
2:17
[1] 32:25

## 3

3
[6] 24:12 26:13 28:5 30:13
30:21 31:9
302
[1] 1:11

## 5

505
[1] 3:20
535
[1] 1:19
56
[1] 3:22

## A

Ability
[3] 18:19 22:24 24:25
Acceptable
[1] 15:21
Accepted
[1] 32:4

[1] 23:6
Acquisitions
[1] 4:3
Activities
[1] 21:17
Actual
[3] 9:6 10:24 27:15
Address
[2] 23:19 23:17
Adjusted
[1] 15:18
Affected
[1] 20:5
Afternoon
[1] 3:9
Agreed
[1] 8:3
Agreeing
[1] 9:17
Agreement
[9] 6:12 7:18 8:5 10:6 10:
24 12:6 24:17 25:9 31:9
Agreements
[2] 10:2 25:7
Ahead
[15] 10:21 13:3 13:24 15:22
17:13 19:8 21:6 22:1 23:13
24:21 27:12 27:20 31:2 31:
17 32:3
Allin
[23] 1:5 1:5 3:8 5:6 5:16 5:
17 5:25 8:12 16:23 17:11 17:
17 19:20 20:1 21:17 21:21
21:22 25:14 26:8 26:11 26:
18 30:24 31:19 31:21
Allin's
[6] 7:19 19:16 23:12 26:14
31:8 32:6
Amount
[1] 29:3
Answer
[7] 7:8 7:21 12:22 18:23 18:
24 20:4 32:12
Answered
[3] 18:11 18:16 18:18
Appreciate
[1] 32:21
Approach
[1] 31:8
Areas
[2] 8:14 20:18
Arrangement
[1] 25:4
Arrangements
[2] 8:18 25:6
Arrived
[1] 31:13
Aspect
[1] 13:19
Association
[1] 1:11
Assuming
[1] 24:8
Attached
[1] 12:10
Attain
[1] 5:3
Attend
[1] 5:10
August
[6] 5:15 6:21 14:4 16:7 19:
24 20:20
Aware
[11] 9:1 10:10 10:14 11:10
19:19 19:25 20:6 20:21 21:
16 21:21 26:3
Awareness
[1] 10:16

## B

Bar

[1] 18:18
Basis
[1] 13:7
Become
[2] 20:21 21:21
Begin
[1] 10:11
Behalf
[1] 16:20 21:4
Best
[1] 18:19
Better
[1] 18:21
Between
[3] 8:4 15:24 19:23
Bit
[1] 14:15
Black
[2] 1:8 1:25
Bob
[7] 4:14 5:10 5:21 11:12 12:
14 23:3 25:24
Boston
[4] 1:19 3:18 3:25 5:4
Boylston
[1] 1:19
Bradstreet
[1] 26:1
Break
[1] 29:20
Briefly
[1] 14:16
Buildings
[1] 20:19
Bush
[5] 5:21 11:6 12:14 12:20
23:3
Business
[2] 25:2 25:3

## C

Case
[1] 1:4
Centers
[1] 8:15
Chance
[1] 14:8
Changed
[3] 31:24 31:25 32:17
Changes
[12] 15:12 15:15 15:17 17:8
17:19 18:1 18:6 18:8 18:10
19:1 19:3 19:6
Chief
[1] 4:16
Circulated
[1] 11:23
Clear
[1] 8:10
Closely
[1] 12:20
College
[1] 5:4
Coming
[1] 32:21
Commencement
[1] 6:4
Commencing
[1] 1:10
Comments
[3] 8:1 14:22 15:3
Commonwealth
[1] 1:9
Communicated
[1] 23:18
Communicating
[2] 9:23 19:20
Communication
[4] 14:18 19:15 24:4 26:14
Communications

[1] 23:18
Companies
[5] 1:5 9:7 21:21 21:22 30:
24
Company
[16] 4:1 4:10 4:11 4:19 4:
24 5:18 5:22 7:19 16:23 19:
16 20:1 23:12 26:15 26:19
31:8 32:6
Company's
[1] 4:3
Complaint
[1] 14:15
Concerned
[2] 22:24 24:25
Concluded
[2] 12:18 32:25
Conducted
[1] 8:16
Conference
[15] 3:10 5:11 5:13 5:20 6:
10 7:17 8:7 9:11 9:15 11:24
12:5 12:18 15:24 19:23 20:20
Consideration
[1] 16:24
Contains
[1] 29:17
Contract
[70] 5:6 5:9 5:12 6:4 6:6 6:
9 7:24 9:8 9:17 9:21 11:1
11:11 12:11 12:23 13:2 13:8
13:10 13:13 14:5 14:13 14:
17 14:23 15:5 15:13 15:20
15:23 15:25 16:8 16:18 16:
20 16:25 17:11 19:7 19:10
19:12 19:24 20:2 20:6 20:22
20:25 21:20 21:22 21:24 22:
6 22:8 25:14 26:2 26:5 26:7
26:10 26:17 26:20 26:24 27:
4 27:13 27:18 27:24 28:2 28:
15 28:18 28:20 29:1 29:11
29:16 29:25 30:4 30:14 30:
16 32:4 32:10
Contractor
[1] 27:7
Contracts
[4] 4:3 9:6 21:9 21:12
Controversy
[1] 7:6
Copy
[5] 14:3 28:15 28:18 29:10
29:16
Correct
[5] 19:2 28:16 28:17 29:19
30:1
Counsel
[5] 4:2 4:8 4:22 7:15 21:4
County
[1] 1:11
Couple
[2] 7:19 9:2
Course
[2] 3:9 28:14
COURT
[1] 1:1
Covered
[1] 6:8
Craig
[3] 1:21 3:7 24:9
Critical
[1] 25:2

## D

D/b/a
[1] 1:5
Date
[8] 6:21 6:22 22:8 22:10 24:
16 26:6 27:8 30:25
Dated
[1] 14:4
Dates
[3] 6:5 15:18 16:5
Days

**[1]** 7:14
**Deadline**
[1] 13:18
**Deal**
[2] 6:18 8:2
**Dealing**
[5] 7:6 17:15 21:8 26:19 26:23
**Deals**
[1] 19:11
**Dealt**
[2] 21:10 24:19
**Decision**
[1] 25:11
**Defendant**
[2] 1:5 1:20
**Define**
[1] 27:9 30:5
**Defined**
[5] 27:23 29:25 30:15 30:18 30:19
**Definition**
[3] 29:22 30:23 31:4
**Definitions**
[1] 30:22
**Degree**
[1] 5:1
**Delay**
[1] 25:12
**Deposition**
[3] 1:7 14:8 32:25
**Describe**
[1] 8:11
**Description**
[5] 28:3 30:9 30:15 30:17 30:20
**Detail**
[2] 6:8 11:2
**Details**
[2] 8:3 16:12
**Determine**
[1] 23:5
**Developed**
[1] 10:16
**Devlin**
[2] 1:15 28:9
**Different**
[5] 6:7 8:14 14:2 18:14 20:14
**Difficulties**
[3] 22:4 23:12 25:21
**Difficulty**
[4] 3:10 15:11 16:14 25:1
**Direct**
[2] 2:4 3:4
**Directed**
[1] 10:20
**Directly**
[2] 15:1 25:8
**Discuss**
[2] 9:16 11:1
**Discussed**
[5] 6:2 6:15 8:6 11:24 22:25
**Discussion**
[4] 12:25 26:22 28:13 31:14
**Discussions**
[5] 10:23 23:2 24:23 26:18 31:7
**DISTRICT**
[2] 1:1 1:1
**Document**
[1] 22:16
**Documents**
[5] 14:9 22:18 23:11 28:16 28:23
**Done**
[4] 10:15 20:8 23:5 25:3
**Down**
[1] 11:18
**Draft**
[5] 12:6 12:23 14:5 15:20

**Drafted**
[1] 19:12
**Drafting**
[1] 20:5
**Drafts**
[3] 17:9 18:2 19:5
**Due**
[1] 29:8
**Duly**
[1] 3:2
**Dunn**
[1] 26:1
**During**
[9] 6:23 8:6 9:24 10:1 10:14 10:16 10:23 12:24 28:14
**Duties**
[1] 6:5

**E**

**Early**
[1] 28:3
**East**
[1] 1:22
**Ed**
[3] 23:3 23:22 24:1
**Edward**
[1] 1:18
**Efforts**
[3] 13:1 13:15 13:22
**Eight**
[1] 29:17
**Eighth**
[1] 1:22
**Elderkin**
[1] 1:22
**Employees**
[1] 10:3
**Employment**
[1] 4:17
**Enclosing**
[1] 14:5
**End**
[2] 7:17 12:5
**Engage**
[1] 21:17
**Enter**
[1] 8:15
**Entered**
[2] 10:2 25:7
**Entering**
[1] 25:14
**Entitled**
[1] 28:6
**Equipment**
[6] 27:7 27:10 27:18 27:23 29:23 30:25
**Erie**
[5] 1:4 1:11 1:12 1:17 1:23
**Esquire**
[3] 1:15 1:18 1:21
**Estate**
[1] 4:4
**Estimate**
[1] 12:1
**Event**
[2] 14:20 21:25
**Events**
[1] 14:10
**Eventually**
[4] 15:20 15:23 22:18 32:16
**Exact**
[2] 6:22 9:1
**Exactly**
[4] 5:22 19:4 25:13 32:18
**Examination**
[2] 2:4 3:4
**Excuse**
[1] 24:9
**Exhibits**

**Exist**
[2] 6:25 7:11
**Expected**
[1] 28:22
**Explain**
[3] 9:15 27:9 31:19
**Explained**
[1] 16:15
**Extent**
[1] 20:5

**F**

**Fee**
[1] 28:25
**Felt**
[1] 15:12
**Ferguson**
[1] 1:25
**Few**
[1] 15:10
**Figure**
[1] 9:20
**File**
[1] 7:5
**Filed**
[1] 7:3
**Finalize**
[1] 13:8
**Financial**
[6] 22:4 24:20 25:1 25:15 26:8 26:11
**First**
[15] 3:1 5:16 10:16 11:18 14:5 15:24 19:23 20:20 22:17 22:21 29:8 30:10 30:19 30:22 32:8
**Fixed**
[2] 28:25 29:3
**Following**
[1] 12:24
**Follows**
[1] 3:2
**Form**
[6] 7:7 7:20 17:13 20:3 20:23 24:4
**Formed**
[1] 4:6
**Forth**
[1] 23:14
**Frame**
[1] 14:6 16:6
**Friday**
[1] 1:9
**Front**
[2] 18:2 28:15
**Full**
[1] 3:15
**Function**
[1] 11:7
**Functions**
[1] 10:6

**G**

**General**
[7] 4:2 4:4 4:8 4:22 5:7 18:5 21:3
**Generally**
[6] 5:8 8:10 9:18 18:7 18:8 18:25
**Generation**
[1] 26:4
**Gornall**
[1] 1:16
**Graduated**
[1] 5:4
**Group**
[2] 7:19 15:21
**Guess**
[1] 18:17

**H**

**Half**
[1] 12:3
**Handled**
[1] 31:24
**Hang**
[1] 29:14
**Hear**
[2] 3:13 9:24
**Heard**
[2] 22:17 22:21
**Hearing**
[1] 3:10
**Held**
[3] 4:7 6:10 28:13
**Help**
[1] 29:10
**Heritage**
[22] 1:2 3:24 4:5 4:6 4:7 4:18 9:9 10:11 10:19 11:5 11:13 13:21 16:21 19:19 19:25 21:5 22:22 25:11 25:15 26:8 26:23 27:6
**Heritage's**
[1] 32:1
**Hire**
[3] 10:5 10:5 13:12
**Hired**
[1] 10:2
**Hiring**
[1] 10:8
**History**
[1] 31:13
**Holdnack**
[1] 1:25
**Hour**
[3] 12:3 12:3 12:4

**I**

**Ice**
[1] 8:16
**Identify**
[1] 24:10
**Immediate**
[1] 25:5
**Important**
[1] 15:12
**Inc**
[4] 1:2 1:18 1:25 4:20
**Include**
[3] 19:13 27:16 27:17
**Included**
[2] 16:24 31:4
**Incorporated**
[2] 6:9 17:11
**Indemnification**
[1] 6:7
**Indicate**
[3] 9:12 9:15 13:15
**Indicated**
[1] 23:11
**Indicates**
[1] 14:4
**Indicating**
[1] 29:24
**Indication**
[3] 9:22 10:1 10:7
**Information**
[11] 6:11 12:21 20:14 22:3 22:5 22:14 23:6 24:18 24:24 26:8 26:11
**Initial**
[1] 15:7
**Installment**
[2] 29:8 31:10
**Installments**
[4] 29:6 31:14 32:2 32:6
**Insurance**
[9] 6:7 15:10 15:12 16:12 16:13 16:14 17:5 17:15 17:22

Interest
[1] 4:10
Interrupted
[1] 3:11
Investigation
[3] 9:15 25:15 25:18
Investment
[1] 3:24
Involved
[13] 4:3 5:17 8:23 11:12 12:
13 14:21 19:16 20:25 21:1
21:4 21:25 23:2 27:15
Involvement
[4] 5:9 5:16 11:10 12:19
Involving
[1] 12:16
Issuance
[1] 25:10
Issue
[4] 15:11 23:19 24:19 26:19
Issues
[4] 6:7 6:8 9:12 23:17
Items
[2] 9:20 20:9
Itself
[2] 9:9 32:11

### J

January
[1] 1:9
Jeff
[5] 5:23 12:15 12:21 12:25
16:1
Jeff's
[1] 11:21
Job
[2] 11:7 21:1
Jobs
[1] 4:7
JOHN
[1] 1:5

### K

Kelly
[1] 1:22
Kind
[4] 13:18 14:1 14:9 25:4
Knowledge
[3] 6:15 12:13 13:21
Knox
[1] 1:16

### L

Language
[3] 16:24 17:10 17:15
Lasted
[1] 12:2
Law
[3] 5:1 5:3 5:4
Lawsuit
[2] 3:8 7:2
Leases
[1] 4:4
Least
[2] 15:6 25:21
Letter
[14] 14:3 14:13 23:14 23:16
24:6 24:8 24:10 24:11 24:12
24:14 24:16 25:11 25:13 26:
13
Limits
[1] 16:16
Line
[2] 18:12 22:8
Linked
[1] 32:13
Live
[2] 3:17 3:18
Local
[4] 9:23 19:15 19:20 21:12

### M

Main
[1] 15:14
Maintain
[2] 7:5 7:5
Major
[1] 25:21
Manage
[3] 6:18 10:3 10:12
Managed
[1] 9:9
Management
[30] 1:2 1:18 4:20 5:12 6:5
6:16 6:17 7:19 8:13 8:16 9:
16 10:4 10:11 10:20 11:22
12:15 13:1 13:3 13:22 14:
18 15:11 15:21 17:18 19:17
22:3 22:25 23:16 23:19 24:
19 25:9
Management's
[1] 24:25
Manager
[2] 11:8 11:9
Managing
[2] 20:13
Maps
[1] 10:17
Mark
[5] 5:21 11:6 12:14 12:20
23:3
Markham
[11] 1:21 3:5 3:7 18:16 18:
22 22:4 22:17 22:11 29:20
29:19 32:20
Markham ..................3
[1] 2:4
Martin
[1] 1:22
Massachusetts
[1] 3:18
Materials
[5] 27:8 27:10 27:23 29:23
30:25
Matter
[1] 21:25
Matters
[1] 4:4
McLaughlin
[1] 1:16
Mean
[2] 22:15 32:11
Meaning
[2] 29:21 29:22
Meant
[2] 27:9 27:13
Meeting
[2] 5:10 11:24
Memoranda
[1] 11:23
Memory
[1] 14:9
Mention
[1] 13:10
Mentioned
[1] 10:4
Messina
[1] 1:22
Minutes
[1] 11:23
Modifications

Sought
[1] 9:19 10:17
Lock
[4] 7:10 14:9 19:4 30:3
Locked
[5] 7:2 14:13 14:13 14:15
25:20
Locking
[1] 9:19 10:5 17:9
Louis
[3] 1:7 2:3 3:16

### N

Move
[1] 18:13

### N

Name
[3] 3:7 3:15 5:24
Names
[2] 11:18 12:17
Nature
[2] 6:11 22:14
Neal
[1] 1:15 28:11
Need
[1] 9:21
Needed
[2] 12:22 13:8
Negotiated
[3] 31:15 31:18 32:17
Negotiations
[2] 11:12 31:23
Net
[2] 1:18 4:19
Never
[2] 25:20 31:21
Next
[8] 7:13 12:19 12:24 14:18
14:20 21:24 22:2 22:25
Ninth
[1] 1:11
None
[1] 29:17
Notary
[1] 1:8
Notes
[3] 5:11 6:23 7:10
Nothing
[1] 17:3
Notified
[1] 25:8
November
[1] 24:12 26:13
Number
[5] 6:6 6:8 9:1 17:7 23:15

### O

Object
[1] 7:20
Objection
[22] 7:7 10:21 13:3 13:24
15:22 17:13 19:8 20:3 20:23
21:6 22:1 22:23 23:7 23:13
24:21 27:12 27:20 29:2 31:1
31:17 32:3 32:10
Obtaining
[1] 15:12
Obvious
[1] 29:13
Occurred
[2] 5:13 6:21
October
[6] 19:25 21:20 22:9 22:12
29:8 31:6
Office
[1] 7:5
Officer
[1] 4:16
Offices
[1] 1:10
Old
[1] 3:21
Once
[6] 13:13 13:13 15:18 16:2
31:25 32:17
One
[6] 9:7 11:21 15:6 28:2 28:
9 28:20
Ones
[2] 15:14 23:4
Operating
[1] 4:16

Social
[11] 8:16 27:15 28:4 28:6
30:9 30:14 30:15 30:17 30:
18 30:20 31:4
Operators
[4] 9:23 19:16 19:20 21:13
Order
[1] 21:17
Overseeing
[1] 12:14
Own
[1] 8:14
Ownership
[1] 4:10

### P

Packing
[1] 27:14
Page
[5] 30:10 30:19 30:20 30:22
31:9
Pages
[1] 29:17
Paragraph
[8] 19:11 19:13 27:4 27:5
28:5 28:5 29:21 30:21
Parking
[1] 20:18
Part
[3] 20:25 25:2 27:5
Participants
[1] 12:8
Participating
[1] 11:15
Parties
[1] 8:4
Pause
[1] 29:15
Pay
[3] 16:17 27:6 32:1
Paying
[1] 22:3
Payment
[9] 15:14 15:16 17:5 17:16
17:23 23:15 31:9 31:20 32:8
Payments
[3] 29:5 31:10 32:13
PC
[1] 1:16
Pennsylvania
[3] 1:1 1:9 1:12
People
[8] 10:2 10:5 10:12 12:11
12:16 13:12 26:22 27:18
Per
[4] 13:7 20:7 20:15 20:16
Per-property
[1] 13:7
Percentages
[1] 15:18
Perform
[8] 10:5 10:6 13:2 13:11 13:
23 20:1 22:25 25:1
Performed
[9] 8:19 8:21 20:21 21:22
27:7 27:10 29:23 32:9 32:14
Performing
[1] 13:9
Period
[1] 4:23
Person
[1] 5:22
Phrase
[2] 29:22 29:25
Place
[3] 10:12 27:18 27:19
Plaintiff
[1] 1:3 1:14
Plans
[5] 19:1 20:7 20:17 20:18
21:16

**Plow**
[3] 9:23 19:16 19:20
**PM**
[2] 1:10 32:25
**Point**
[7] 8:4 8:5 10:10 14:22 18:
13 26:17 26:25
**Position**
[2] 4:15 21:3
**Positions**
[1] 4:7
**Predates**
[1] 26:4
**Preference**
[2] 31:19 32:1
**Prendergast**
[6] 4:14 5:21 11:4 12:14 23:
3 25:24
**Preparation**
[1] 13:19
**Prepare**
[5] 5:12 7:25 11:2 12:6 27:
19
**Preparing**
[1] 9:16
**President**
[4] 4:2 4:8 4:22 21:3
**Pretty**
[1] 12:20
**Previously**
[1] 21:4
**Price**
[5] 6:6 8:6 16:17 20:15 20:
15
**Pricing**
[3] 9:20 13:7 20:8
**Principal**
[1] 7:18
**Problems**
[1] 24:20
**Proceed**
[1] 25:4
**Proceedings**
[1] 29:15
**Process**
[1] 10:12
**Progress**
[1] 18:15
**Proper**
[1] 25:6
**Properly**
[2] 8:21 25:3
**Properties**
[9] 1:18 4:19 6:19 8:17 9:7
9:19 20:13 20:15 25:5
**Property**
[6] 3:24 11:8 11:8 13:7 20:
7 20:16
**Propose**
[1] 32:6
**Proposed**
[3] 6:12 14:5 14:17
**Provide**
[2] 16:13 31:3
**Provided**
[3] 6:17 26:11 30:24
**Provides**
[2] 28:25 31:10
**Provision**
[2] 19:10 26:23
**Provisions**
[4] 15:8 29:21 30:4 30:8
**Public**
[1] 1:8
**Publicly**
[1] 4:11
**Put**
[2] 12:21 12:22
**Putting**
[2] 12:11 13:6

**Q**

**Questioning**
[2] 18:12 28:16
**Questions**
[7] 3:8 5:11 12:22 29:12 29:
20 32:20 32:23

**R**

**Range**
[1] 12:4
**Re**
[1] 15:6
**Reached**
[2] 7:18 25:11
**Reading**
[1] 29:7
**Ready**
[6] 13:2 13:11 13:22 20:1
20:22 21:18
**Real**
[1] 4:4
**Really**
[3] 18:15 28:16 30:22
**REALTY**
[1] 1:2
**Receive**
[1] 15:1
**Received**
[4] 14:24 22:2 22:5 22:14
**Receiving**
[2] 23:15 24:24
**Recollection**
[6] 13:20 18:3 18:5 18:24
22:7 32:15
**Record**
[2] 28:9 28:11 28:13
**Redrafted**
[1] 15:9
**Redrafts**
[1] 15:6
**Refer**
[1] 30:17
**Referenced**
[1] 30:13
**References**
[2] 30:14 30:16
**Referring**
[4] 17:22 20:11 30:7 30:8
**Refers**
[1] 30:18
**Refresh**
[1] 14:9
**Regard**
[1] 5:6
**Regarding**
[2] 11:24 19:16
**Regional**
[1] 11:8
**Relating**
[1] 13:1
**Remember**
[11] 6:22 11:20 11:21 15:2
15:3 18:7 18:8 18:17 19:3
19:4 31:23
**Removal**
[16] 6:17 6:19 8:16 9:6 9:9
13:14 20:14 21:1 21:5 21:7
21:11 25:2 25:6 27:14 27:15
28:3
**Rephrasing**
[1] 18:19
**Report**
[7] 4:13 4:14 7:14 8:21 25:
20 25:25 26:4
**Reported**
[1] 1:25
**Reporting**
[1] 1:25
**Represent**
[2] 3:7 32:8

**Rule**
[1] 7:13
**Requested**
[2] 10:19 17:19
**Requesting**
[2] 16:13 19:25
**Requests**
[1] 10:11
**Response**
[2] 22:22 24:24
**Responsibility**
[1] 8:20
**Results**
[1] 25:18
**Retain**
[1] 8:13
**Review**
[5] 8:12 9:16 11:3 14:12
**Reviewed**
[1] 14:23
**Room**
[1] 5:23
**Run**
[1] 13:13

**S**

**Sales**
[1] 4:4
**Salting**
[1] 27:14
**Sanding**
[1] 27:14
**Schedule**
[2] 20:12 20:16
**Schedules**
[7] 8:12 8:10 13:7 20:7 20:
8 20:10 21:16
**School**
[2] 5:3 5:5
**Scope**
[1] 8:11
**Season**
[3] 9:5 13:14 21:18
**Second**
[3] 28:10 28:12 30:20
**Section**
[3] 30:9 30:13 30:15
**Sections**
[1] 28:3
**See**
[3] 8:2 23:11 31:11
**Sending**
[1] 25:12
**Senior**
[1] 11:8
**Sennett**
[1] 1:16
**Sent**
[7] 14:17 16:18 26:13 29:10
29:19 30:3 30:4
**Service**
[1] 9:6
**Services**
[7] 6:17 27:7 27:10 27:22
29:23 30:24 31:3
**Set**
[2] 23:14 32:16
**Seven**
[5] 29:5 31:10 31:14 32:6
32:7
**Several**
[3] 18:19 22:7 22:9
**Shall**
[1] 27:6
**Shares**
[1] 4:12
**Shopping**
[1] 8:14
**Showing**
[2] 20:18 25:21

[1] 22:8
**Signed**
[16] 13:13 15:23 16:8 16:18
16:20 17:12 21:20 21:24 22:
6 26:2 26:7 26:10 26:17 27:
2 27:18 32:4
**Signing**
[3] 15:25 19:24 26:5
**Site**
[5] 9:19 20:7 20:17 20:18
21:16
**Sites**
[3] 8:23 10:3 10:13
**Situation**
[1] 25:16
**Smaller**
[1] 15:15
**Snow**
[45] 5:12 6:5 6:16 6:17 6:
19 7:19 8:13 8:16 8:18 9:6
9:9 9:16 10:4 10:11 10:20
11:21 12:15 13:1 13:14 13:
22 14:18 15:11 15:21 17:18
20:13 21:1 21:5 21:7 21:8
21:11 21:18 22:3 22:24 23:
16 23:18 24:19 24:25 25:2
25:6 25:8 27:14 27:14 27:15
28:3 31:6
**Snowfall**
[1] 27:19
**Someone**
[2] 11:19 22:15
**Sometime**
[2] 7:13 16:7
**Somewhere**
[4] 17:19 27:23 28:2 29:24
**Sondra**
[2] 1:8 1:25
**Soon**
[1] 25:10
**Sorry**
[2] 17:25 23:25
**Sound**
[1] 14:6
**Speaking**
[1] 5:8
**Speaks**
[1] 32:10
**Specific**
[4] 16:5 16:24 18:3 29:12
**Specifically**
[10] 6:2 14:2 16:11 17:3 18:
25 27:3 29:22 30:7 31:24 32:
14
**Specifications**
[1] 13:7
**Specificity**
[2] 15:4 17:8
**Specifics**
[2] 5:8 8:9
**Spelled**
[1] 31:10
**Spread**
[1] 29:5
**Started**
[1] 13:14
**State**
[1] 8:10
**States**
[5] 1:1 8:25 9:1 27:5 27:6
**Status**
[3] 9:12 10:8 13:15
**Step**
[1] 22:25
**Steps**
[1] 25:5
**Still**
[2] 6:25 22:12
**Stop**
[1] 3:12
**Street**
[1] 2:6

[5] 1:11
**Strike**
[2] 8:2 31:8
**Subcontractors**
[2] 8:14 8:19
**Subcontracts**
[1] 8:15
**Submit**
[1] 16:23
**Submitted**
[2] 10:25 15:20
**Subsequent**
[1] 8:17
**Substance**
[3] 6:11 10:24 16:9
**Sufficiently**
[1] 18:12
**Suggested**
[2] 13:18 17:10
**Supplied**
[3] 27:8 27:11 29:24
**Sworn**
[1] 3:2

**T**

**Task**
[1] 12:6
**Telephone**
[3] 13:1 16:2 20:20
**Tenants**
[1] 25:3
**Tenth**
[1] 1:16
**Term**
[1] 30:18
**Terminated**
[2] 26:20 27:5
**Terminating**
[2] 24:17 25:9
**Termination**
[10] 19:7 19:11 24:6 24:8
24:11 25:10 26:23 27:4 27:8
30:25
**Terms**
[19] 4:17 5:7 12:19 13:9 14:
6 15:14 15:16 15:16 17:6 17:
16 17:23 21:15 27:17 27:22
30:24 31:9 31:20 32:5 32:9
**Testified**
[1] 3:2
**Timetable**
[1] 13:18
**Today**
[2] 14:8 32:21
**Together**
[4] 12:12 12:21 12:23 13:6
**Tough**
[1] 15:11
**Towards**
[1] 7:24
**Traded**
[1] 4:11
**Transmission**
[1] 3:11
**Treemont**
[1] 3:20
**Trouble**
[1] 16:16
**Trust**
[1] 3:24
**Try**
[4] 6:18 9:14 18:13 32:12
**Trying**
[2] 16:12 23:17
**Twice**
[4] 15:19 16:3 31:25 32:18
**Two**
[2] 15:6 15:14
**Type**
[3] 9:4 16:6 21:8
**Types**

**Typically**
[1] 28:21

**U**

**Ultimately**
[1] 5:12
**Under**
[11] 8:15 10:6 13:2 13:9 20:
2 20:22 21:22 22:8 30:20 30:
23 31:4
**Understood**
[1] 11:2
**Undertake**
[1] 13:22
**Undertaken**
[3] 8:12 9:16 27:17
**Undertaking**
[1] 13:2
**UNITED**
[1] 1:1
**Unwilling**
[1] 25:4
**Up**
[3] 8:4 10:10 32:16

**V**

**Valanzola**
[34] 1:18 7:7 7:20 10:21 13:
3 13:24 15:22 17:13 18:11
18:18 19:8 20:3 20:23 21:6
22:1 22:23 23:3 23:7 23:13
23:22 24:1 24:9 24:21 26:25
27:12 27:20 28:21 29:2 29:
16 31:1 31:17 32:3 32:10 32:
23
**Various**
[2] 10:3 10:12
**Vendors**
[4] 22:4 23:15 23:17 25:7
**Verbally**
[1] 22:17
**Vernon**
[12] 5:23 5:25 9:11 9:14 11:
12 12:15 12:25 14:4 14:17
16:1 17:18 31:22
**Version**
[1] 15:7
**Vice**
[4] 4:2 4:8 4:22 21:3
**Video**
[1] 3:9

**W**

**Wants**
[1] 28:11
**Week**
[1] 12:24
**Weeks**
[2] 22:7 22:9
**West**
[2] 1:11 1:16
**WESTERN**
[1] 1:1
**Winter**
[1] 8:17
**Witness**
[2] 28:15 32:22
**Write**
[1] 11:18
**Written**
[4] 10:24 22:15 22:18 24:4

**Y**

**Years**
[2] 8:18 25:8
**Yourself**
[1] 16:20

**Z**

**Zicht**

1              C E R T I F I C A T I O N

2

3       I, Sondra A. Black, a Court Reporter and Notary

4   Public in and for the Commonwealth of Pennsylvania, do

5   hereby certify that the foregoing is a true and accurate

6   transcript of my stenographic notes in the

7   above-captioned matter.

8

9

10

11                          Sondra A. Black

12

13

14

15   Dated: January 30, 2006

16                          Notarial Seal
                            ...dra A. Black, Notary P...
17                          Waterford Twp., Erie Co...
                            ...mission Expires Aug
18                          ...nnsyl... ...nia Associat...

19

20

21

22

23

24

25