1           IN THE UNITED STATES DISTRICT COURT
2         FOR THE WESTERN DISTRICT OF PENNSYLVANIA

3   HERITAGE REALTY MANAGEMENT,:
    INC.,                      :
4              Plaintiff       :
                               :
5         vs.                  :   CASE NO. CA 04-333 ERIE
                               :
6   JOHN ALLIN d/b/a ALLIN     :   JUDGE SEAN MCLAUGHLIN
    COMPANIES,                 :
7              Defendant       :

8

9           Deposition of JOHN ALLIN, taken before and
10   by Carol A. Holdnack, RPR, Notary Public in and for
    the Commonwealth of Pennsylvania, on Monday,
11   January 23, 2006, commencing at 9:02 a.m., at the
    offices of Knox McLaughlin Gornall & Sennett, P.C.,
12   120 West Tenth Street, Erie, PA 16501.

13

14  For the Plaintiff:

15      Richard A. Lanzillo, Esq.
        Knox McLaughlin Gornall & Sennett, P.C.
16      120 West Tenth Street
        Erie, PA 16501

17      Kristina L. Angus, Esq.
18      Heritage Property Investment Trust, Inc.
        131 Dartmouth Street
19      Boston, MA 02116

20  For the Defendant:

21      Craig A. Markham, Esq.
        Elderkin Martin Kelly & Messina
22      150 East Eighth Street
        Erie, PA 16501

23

24

25          Reported by Carol A. Holdnack, RPR
            Ferguson & Holdnack Reporting, Inc.

**EXHIBIT**

B

1

1                        I N D E X

2

3    JOHN ALLIN

4         Direct Examination by Mr. Lanzillo . . . .  3

5

6    EXHIBITS:

7         J. Allin Deposition Exhibit 1  . . . . . . 47

8         J. Allin Deposition Exhibit 2  . . . . . . 48

9         J. Allin Deposition Exhibit 3  . . . . . . 49

10        J. Allin Deposition Exhibit 4  . . . . . . 51

11        J. Allin Deposition Exhibit 5  . . . . . . 51

12        J. Allin Deposition Exhibit 6  . . . . . . 52

13        J. Allin Deposition Exhibit 7  . . . . . . 77

14        J. Allin Deposition Exhibit 8  . . . . . . 79

15

16

17

18

19

20

21

22

23

24

25

1       J O H N   A L L I N, first having been

2       duly sworn, testified as follows:

3

4                       DIRECT EXAMINATION

5       BY MR. LANZILLO:

6

7          Q.    Mr. Allin, my name is Rich Lanzillo.  I represent

8       Heritage Realty in this lawsuit.  I'm going to be asking you

9       a series of questions today regarding the basis for the

10      lawsuit.  Both my questions and your responses will be taken

11      down by our court reporter, Carol.  To ensure that the

12      transcript is clear, there are a couple of basic ground

13      rules you and I will need to keep in mind.

14             First, it's important that we don't talk at the

15      same time.  So if you would wait until I finish my question

16      before attempting to respond to it, and I'll wait until you

17      finish your response before I ask you my next question.

18      That will make Carol's job a bit easier.

19             If you need a break during the deposition, just

20      let us know.  Most importantly, if at any time you do not

21      hear my question or do not understand it, I need you to tell

22      me that so that I can either repeat or rephrase the

23      question.  If you respond to my question, I will assume that

24      you both heard it and understood it.  Is that fair enough?

25         A.    Yes.

1      Q.    Would you state your full name and your address.

2      A.    John A. Allin, A-L-L-I-N.  Home address is 2319

3  South Shore Drive, Erie 16505.

4      Q.    And you're married to Peggy Allin?

5      A.    Yes.

6      Q.    And Mrs. Allin is here at the end of the table

7  with us today in the deposition room, correct?

8      A.    Yes.

9            MR. LANZILLO:  All right.  Mrs. Allin will be

10           testifying today pursuant to which of our notices,

11           the notice directly to her or the corporate

12           designee notice, Craig?

13           MR. MARKHAM:  I think directly to her.  I mean,

14           some of the information you're asking for is

15           overlapped principally between Mr. and Mrs. Allin.

16           Mr. Allin -- well, it depends on the area of

17           inquiry.  But, principally, her individual

18           deposition notice is why she's here.

19     Q.    Okay.  Are you currently employed?

20     A.    Yes.

21     Q.    And how are you employed?

22     A.    I am employed by Snow Dragon, LLC in Euclid, Ohio.

23     Q.    And what is the nature of the business of Snow

24  Dragon, LLC?

25     A.    It manufactures and markets and sells snow melting

1   equipment.

2        Q.    What's your position with Snow Dragon?

3        A.    I am the president.

4        Q.    Are you also an owner, or a member?

5        A.    I have an equity position in that company, yes.

6        Q.    Are you the majority?

7        A.    No.  I'm sorry, I should wait until you finish.

8        Q.    Are you the majority equity holder of that entity?

9        A.    No.

10       Q.    What percentage do you own?

11       A.    20 percent.

12       Q.    How long have you been employed as the president

13   of Snow Dragon?

14       A.    One week.

15       Q.    How long have you been a part owner of Snow

16   Dragon?

17       A.    One week.

18       Q.    How were you employed prior to joining Snow

19   Dragon?

20       A.    I was employed by Symbiot Business Group.

21       Q.    Was that as their corporate vice president of

22   operations?

23       A.    That's correct.

24       Q.    How long did you hold that position?

25       A.    13 months.

1          (Discussion held off the record.)

2     Q.    You joined Symbiot as its corporate vice president

3  of operations at the time that either the business of Snow

4  Management Group or the assets of Snow Management Group were

5  sold to Symbiot; is that correct?

6     A.    That's correct.

7     Q.    When did that transaction take place, the sale

8  to --

9     A.    The closing was November 22nd.

10    Q.    Of '04?

11    A.    That's correct.

12    Q.    Do you still conduct business as John Allin doing

13 business as Allin Companies?

14    A.    No.

15    Q.    When did you cease to do business as Allin

16 Companies?

17    A.    Allin Companies -- what was left after the Symbiot

18 acquisition was landscape contracting, and that was acquired

19 by an entity out of Ohio.

20    Q.    What's the name of that entity?

21    A.    Yardmaster, Inc.

22    Q.    And when did that occur?

23    A.    April 15th, '05.

24    Q.    Allin Companies, is that a proprietorship,

25 partnership, LLC, corporate entity, when it was in business?

1      A.    It was a sole proprietorship.

2      Q.    It would be your sole proprietorship?

3      A.    That's correct.

4      Q.    Does your wife have an ownership interest in that

5  entity?

6      A.    No.

7      Q.    The nature of the business of Allin Companies, as

8  I understand it, included snow removal services, landscape

9  contracting; is that correct?  And was there any other

10  aspect to the business?

11      A.    That's correct.  We also built decks, did

12  irrigation, installation and maintenance for lawns.

13      Q.    As far as the breakdown of the different aspects

14  of Allin Companies business, could you give me an estimate

15  of how much of your work was devoted to landscape

16  contracting, versus snow removal, versus irrigation, versus

17  decks?

18      A.    Including the work that was done by the sole

19  proprietor known as Snow Management Group, 10 percent of the

20  work was landscape, the balance was snow.

21      Q.    So I take it that a very small portion of the

22  business was devoted to irrigation and decks?

23      A.    Yes.

24      Q.    Roughly 90 percent would have been snow removal?

25      A.    Correct.

1      Q.    What was the principal place of business of Allin

2  and Companies when it was in operation?

3      A.    1406 West 21st Street, Erie 16502.

4      Q.    Did Allin and Companies, including any of the, for

5  lack of a better term, divisions of Allin Companies maintain

6  any other places of business other than the 21st Street

7  address?

8      A.    No.

9      Q.    Did Snow Management ever have a place of business

10 or an address located in Essex, Connecticut?

11     A.    Essex, Connecticut would have been the location of

12 one of our employees.

13     Q.    And who was that?

14     A.    Jeffrey Vernon.

15     Q.    What was Mr. Vernon's position?

16     A.    He was in charge of sales and production.

17     Q.    Was he a vice president?

18     A.    Yes, we had that title.

19     Q.    How long was Mr. Vernon employed by you?

20     A.    Sometime in late spring 2002 until we sold the

21 company.

22     Q.    Till November of '04?

23     A.    Correct.

24     Q.    Did he work principally in the snow removal part

25 of the business or did he also do anything with landscape

1    contracting?

2        A.    He was responsible only for snow.

3        Q.    What were his job responsibilities?  I think you

4    mentioned he was involved in marketing or sales.

5        A.    Sales.  And he oversaw all of the field managers.

6        Q.    What was the function of the field managers?

7        A.    Field managers had specified regions that they

8    were responsible for overseeing the snow removal on specific

9    sites within that region.

10        Q.    So he was both on the operational side and on the

11    sales side of the business?

12        A.    That's correct, although his operational

13    responsibilities were in the field, not here in the office.

14        Q.    Was he involved in the subcontracting portion of

15    the business?

16        A.    To a certain extent, yes.

17        Q.    What were his job responsibilities in that area?

18        A.    In certain instances he would interview and hire

19    subcontractors to work on various sites.  But he was not

20    hiring all the subcontractors on all the sites.

21        Q.    What would determine whether Mr. Vernon would get

22    involved in the interviewing and hiring process?

23        A.    The geographic region.  He took responsibility for

24    the area that was immediately surrounding his residence.

25        Q.    Okay.  What was the range that he covered as far

1   as his interviewing and hiring of subcontractor
2   responsibilities?
3       A.    There was a regional field manager that lived
4   fairly close to him, and he would assist that individual.
5   He wouldn't have total responsibility.  In some cases he
6   would go as far away as New Jersey, depending upon the scope
7   of work and the intricacy of the site.
8       Q.    Would you have been Mr. Vernon's direct
9   supervisor?
10      A.    Yes.
11      Q.    And when I refer to employees of Allin and
12  Companies, am I correct that I'm really talking about your
13  employees since you were a proprietorship?
14      A.    That's correct.
15      Q.    And Mr. Vernon's compensation, how was it
16  determined?  Was it hourly, salary?
17      A.    He was paid --
18      Q.    -- commission?
19      A.    -- a salary plus a draw against commission.
20      Q.    What were the terms of his draw against
21  commission?
22      A.    We paid him a draw.  And then once a year we were
23  to reconcile against commissions that he would be owed.
24      Q.    What was his draw amount?
25      A.    52,000 per year.

1     Q.    And he received a commission of what percentage?

2     A.    I don't recall.  I would have to review his

3  employment agreement.

4     Q.    He did have a written employment agreement?

5     A.    He did.

6     Q.    He did not stay on when Symbiot purchased the

7  company?

8     A.    That's not correct.

9     Q.    Okay.  I see.  He became a direct employee of

10  Symbiot at that point.

11     A.    That's correct.

12     Q.    When did he cease to be -- of course, I'm talking

13  about Mr. Vernon now.  When did Mr. Vernon cease to be an

14  employee of Symbiot sometime in the summer of 2005?  Did he

15  resign?  Was he terminated?  Do you know the circumstance

16  surrounding his departure from Symbiot?

17     A.    It's my understanding he did resign.

18     Q.    Where is he now?

19     A.    Today?

20     Q.    Generally.  Is he living in Connecticut still?

21     A.    Yes, he is still living in Connecticut.

22     Q.    When is the last time you had any contact with

23  Mr. Vernon?

24     A.    Last week.

25     Q.    Do you still conduct business with him in any

1    regard?

2        A.    No.

3        Q.    Have you discussed this case or your deposition

4    with Mr. Vernon since he left Symbiot?

5        A.    We have had discussion about Heritage.  We have

6    had no discussion about the deposition today.

7        Q.    What was the nature of the discussion regarding

8    Heritage?

9        A.    Asking him if he had any documentation that we

10   could supply to our attorneys.

11       Q.    What did he tell you?

12       A.    He supplied us with what he had, although it was

13   my understanding he had a corrupted hard drive that he could

14   not get into.

15       Q.    What did he provide you with as far as written

16   documentation?  Was he able to give you anything at all?

17       A.    I don't know.

18       Q.    Was it transmitted through you, Mr. Allin, or

19   directly to Attorney Markham?

20       A.    I don't know if anything has been given directly

21   to Attorney Markham.  But it would have come through our

22   office to the law firm we initially retained.

23       Q.    That was the --

24       A.    They were over in the Cleveland area.

25       Q.    Would it be fair to say that, to your knowledge,

12

1  Mr. Vernon did not have any time records as far as his

2  activities relative to Heritage?

3      A.    I don't know that.

4      Q.    Are you aware of any time records that he had?  I

5  understand you don't know whether he had them and what he

6  may have provided through others.  But to your personal

7  knowledge, have you ever seen any time records that were

8  purportedly supplied by Mr. Vernon?

9      A.    I have not.

10     Q.    Mr. Vernon told you that he had a corrupted hard

11  drive on his computer that prevented him from generating

12  information that he thought he might otherwise be able to

13  provide?

14     A.    That's correct.

15     Q.    And when did he tell you that?

16     A.    Sometime in the last month to six weeks.

17     Q.    About how many individuals were employed by Allin

18  Companies, by you, prior to the acquisition by Symbiot?

19     A.    The number would fluctuate depending upon the time

20  of year.

21     Q.    What's the range?

22     A.    Anywhere from 30 to 75, depending upon how many

23  temps were working at the call center and things of that

24  nature.

25     Q.    Would it be accurate for me to conclude that

1  during the winter months your employee ranks would increase

2  and then during the summer they would decrease?

3      A.   That would be accurate.

4      Q.   You mentioned a call center.  What's that?

5      A.   It is a room in the building where people answer

6  phones, reports from various service providers, requests

7  from customers, and dispatching of service providers to

8  customer locations as or if needed.

9      Q.   So as the snow would be falling in a particular

10 locale there might be a call from a client or customer, it

11 would come in through your call center.  And then your call

12 center would contact the service provider.  Is that the

13 basic routine?

14     A.   That's not generally how it happened, but that

15 could happen from time to time.

16     Q.   Generally, what would happen at the call center?

17 What would the nature of the calls that would come into the

18 center encompass?

19     A.   If you plowed a site, you would call us to report

20 that you had performed service, and we would keep record of

21 that.

22     Q.   I see.  So the call center's principal function,

23 if I'm following you correctly, was to monitor the

24 performance of services by your subcontractors?

25     A.   That was one of the responsibilities.

1     Q.   What were the others, other responsibilities?

2     A.   Take calls from customers who required additional

3  service or callback service.

4     Q.   Anything else?

5     A.   They would make the outbound call to a service

6  provider to dispatch them to that particular site to address

7  the issue that may have arisen.

8     Q.   And approximately how many of the 30 to 75

9  employees would be devoted to the call center?

10     A.   I can't answer that.  I could if I would [sic].

11     Q.   Was the call center 24 hours?

12     A.   Certain times of the year, yes.

13     Q.   And, typically, what would the staffing be, say,

14  in the winter months?  Would there be one person in the call

15  center, five people in the call center?

16     A.   It would vary depending upon the severity of the

17  winter and the prediction of snow in various markets.

18     Q.   Of the -- well, let me ask you this.  The 30 to 75

19  employees -- and I know that their identities changed during

20  the course of the year.  But would those folks be

21  responsible for the snow removal side and other aspects of

22  the business such as landscape contracting?

23     A.   In the numbers I gave you, that's correct.

24     Q.   And when the numbers would swell to 75 in the

25  winter, those additional employees, would they be working

1   primarily on the snow removal aspect of the business?  That

2   seems reasonable.

3       A.   Yes.

4       Q.   In that range, 30 to 75 employees, was that fairly

5   typical over the last several years prior to the sale to

6   Symbiot, or did that range grow over time?

7       A.   It grew over time.

8       Q.   I take it the snow removal aspect of your business

9   has grown for a number of years prior to the merger -- or

10  excuse me, the sale?

11      A.   Yes.

12      Q.   Other than Mr. Vernon, who was apparently based in

13  Connecticut, did you have any employees based in other

14  locations prior to the sale of -- I assume it was a sale of

15  assets; I'll get to that in a minute -- but prior to the

16  transaction with Symbiot?

17      A.   Yes.

18      Q.   Where were your other employees based?

19      A.   In various locations.  This list may not be

20  all-inclusive.

21      Q.   Give me your best recollection, please.

22      A.   Two to three in New Jersey.  One in Massachusetts.

23  Two or three in Connecticut.  Two or three in New York.  One

24  in Iowa.  One in Minneapolis.  One in Chicago.  That may not

25  be all-inclusive.

1      Q.    Of the ones that you were able to recall, were

2    these employees of yours at the time that you executed the

3    agreement with Heritage Realty Management?  In other words,

4    were they already existing employees or did you add any of

5    these folks at the time of the contract?

6            MR. MARKHAM:  At the time he signed it, you mean?

7            MR. LANZILLO:  Um-hum.

8      Q.    At or after the time you signed it.

9      A.    Three were hired after the signing.  The balance,

10    to the best of my recollection, were already on staff.

11     Q.    And who were the three employees who were signed

12    at or after the execution of the contract with Heritage?

13     A.    Duane.

14     Q.    Could you give --

15     A.    Dave.

16     Q.    I know who Duane is from reading the documents,

17    but for the record could you give his name, full name,

18    please.

19     A.    No.  If you've read the documents, you understand

20    why.

21     Q.    Yeah.

22     A.    It's Haataja.  And you can guess at the spelling.

23            MR. LANZILLO:  I'll give it to you.

24            H-A-A-T-A-J-A.

25     Q.    And Dave, is that last name D-Z-I-U-B-A-N?

1       A.    That's correct.

2       Q.    Anyone else?  There was a third person.

3       A.    Yeah, there is a third individual, and I cannot

4   recall his name.

5       Q.    Was it Bryan Rohe, R-O-H-E?

6       A.    That sounds correct.

7       Q.    And these are individuals who prior to the

8   contract with Heritage had not ever provided any services to

9   or through Allin Companies?

10      A.    That's correct.  Some other individuals were

11  hired, but we were anticipating that they would have

12  other -- or responsibilities for other customers other than

13  Heritage.  An example would be the fellow in Massachusetts.

14  He was not hired solely for the Heritage contract.  He

15  was -- it was anticipated that Heritage become part of his

16  portfolio.

17      Q.    How were the three employees hired after the

18  Heritage contract to be compensated, or how were they

19  compensated?  Salary, hourly, commission?

20      A.    I believe that they were paid a salary, and

21  incentivized in some fashion.

22      Q.    And the incentives would be what?

23      A.    To secure additional sites for us to maintain

24  around the -- or within the immediate vicinity of the

25  Heritage portfolio.

1    Q.    Okay.   And the three individuals, Duane, Dave, and
2    I believe the other one was Bryan, where was each based?
3    A.    I don't know the exact cities that they lived in.
4    Dave Dziuban was in the Chicago-land area.   Duane was in the
5    Minneapolis vicinity.   Bryan was in Des Moines, I think.
6    Q.    Were those areas where you had previously done any
7    business or were these brand new sites for you?
8    A.    Brand new sites, Heritage sites.
9    Q.    Do you have any employment records for these
10   individuals showing precisely what they were paid?
11   A.    I do not.   The company would have.
12   Q.    The company does.   And I say the company, I guess
13   they're your business records, correct?
14   A.    Correct.
15   Q.    There are business records that would show either
16   1099 wages or W-2 wages.
17   A.    We followed the laws of the land, and a W-2 would
18   have been issued for them.
19   Q.    I'm not trying to trick you.   I don't know what --
20   whatever it is, those records still exist?
21   A.    We played by the rules, and, yes, they would still
22   exist.
23   Q.    Did these individuals continue as employees after
24   Heritage terminated the contract?
25   A.    They were terminated approximately one week after

1    the Heritage termination.

2        Q.    By these employees, I'm referring to the three we

3    have been discussing.

4        A.    That's correct.

5        Q.    So they would have been employees for a very short

6    period of time.

7        A.    That's correct.

8        Q.    They were hired after the execution of the

9    contract, which I believe was October -- the contract is

10   dated October 12th.  And I know that the signature date is a

11   little different for each of the parties.  There's an

12   Exhibit A; I believe it's from the Complaint.  For the

13   record, I've showed you a document that was previously

14   marked as Exhibit A.  I believe that comes from either the

15   pleadings or perhaps from a motion filed earlier in this

16   case.

17       Am I correct, Mr. Allin, this is a copy of the

18   contract dated October 12, 2004 between Heritage Realty

19   Management and you, without exhibits?

20       A.    It appears to be that, yes.

21       Q.    And it appears that the contract is dated

22   October 12, 2004.  And it's dated with your signature on the

23   last page, Page 8, October 4, 2004?

24       A.    Yes.

25       Q.    Is that your signature and handwriting on the last

1    page?

2        A.    It is.

3        Q.    Am I reading that correctly?  It says John A.

4    Allin, 10/4/04, with changes in red?

5        A.    That's what it says.

6        Q.    All right.  So going back to these three employees

7    who were hired after the execution of this contract.  It's

8    your testimony that each was hired after October 4, '04 and

9    then terminated within approximately one week following

10   Heritage's termination of the agreement on November 4, 2004;

11   is that correct?

12       A.    No.

13       Q.    How am I incorrect in that summary?

14       A.    I do not know their exact dates of employment.

15       Q.    Is it possible that some were hired prior to the

16   execution of the agreement?

17       A.    It's possible it's snowing outside now, but I

18   don't know that for a fact.

19       Q.    That's something we could ascertain from the

20   business employment records that you still maintain?

21       A.    I believe so, yes.  And so we're clear, I do need

22   to add one thing.  Dave Dziuban was not terminated.  We kept

23   him.

24       Q.    How long did Mr. Dziuban remain with Allin?

25       A.    He was there when it was sold to Symbiot and for a

1    period of time thereafter.

2        Q.    Who was Allin Companies/Snow Management Group's

3    accountant and auditor?  Who did the accounting work for

4    you?

5        A.    I'm not sure I understand what you're asking me.

6        Q.    Did your business have an accounting firm?

7        A.    We did.  And it was right about in that time frame

8    that we changed accounting firms.

9        Q.    Who was your prior firm prior to the change?

10       A.    Kramer Smith and Bish.

11       Q.    I'm not familiar with them.  Are they in town?

12       A.    712 Kahkwa.

13       Q.    And who was the successor to Kramer Smith and

14   Bish?

15       A.    I don't know the name of the firm.  I can't

16   remember it.  But if I heard it, I would know it.

17       Q.    Is it an Erie firm?

18       A.    Yes.

19       Q.    Does that firm remain your personal accountant

20   today?

21       A.    Yes.

22       Q.    Is it one of the larger firms?

23       A.    Yeah.  Dennis Grow is doing our taxes in that

24   firm.  They're at -- I think they're at 10th and State.

25       Q.    That would be Schaffner Knight Minnaugh and

1   Company?

2       A.   That's it.

3       Q.   And those firms, Kramer Smith and Schaffner

4   Knight, they worked for the business, they did accounting

5   work for the business, as well as any personal accounting

6   matters that you had; is that accurate?

7       A.   Yes.

8       Q.   All right.   The actual removal of snow by -- and

9   I'm going to call it SMG for ease, Snow Management Group.

10  Fair enough?

11      A.   Yes.

12      Q.   The actual removal of snow by SMG, was that

13  performed solely through subcontractors, or did you do some

14  of that yourself?

15      A.   99 percent of it would have been done with

16  subcontractors.   That was the model.

17      Q.   Did SMG have snow moving and removal equipment

18  that it owned, that you owned personally?

19      A.   Yes.

20      Q.   What types of equipment did you own?

21      A.   Skid steers, snow pushers, which are essentially

22  large plows, box plows.   Trucks with plows on them, and salt

23  spreaders.   Some specialized equipment, meaning ATVs with

24  plows and salt spreaders on them for clearing sidewalks.

25  Power brooms, both walk-behind and mechanized.   There could

1  be some other minor equipment, but that's the bulk of it.

2      Q.    Was that equipment situated here in Erie or was it

3  spread out in other locations?

4      A.    Spread out in other locations.  A good portion of

5  it was located here in Erie and brought back here between

6  winter seasons.  And some was stored on customer sites and

7  at other common areas that we could rent/keep.

8      Q.    But, again, about 99 percent of the actual snow

9  removal work would have been performed by subcontractors?

10  As you said, that was the business model?

11      A.    Yes.  However, we would supply snow pushers, skid

12  steers, some of the mechanized equipment, for the

13  subcontractors to use.  The snow pushers themselves, we

14  would not traditionally allow a subcontractor to own.

15      Q.    I see.  Did you acquire any new equipment based on

16  the Heritage contract?

17      A.    Yes.

18      Q.    What did you purchase?

19      A.    We purchased some more pushers.  No, I take that

20  back.  That's not correct.  We did not acquire pushers for

21  the Heritage contract.  We had enough left over from

22  contracts that we did not renew, that we were going to

23  relocate that equipment to the Heritage sites.

24      Q.    So then no new equipment was purchased based on

25  the Heritage contract?

1      A.    Trucks for the field managers, they were

2    purchased.  Those trucks had plows and salt spreaders on

3    them.

4      Q.    Would those be standard pickup-type trucks with

5    some special equipment?

6      A.    Three-quarter ton Dodges with D blades and salt

7    spreaders.

8      Q.    What happened to those trucks after the

9    termination of the Heritage contract?

10      A.    They sat in Erie, doing nothing.

11      Q.    Were they sold to Symbiot?

12      A.    Yes.

13      Q.    And how many trucks did you purchase?

14      A.    I purchased six that year, I believe.  And they

15    would have been for all the new employees that we hired.

16    There were no replacement trucks.  And as I previously

17    stated, some of the employees were hired in markets where

18    the addition of the Heritage sites required additional

19    managerial staffing.  But once we lost the Heritage

20    contract, we still had enough work that we thought we could

21    muddle through paying their salaries and keeping them on

22    board.

23      Q.    So those new hires in those areas, they were not

24    terminated after the Heritage contract was terminated; you

25    continued with them doing other work?

1    A.    As I previously stated, there was one in

2  Massachusetts, one in New Jersey.  Those people were kept.

3    Q.    The six new trucks, then, were any trucks traded?

4  In other words, when you got the six new trucks, were you

5  trading in any older trucks?

6    A.    No.

7    Q.    And where did you buy those?

8    A.    Humes.

9    Q.    Humes in Waterford?

10    A.    That's correct.

11    Q.    Where are those trucks now?  Are they with

12  Symbiot?

13    A.    That's correct.

14    Q.    Are there any business records concerning the

15  purchase of those trucks?  Do you have the paperwork on

16  them?

17    A.    I believe so.

18    Q.    Who would be the custodian of those records?

19    A.    Peggy Allin.

20    Q.    Other than the trucks that were later sold to

21  Symbiot, any other equipment purchased based upon the

22  Heritage contract?

23    A.    Not that I can recall at this time.

24    Q.    The subcontractors who did 99 percent of the snow

25  removal work for Allin, were those -- those were not

1    employees, those were independent contractors, I assume; is

2    that correct?

3        A.    That is correct.

4        Q.    Prior to Heritage, how many clients or customers

5    did you have in the snow removal area?

6        A.    I wouldn't -- I would be guessing if I gave you a

7    number.

8        Q.    Would it be fair to say hundreds?

9        A.    There would have been hundreds of sites.  I don't

10   know that there would be hundreds of customers.  And it's

11   more like thousands of sites.

12       Q.    Okay.  Any particular geographic region or all

13   over the country?

14       A.    The business was focused predominantly east of the

15   Mississippi.  However, that does not mean we did not have

16   customers west of the Mississippi.

17       Q.    I assume Florida was probably not a very lucrative

18   market for you.

19       A.    Well, it does snow in all 50 states at some point

20   every decade.  That's a reasonable assumption.

21       Q.    But probably not enough to justify a substantial

22   marketing effort on your behalf.

23       A.    That's correct.

24       Q.    What's your best recollection, approximately, of

25   the number of subcontractors that you would have in any

1    given year?

2         A.   It would be under 1,000 and over 200.

3         Q.   Okay.

4         A.   And that's as close as I can narrow it down.

5         Q.   Who within your business was responsible for

6    recruiting and interacting with the subcontractors?

7         A.   There's a number of different people that were

8    involved in the direct contact with subcontractors.  They

9    would have -- they were all housed in Erie, and would

10   include the field managers that were stationed in the

11   various regions.

12        Q.   Who can you recall here in Erie who was

13   responsible for recruiting and maintaining relationships

14   with subcontractors?

15        A.   About the only thing I can give you definitive

16   would be the person who was responsible for that department,

17   and that would be Lisa Edwards.

18        Q.   Is she still in Erie?

19        A.   Yes.

20        Q.   Did she go to work for Symbiot after that

21   transaction?

22        A.   Yes, she did.

23        Q.   When did she cease working for Symbiot?

24        A.   It's my understanding she is still working now.

25        Q.   She is still working for them.  What's left of

1    what was formally Snow Management Group and is now part of

2    Symbiot's organization here in Erie?  I read some articles

3    that there's been a contraction or reshuffling of

4    responsibilities with stuff being transferred over to Salt

5    Lake City.

6        A.    I have not been in the building in a while.  My

7    employment came to an end there December 15th.  They have

8    downsized severely and considerably, and I'm probably not

9    the right person to ask that question of.

10        Q.    Is it your understanding, though, that the

11    principal operations that were here in Erie have since been

12    transferred to Salt Lake?

13        A.    Not yet, but they're in the middle of

14    transitioning that.

15        Q.    What were the circumstances surrounding the end of

16    your employment with Symbiot on or about December 15th?

17        A.    Symbiot felt that I was not meshing with the

18    culture in Salt Lake, and that it would be best if I pursued

19    other endeavors, and I agreed.

20        Q.    Did you have an employment agreement following the

21    acquisition by Symbiot?

22        A.    I did.

23        Q.    And I take it, it was terminable on certain

24    conditions, either party or Symbiot had the right to

25    terminate on notice or upon payment of an amount?

1     A.   Yes, that's essentially correct.

2     Q.   What was the nature of the transaction between you

3 as the proprietor of Snow Management Group and Allin

4 Companies and Symbiot?  In other words, was it an asset

5 purchase agreement, was it a -- what was it?

6     A.   They purchased assets and certain liabilities as

7 it related to the snow business.  They did not purchase any

8 landscape, irrigation, deck, any of that work.

9     Q.   When did that asset purchase occur?

10    A.   The closing was on November 22nd of '04.

11    Q.   When did you start negotiating with Symbiot

12 regarding that transaction?

13    A.   September of '04.

14    Q.   Had you been looking for a strategic buyer for

15 portions of your business prior to September of '04?

16    A.   Yes.

17    Q.   When did those efforts start?

18    A.   February -- February of '04.

19    Q.   What prompted you to decide to look for a

20 purchaser of some or all of the business?

21    A.   We had been growing expedientially since the

22 Olympic project.  And we had been growing from cash flow.

23 It became apparent in the winter of '03/'04 that in order to

24 continue to sustain the type of growth that we were

25 experiencing and anticipated, that we would need capital or

1   we would need to become properly capitalized in order to

2   continue that growth.  So there was an effort made to engage

3   either a venture partner or to allow someone to acquire a

4   portion of the business to provide us with the capital that

5   we would need.

6       Q.   Were you experiencing financial problems in

7   connection with the operation of the Snow Management Group

8   when you started looking for a venture capital partner or a

9   strategic buyer?

10      A.   No.

11      Q.   Were you paying debts as they came due?

12      A.   Yes.

13      Q.   Did that include debts to your subcontractors?

14      A.   Yes.

15      Q.   At any time between February of 2004 when you

16  started looking for a strategic buyer and the date you

17  entered into the Heritage contract, did you fall into

18  arrears with a significant portion of your subcontractors?

19      A.   We did fall into arrears, but not with a

20  significant portion of our subcontractors.  We had thought

21  we had an arrangement to be acquired, and that did not come

22  to fruition.  And by the time that had taken place, the

23  original purchaser decided against going through with the

24  agreement.  By that point, we had fallen behind by

25  approximately 3.6 million to service providers only.  All

1    other debts were paid on time and were current.

2        Q.    Who was the original anticipated purchaser of the

3    business?

4        A.    We had had conversations with a number of

5    different individuals and entities.  And I had been trying

6    to educate a number of different people about the snow

7    industry.  And at the same time I had engaged an engineering

8    firm to design a snow melter that we wanted to use.  And

9    that -- the parent company of that entity was interested in

10   acquiring all of SMG.

11       Q.    Prior to Symbiot, did you have a letter of intent

12   from anyone to purchase the business, or a portion of the

13   business?

14       A.    I don't know if we ever had an actual letter of

15   intent.

16       Q.    I may have misinterpreted your testimony a few

17   moments ago, Mr. Allin.  But I was under the impression that

18   the discussions were fairly serious with at least one or

19   more potential buyers.  Would that be a fair assessment of

20   your testimony?

21       A.    Yes, sir.

22       Q.    What was the name of the potential purchasers with

23   which you had serious negotiations?

24       A.    It was Park Ohio Holdings Company in Cleveland.

25       Q.    Anyone else?

1       A.    When we began negotiating with Park Ohio, they

2  asked us not to have conversations with any other entities,

3  and we did not.  But there were other interested parties.

4       Q.    You did fall behind, though, to the tune of

5  $3.6 million to service providers at one point?

6       A.    That's correct.

7       Q.    When did that occur?

8       A.    Over the course of the negotiations with Park

9  Ohio.

10      Q.    Are you implying there was some cause and effect

11 to -- between the negotiations on the one hand and the

12 falling behind with your service providers?

13      A.    I don't think they were directly related, no.

14      Q.    You said earlier that there was a need to raise

15 capital based on your growth.  Would it be fair for me and

16 accurate for me to conclude that you did not have the cash

17 flow sufficient to service, at least at one point, $3.6 in

18 debt to your service providers?

19      A.    That would be accurate.

20      Q.    Did you at some point retain a workout firm?

21      A.    After the Park Ohio deal came apart, they

22 recommended that -- the CEO of Park Ohio recommended that we

23 engage Bob Cohen from Centrus to assist us in going forward

24 so that we could continue to concentrate on the business and

25 not on the problems that might arise from not being able to

1    get a capital infusion in the company.

2        Q.   I mean, those were existing problems.  I mean, at

3    the time you had -- well, let me back up.  Tell me if this

4    statement is correct.  When you retained Centrus and Bob

5    Cohen, you did not have funds sufficient to pay your service

6    contractors; is that accurate?

7        A.   That's accurate.

8        Q.   And one of the reasons why you retained Centrus

9    was to have Centrus assist you in negotiating some

10   accommodation from your service provider creditors?

11       A.   Centrus' -- Bob Cohen's charge was to assist us on

12   a number of fronts.

13       Q.   What were those fronts?

14       A.   Getting a capital infusion, a potential buyer or

15   investor, to keep the service providers abreast of the

16   situation and what was taking place.  We didn't have anybody

17   who was threatening anything at that point in time.  And we

18   were doing this as a precursor to any problems that might

19   arise.

20       Q.   When you sold the snow removal business to

21   Symbiot, was there some arrangement made for the payment of

22   your subcontractors, at least the subcontractors with which

23   there was an arrearage?

24       A.   Symbiot did make arrangements to assume that

25   liability and to make the service providers whole.

1    Q.   Were they made whole, or did they accept -- were

2    the service providers required to accept less than full

3    payment?

4    A.   I don't believe the service providers were

5    required to do anything.  They were asked to accept 75 cents

6    on the dollar.

7    Q.   Did your service providers accept that 75 cents?

8    A.   Overwhelmingly.  The response was positive.  And

9    all but only a couple gladly accepted it.

10   Q.   What happened to the service providers who

11   declined to accept the 75 cents?

12   A.   I don't know.  That was taken out of my hands.

13   But there were -- if there were one or two, that was a lot.

14   Q.   Did any service provider ever sue you?

15   A.   We have one who has filed suit against us.

16   Q.   Which one is that?

17   A.   Karioty (phonetic), something or other.

18   Q.   Karioty?

19   A.   Yeah.

20   Q.   Where are they based?

21   A.   Connecticut.

22   Q.   And how much were they owed?

23   A.   I don't know.

24   Q.   Let me ask you a couple questions about the

25   structure of the agreement with Symbiot.  Did they assume

1    any debt other than the -- some or all of the debt to the

2    service providers?

3        A.   Yes.

4        Q.   Bank debt, things of that nature, secured debt?

5        A.   Yes.

6        Q.   And did they -- did Symbiot assume all of the debt

7    to the service providers, or up to a certain amount?

8        A.   It was written to be up to $4 million.

9        Q.   And then was there cash to you as part of that

10   deal?

11       A.   At closing I got $50,000 that went to my lawyer.

12       Q.   And nothing beyond that?

13       A.   That's correct.

14       Q.   Is there any payout going forward?

15       A.   I hope so.

16       Q.   Is there like an earn-out type of arrangement?

17       A.   Yes.

18       Q.   And that, obviously, is tied to the performance of

19   what was formally SMG and now part of Symbiot?

20       A.   Yes.  However, Symbiot has had some material

21   direction change in how they're operating.  So it would be

22   next to impossible for them to achieve the earn-out goals

23   that have been set forth, and we're in the process of

24   negotiating that.

25              (Discussion held off the record.)

1       Q.   I just made the comment that typically earn-outs
2    are aspirational.
3       A.   We've kind of figured that out.
4       Q.   Heritage paid $340,000 roughly, $340,482 to you.
5    Where did that money go?
6       A.   Into the checking account.
7       Q.   Were those proceeds transferred to Symbiot as part
8    of the transaction?
9       A.   Well, we had to operate the business up until the
10   closing took place, and we used those funds for that.
11      Q.   How much was in the checking account at or about
12   the time of the receipt of Heritage's payment?
13      A.   I don't know.
14      Q.   How rapidly were the proceeds of Heritage's
15   payment depleted after they were received?  Did they go out
16   the door pretty quickly?
17      A.   I don't know that.
18      Q.   There certainly would be bank records to show
19   that, would there not?
20      A.   I would hope so.
21      Q.   The checking account records.
22      A.   I would hope so.
23      Q.   Where did you do your banking?  Who had your
24   checking account?
25      A.   National City.

1    Q.   Did you do any banking at any other financial

2  institutions other than National City?

3    A.   Not that I'm aware.

4    Q.   The assets that were owned by -- used as part of

5  SMG's business and that were ultimately sold to Symbiot,

6  were they titled in your name individually?

7    A.   Some were titled in my name.  Some were titled in

8  Allin Company's name.  Some were titled in Snow Management

9  Group's name.  Some were titled in Peggy's name.

10   Q.   Were all of the tangible assets that were formally

11 used as part of the business of Snow Management Group

12 transferred to Symbiot?

13   A.   Everything except the landscaping assets.

14   Q.   What about the real estate; did real estate stay

15 with you?

16   A.   I had no real estate.  We leased everything.

17   Q.   What were the annual revenues in the last years of

18 Snow Management Group from snow removal?  What did you guys

19 gross?

20   A.   It's been a while since I've looked at those

21 records.  It strikes me that it was in the vicinity of

22 $15 million.

23   Q.   In the last year of operation, did expenses exceed

24 revenues?

25   A.   In '04, yes, we showed a loss.

1      Q.   I assume that -- I mean, if you had at one point

2   3.6 million owed to service providers/subcontractors, it

3   sounds that you would have had at least an off year.

4      A.   '04, yes.  '03 was profitable.

5      Q.   What about existing contracts that were in your

6   name or the names of Allin and Companies or Snow Management

7   Group; how were they handled as part of the Symbiot

8   transaction?  Were they assigned, assumed?

9      A.   Those that had assignment clauses in them were all

10  assigned, and all customers agreed to the assignment.  Those

11  that did not have assignment language, they were notified of

12  the transaction, and we had no issues or problems with any

13  of them.

14     Q.   And when you say that, were those terminated,

15  then, at that point?

16     A.   No, they were assigned also.

17     Q.   They consented.

18     A.   Yes.  Some, we needed their consent.  Some, we did

19  not.  We had no problems with any of them.

20     Q.   Who were your principal contacts at Symbiot as

21  part of that transaction, the sale of the SMG business?

22     A.   I dealt with Bruce Wilson, Matt Glover and Steve

23  Glover.  And Mark Webb.

24     Q.   What was Webb's title?

25     A.   He was a CFO.  Although, to be accurate, he was

1    the responsibility for that contract?

2         A.    Yes.

3         Q.    And I know I asked you this before; I apologize.

4    When did you begin your discussions with Symbiot?  Was it

5    September?

6         A.    Yes.

7         Q.    Was there a letter of intent executed at some

8    point prior to the asset purchase agreement that was closed

9    on November 15, 2004?

10        A.    Yes.

11        Q.    And when was the letter of intent signed?

12        A.    I don't know the date.

13        Q.    Was it September?

14        A.    No.

15        Q.    Was it before or after the contract with Heritage?

16        A.    It would have probably been before.

17        Q.    Did Symbiot receive or assume the accounts

18   receivable of the business?  Is that part of the assets that

19   went over to Symbiot?

20        A.    Yes.

21        Q.    Whatever was left in the bank accounts went to

22   Symbiot; is that accurate?

23        A.    I don't know.

24        Q.    What liabilities remained with you as part of the

25   Symbiot transaction?

1      A.    Anything associated with the landscape portion of
2  the business.
3      Q.    Were there any pending lawsuits against you at the
4  time of the Symbiot transaction?
5      A.    Yeah.
6      Q.    What were they?
7      A.    Yours.
8      Q.    And in addition to that, any others?
9      A.    There were insurance-related slip-and-fall type
10  suits, but that would have been it.
11      Q.    Was there some sort of a problem with
12  subcontractors or one or more subcontractors falsifying an
13  insurance certificate?
14      A.    Oh, we've had that happen on a number of
15  occasions.
16      Q.    Which left the subcontractor and you, pursuant to
17  your agreements, uninsured for that particular loss?
18      A.    We have insurance.
19      Q.    Well, when you say insurance-related type
20  lawsuits, were those all being defended by your insurance
21  company, or did your carrier deny coverage on any of the
22  suits?
23      A.    We had an issue with a carrier from the '02/'03
24  season, that they had initially denied coverage for various
25  snow-related incidents.  And we initiated a lawsuit against

1    them.

2        Q.    And how did that resolve?  Did they later

3    assume --

4        A.    Soon.

5            MR. MARKHAM:  It's still pending.

6        Q.    It's still pending.  I see.  Am I correct that the

7    denial of coverage left you partially uninsured, at least

8    pending the outcome of the coverage dispute?  If you lose

9    that case, is it your -- is it on your dime, I guess is the

10   question.

11       A.    Yes.

12       Q.    Did Symbiot assume any of that exposure or did

13   that stay with you?

14       A.    That stayed with me.

15       Q.    Who at Snow Management Group had the first contact

16   with anyone on behalf of Heritage?  Did you have the first

17   contact?

18       A.    It was not me.

19       Q.    Was it Vernon, Mr. Vernon?

20       A.    I don't know who had the first contact.

21       Q.    Do you have an understanding as to how that

22   contact occurred?

23       A.    I don't know specifically how that occurred.

24       Q.    Do you know who approached whom?

25       A.    I don't know that.

1       Q.    Personally, what was your first contact with

2   anyone on behalf of Heritage?

3       A.    Fort Lauderdale, Florida, at a meeting that we

4   were invited to attend.

5       Q.    Was that a meeting of the property managers?

6       A.    That's my understanding of what it was, yes.

7       Q.    When did that meeting occur?

8       A.    I think it was in February of '04.

9       Q.    And who accompanied you on that trip?

10      A.    Jeff Vernon.

11      Q.    Tell me what happened on that trip.  What was

12  the -- what was your interaction with individuals from

13  Heritage?

14      A.    We did have dinner with a number of the Heritage

15  individuals, and we were invited to make a presentation

16  about Snow Management Group and what we could offer

17  Heritage.

18      Q.    And by presentation, I take it, it was a sales

19  pitch, here's what we can do for you?

20      A.    No, it wasn't a sales pitch.  We were invited to

21  educate the property managers about Snow Management Group

22  and what we do.  At the -- at that meeting, Bob Prendergast

23  stood up and told everybody, these are the people we're

24  going to deal with next year, and we want you to be educated

25  as to how they do business.

1      Q.    Now, this is several months before the contract.

2   Were you looking to obtain Heritage's business when you made

3   that presentation?

4      A.    It was my understanding that we already had their

5   business.  This was a formality to bring other people within

6   Heritage on board and to buy into the idea of consolidating

7   the contract.

8      Q.    Did you have a contract with Heritage at that

9   time?

10     A.    No, just a verbal commitment.

11     Q.    And I take it since this was your first contact

12  with Heritage, that whatever verbal commitment you

13  understood to exist would have been between someone at

14  Heritage and another representative of SMG; is that

15  accurate?

16     A.    I was there when he made -- the initial comment

17  that I heard, the first time that I heard a commitment was

18  when Bob Prendergast stood up in front of the 30 or 35

19  people that were there and said, these are the people we're

20  doing business with.

21     Q.    Okay.  But you knew at that point you didn't have

22  a contract with Heritage, correct?

23     A.    We did not have a written correct.

24     Q.    And you hadn't negotiated terms of any other

25  arrangement, had you?

1      A.    That's correct.

2      Q.    Did SMG send any promotional materials to Heritage

3  before or after that meeting?

4      A.    I don't know.

5      Q.    Would that have been Mr. Vernon's scope of

6  employment, his responsibility?

7      A.    It would have fallen within his responsibility to

8  do so, yes.

9      Q.    Between the meeting in Fort Lauderdale and the

10  execution of the contract, did you have any direct

11  negotiations or dealings with individuals at Heritage?

12      A.    Not by voice.  I reviewed certain documents that

13  were forwarded to me from Jeff Vernon, and made comments and

14  suggestions.

15      Q.    So what would happen is Vernon -- Vernon was your

16  interface with Heritage?

17      A.    Essentially, yes.

18      Q.    All right.  And as things would develop, he would

19  share information or documents with you?

20      A.    Not every document.  But when he needed advice, he

21  would contact me.  There was, as I recall, one or two

22  e-mails directly between myself and Bob Prendergast late in

23  the game.

24      Q.    Okay.  Other than that, though, between Fort

25  Lauderdale and the execution of the agreement, you did not

1    interact with -- directly with anyone at Heritage?

2        A.    That's correct.

3        Q.    Had you or SMG done any work at all for Heritage

4    prior to Fort Lauderdale?

5        A.    Not that I'm aware of.  Or not that I recall.

6        Q.    Recognizing that it would have been Mr. Vernon

7    involved, when did actual negotiations of terms of an

8    agreement commence between SMG and Heritage?  Do you have an

9    understanding?

10       A.    My recollection is that that began in either May

11   or June.

12       Q.    '04?

13       A.    Yes.

14       Q.    Did you have an understanding as to who was

15   Mr. Vernon's principal contact or contacts at Heritage?

16       A.    The only name that I heard on a regular basis up

17   until the actual contract execution was Bob Prendergast.

18            (J. Allin Deposition Exhibit 1 marked for

19             identification.)

20       Q.    Mr. Allin, I previously marked -- or had

21   previously marked an Exhibit A, which was the contract,

22   which we'll come back to.  I'm now showing you a document

23   we've identified as your Deposition Exhibit 1.  Do you

24   recognize this document?

25       A.    I have seen it before.

1        Q.    This was apparently a letter authored by Jeffrey

2   Vernon directed to Heritage -- I'm sorry, strike that.  This

3   is a letter from Heritage to Mr. Vernon.  That's what I

4   would call a nonbinding letter of intent.  Were you shown

5   this at or about the time it was received?

6        A.    I don't know when I saw it specifically.

7        Q.    When you did review it, did you understand at that

8   time that it was a nonbinding expression of Heritage's

9   intent to enter into a contract with you?

10       A.    I see what it says.

11       Q.    Is that the way you understood it when it arrived?

12       A.    I can't say as I understood it one way or the

13   other.

14             (J. Allin Deposition Exhibit 2 marked for

15              identification.)

16       Q.    Let me show you what we'll mark as your Deposition

17   Exhibit 2.  This is a compilation of documents.  The one I'm

18   going to show the witness now is the last two pages.  Have

19   you seen this document before?

20       A.    Yeah.

21       Q.    Who authored Exhibit 2?

22       A.    I did.

23       Q.    Am I correct that this document relates to the

24   arrearages owed to your subcontractors?

25       A.    There's other things, but it does address that,

1   yes.

2        Q.    You had mentioned that one of the subcontractors

3   ultimately did commence an action against you.  When was

4   that filed?  Was it before or after the Symbiot transaction?

5        A.    After.  Long after.

6             MR. MARKHAM:  Just so it's clear, it's an AAA

7             arbitration.  It's not what you and I would

8             consider a lawsuit.

9        A.    I'm not a lawyer.

10       Q.    That's fine.  Appreciate the clarification.  The

11  document we've marked as your Exhibit 2 is a letter dated

12  April 15, 2004 to SMG Service Providers all over the United

13  States, Re:  This past winter season.  And it was executed

14  signed by you, Jeff Vernon, Lisa Edwards and Mike Suleski.

15       A.    Correct.

16            (J. Allin Deposition Exhibit 3 marked for

17             identification.)

18       Q.    Take a look at Exhibit 3.  Tell me if you've seen

19  that one before.  I've handed you Exhibit 3, which appears

20  to be a letter dated October 2, 2004 on the letterhead of

21  Centrus Group, Incorporated, business planning and

22  turnaround management, Re:  Allin Companies/Snow Management

23  Group.  Signed by Robert L. Cohen.  Is that correct?

24       A.    Yes.

25       Q.    Have you seen this one before?

1          A.    At one point I would have seen it, yes.

2          Q.    Was this sent to your service providers?

3          A.    I can't tell who this one was sent to.

4          Q.    It appears to have been redacted.  By whom, I

5     don't know.

6          A.    I don't know what redacted is.

7          Q.    That means the addressee has been obliterated, has

8     been blocked out.

9          A.    Okay.

10         Q.    But am I correct that you were aware on or about

11    October 2, 2004 that Centrus Group was sending out a letter

12    in this form to at least your service providers and perhaps

13    other creditors on behalf of Allin and Companies?

14         A.    Yes.

15         Q.    And you understood at the time that the letter

16    sent by Centrus was proposing or advising these creditors

17    that there were a couple of possible avenues or options for

18    addressing debt owed by Allin and Companies and Snow

19    Management Group, one of which was the possibility that

20    Allin and Companies would be acquired, which would create

21    some additional cash.  The second was to solicit the support

22    of the company's creditors to accept a payout of debt based

23    upon profit performance of the company over a period of

24    time.  And then the third was a sweat -- a swap of debt for

25    equity by the creditors.