

**HERITAGE PROPERTY**
INVESTMENT TRUST, INC.

*Corporate Office:* 131 Dartmouth Street, Boston, Massachusetts 02116
Telephone: (617) 247-2200 • Fax: (617) 266-0886 • Legal Dept. Fax: (617) 267-4337
www.heritagerealty.com

August 13, 2004

<u>*VIA NEXT DAY DELIVERY*</u>

Jeffrey Vernon
Vice President
Business Development and Production
Snow Management Group, Inc.
1 Waterside Lane, 3rd Floor
Essex, CT 06426-1056

Re:    **Proposed Contract between Heritage Realty Management, Inc. ("Heritage")
and Snow Management Group, Inc. and John Allin d/b/a Allin Companies
("Contractor")**

Dear Jeff:

In accordance with our conversation last week, enclosed is the first draft of the proposed contract referenced above. Please accept this letter as confirmation that Heritage is willing to enter into the above-referenced contract, provided we can reach agreement on the essential business terms and execute a contract within the next 10 days. It is our understanding that this a non-binding expression of Heritage's intent and that neither Heritage or Contractor are obligated in any way unless and until such time as the contract is signed by both parties.

Please contact me in the event you have any questions.

Sincerely,

Louis C. Zicht
Vice President and General Counsel
LCZ/cej

Enclosure
    cc:    Robert Prendergast
           Mark Bush
           Bill Read *(Mequon WI)*
           Tom Wellman *(Speedway IN)*

JA00508

08/29/2004 09:10 FAX                                                  @002



DEPOSITION
EXHIBIT

J. Allin #1

# SNOW MANAGEMENT GROUP

MANAGING SNOW AND ICE NATIONWIDE

April 15, 2004

SMG Service Providers
All over the United States

RE: This past winter season

Dear Service Providers:

Snow Management Group is experiencing something most companies can only dream about. We are in the midst of almost uncontrollable growth. Companies are (literally) begging us to take on their work. Most would think that is enviable; however, it has brought with it some problems we were not at all prepared to deal with. Moving the snow and gaining new customers has been the easy part. Having internal "systems" to support this phenomenal growth has proven to be the challenge.

Sending out accurate and timely invoices to our customers might seem like an easy task. Paying Providers might also seem like an easy task. Just stroke out the checks!! At $3 Million in sales – it is. Growing 20 fold in the past 3 years makes these once easy tasks considerably more difficult. Additionally, managing that much money is no longer a one-person job. It becomes a job for a **team** of professional, accounting-savvy people. We have learned this the hard way, as most will undoubtedly attest to and agree with. We have gone through several high level financial people; however, finding the right person with the proper background in "systems" has been a challenge. This lack of proper accounting systems and the right person(s) to implement such systems has caused some cash flow problems, resulting from delays in our getting monies in-house so that we can pay Providers timely. However, SMG is profitable. Everyone will be paid those monies due them, as SMG has never "stiffed" any viable Provider who follows the reasonable documentation expectations.

Additionally, we have been forced to follow our own rules with regards to paperwork and documentation. Last season we had a Service Provider forge a Certificate of Insurance that was sent to SMG. A slip and fall incident occurred and we are now embroiled in a nasty series of lawsuits that will cost several tens of thousands of dollars to clear up as a result of the forged certificate. Consequently, our own insurance carrier forced us to demand proper documentation across the board in order to keep our own coverage in place. Understandably, this has caused us to play "hard ball" when it comes to the paperwork aspect of our business. Some Service Providers have had some difficulty with this reality and this too has caused delays in some being paid monies owed.



DEPOSITION
EXHIBIT

J. Allin    #2

1406 WEST 21ˢᵀ STREET / ERIE, PA 16502-2203
(PH) 814-452-1221 / (TOLL FREE FAX) 877-275-5886
WWW.SNOWMANAGEMENTGROUP.COM

HA000041

SMG **does** espouse those principles put forth in "Managing Snow and Ice". Service Providers should be paid, and paid in a timely fashion. However, we must wait for the dollars to come in before sending them back out. This is an unarguable basic principle of business. We have used our line of credit judiciously to bridge the gap where possible. Our receivables greatly outdistance our payables; thus we are solvent. In fact, we are quite profitable from an accrual standpoint. You'll all get paid.

The question arises, what about next season? Will SMG grow like this again and again be in this position next season? We seriously doubt it. We shall not take on any large accounts the day before it snows. (We have learned <u>that</u> lesson quite well.) We have also hired an experienced accounting *team* to take over, set up, and implement all accounting "systems". They will be guided by a team of consultants from one of the world's leading accounting firms. The consulting firm will assist in writing and implementing internal accounting systems that will take the responsibility for such systems out of the hands of those of us who are great at plowing snow, but not so great at making GAAP a reality within our organization. No longer will we use one person to attempt to do it all. We're snowplowers – not accountants. It took us awhile to figure that out.

We understand that most of you would like the cash rather than an explanation. We believe an explanation is warranted and necessary. Thank you for your patience as we experience this phenomenal growth. We understand that our difficult position has caused you your own set of challenges. The cash will follow shortly as the money comes into our office. That's a promise.

Respectfully,

John A. Allin
President

Jeff Vernon
VP – Business
Development

Lisa Edwards
VP – SMG
Operations

Mike Suleski
CFO

HA000042



Centrus
Group, Inc.

Business Planning and
Turnaround Management

October 2, 2004



### RE: ALLIN COMPANIES--SNOW MANAGEMENT GROUP

Dear Madam or Sir:

Thank you for your patience with regards to the activities associated with Allin Companies and Snow Management Group. In the past thirty days, Centrus has collected all of the information provided by vendors to the company and has made the appropriate modifications to the company's accounts payable database. Currently, the company does not have adequate cash on hand to satisfy the claims of all creditors. Whatever course of action is ultimately selected by the company, the intention is to make all reasonable efforts in addressing vendor creditor claims on an equal basis.

Presently, the company is evaluating three potential alternative courses of action with the intention to satisfy the claims of company creditors. In all cases, action on whichever course of action is selected will commence within the next thirty days.

### ACTION 1-Acquisition
Within the next week, Allin Companies is anticipating the receipt of a Letter of Intent for the purchase of all of the assets of Snow Management Group. The proposed acquisition price may be adequate to promptly compensate vendor creditors for a significant portion of their outstanding claims, with the potential to compensate creditors for the balance of outstanding claims over a period of time. The potential purchaser has stated that it will be prepared to make a firm commitment for the purchase of the company's assets on or before October 15, 2004 following the completion of their due diligence.

### ACTION 2-Profit Payout
The second alternative is to solicit the support of the company's creditors to accept a payout of debt based upon the profit performance of the company over a period of time. In this scenario, the company would maintain payments to vendors on a current basis for all products and services sold to the company after September 1, 2004. Any payments on all claims against the company which arose prior to September 1, 2004 will be funded from company profits over a period of time. Throughout this process, a committee comprised of creditors with the largest unsecured claims will be established to oversee and evaluate the actions of the company on behalf of the balance of the company vendor creditors.

### ACTION 3-Equity for Debt
Several vendor creditors of the company have expressed an interest in accepting stock in Allin Companies or Snow Management Group in exchange for their outstanding claims. As noted in Action 2 above, this process would also be evaluated by the committee comprised of creditors with the largest unsecured claims against the company.

Whichever action item is ultimately selected, the company is committed to maximizing the value of the company in the interest of maximizing the ultimate payout to satisfy the amounts due to the creditors of the company. The current actions of the company will focus upon the support of completing the sale of Snow Management Group and disbursing the proceeds of that sale to the creditors of the company while assuring that no actions are taken that will frustrate the ability to implement the two alternative actions discussed above.

You will receive a letter from me on or before October 18, 2004 that will address the selected course of action for Allin Companies and Snow Management Group. If you should have any questions, please forward your email inquiries to me directly at bcohen@centrusgroup.com. Again, thank you for your patience and participation in this matter.

Sincerely yours,

Robert L. Cohen
Advisor to Allin Companies and Snow Management Group

1653 Merriman Road
211 Riverparke Building
Akron, OH 44313
Akron (330) 864-5800
Cleveland (216) 736-7890
FAX (330) 865-9222

DEPOSITION
EXHIBIT
J.Allin #3

HA000039



October 21, 2004



**Centrus Group, Inc.**

Business Planning and
Turnaround Management

**RE: Allin Companies and Snow Management Group**

Dear Madam or Sir:

As a follow up to my recent correspondence, we have received an executed Letter of Intent from a strategic buyer who has made an offer to purchase all of the assets of Snow Management Group. This strategic buyer is engaged in the business of snow removal on a national basis, and intends to utilize many of the assets, relationships and the employees of Snow Management Group to expand the combined operations throughout the country. This is an exceptional opportunity for the customers, vendors, service providers and employees.

A Letter of Intent is not a commitment to purchase the company. A Letter of Intent is like an engagement ring, with a serious interest to complete the transaction of the acquisition based upon certain findings and observations between the time of the issuance of the Letter of Intent and the final purchase of the company. Nonetheless, the agreement between the parties contemplates a short time schedule, with the completion of the sale of these assets to occur within the next thirty days. There are a minimal number of conditions necessary to be satisfied prior to the closing. The current expectations are that these conditions should be satisfied within the necessary period of time to complete the transaction. The Letter of Intent does provide a base from which all creditors of the company should benefit.

Thank you for your patience on this matter. Please anticipate the receipt of another letter from me regarding this issue within the next two weeks. Please forward your comments and questions to me at bcohen@centrusgroup.com. Your comments are most helpful in developing the payment plan for all creditors.

Sincerely yours:

R L Cohen

Robert L. Cohen
Advisor to Allin Companies and Snow Management Group

**DEPOSITION EXHIBIT**
J. Allin #4

1653 Merriman Road
211 Riverparke Building
Akron, OH 44313
Akron (330) 864-5800
Cleveland (216) 736-7890
FAX (330) 865-9222

HA000040

Heritage Properties
131 Dartmouth St  6th Floor
Boston, MA 02116

Be careful who you deal with, we as contractors have
not been paid for last year
Read enclosed documents



J. Allin  #5

HA000043

| Expense | Date Incurred | Date Paid | Entity Paid | Amount of Expense | Affiliation Allin Co/SMG | COMMENTS |
|---|---|---|---|---|---|---|
| Duane Haalaja Travel | | | | | | |
| Ground Transportation | 11/1/2004 | | ATA | $181.70 | new hire | |
| | 11/1/2004 | | (picked up from Pitts. Airport | | new hire | PJ Short picked up |
| Hotel 11/1/04 - 11/6/04 | | | El Patio Motel | | new hire | |
| training 11/2 - 11/4/04 | | | | $ 44.00 x 5 nights | new hire | training @SMG |
| Bryan Rohe Travel | | | | | | |
| Transportation from Cleve - Erie | 10/31/2004 | | ATA/Southwest | $221.70 | new hire | |
| | 10/31/2004 | | Anderson Airlink | $25.00 | new hire | trans fr hotel to SMG |
| Hotel 10/31/04 - 11/4/04 | | | | | 0 new hire | roomed w/ D Dziuban |
| training 11/2/04 - 11/4/04 | | | | | new hire | training @ SMG |
| David Dziuban Travel | | | | | | |
| Transportation from Cleve - Erie | 10/31/2004 | | Southwest | $102.60 | new hire | |
| | 10/31/2004 | | Anderson Airlink | $20.00 | new hire | trans fr hotel to SMG |
| Hotel 10/31/04 - 11/4/04 | | | | | new hire | training @SMG |
| training 11/2/04 - 11/4/04 | | | | $ 44.00 x 5 nights | new hire | |
| Regional Manager-SPs , Site Reviews, Budgeting | | | | $ 3,800.00 | rm - Smallwood | 40 hours @ $95 per |
| Field manager-SPs, Site Reivews | | | | $ 760.00 | fm - J Casey | 8 hours at $95 per |
| Field manager-SPs, Site Reivews | | | | $ 950.00 | fm - J. terrance | 10 hours at $95 per |
| Regional Manager-SPs, Site Reviews, Budgeting | | | | $ 9,500.00 | rm - R Hrovat | 100 hours at $95 per |
| Regional Manager-SPs, Site Reviews, Budgeting | | | | $ 9,500.00 | rm - R Santoro | 100 hours at $95 per |
| Production-Site Visits, Production Maps | | | | $ 2,375.00 | prod coord- D. Gallagher | 25 hours at $95 per |
| Production-Production Maps & Binders | | | | $ 9,000.00 | prod - T. Pancura | 200 hours at $45 per |
| Production-Number Calculations | | | | $ 5,200.00 | prod - C. Zelgowski | 80 hours at $65 per |
| Production-SPs, Field Mangers, Training, Budgeting | | | | $ 3,800.00 | prod - R. Rieder | 40 hours at $95 per |
| Special Accounts Manager-Estimating, Point of Contact Info., Training | | | | $ 9,500.00 | sac - B. Marshall | 100 hours at $95 per |
| new hire -field manager | | | | $ 9,500.00 | Dave Dziuban - Chicago | 100 hours at $95 per |
| new hire -field manager | | | | $ 9,500.00 | Bryan Rohe -DesMoines | 100 hours at $95 per |
| new hire -field manager | | | | $ 9,500.00 | Duane Haalaja-Minneapolis | 100 hours at $95 per |



DEPOSITION
EXHIBIT

JAllin #6

H\mrussell\Heritage Expense Log\12/8/2005\2:42 PM

| Expense | Date Incurred | Date Paid | Entity Paid | Amount of Expense | Affiliation Allin Co/SMG | COMMENTS |
|---|---|---|---|---|---|---|
| **JV Travel expenses** | | | | | | |
| **Brian Marshall Travel expenses** | | | | | | |
| Peggy Allin - interviews | | | | | | |
| Airfare | 8/23/2004 | | Sun Country Airlines | $129.10 | same | |
| Hotel | 8/23/2004 | 8/25/2004 | Courtyard Minneapolis-St. Paul Airp | $149.00+Tax | same | |
| Airfare | 8/25/2004 | | Northwest Airlines | $364.69 | same | |
| Meals 08/23/04-0825/04 | 10/18-10/23 | | various | $ 25.00 perdiem x 3 | same | |
| Airfare | 10/18/2004 | | United Airlines | $1,037.60 | same | |
| Hotel | 10/20/2004 | 10/20/2004 | Comfort Inn - Denver | $ 64.99 + tax | same | |
| Hotel | 10/21/2004 | 10/21/2004 | Fairfield Inn & Suites - Minn/St. Paul | $ 82.01 + tax | same | |
| Taxi | 10/22/2004 | | | $15.00 | same | |
| Hotel | 10/22/2004 | | Radisson Hotel - Des Moines IA | $ 99.00 + tax | same | |
| Meals 10/18-10/23 | 10/18-10/23 | | various | $ 25.00 perdiem x 6 | same | |
| Erie to Cleveland | 10/25/2004 | 10/25/2004 | Anderson Airlink | $25.00 | same | |
| Cleveland to Chicago | 10/25/2004 | | Continental | $64.90 | same | * Had a $95.80 ecredit |
| Hotel | 10/25/2004 | 10/25/2004 | Fairfield Inn Chicago | 119.00+tax | same | |
| Ground trans. Cleveland to Erie | 10/26/2004 | | John Allin | unknown | same | personal or company? |
| **Duane Haataja Travel** | | | | | | |
| Ground Transportation | 11/1/2004 | | ATA | $181.70 | new hire | PJ Short picked up |
| Hotel 11/1/04 - 11/6/04 | 11/1/2004 | | (picked up from Pitts. Airport | | new hire | |
| training 11/2 - 11/4/04 | | | El Patio Motel | $ 44.00 x 5 nights | new hire | training @SMG |
| **Bryan Rohe Travel** | | | | | | |
| Transportation from Cleve - Erie | 10/31/2004 | | ATA/Southwest | $221.70 | new hire | trans fr hotel to SMG |
| Hotel 10/31/04 - 11/4/04 | 10/31/2004 | | Anderson Airlink | $25.00 | new hire | roomed w/ D Dziuban |
| training 11/2/04 - 11/4/04 | | | | 0 | new hire | training @ SMG |
| **David Dziuban Travel** | | | | | | |
| Transportation from Cleve - Erie | 10/31/2004 | | Southwest | $102.60 | new hire | |
| Hotel 10/31/04 - 11/4/04 | 10/31/2004 | | Anderson Airlink | $20.00 | new hire | trans fr hotel to SMG |
| training 11/2/04 - 11/4/04 | | | | $ 44.00 x 5 nights | new hire | training @SMG |
| **Legal Council** | | | | | | |
| **Supplies** | | | | | | |
| Labels | | | | $ 135.00 | SMG | 1075 PACKETS - RFP TO SVC PROVIDERS |
| Business Envelopes | | | | $ 110.00 | SMG | 1075 PACKETS - RFP TO SVC PROVIDERS |
| Manilla Envelopes | | | | $ 65.00 | SMG | 1075 PACKETS - RFP TO SVC PROVIDERS |
| Paper | | | | $ 78.00 | SMG | 1075 PACKETS - RFP TO SVC PROVIDERS |
| Postage | | | | $ 1,386.75 | SMG | 1075 PACKETS - RFP TO SVC PROVIDERS |
| Copy Count | | | | $ 537.50 | SMG | 1075 PACKETS - RFP TO SVC PROVIDERS |
| Faxing | | | | $ 125.00 | SMG | 1075 PACKETS - RFP TO SVC PROVIDERS |
| **Personnel** | | | | | | |
| as of 11/8/04 | | | | | | |
| sites entered in system | | | | $ 180.00 | ops-audit - Beth | 4 hours at $ 45 per |
| sites entered in system | | | | $ 180.00 | ops-admin - Tina | 4 hours at $ 45 per |
| phone calls | | | | $ 1,080.00 | ops-audit - Beth | 24 hours at $45 per |

H:\mrussell\Heritage Expense Log\12/8/20052:42 PM

| Description | | Amount | Person | Rate |
|---|---|---|---|---|
| phone calls | $ | 1,080.00 | ops-admin - Linda | 24 hours at $45 per |
| phone calls | $ | 1,080.00 | ops-admin - Stacey | 24 hours at $45 per |
| phone calls | $ | 1,080.00 | ops-admin - Tina | 24 hours at $45 per |
| rfp data entry | $ | 360.00 | ops-admin - Linda | 8 hours at $ 45 per |
| rfp data entry | $ | 6,175.00 | ops mgr - L. Edwards | 65 hours @ $ 95 per |
| Regional Manager-SPs, Site Reviews, Budgeting | $ | 3,800.00 | rm - Smallwood | 40 hours @ $95 per |
| Field manager-SPs, Site Reivews | $ | 760.00 | fm - J Casey | 8 hours at $95 per |
| Field manager-SPs, Site Reivews | $ | 950.00 | fm - J. terrance | 10 hours at $95 per |
| Regional Manager-SPs, Site Reviews, Budgeting | $ | 9,500.00 | rm - R Hrovat | 100 hours at $95 per |
| Regional Manager-SPs, Site Reviews, Budgeting | $ | 9,500.00 | fm - R Santoro | 100 hours at $95 per |
| Production-Site Visits, Production Maps | $ | 2,375.00 | prod coord- D. Gallagher | 25 hours at $95 per |
| Production-Production Maps & Binders | $ | 9,000.00 | prod - T. Pancura | 200 hours at $45 per |
| Production-Number Calculations | $ | 5,200.00 | prod - C. Zelgowski | 80 hours at $65 per |
| Production-SPs, Field Mangers, Training, Budgeting | $ | 3,800.00 | prod - R. Rieder | 40 hours at $95 per |
| Special Accounts Manager-Estimating, Point of Contact Info., Training | $ | 9,500.00 | sac - B. Marshall | 100 hours at $95 per |
| Bus. Development | $ | 33,000.00 | bus devel - J Vernon | 200 hours at $165 per |
| Bus. Development | $ | 22,500.00 | bus devel - J Allin | 100 hours at $225 per |
| Human Resources | $ | 45,000.00 | h.r. - P Allin | 200 hours at $225 per |
| Accounting | $ | 1,140.00 | accounting - M Suleski | 12 hours at $95 per |
| new hire -field manager | $ | 9,500.00 | Dave Dziuban - Chicago | 100 hours at $95 per |
| new hire -field manager | $ | 9,500.00 | Bryan Rohe -DesMoines | 100 hours at $95 per |
| new hire -field manager | $ | 9,500.00 | Duane Haataja-Minneapolis | 100 hours at $95 per |

| Expense | Date Incurred | Date Paid | Entity Paid | Amount of Expense | Affiliation to Allin Co/SMG | COMMENTS |
|---|---|---|---|---|---|---|
| Flight to Ft. Lauderdale–John Allin | 1/21/2004 | 1/21/2004 | Northwest Airlines | 233.9 | same | |
| Flight to Ft. Lauderdale–Jeff Vernon | 1/21/2004 | 1/21/2004 | Northwest Airlines | 207.9 | same | |
| Ground Transportation | 2/22/2004 | 2/22/2004 | | | same | |
| Hotel –JA & JV | 2/22/2004 | 2/22/2004 | Harbor Beach Resort & Spa Mariott | $0 | same | $319.00 paid by Heritage |

| Expense | AMOUNT | TOTAL |
|---|---:|---:|
| AIRFARE | $ 364.69 | |
| | $ 1,037.60 | |
| | $ 64.90 | |
| | $ 181.70 | |
| | $ 221.70 | |
| | $ 102.60 | $ 2,102.29 |
| HOTEL | $ 149.00 | |
| | $ 64.99 | |
| | $ 82.01 | |
| | $ 99.00 | |
| | $ 220.00 | |
| | $ 220.00 | $ 835.00 |
| FOOD | $ 75.00 | |
| | $ 150.00 | |
| | $ 125.00 | |
| | $ 125.00 | |
| | $ 125.00 | $ 600.00 |
| GROUND | $ 25.00 | |
| | $ 20.00 | |
| | $ 25.00 | $ 70.00 |
| TRANSP. TOTAL | $ 2,102.29 | $ 3,478.19 |
| | | |
| LABELS | $ 135.00 | $ 135.00 |
| ENV | $ 110.00 | |
| | $ 65.00 | $ 175.00 |
| PAPER | $ 78.00 | $ 78.00 |
| POSTAGE | $ 1,386.75 | $ 1,386.75 |
| COPIES | $ 537.50 | $ 537.50 |
| FAXING | $ 125.00 | $ 125.00 |
| SITE DATA ENTRY | $ 180.00 | |
| | $ 180.00 | $ 360.00 |
| PHONE CALLS | $ 1,080.00 | |
| | $ 1,080.00 | |
| | $ 1,080.00 | |
| | $ 1,080.00 | $ 4,320.00 |
| RFP DATA ENTRY | $ 360.00 | |
| | $ 6,175.00 | $ 6,535.00 |
| MGMT/PRODUCTION | $ 3,800.00 | |
| | $ 760.00 | |
| | $ 950.00 | |
| | $ 9,500.00 | |
| | $ 9,500.00 | |
| | $ 2,375.00 | |
| | $ 9,000.00 | |
| | $ 5,200.00 | |
| | $ 3,800.00 | |
| | $ 9,500.00 | |
| | $ 33,000.00 | |
| | $ 22,500.00 | |
| | $ 45,000.00 | |
| | $ 1,140.00 | |
| | $ 9,500.00 | |
| | $ 9,500.00 | |
| | $ 9,500.00 | $ 184,525.00 |
| SUPPLIES/PERSONNEL TOTAL | | $ 198,177.25 |
| GRAND TOTAL | | $ 201,655.44 |

| Expense | Date Incurred | Date Paid | Entity Paid | Amount of Expense | Affiliation Allin Co/SMG | COMMENTS |
|---|---|---|---|---|---|---|
| **JV Travel expenses** | | | | | | |
| **Brian Marshall Travel expenses** | | | | | | |
| Peggy Allin - Interviews | | | | | | |
| Airfare | 8/23/2004 | | Sun Country Airlines | $129.10 | same | |
| Hotel | 8/23/2004 | 8/25/2004 | Courtyard Minneapolis-St. Paul Airp | $149.00+Tax | same | |
| Airfare | 8/25/2004 | | Northwest Airlines | $364.69 | same | |
| Meals | 08/23/04-0825/04 | 10/18-10/23 | various | $ 25.00 perdiem x 3 | same | |
| Airfare | 10/18/2004 | | United Airlines | $1,037.60 | same | |
| Hotel | 10/20/2004 | 10/20/2004 | Comfort Inn - Denver | $ 64.99 + tax | same | |
| Hotel | 10/21/2004 | 10/21/2004 | Fairfield Inn & Suites - Minn/St. Paul | $ 82.01 + tax | same | |
| Taxi | 10/22/2004 | | | $15.00 | same | |
| Hotel | 10/22/2004 | | Radisson Hotel - Des Moines IA | $ 99.00 + tax | same | |
| Meals | 10/18-10/23 | 10/18-10/23 | various | $ 25.00 perdiem x 6 | same | |
| Erie to Cleveland | 10/25/2004 | | Anderson Airlink | $25.00 | same | |
| Cleveland to Chicago | 10/25/2004 | | Continental | $64.90 | same | * Had a $95.80 ecredit |
| Hotel | 10/25/2004 | 10/25/2004 | Fairfield Inn Chicago | 119.00+tax | same | |
| Ground trans, Cleveland to Erie | 10/26/2004 | | John Allin | unknown | same | personal or company? |
| **Duane Haataja Travel** | | | | | | |
| Ground Transportation | 11/1/2004 | 11/1/2004 | ATA | $181.70 | new hire | PJ Short picked up |
| Hotel 11/1/04 - 11/6/04 | | | (picked up from Pitts. Airport | | new hire | |
| training 11/2 - 11/4/04 | | | El Patio Motel | $ 44.00 x 5 nights | new hire | training @SMG |
| **Bryan Rohe Travel** | | | | | | |
| Transportation from Cleve - Erie | 10/31/2004 | 10/31/2004 | ATA/Southwest | $221.70 | new hire | trans fr hotel to SMG |
| Hotel 10/31/04 - 11/4/04 | | | Anderson Airlink | $25.00 | new hire | roomed w/ D Dziuban |
| training 11/2/04 - 11/4/04 | | | | 0 SMG | new hire | training @ SMG |
| **David Dziuban Travel** | | | | | | |
| Transportation from Cleve - Erie | 10/31/2004 | 10/31/2004 | Southwest | $102.60 | new hire | |
| Hotel 10/31/04 - 11/4/04 | | | Anderson Airlink | $20.00 | new hire | trans fr hotel to SMG |
| training 11/2/04 - 11/4/04 | | | | $ 44.00 x 5 nights | new hire | training @SMG |
| **Legal Council** | | | | | | |
| **Supplies** | | | | | | |
| Labels | | | | $ 135.00 | SMG | 1075 PACKETS - RFP TO SVC PROVIDERS |
| Business Envelopes | | | | $ 110.00 | SMG | 1075 PACKETS - RFP TO SVC PROVIDERS |
| Manilla Envelopes | | | | $ 65.00 | SMG | 1075 PACKETS - RFP TO SVC PROVIDERS |
| Paper | | | | $ 78.00 | SMG | 1075 PACKETS - RFP TO SVC PROVIDERS |
| Postage | | | | $ 1,386.75 | SMG | 1075 PACKETS - RFP TO SVC PROVIDERS |
| Copy Count | | | | $ 537.50 | SMG | 1075 PACKETS - RFP TO SVC PROVIDERS |
| Faxing | | | | $ 125.00 | SMG | |
| **Personnel** | | | | | | |
| sites entered in system | as of 11/8/04 | | | $ 180.00 | ops-audit - Beth | 4 hours at $ 45 per |

H:\rrussell\Heritage Expense Log\12/8/20052:42 PM

| John Allin | | |
|---|---|---|
| **Date** | **Tasks** | **Hours** |
| | | |
| 2/18/2004 | Preparation of presentation in FL | 10 |
| 02/22-02/24/04 | Trip to present SMG to Heritage | 48 |
| 04/15-04/27/04 | gather update info from Jeff, Brian, Rudy & Chet | 4 |
| 06/07-06/09/04 | Work with Brian & Jeff to align pricing | 8 |
| 08/19-08/26/04 | Correspondence with SP's in MN to do sites | 2 |
| 09/30-10/04/04 | Review & amend contract & SP Agreement | 8 |
| 10/8-10/09/04 | Review & initial revised contract | 2 |
| 10/26-10/28/04 | Several meetings on training of new FM's & contacting all Property Mgr's | 8 |
| 10/29-11/04/04 | Finalize & approve all FM's responsibilities for all sites & corresponding Property Mgr's | 10 |
| | | 100 |
| | | |
| Jeff Vernon | | |
| **Date** | **Tasks** | **Hours** |
| 02/16-02/19/04 | Preparation of presentation in FL | 20 |
| 02/22-02/24/04 | Trip to present SMG to Heritage | 48 |
| 5/23/2004 | Meeting w/Bob P in Las Vegas - negotations | 2 |
| 06/07-06/09/04 | Work with John & Brian to align pricing | 10 |
| 6/16/2004 | Trip to Boston w/Mike Smallwood to meet with Bob P | 8 |
| 9/20/2004 | Trip to Rutland, VT to measure site and get SP | 16 |
| 8/2/2004 | Conference Call Heritage/SMG - moving forward | 2 |
| 08/03-08/05/04 | Follow up work from conference call - due diligence | 10 |
| 10/4-10/09/04 | Travel to Erie to work with Production Crew to complete sites, equipment, SP's, maps, etc. | 60 |
| 10/11-10/15/04 | Working on bid sheets, sites, SP's, production, equipment | 10 |
| 10/21-10/22/04 | Meetings in Erie - finalize info for RFPS to go out | 4 |
| 10/29-11/04/04 | Finalize & approve all FM's responsibilities for all sites & corresponding Property Mgr's | 10 |
| | | 200 |

| sites entered in system | $ | 180.00 | ops-admin - Tina | 4 hours at $ 45 per |
| phone calls | $ | 1,080.00 | ops-audit - Beth | 24 hours at $45 per |
| phone calls | $ | 1,080.00 | ops-admin - Linda | 24 hours at $45 per |
| phone calls | $ | 1,080.00 | ops-admin - Stacey | 24 hours at $45 per |

| Task | Amount | Person | Rate |
|---|---|---|---|
| phone calls | $ 1,080.00 | ops-admin - Tina | 24 hours at $45 per |
| rfp data entry | $ 360.00 | ops-admin - Linda | 8 hours at $ 45 per |
| rfp data entry | | | |
| Regional Manager-SPs, Site Reviews, Budgeting | $ 6,175.00 | ops mgr - L. Edwards | 65 hours @ $ 95 per |
| Field manager-SPs, Site Reivews | $ 3,800.00 | rm - Smallwood | 40 hours @ $95 per |
| Field manager-SPs, Site Reivews | $ 760.00 | fm - J Casey | 8 hours at $95 per |
| Regional Manager-SPs, Site Reviews, Budgeting | $ 950.00 | fm - J. terrance | 10 hours at $95 per |
| Regional Manager-SPs, Site Reviews, Budgeting | $ 9,500.00 | rm - R Hrovat | 100 hours at $95 per |
| Production-Site Visits, Production Maps | $ 9,500.00 | fm - R Santoro | 100 hours at $95 per |
| Production-Production Maps & Binders | $ 2,375.00 | prod coord- D. Gallagher | 25 hours at $95 per |
| Production-Number Calculations | $ 9,000.00 | prod - T. Pancura | 200 hours at $45 per |
| Production-SPs, Field Mangers, Training, Budgeting | $ 5,200.00 | prod - C. Zelgowski | 80 hours at $65 per |
| Special Accounts Manager-Esitmating, Point of Contact Info., Training | $ 3,800.00 | prod - R. Rieder | 40 hours at $95 per |
| Bus. Development | $ 9,500.00 | sac - B. Marshall | 100 hours at $95 per |
| Bus. Development | $ 33,000.00 | bus devel - J Vernon | 200 hours at $165 per |
| Human Resources | $ 22,500.00 | bus devel - J Allin | 100 hours at $225 per |
| | $ 45,000.00 | h.r. - P Allin | 200 hours at $225 per |

H:\Russell\Heritage Expense Log\12/8/20052:42 PM

| | | | |
|---|---|---|---|
| Accounting | $ | 1,140.00 | accounting - M Suleski | 12 hours at $95 per |
| new hire -field manager | $ | 9,500.00 | Dave Dziuban - Chicago | 100 hours at $95 per |
| new hire -field manager | $ | 9,500.00 | Bryan Rohe -DesMoines | 100 hours at $95 per |
| new hire -field manager | $ | 9,500.00 | Duane Haataja-Minneapolis | 100 hours at $95 per |

| Date | Description | Amount |
|---|---|---|
| 10/20/2004 | data enter some of the 110 sites into PAMS | 4 |
| 10/19/04 - 11/11/04 | Calls to prospective bidders and/or calls to confirm receipt of RFP package | 24 |
| 9/14/04 - 11/17/04 | Calls to and from prospective bidders re: confirmation of SPs to receive RFP packets, calls to SP to confirm receipt of RFP package, site specific questions re: scope of work, follow up calls regarding Symbiot not responsible for contract | 24 |
| 9/14/04 - 11/17/04 | Calls to and from prospective bidders re: confirmation of SPs to receive RFP packets, calls to SP to confirm receipt of RFP package, site specific questions re: scope of work, follow up calls regarding Symbiot not responsible for contract | 24 |

| Date | Description | Amount |
|---|---|---|
| 9/14/04 - 11/17/04 | Calls to and from prospective bidders re: confirmation of SPs to receive RFP packets, calls to SP to confirm receipt of RFP package, site specific questions re: scope of work, follow up calls regarding Symbiot not responsible for contract | 24 |
| 10/20/2004 | develop process re: software functionality to data enter Heritage account information and locations into PAMS | 8 |
| 10/20/2004 - 11/11/04 | develop process re: data entry of Heritage sites, SP proposals numbers, valid services, snowfall inches relative to scope for all Heritage account information and locations into PAMS | 65 |

| Dates | Hours | Reason |
|---|---|---|
| June 17,2004 | 4.00 | Search internet for local newspapers in various cities needed; contacting newspapers to gather info placing ads; present pricing to JA for approval to place ads |
| June 17 or 18th | 3.00 | Fax ads to various newspapers, confirmation and requesting/receiving tear sheets |
| lst of July | 4.00 | Separate resumes by state, put in excel documents for review, review resumes w/JA to start interview process |
| July/August | 4.00 | Sending e-mails for initial introduction to determine if good candidate to interview |
| 8/23/2004 thru 08/25/04 | 48.00 | Travel to MN for interviewing/interviewing time 8 hrs   Interviews on 24th |
| 09/30/2004 thru 10/01/04 | 3.00 | Fax ads to various newspapers, confirmation and requesting/receiving tear sheets |
| 10/07/04 thru 10/08/04 | 4.00 | Separate resumes by state, put in excel documents for review, review resumes w/JA & JV to start interview process |
| 10/11/04 to 10/15/04 | 25.00 | Call Center personnel training |
| 10/21/04-10/23/04 | 48.00 | Travel to MN to IA for interviewing (Interviews in IA were from 12 noon until 8 PM), 12 hrs on 22; 8 hr ea for 20/21 Interviews on 23rd were 7 AM until 11 AM then travel home |
| 10/25/04-10/26/04 | 27.00 | Traveled to Chicago for interviews - went out of Cleveland, took Airlink at 4:30 AM (Est 15 hours on the 25th; est another 12 hours on 26th, interviews started at 7 am |
| 10/27/04-10/29/04 | 10.00 | Job offers made, confirmation of travel arrangements, preparation of binders; |
| 10/29/2004 | 1.00 | Order trucks for new hires and coordinate with Rudy |
| 10/29/2004 -10/31/04 | 3.00 | notifying staff of agendas; first day binders, policies, insurance info |
| 10/31/2004 | 3.00 | Dinner w/David Dziuban, Bryan Rohe, JA @ Colony Restaurant |
| 11/01/04-11/03/04 | 10.00 | Training w/new hires |
| 11/8/2004 | 3.00 | Setup employee folders |

200.00

*SNOW REMOVAL AND ICE MANAGEMENT SERVICES MASTER AGREEMENT*

*Heritage Properties*

This Agreement, hereinafter called "Agreement", deemed to have been in force when Service Provider began plowing operations on the sites assigned to him/her beginning this 2004-2005 winter season, by and between SNOW MANAGEMENT GROUP, 1406 West 21st Street, Erie, PA, 16502-2203, hereinafter called "SMG" and _____ hereinafter called "Service Provider."

IN CONSIDERATION of the mutual promises, covenants, and agreements made and contained herein, and intending to be legally bound hereby, the parties hereto agree as follows:

1. **Definitions:** When used herein with initial capitalizations, whether in the singular or in the plural, the following terms shall have the following meanings:

"Contract Administrator" = Snow Management Group employee located at Corporate Office, under whose direction the snowplowing contract remains.

"De-icing" = Refers to the treatment of ice-covered sidewalks to reduce potential slip and fall incidents that may occur due to icy conditions.

"Deliverables" = the expected functionality, use or results to be achieved or the product to be provided upon completion of the Services.

"Field Manager" = SMG employee representative for the geographic market area where the Customer's property is located.

"Hourly Rate" = each piece of equipment is priced hourly and invoiced based upon the time equipment is actually used.

"Per Event/Per Storm" = Consistent rate paid to Service Provider which covers from the beginning of a storm event until the end of that event, including cleanup work that is necessary after the storm. Cleanup Work does NOT include Hauling/Stacking which requires authorization and a work order from SMG. SMG has final say on when the storm ends.

"Per Push" = Consistent rate paid each time the Service Provider plows.

"Regional Manager" = SMG employee representative who is responsible for customer satisfaction in a specific geographic region.

"Remove the Snow" = The Work required to bring in a loader and several trucks to take the snow off the Site. This type of Work requires a special Work Order and specific authorization from the SMG Contract Administrator because of the expensive nature of this operation.

"Service Provider" = Sub Contractor to SMG, performing snow and/or ice management services on an SMG controlled premises.

"Sidewalk Clearing" = Manual or Mechanical Work required to remove snow from sidewalk areas, usually by laborers.

"Site(s)" = SMG's Customer locations where snowplowing and deicing operations take place.

"SMG Controlled Premises" = Sites being plowed or deiced under SMG direction through a contractual arrangement with SMG's customer.

"Specifications" = the written description of the performance requirements of Service Provider in the provision of the Services, including Deliverables, and the consideration payable to Service Provider therefore. The Specifications are supplied by appropriate Field representatives of SMG.

"Stack the Snow" = The Work required to pile snow. This requires a loader of some kind. This Work requires a Work Order issued by SMG.

"Plowing" = The Work required to push snow to the outer edges of a parking lot using a truck or plowing vehicle or machine in combination.

"Production Coordinator" = SMG employee responsible for determining production schedules, choreographing the plowing of the site, and determining acceptable service quality of the finished Deliverables.

"SMG Representative" = An SMG employee designated to coordinate the performance of Services, more often referred to as Regional Field Manager, Contract Administrator, or Production Coordinator.

"Wired-Time" = The method used for recording visits to any given Site in "real-time", up-to-the-second reporting. Requires the use of an SKU sticker at the Site and a pigtail/scanner unit attached to a mobile telephone.



JA00448

2. **Engagement:** Subject to the terms and conditions hereinafter provided, SMG hereby engages Service Provider for the purpose of rendering snow removal and ice management services ("Services") on SMG controlled sites in the various states in which SMG does business. The purpose of the Services is to provide a safe environment for SMG's customers and their employees and patrons to enter and leave SMG controlled facilities. SMG does not guarantee that Service Provider will be asked to perform any minimum amount of Services hereunder. The Master Agreement may be augmented by Specific Project Guidelines, as noted herein. Service Provider agrees to adhere to Customer/SMG's Specific Project Guidelines.

3. **Specific Project Guidelines:** Some SMG customers have specific rules, requirements and guidelines. In the event of such specific guidelines, SMG will attach those guidelines and make them part and parcel to this Agreement. If such guidelines are attached to this agreement, said guidelines shall be followed and considered part of this Agreement. Service Provider understands and accepts such conditions, guidelines, rules or guidelines and agrees to adhere to same as may be put forth herein. It is further understood that should Service Provider be working on several SMG controlled premises (owned by different customers), there may be guidelines for each customer location.

4. **Valid Agreement:** This Agreement is the only valid agreement between the parties. This agreement supercedes any prior written or oral Agreements. Verbal alterations to this Agreement are not valid, nor authorized. Service Provider agrees that this agreement is deemed to have been in force when Service Provider began plowing operations on the sites assigned to him/her beginning this 2004-2005 winter season.

5. **Oral Agreements:** Neither party shall be held to any verbal interactions, and this written Agreement is the only Agreement in place for rendered services, or to be rendered services. This agreement supercedes any prior written or oral Agreements. Only written alterations (signed and dated by the Service Provider and an authorized representative of SMG) may amend this Agreement.

6. **Acceptance:** Service Provider hereby accepts said engagement and agrees to provide personnel to render such Services at such place(s) as shall be mutually agreeable to SMG and Service Provider. SMG shall have the right to reject at any time any personnel SMG believes to be unqualified or otherwise unsatisfactory to perform such Services.

7. **Contract Administration:** Site owner/manager has authorized Snow Management Group to provide contract administration services with respect to all aspects of the snow removal and ice management contracts executed between Service Provider and SMG. SMG shall have authority to make decisions in the best interest of SMG and its Customer. Service Provider shall take direction from SMG with respect to all aspects of the snow and ice management contract terms and conditions. All directives and requests for additional Services shall be at the direction of SMG and no other party. Contract Administrator shall initiate all Work Orders numbers. Failure to adhere to SMG's directives or guidelines may be cause for immediate termination of the Agreement or requested Services.

8. **Customer Contact:** All contact with SMG's customer is to be through SMG's assigned Field staff or SMG's Corporate Contract Administrator. Direct contact with SMG's customer is unprofessional, inappropriate and may be considered tortuitous interference with our contractual relationship with our customer relationship. Such actions may cause immediate termination of this Agreement. Service Provider shall take direction from SMG with respect to all aspects of the Engagement for Services.

9. **No Improvement To Property:** Snow and ice management services do not materially improve the value of any site, thus no liens may be filed against any property where snow and ice management services are performed. Service Provider agrees that it will not, at any time, file any lien or notice of claim to any lien of any kind or nature whatsoever, nor permit the same to be filed for work performed or materials furnished pursuant to the terms of this Agreement or any modification hereof, or for any extra work performed and materials furnished; or for any other reason or upon any ground whatsoever. Service Provider does hereby waive and relinquish the right to any and all liens or claim of liens as may be permitted or provided for by any provision of any law.

10. **Statement of Work:** Service Provider shall perform the Services during the term of the Agreement, or any extension thereof. Service Provider warrants that the Services shall be performed in a workmanlike manner in accordance with the Specifications or Work Orders and the prevailing commercial standards applicable thereto. The warranties provided herein are cumulative of any other warranties agreed to by Service Provider or provided by law.

JA00449

11. **Performance and Personnel**: During the term of the Agreement, Service Provider shall cause its employees and agents to obey all instructions and directions issued by SMG concerning business operations when Service Provider's employees and agents are on SMG controlled sites. Service Provider's personnel working at SMG controlled locations shall comply with the rules and requirements of SMG as may be in effect from time to time, regarding the acceptable conduct, appearance, cleanliness, work history and qualifications, and personal history (including without limitation, no history of violent or criminal conduct for persons working at SMG controlled locations). Service Provider shall perform all drug testing, background and credit checks, and other procedures required by SMG policy. At the request of SMG, Service Provider shall provide assurances to SMG, that Service Provider's personnel comply with the rules and requirements of SMG pertaining to work history and qualifications and personal history. SMG shall, upon written request, disclose the above employment rules, requirements, and policies to Service Provider, and Service Provider shall screen its personnel to ensure compliance. Upon written request, Service Provider shall provide SMG with the name, address, date of birth, and social security number of each person assigned to work on SMG's premises, and shall update such information whenever changes occur. While at any SMG location, Service Provider shall follow all directions and instructions given by SMG. Upon the request of SMG, which request may be made for any reason, Service Provider shall reassign or otherwise arrange so that a particular employee or agent of Service Provider does not work at any SMG location.

12. **Use of SMG Equipment**: From time to time Service Provider may have occasion to utilize SMG owned, or leased, equipment in the performance of the Service or Work. Service Provider warrants that all personnel permitted to operate SMG equipment shall have been properly trained and are competent in the operation of such equipment, shall be versed in proper ongoing safety checks for said equipment, and shall be properly outfitted to work in winter conditions. Service Provider agrees that damages to or loss of SMG owned or leased equipment shall be the sole responsibility of the Service Provider. Any third party bodily injury or property damage resulting from use of SMG supplied equipment shall be the responsibility of the Service Provider in accordance with the Indemnification and Insurance requirements as set forth in this Agreement

13. **Progress Reporting:** Until completion of the Services or final acceptance of any Deliverables required hereunder, Service Provider will provide progress reports as set forth by the Contract Administrator or Field Manager. Service Provider will also deliver reports to SMG with respect to the status, progress, and issues toward completion of the Services, Work or any Deliverables as are required by SMG. This includes necessary storm documentation. Such reporting and documentation shall be made at no additional cost to SMG.

14. **SMG's Instructions**: During the term of the Agreement, Service Provider shall cause its employees and agents to obey all reasonable instructions and directions issued by SMG concerning the SMG's business operations when Service Provider's employees and agents are on SMG controlled premises.

15. **Security**: When Service Provider performs Services at SMG controlled premises, Service Provider shall comply with SMG's customers' building security, information security, safety, and fire protection procedures. If Service Provider is provided keys or other access devices, including without limitation codes and passwords, to SMG controlled premises, equipment, or systems, Service Provider shall use reasonable efforts to protect such keys or access devices, shall maintain a log book of the names of personnel and times when they have possession of such keys or access to the systems or equipment, shall account for all such keys and access devices whenever requested to do so by SMG, and shall return and discontinue use of all such keys and access devices upon request or upon termination of its obligations hereunder. SMG may require Service Provider's personnel to carry or display identification cards when on SMG controlled premises. SMG shall have the right to inspect the contents of all containers or packages being brought onto or removed from SMG controlled premises.

16. **Indemnification**: Service Provider agrees to indemnify, hold harmless and defend SMG, SMG's customer, and any employee or agent thereof (each of the foregoing being hereinafter referred to collectively as the "Indemnified Party") against all liability (including reasonable attorneys' fees and costs) to third parties (other than liability the fault of the Indemnified Party) arising from the acts or omissions of Service Provider or its agents in the performance of its obligations hereunder. Service Provider's obligation to indemnify shall survive the expiration or termination of this Agreement by either party for any reason. Service Provider shall conduct the defense in any such third party action arising as described herein with counsel reasonably acceptable to SMG and SMG shall cooperate with such defense.

17. **Insurance**: For and during the term of this Agreement and for as long as Service Provider is performing Services hereunder, Service Provider shall secure and maintain at its own expense insurance of the type and in the amounts set forth below.

Commercial General Liability Insurance in an amount of not less than $1,000,000 per occurrence, subject to a $2,000,000 aggregate covering, without limitation, bodily injury (including death), personal injury, defamation, property damage including,

JA00450

and without limitation, all contractual liability for such injury or damage assumed by Service Provider under this Agreement. This policy shall include products/completed operations coverage.

Workers' Compensation in accordance with all federal and state statutory requirements and Employer's Liability Insurance in an amount of not less than $500,000 per accident for bodily injury and $500,000 per employee/aggregate for disease. Service Provider and its underwriter shall waive subrogation against SMG.

Commercial Automobile Liability Insurance in an amount of not less than $1,000,000 combined single limit covering bodily injury (including death) and property damage for all owned, hired and non-owned vehicles used by Service Provider.

Umbrella Liability Insurance with an amount of not less than $1,000,000 combined single limit.

**SMG, SMG's customer (to be specifically named, if requested), their directors, officers, employees, agents, subsidiaries and affiliates shall be named as additional insured** on the general liability and automobile policies. These insurance provisions set forth the minimum amounts and scopes of coverage to be maintained by Service Provider and are not to be construed in any way as a limitation on Service Provider's liability under this Agreement. Service Provider shall not self-insure any of its obligations under this Agreement without full disclosure to SMG of its intention to self-insure and without obtaining SMG's prior written consent. Any and all deductibles specified in the above-referenced insurance policies shall be assumed by, for the account of, and at the sole risk of Service Provider. The insurance coverages shall be primary and will not participate with nor will be excess over any valid and collectable insurance or program of self-insurance carried or maintained by SMG.

Service Provider shall furnish Certificates of Insurance evidencing all of the forgoing insurance coverages prior to or upon execution of this Agreement. All of the above-described policies shall provide that no less than thirty (30) days' prior written notice of cancellation, material modification, reduction in coverage or non-renewal shall be given to SMG. In the event that any Services under this Agreement are to be rendered by persons other than the Service Provider's own employees, Service Provider shall arrange for such persons to forward to SMG prior to commencement of Services by them, Certificates of Insurance evidencing such amounts, in such form, and with such insurance companies as are satisfactory to SMG. **Faxed Certificates are not acceptable. Only originals mailed from the Agent of Record are acceptable evidence of proper insurance coverage.**

18. **Authority:** Service Provider and SMG each represent to the other that the execution, delivery and performance of this Agreement by such party have been duly approved by all necessary corporate action, and do not conflict with, or result in a material breach of, the articles of incorporation or by-laws of such party, any material agreement by which such party is bound, or any law, regulation, rule, judgment or decree of any governmental instrumentality or court having jurisdiction over such party, and this Agreement has been duly executed by such party and constitutes a valid and legally binding obligation of such party enforceable in accordance with its terms.

19. **Compliance with Laws:** Service Provider warrants that it shall perform its obligations under this Agreement in compliance with all applicable statutes, acts, ordinances, laws, rules, regulations, codes, and standards.

20. **Insurance Falsification:** If Service Provider does not have or does not maintain the required insurance coverage, or has falsely led SMG to believe it had adequate coverage as mandated herein, Service Provider agrees to personally indemnify, hold harmless and defend SMG from all suits or claims that may occur as a result of such acts or omissions.

21. **Incident Reporting:** Service Provider agrees to report any incident to SMG within 24 hours of such incident, utilizing SMG supplied "Incident Reporting Forms". Such incidents include, but are not limited to: interactions with SMG's customer; an accident of any kind where damage has occurred; damages of any kind to SMG's customer's site; damages of any kind to SMG's equipment, etc.

22. **Fees:** SMG agrees to pay the fees provided in the Specifications in U.S. dollars at the address of the Service Provider stated herein. SMG shall not reimburse Service Provider for travel, transportation, lodging, and subsistence for travel required to satisfactorily complete the Deliverables. Service Provider will provide all fuel for his/her equipment. All maintenance will be at Service Provider's expense. Equipment is to be properly maintained to avoid breakdown during the snow removal period. Service Provider will not be paid when equipment is broken down or inoperable.

23. **Invoices:** Service Provider shall submit an invoice to the Contract Administrator, at the **end of each month** in which services were performed. Invoices shall be payable net thirty (30) days after receipt of a correct, valid, approved invoice. An invoice is

JA00451

not deemed correct and valid until approved by the Regional Field Manager and the Contract Administrator. Invoices shall not be considered for approval until all required paperwork is received in-house at SMG's Corporate Office in Erie, PA. Each invoice shall include Service Provider identification and other information required by SMG and a description of the Services provided, detailed equipment and labor hours, and/or a description of items for which SMG is being charged. Invoices shall be subject to approval by the Contract Administrator and SMG's Regional Field Manager. No payment made by SMG shall be considered as acceptance of satisfactory performance of Service Provider's obligations under this Agreement, nor shall any payment be construed as acceptance of substandard or non-conforming products or services or as relieving Service Provider from its full responsibility under the Agreement. Service Provider understands and accepts that invoices shall not be approved for payment until evidence of proper insurance, a fully executed contract and a properly executed form W-9 are received by SMG. Fax copies of invoices are not acceptable.

Service Provider agrees, by signing this agreement, that SMG shall not be liable for payment of any invoice received more than forty-five (45) days after the end of the month in which services have been rendered. SMG retains the right to withhold 10% of the invoice payments due for damages that may be attributable to Service Provider's actions in the delivery of the Services on the Site. The retained payments shall be released only upon the Contract Administrator's receipt of a written "sign-off" sheet from SMG's customer, and SMG's Field Manager, indicating that all repairs and outstanding issues have been completed or resolved to the satisfaction of SMG's customer, and the SMG Field Representative in charge of the site in question. This includes damages done to SMG equipment. All damage which occurs as a result of plowing, clearing, stacking, hauling or ice control operations shall be repaired not later than April 15 of the term year. Failure to effect such repairs by April 15th may result in SMG hiring a qualified contractor to effect said repairs. SMG shall then backcharge Service Provider the amount of such repairs, plus 10% administration fee, from any retainage owed to the Service Provider.

24. **Damages done to the site:** All damage which occurs as a result of plowing, clearing, stacking, hauling or ice control operations shall be repaired not later than April 15 of the term year. Failure to effect such repairs by April 15th shall result in SMG hiring a qualified contractor to effect said repairs, and backcharge Service Provider the amount of such repairs, plus 10% administration fee, from any retainage owed to the Service Provider.

25. **Damages done to SMG Equipment:** Some SMG owned equipment may be provided for use on selected sites. On these selected sites, use of this equipment is figured into the pricing structure of the job. This equipment is "on loan" to the Service Provider. If Service Provider, or its employees, agents or assigns, causes or permits such equipment to be damaged or lost , Service Provider agrees to repair, or replace such equipment to SMG's satisfaction at Service Provider's expense. Failure to effect such repairs by April 15th shall result in SMG having such repairs completed, and SMG shall backcharge Service Provider the amount of such repairs, plus 10% administration fee, which amount shall be immediately due and payable and may be paid from any retainage owed to the Service Provider. Service Provider, by executing this agreement, accepts this condition without reservation.

26. **Sales Taxes:** SMG shall provide Service Provider customary proof that the transactions contained under this agreement are exempt from applicable state sales taxes. SMG shall be responsible for charging and collecting applicable state sales tax in those markets where such taxes are due. Service Provider shall pay any other taxes, assessments or fines arising from Service Provider's performance or the transactions under this Agreement, including taxes based upon Service Provider's net income and penalties imposed due to failure to file or pay collected sales or use taxes. Erroneously charging SMG sales tax shall result in rejection of the invoice for resubmission to SMG. Such invoices shall not be considered valid and acceptable until such changes are completed and invoices resubmitted.

27. **Good Standing and Permits:** Service Provider represents and warrants that it is in good standing in the state of its organization and is qualified to do business in each state in which it proposes to provide products and services, and that it has all licenses and permits necessary or required to provide such products and services. Service Provider shall provide copies or other evidence thereof to SMG upon request. Any fees for licenses and permits required by law or regulation that may be necessary to Service Provider's performance hereunder shall be the responsibility of Service Provider.

28. **Employee Matters:** Service Provider's personnel shall not be considered employees of SMG within the meaning or application of any federal, state, or local laws or regulations. Service Provider shall be responsible for the payment of wages, salaries, and other amounts due its employees in connection with the services performed hereunder, and shall be responsible for all payroll reports and obligations, including but not limited to withholding, social security, unemployment insurance, workers' compensation, immigration and naturalization, and similar items.

JA00452

29. **Equal Employment**: Both parties agree that they shall not discriminate against any employee or applicant for employment because of race, creed, color, age, sex, national origin, marital status, liability for service in the armed forces, disability due to veteran status, status as veteran of the Vietnam era, or the handicapped, and to extent applicable, they shall comply with all the requirements of the Equal Opportunity Clause set forth in Executive Order 11246, as amended, and its implementing instructions, as well as the Rehabilitation Act of 1973 and the Vietnam Era Veterans' Readjustment Assistance Act of 1974. In the event that and at such time as SMG requests, Service Provider shall furnish to SMG written certification that Service Provider is in compliance with Executive Order 11246 and applicable regulations thereunder. Both parties certify that they do not and shall not maintain facilities for their employees in a segregated manner or permit their employees to perform their services at any location under their control where segregated facilities are maintained, and agree to obtain similar certifications from any Service Providers.

30. **Confidential Information**: Each party agrees that information concerning the other party's business (including that of all corporate affiliates and Service Providers) is "Confidential Information" and proprietary to each party and shall be maintained in confidence and not disclosed, used or duplicated.

31. **Covenant Not-to-Compete**: Because SMG has expended many years and large sums of money developing and maintaining its accounts, and because Service Provider will be placed in contact with many of these accounts in performing the Services under this Agreement, Service Provider agrees that he/she will not compete with SMG as an employee, Service Provider, contractor or in any other capacity, by providing the services which are subject of this Agreement for any of SMG's customers for a period of two (2) years after the termination, for any reason whatsoever, of his/her engagement with SMG as an independent contractor. In addition, Service Provider will not disclose any confidential information gained from SMG. In the event of the Service Provider's violation of this agreement not to compete, SMG will be entitled to both temporary and permanent injunctions and, at its option, liquidated damages in an amount equal to the total gross amount which Service Provider earns from competing jobs during the two (2) year period after termination with SMG, plus the costs of enforcing this Agreement including court costs/attorney fees.

32. **Use of Name**: Neither party shall advertise, market or otherwise make known to others any information relating to the subject matter of this Agreement, including mentioning or implying the name of the other, or any other such purposes without the prior written approval of the other party. The provisions of this section shall survive the termination of this Agreement.

33. **Change Orders**: Service Provider shall promptly comply with each Change Order and evidence its acceptance of each Change Order by promptly executing the Acceptance Copy of each Change Order and returning such Acceptance Copy to SMG. Service Provider shall promptly notify SMG of any objections to the Change Order and Service Provider's failure to timely object shall constitute acceptance of the Change Order.

34. **Use of Wired-Time System**: The Wired-Time System is an "up-to-the-second" reporting system that will allow viewing of exactly when a Service has been started and completed on the selected Site(s). This system consists of a scanner attached by pigtail to a cell phone. Scanning an SKU tag on each Site will cause immediate recording of the arrival and departure time by the Service Provider's personnel and equipment for the following services: snowplowing, deicing of parking lots, service of the sidewalks. Service Provider **may** be required to use aforementioned Wired-Time System in some selected markets and for some selected customers of SMG. SMG shall provide the SKU tags as part of this package and for use by the Service Provider. SMG personnel shall be able to log in to a server and view the selected Sites in real time to determine services that have been, or have not been, rendered at each Site. Service Providers will be supplied with minimum number of pigtail and scanner units. Additional units may be obtained from the SMG Contract Administrator at Service Provider's sole expense. The SMG Contract Administrator shall retain ownership of each unit. A Nextel Wireless Telephone shall be required to use the Wired-Time Scanner, and shall be provided by the Service Provider at no additional charge to SMG. Use of the Wired-Time System is "in addition to" and not a substitute for, the normal check in procedures outlined herein.

35. **Snow Management Group Call-In Procedures**: When instructed to do so as part of this agreement, Service Providers must call in to SMG's Central Dispatch office after any Service is provided to any Site. For example, once a lot has been Plowed or a sidewalk has been cleared, or a Site has been salted, the Service Provider may be required to call SMG's Central Dispatch and advise SMG as to what work has been completed and on which Sites the work was done. Each Service Provider is assigned a personal identification number (PIN). If Provider has not been assigned a PIN number, the Provider must speak with SMG's Contract Administrator on that account. At that time the Contract Administrator will issue the Provider an assigned PIN #. The PIN identifies the Service Provider to the Call Center Representative on duty, who will ask a series of questions about the Site that the Service Provider is responsible for maintaining. The Call Center Representative on duty will log this information in SMG's computerized tracking system.

JA00453

The Service Provider may elect to "check-in" electronically as an alternate to the "call-in" procedure described above. The electronic "check-in" consists of utilizing the internet and logging in to SMG's Server using the aforementioned PIN number as identification. Service Provider then fills out the "check-in" form in lieu of calling in to Central Dispatch. This "check-in" will be verified and approved by the appropriate SMG Contract Administrator at SMG's Corporate Call Center. Once this electronic "check-in" is approved, Service Provider may then submit an invoice in the same electronic fashion (through SMG's on-line Server). If the invoice agrees with the electronic "check-in", the invoice will be automatically approved and immediately submitted to SMG's Accounting Department for payment. This electronic system is not a substitute for the Wired-Time System, and must be utilized in conjunction with, and in addition to, the Wired-Time System of activity reporting.

The parties hereby agree that in the event of a billing discrepancy arises concerning the Work performed, SMG's call-in Service log and records will be the sole proof on which the parties will rely to demonstrate and establish that the Work has been successfully completed. Failure to follow the Call-In Procedures may result in termination of this Agreement for cause.

36. **Financial Statements:** Service Provider agrees to provide SMG with sufficient evidence of its acceptable financial health and ability to properly execute the Services contained as part of this Agreement, if and when asked to do so by the CFO of SMG. Such evidence shall be due and owing within 10 days of written request to do so, and from time to time such information relating to the financial condition of Service Provider as SMG may reasonably request. SMG agrees not to disclose this information to any party without specific authorization by the Service Provider.

37. **Force Majeure:** In the event that either party is unable to perform any of its obligations under this Agreement, or to enjoy any of its benefits because of an event wholly beyond its control, (a "Force Majeure Event"), including but not limited to fire, natural disaster, action or decrees of governmental bodies, the party who has been so affected shall immediately give written notice to the other party and shall do everything possible to resume performance. Upon receipt of such notice, performance of the affected obligations as defined under this Agreement shall be temporarily suspended for the period of the Force Majeure Event. If the period of nonperformance exceeds thirty (30) days from the receipt of notice of the Force Majeure Event, the party whose ability to perform has not been so affected, may by giving written notice, terminate this Agreement. Delays in delivery due to Force Majeure Events shall automatically extend the delivery date for a period equal to the duration of such Events; any warranty period affected by a Force Majeure Event shall likewise be extended for a period equal to the duration of such Force Majeure Event. As applied to this section and to determine whether an event is wholly beyond control of a party, weather conditions or snow or ice storms, difficulty in obtaining supplies such as salt, de-icers, fuel, strikes, slowdowns, or other labor related delays are not Force Majeure Events.

38. **Charging Against SMG:** Service Provider will not use the SMG name or attempt to use SMG's credit, for the purpose of buying or charging fuel, parts, tires or anything else that would inure to the Service Provider's benefit. If anything is charged to SMG without authorization, Service Provider can expect SMG to take whatever legal action is necessary to seek reimbursement and Service Provider shall be responsible for all expenses incurred by SMG. This action shall also be cause for termination of this Agreement by SMG.

39. **Limitation of Liability:** SMG shall not be liable to the Service Provider for any indirect, special, consequential, incidental or punitive damages. This limitation shall not diminish either party's obligation to indemnify, hold harmless and defend the other party under the terms of this Agreement.

40. **Term:** The term of this Agreement shall be for a period of one (1) year commencing on the Effective Date and ending one year later; provided, however, that SMG, at its option and in writing, may extend the Agreement for two (2) successive one (1) year terms if SMG is satisfied with the performance of Service Provider during the first year.

41. **Termination for Convenience:** Unless otherwise provided herein, SMG may terminate this Agreement or any Services at any time by providing written notice of termination delivered by fax, mail, email or by hand to Service Provider.

42. **Procurement Partnership Participation:** Participation in the Procurement Partnership System (PPS) is encouraged, but not mandatory to work for SMG. Only contractors working for SMG may participate in the PPS. Those Service Providers who participate in the PPS and purchase materials or equipment through the PPS must have their PPS accounts "paid in full" before receiving payment from SMG for services rendered. At Service Provider's option and with their specific written permission, SMG shall deduct monies owed to the PPS from monies due for services rendered.

JA00454

43. **Survival:** Termination of this Agreement shall not release either party from their respective obligations hereunder with regard to products or services already delivered or performed, including, without limitation, obligations of payment, warranty, and from the confidentiality and indemnity provisions hereof.

44. **Dispute Resolution:** Any dispute, claim or controversy arising out of, connected with or relating to this Agreement, shall be resolved by binding arbitration administered and conducted under the Commercial Arbitration Rules of the American Arbitration Association and Title 9 of the United States Code. The arbitrators shall have no power to change any of the provisions of this Agreement in respect (nor shall they have any power to make an award for reformation) and the jurisdiction of the arbitrators is hereby expressly limited accordingly. A judgment upon the arbitration award may be entered in any court having jurisdiction. Any arbitration hearing shall take place in Erie, PA.

45. **Subcontracts and Assignment:** Service Provider shall not assign, in whole or part, any of its obligations under this Agreement without SMG's written consent, which may not be unreasonably withheld. SMG may assign any benefits or obligations under this Agreement to any "affiliate" (as defined in 11 U.S.C. 101(2)) of SMG. In addition, SMG may assign its interest to any SMG customer and, upon proof of any such assignment, Service Provider shall perform all obligations under this Agreement directly for said SMG customer. The assignor under such assignment by SMG shall remain liable under the Agreement. Service Provider shall not subcontract any portion of its performance obligations under an Agreement without SMG's prior written approval, which may be withheld, without explanation.

46. **Applicable Law:** This Agreement shall be governed by the laws of Pennsylvania.

47. **Severability:** Any invalidity, in whole or in part, of any provision of this Agreement shall not affect the validity of any other of its provisions.

48. **Waiver:** No term or provision hereof shall be deemed waived and no breach excused unless such waiver or consent shall be in writing and signed by the party claimed to have waived or consented. Failure to exercise a right or remedy at law or granted hereunder shall not be deemed a waiver of such right or remedy. Failure to claim default hereunder shall not waive any default.

49. **Relationship Between the Parties:** The Services of Service Provider are to be rendered as an independent contractor, and Service Provider is not an employee, agent, or partner of SMG. This Agreement and the transactions referred to herein were negotiated in an "arms length" manner. The parties warrant that this Agreement and such transactions have not been procured through unfair or unethical conduct. This Agreement is solely for the benefit of the parties hereto and no other persons.

50. **Notices:** All notices or other communications required or contemplated herein shall be sufficient and deemed delivered if in writing and deposited with the United States Postal Service, postage prepaid via certified mail, addressed to the parties as set forth below, or to such other address as may be changed from time to time by notice duly given.

To: _____
_____
_____
Attention:_____

To: Snow Management Group
1406 West 21st Street
Erie, PA 16502-2203
Attention: Contract Administrator

51. **The Agreement:** This Agreement, including the pricing schedule, and all documents referred to herein and attached hereto, constitute the entire agreement of the parties on the specific subject matter hereof and supersede all prior representations,

JA00455

understandings and agreements between the parties with respect to such subject matter, and only the signing of same by both parties shall cause this Agreement to be valid as of the first day work commenced upon the sites assigned. The documents referred to herein and attached hereto shall be read together with this Agreement to determine the parties' intent. If there is a conflict between or among such documents, this Agreement shall be the final expression of the parties' intent. Any amendments to this Agreement must be in a writing signed by both parties.

IN WITNESS WHEREOF, the parties hereto shall be deemed to have executed this Agreement as of the date the first service date on the site(s) assigned to the Service Provider and/or Service Provider.

Snow Management Group                SERVICE PROVIDER _____

By:      _____Lisa Edwards_____          By:      _____
                                                              (Signature)
Name:    _____          Name:    _____
                                                              (Print)
Title:   _____VP – SMG Operations_____       Title:   _____

Date:    _____          Date:    _____

JA00456

## PRICING SCHEDULE

Rates are effective for the length of this agreement for the following accounts:

_____     _____     _____

_____     _____     _____


**Per Event/Per Storm -**  Pricing based on a per event basis, including any required deicings of parking lots and/or sidewalks. "Per Storm" or "Per Event" is defined as the amount of snow that falls from start to finish of the Event, including cleanup work that is necessary after the storm.  SMG has final say on when the storm ends.  Rates are effective for the length of this agreement.

Plow Lot/Walks – including all necessary deicing and cleanup work


**Site #** _____

0-1"_____     1.1-2"_____     2.1-4"_____     4.1-6.0"_____     6.1-8.0"_____
(deicing only)

8.1-10"_____     10.1-12"_____     12.1-15"_____     15"+_____

▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪

**Site #** _____

0-1"_____     1.1-2"_____     2.1-4"_____     4.1-6.0"_____     6.1-8.0"_____
(deicing only)

8.1-10"_____     10.1-12"_____     12.1-15"_____     15"+_____

▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪

**Site #** _____

0-1"_____     1.1-2"_____     2.1-4"_____     4.1-6.0"_____     6.1-8.0"_____
(deicing only)

8.1-10"_____     10.1-12"_____     12.1-15"_____     15"+_____

**************************************************************************

**Site #** _____

0-1"_____     1.1-2"_____     2.1-4"_____     4.1-6.0"_____     6.1-8.0"_____
(deicing only)

8.1-10"_____     10.1-12"_____     12.1-15"_____     15"+_____

JA00457

SMG Subcontract Agreement

_____     _____
(SMG Representative)                    (Service Provider)

JA00458



# HERITAGE PROPERTY
## INVESTMENT TRUST, INC.

*Corporate Office:* 131 Dartmouth Street, Boston, Massachusetts 02116
Telephone: (617) 247-2200 • Fax: (617) 266-0885 • Legal Dept. Fax: (617) 267-4557
www.heritagerealty.com

<u>*VIA OVERNIGHT MAIL*</u>

November 3, 2004

John Allin
d/b/a Allin Companies and Snow Management Group
1406 West 21st Street
Erie, PA 16502-2203

Re:     *Contract dated October 12, 2004 between Heritage Realty Management, Inc.
        and John Allin, d/b/a Allin Companies and Snow Management Group
        ("agreement")*

Dear Mr. Allin:

Heritage Realty Management, Inc. ("Heritage") is in receipt of recent correspondence
which raises serious issues regarding the ability of your company to pay its obligations as
they come due. We are also in receipt of a letter dated October 21, 2004, regarding an
offer to purchase all of the assets of your company and have also been informed that
some of your contractors may not have been paid during the past year.

It is our position that material information regarding the financial condition and troubles
your company is experiencing should have been disclosed to Heritage before it signed the
agreement on October 12, 2004. For months, you have been pursuing various
alternatives in order to satisfy the claims of company creditors, including entertaining an
offer for the purchase of all of your assets, offering a profit payout over a period of time
and exchanging equity in the form of stock in consideration of outstanding debt.

Needless to stay, Heritage is not only troubled that this information was not shared with it
during the contract negotiations, but also feels that your failure to disclose this material
information fraudulently induced it to enter into the agreement with you.

Accordingly, since you fraudulently induced Heritage to enter into the above-referenced
agreement with you, it is the position of Heritage that the agreement is null and void and
Heritage has no further obligations thereunder. It is hereby requested that you
immediately refund to Heritage the payment made to you in the amount of $340,482.90,
pursuant to Article 6 (a) (i). In the event the agreement is found to be valid and



DEPOSITION
EXHIBIT

J.Allin #8

HA000006

John Allin
November 3, 2004
-2-

enforceable, then this letter shall also constitute notice pursuant to Article 17 (c) of the agreement, that Heritage hereby elects to terminate the agreement and demands an immediate return of the first installment payment to you in the amount of $340,482.90. Since you have not provided services or supplied any equipment or materials, the full amount must be refunded.

Please confirm in writing your agreement to comply with the request set forth in this letter, which must include return of the payment made to you, on or before Friday, November 5, 2004. In the event you fail to respond and refund the amount demanded, immediate legal action will be commenced which shall include a request for appropriate injunctive relief and a claim for damages.

I trust that Heritage's position is clear, however, if you should have any questions, please direct them to my attention.

Sincerely,

Edward W. Valanzola
Associate General Counsel

cc:     Robert Prendergast, Mark Bush, Louis C. Zicht, Esq., David Sweetser, Lori Aspinall

HA000007