1           IN THE UNITED STATES DISTRICT COURT

2       FOR THE WESTERN DISTRICT OF PENNSYLVANIA

    HERITAGE REALTY MANAGEMENT, INC.,  :

3         Plaintiff           :

                              :

4        v.                 : Case No. 04-333 Erie

                              :

5     JOHN ALLIN d/b/a ALLIN COMPANIES,  :

        Defendant           :

6

7       Deposition of ROBERT G. PRENDERGAST, taken before

8    and by Sondra A. Black, Notary Public in and for the

9    Commonwealth of Pennsylvania, on Friday, January

10   20, 2000, commencing at 2:18 p.m., at the offices of

11   the Erie County Bar Association, 302 West Ninth Street,

12   Erie, Pennsylvania 16502.

13

14   For the Plaintiff:

15     Neal R. Devlin, Esquire

      Knox McLaughlin Gornall & Sennett, PC

16     120 West Tenth Street

      Erie, PA 16501

17

      Edward W. Valanzola, Esquire

18     Net Properties Management, Inc.

      535 Boylston Street

19     Boston, MA 02116

20   For the Defendant:

21     Craig A. Markham, Esquire

      Elderkin Martin Kelly & Messina

22     150 East Eighth Street

      Erie, PA 16501

23

24

             Reported by Sondra A. Black

25       Ferguson & Holdnack Reporting, Inc.

**EXHIBIT**

D

1                          I N D E X

2

3    ROBERT G. PRENDERGAST

4         Direct Examination by Mr. Markham......................3

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              R O B E R T   G.   P R E N D E R G A S T, first having

2              been duly sworn, testified as follows:

3

4                          DIRECT EXAMINATION

5    BY MR. MARKHAM:

6

7         Q.   Please state your full name.

8         A.   Robert G. Prendergast.

9         Q.   Where do you live?

10        A.   70 Alpine Drive, Holistan, Massachusetts.

11        Q.   How old are you?

12        A.   45.

13        Q.   Where do you work?

14        A.   Heritage Property Investment Trust, 131 Dartmouth

15   Street, Boston, Massachusetts.

16        Q.   What's your job title?

17        A.   Chief operating officer.

18        Q.   How long have you worked for Heritage?

19        A.   Since November of 1999.

20        Q.   Have you held the position of CEO since then?

21        A.   No.

22        Q.   Tell us the positions you've held at Heritage.

23        A.   Director of construction, director of property

24   management and construction, and then chief operating

25   officer.

1       Q.    How long have you been chief operating officer?

2       A.    Since June of -- hang on a second.  '04.  June of

3    '04.

4       Q.    What's your educational background?

5       A.    I have a Bachelor of Science Degree from Seton Hall

6    University.

7       Q.    Before working at Heritage, where did you work?

8       A.    I worked for Urban Retail Properties Company --

9       Q.    For what --

10      A.    -- in Boston, based out of Chicago.

11      Q.    For what period of time?

12      A.    From June of 1990 through October of 1999.

13      Q.    What was your job there?

14      A.    I was assistant asset manager and asset manager for

15   Urban Retail Properties Company.

16      Q.    What was the nature of your involvement with

17   Mr. Allin's contract?

18            MR. VALANZOLA:  Objection.  Do you want to be

19            specific for a period of time.

20            MR. MARKHAM:  Let me first just get a general sense

21            of it, and then we'll go into specifics.

22      Q.    Can you just describe in general what your

23   involvement was.

24            MR. VALANZOLA:  Objection.  Go ahead.

25      A.    Sure.  I was first solicited by Snow Removal Company

1    in -- the contract was signed in what year, '04?  In late

2    '03, early '04 by Mr. Vernon offering his services.  I

3    thought it was something that we may be able to use, and so

4    we started talking to Mr. Vernon about the possibility of

5    utilizing his services for our company.

6        Q.   Before that occasion, were you familiar with

7    Mr. Vernon?

8        A.   Not until he solicitied us, no.

9        Q.   How did those discussions develop?  I mean --

10       A.   Over time.

11       Q.   Can you give me a time frame when they reached a

12   critical mass more or less?  Where it seemed as though

13   something could be worked out between the two of you.

14           MR. VALANZOLA:  Objection.  Go ahead.

15       A.   I think we really started discussing pricing on

16   whether or not it would be feasible for us to look at

17   something -- a contract of this nature in May of '04.

18       Q.   At that point in time was Mr. Vernon giving you some

19   idea of what it would cost you?

20           MR. VALANZOLA:  At what point in time, Craig?

21           MR. MARKHAM:  May of '04 time frame.

22       A.   I can't remember the specific time frame, but we had

23   sent Mr. Vernon all our site plans for our properties, and he

24   put together a price.

25       Q.   You don't recall the time frame for your receipt of

5

1    his price?

2         A.    No.   I don't recall the exact time frame for that.

3         Q.    Was Mr. Vernon the only person you were dealing

4    with?

5         A.    There was another person from Snow Management,

6    someone that worked for Mr. Vernon, but I can't recall his

7    name right now.

8         Q.    It was not Mr. Allin?

9         A.    No.   It was not Mr. Allin.

10        Q.    Did you ever have any communications with him

11   directly?

12        A.    I think we -- we spoke once or twice.

13        Q.    Do you recall the circumstances of those

14   discussions?

15        A.    Not particularly, no.

16        Q.    Do you recall what you talked about?

17        A.    Probably about -- probably about his company and his

18   possible service to our company.

19        Q.    Now, we've heard about this telephone conference

20   call sometime in early August 2004 involving Mr. Zicht.  At

21   that point in time what was your understanding of the status

22   of negotiations with Snow Management Group?

23             MR. VALANZOLA:   Objection.   Go ahead.

24        A.    We were still negotiating price and what properties

25   may or may not be available for him to give us a proposal on.

1     Q.   Do you recall how far apart you may have been in

2    terms of the price?

3     A.   I -- I do recall Mr. Vernon's first submittal,

4    which -- which was significantly over our average snowfall,

5    and we were the ones that actually submitted pricing back to

6    him just giving him ideas of what our average snow falls

7    were -- actually, snow costs were for the last number of

8    years of the properties we were considering.

9     Q.   Can you place a time frame on that discussion?

10     A.   I -- I would say it would be somewhere between May

11   and when we executed the contract.

12     Q.   At some point before the signing of the contract did

13   you or someone at Heritage begin telling your local operators

14   that Snow Management was going to be involved in managing the

15   removal operations?

16        MR. VALANZOLA:  Objection as to form.  Go ahead.

17     A.   I'm not sure when and if those conversations took

18   place.

19     Q.   So you're not even sure that that happened?

20        MR. VALANZOLA:  That's what he answered.

21        MR. MARKHAM:  I just want to make sure I'm clear on

22        that.

23        MR. VALANZOLA:  Unless you have something to add to

24        your last answer --

25     A.   The only thing I'll add is, at the time we were

 1     getting close to signing the contract, Snow Management and

 2     Mr. Vernon did not have anyone ready to go, and we had

 3     offered to give him the list of snow removal contractors that

 4     we had used in the past because he did not have anyone lined

 5     up to do the removal.  So that is probably when the

 6     communication went from our regional and local property

 7     managers to the usual snow removal contractors that we were

 8     thinking of going through this method of removing snow.

 9         Q.   Can you put a time frame on that communication?

10         A.   I can't put a time frame, but I can tell you up

11     until the signing of the contract we did receive inquiries

12     and concerns from our managers that no snow removal

13     contractors were contacted.  And we did not have, even after

14     the signing of the contract, any communication from Snow

15     Management that there had been anyone hired to do the work

16     that they were hired to do.

17         Q.   Was that a concern to you?

18         A.   Yes, it is.

19         Q.   Did you communicate that concern to Snow Management?

20         A.   Yes, I did.

21         Q.   Do you recall what their response was?

22         A.   They were working on it.

23         Q.   Before the contract was signed, did you ask them to

24     get these people lined up?

25         A.   I asked them to make sure that they were ready to

1    fulfill the obligations under their contract, if we were

2    going to go through with it and if they had the ability to do

3    it.

4        Q.   What types of things would they have to do to get

5    ready to perform the contract?

6        A.   Well, they would have -- they would have to

7    entertain proposals or negotiate with subcontractors to

8    perform the work.  There was no equipment that was being

9    supplied by Snow Management, they were doing all the work

10   through subcontractors.

11       Q.   Do you know whether they were putting regional

12   managers in place?

13       A.   How -- how they managed the services was their --

14   was up to them.

15       Q.   Did they indicate to you that that's how they were

16   going to do it?

17       A.   They may have.  But again, up until and when we

18   signed the contract, we had received no correspondence on any

19   of -- who any of those people were.

20       Q.   Before the contract was signed, did you have

21   discussions concerning hiring the operators -- did you have

22   discussions along those lines with Mr. Allin's company?

23       A.   I'm not sure I understand "the operators".

24       Q.   It was a poorly worded question.  Let me take a shot

25   at it again.  Before the contract was signed, did you speak

1   with Mr. Vernon about the need for him to get people lined up

2   to do the work?

3        A.   I think the only discussions we had was that when we

4   signed the contract I was concerned that he'd have everyone

5   lined up to do the work.

6        Q.   Can you put a time frame on those discussions with

7   him?

8        A.   Probably prior to signing the contract.

9        Q.   Can you give me the month that you had those

10  discussions?

11       A.   I really don't know if I could pin it down.

12       Q.   Could it have been in the summertime?

13       A.   I doubt it.  We were -- we were still negotiating

14  price and whether or not it would be feasible for us to do

15  this work in the summertime.

16       Q.   Were you the person who was mainly involved in

17  negotiating the terms of the contract?

18            MR. VALANZOLA:  Objection.

19       A.   Yes.  As far as the business terms.

20       Q.   Was there someone else involved in other terms?

21       A.   Mr. Zicht was involved in putting the contract

22  together.

23       Q.   Anyone else?

24       A.   I don't think there was anyone else from our

25  company.

1     Q.    When you received inquiries from the local operators

2    about the status of things for the upcoming season, what did

3    you tell them?

4     A.    I --

5          MR. VALANZOLA:  Objection.  You can answer.

6     A.    I didn't receive those inquiries.

7     Q.    Who did?

8     A.    The local property managers.

9     Q.    Those inquiries somehow worked their way back to

10   you?

11    A.    No.

12    Q.    How did you become aware of them?

13    A.    Well, the regional managers would tell me.

14    Q.    And --

15    A.    But the specific vendors themselves did not call me.

16    Q.    And these managers, are they Heritage employees?

17    A.    Yes.

18    Q.    Do you know what these managers were telling the

19   people who were making the inquiries?

20    A.    I'm not sure.

21    Q.    Did you provide the managers with any instructions

22   or direction of what should be told to these people?

23    A.    I'm trying to recall.  We might have told them that

24   we're trying to work on a different procedure and processing

25   the --

```
 1           MR. VALANZOLA:  Only if you know.  Not what you

 2           might have told them.  Only if you know.

 3      A.   I don't recall matter of fact, no.

 4      Q.   I'm going to try to show you a copy of an e-mail

 5  from your office.  Can you make that out?

 6           MR. VALANZOLA:  Still a little fuzzy, and it's

 7           cutting off the two ends.

 8      A.   You can't see the whole thing.

 9           MR. MARKHAM:  The margins on the side are cut off?

10      A.   Can you zoom out.

11           MR. VALANZOLA:  You got it all.

12           (Discussion held off the record.)

13      Q.   Can you read it?

14      A.   I think we might be able to read it.

15      Q.   I'm looking at the e-mail dated August 3, 2004 from

16  you to a number of different people.

17      A.   Okay.

18      Q.   Can you tell me the context of this e-mail, what's

19  going on.

20           MR. VALANZOLA:  Can he have the benefit of

21           reading -- is there more to this document below

22           what we're reading?

23           MR. MARKHAM:  Let me push it up.

24           MR. VALANZOLA:  Is that the entire document?

25           MR. MARKHAM:  Let me turn it over and check.  The
```

1          only thing that appears after that is his signature

2          line.

3     A.   Whose signature line?

4     Q.   Yours.  Well, it's not a signature.  It's just an

5  identifying line, name, address, phone number.

6          MR. VALANZOLA:  Can you just move it over.  The

7          indent that's on the -- move it over to the indent

8          that's on the right just a little bit.  Right

9          there.  Go back just a little bit.  You're cutting

10         the margins off.

11    A.   Can I read it?

12    Q.   Can you?

13    A.   Hang on a second.

14    Q.   Take your time.

15    A.   I read it.

16    Q.   Can you recall what was going on at that point in

17 time?

18    A.   Sure.  Snow Management needed to know what actually

19 they were -- needed to do at each of the properties, so the

20 managers were asked to put together any particular

21 circumstances regarding the properties so Snow Removal would

22 have a complete understanding on what they were bidding on.

23    Q.   Do you recall whether you would have taken any notes

24 in regards to the conference call identified in this e-mail?

25    A.   I can't remember if I did or not.  Most of my stuff

1    I purge once we complete a contract.  All I really have in my

2    file is the completed contract.

3        Q.    In the first sentence of the e-mail you ask that the

4    managers prepare any information on the sites as to 24-hour

5    operations or any special snow handling requirements so Snow

6    Management can be fully prepared.  What were you referring to

7    there when you say, "fully prepared"?

8        A.    Well, they need to be fully prepared in order to

9    execute the work that needed to be done and to bid on the

10   work.  Some of our properties have supermarkets that are open

11   24 hours a day.  Some of our properties have restrictions on

12   where snow can be piled, if it can be piled, if it can be

13   removed.  Snow Management did not go out to see these

14   properties, so they were relying on all the work that we did

15   to put on the plans that we sent them.

16       Q.    At the bottom of this e-mail -- can you still see

17   the bottom?

18       A.    Yeah.

19            MR. VALANZOLA:  We see down to 131 Diamond Street,

20            Boston, Mass.

21       Q.    Let me move it up then.  I want to ask you about the

22   message -- or the communication at the very bottom which is

23   addressed to --

24            MR. VALANZOLA:  It's cut off at the right, Craig.

25            MR. MARKHAM:  How's that?

14

1          MR. VALANZOLA:  It's okay.  It's just fuzzy.

2    Q.   This is addressed to Jeff.  I'm assuming Jeff

3  Vernon.  Can you read it?

4    A.   I'm trying to read it right now.

5          MR. VALANZOLA:  Why don't you read it to us.  It

6          might be easier for us to read it if you're reading

7          it.

8    Q.   "Jeff, again please provide references as well as

9  please provide any financial information regarding the

10  company for our review.  We want to make sure and feel

11  comfortable that Snow Management will be able to live up to

12  their obligations to us to remove the snow given we have a

13  fixed cost contract.  You can forward this info to Lou

14  Zicht."

15    A.   Okay.

16    Q.   Do you know if Heritage received the information

17  requested here?

18    A.   Well, since I asked him to forward it to Lou Zicht,

19  I think that would have been a question you should have asked

20  Lou.

21    Q.   By that, I take it you don't know?

22    A.   I don't know for sure, no.

23    Q.   Do you recall seeing any financial information

24  relating to Mr. Allin or Snow Management before the contract

25  was signed?

1     A.    I don't recall receiving -- seeing any information

2     from Snow Management regarding their company.

3     Q.    Did you receive any information from any other

4     source?

5     A.    Yes.

6     Q.    What source was that?

7     A.    We received a report that we requested from Dunn &

8     and Bradstreet.

9     Q.    Was this requested before the contract was signed?

10    A.    Yes.

11    Q.    Was it received by you before the contract was

12    signed?

13    A.    I saw it before the contract was signed.

14    Q.    Did the information in that report create any

15    concerns for you?

16    A.    There was --

17        MR. VALANZOLA:  Objection.  Go ahead.

18    A.    There was very, very little information in the

19    report on Snow Management.

20    Q.    Did you ask Mr. Zicht if he had received the

21    information you had requested?

22    A.    I can't recall.

23    Q.    Other than the Dunn & Bradstreet report, do you

24    recall any other information which you may have received

25    about Snow Management Group or Mr. Allin before the contract

1    was signed?

2              MR. VALANZOLA:  Objection.  You can answer.

3         A.   I don't recall receiving any other financial

4    information regarding Snow Management.

5              MR. MARKHAM:  I'll mark this e-mail as an exhibit

6              so it'll be attached to the transcript also.

7              MR. VALANZOLA:  Is there additional information

8              above the part we're looking at?  Not below, but

9              above.  So we have the benefit of seeing the entire

10             document.

11             MR. MARKHAM:  Sure.  I'll pull it down, hang on.

12             Can you see the top?

13             MR. VALANZOLA:  You've gone down too far.  Could

14             you bring it down -- that's it.  A little bit more.

15             If you can focus it now so we can read what that

16             says.

17             MR. MARKHAM:  How's that?

18             MR. VALANZOLA:  I can't make it out.

19             MR. MARKHAM:  Let me try something.  Is that making

20             it better?

21             MR. VALANZOLA:  No.  Worse.  Keep going.  Little

22             more.

23             THE WITNESS:  No.

24             MR. VALANZOLA:  Back.

25             MR. MARKHAM:  Is it better now?

1          MR. VALANZOLA:  No.  It's terrible.

2          MR. MARKHAM:  I can read to you what appears above

3          that message of August 3rd.  At the very top the

4          name Mary Russell appears.  It's an e-mail from her

5          to Jeff Vernon.  And really all it contains is the

6          names "Home Depot, CVS, New Plan - Mike Doud,"

7          D-O-U-D, "Westfield - Pat."  That's what appears

8          above Mr. Prendergast's e-mail.

9          MR. VALANZOLA:  Okay.  Thank you.

10     Q.   With regard to the time frame of before the contract

11  was signed, are you aware of any work undertaken by Snow

12  Management Group to get ready for the snow season?

13          MR. VALANZOLA:  Objection.  You can answer.

14     A.   No.

15     Q.   After the contract was signed, looking at that time

16  frame, are you aware of any work undertaken by Snow

17  Management to get ready to perform under the contract?

18          MR. VALANZOLA:  Again, objection as to form.  You

19          can answer.

20     A.   Can you tell me what you mean by "work".

21     Q.   I mean it in the very broadest sense.  Any

22  activities, undertakings, endeavors, anything in the broadest

23  sense of the word "work".

24     A.   Sure.  They probably mailed a couple of letters.

25     Q.   Again, I don't want you to necessarily guess or

1    speculate.  I just want to know what you're aware of of

2    having occurred.  Are you aware of them sending a couple

3    letters?

4         A.   Well, again, I'm speculating.  You asked me in the

5    broadest sense of the word did they do any work.  What does

6    that mean?  They could have done letters.  They could have

7    not done anything.  I do not know anything specific that they

8    were doing under their contract.

9         Q.   As an example, you mentioned before hearing from the

10   regional managers from the plow operators before the contract

11   was signed.  Did you hear anything, as an example, from them

12   after the contract was signed indicating we have a contract

13   with Snow Management or they're out here submitting requests

14   for proposals, things of that nature?

15             MR. VALANZOLA:  I'll object as to form.  I'll

16             object as to I'm not sure he said what you said in

17             the beginning part of that question.  And if he

18             understands the question, I'll allow him to answer

19             it.

20        A.   I believe I heard from some of our regional managers

21   that Snow Management was in contact with some of our

22   incumbent snow removal contractors, but at that point that's

23   all I know.

24        Q.   Do you know whether or not Snow Management Group

25   actually hired its own regional managers to perform under the

1  contract?

2      MR. VALANZOLA:  Objection.  Go ahead.

3      A.   I'm not sure.

4      Q.   Did you have any discussions with Mr. Vernon, before

5  the contract was signed, about the contract provision dealing

6  with termination?

7      A.   I don't recall if I did or not.

8      Q.   Did you have any input into the language used in the

9  contract regarding termination?  And this is the language in

10  Paragraph 17.

11      MR. VALANZOLA:  Objection.  You can answer.

12      A.   I honestly can't remember if I had any input in that

13  clause.  I was mostly dealing with the business terms.

14      Q.   Before the contract was signed, did you have any

15  discussions with Mr. Zicht about the meaning of that

16  provision of the contract?  Paragraph 17.

17      A.   I can't recall.

18      Q.   At some point after the contract was signed, did you

19  receive information that raised an issue about Snow

20  Management's ability to perform?

21      MR. VALANZOLA:  Objection.  You can answer.

22      A.   Can you just clarify what you mean by "perform".

23      Q.   Satisfy the obligations of the contract.

24      A.   Of what contract?

25      Q.   The contract that was signed between your company

1      and Mr. Allin.

2             MR. VALANZOLA:  You're talking about a period of

3             the execution of the contract?

4             MR. MARKHAM:  Yes.

5      A.    So is your question after we --

6             MR. VALANZOLA:  If you don't understand the

7             question, tell him you don't understand the

8             question.  Let him rephrase it.  Don't do that for

9             him.  Do you understand the question?

10            MR. MARKHAM:  Let me rephrase it.

11            MR. VALANZOLA:  Just say you don't understand the

12            question.

13     A.    I don't understand it.

14            MR. VALANZOLA:  Please try again, Craig.

15     A.    I don't mean to be difficult.  I'm not really sure

16     what you're -- I'm not really sure what you're asking.

17     Q.    That's fine.  At any point you're not sure what I'm

18     asking, let me know and I'll try again.

19     A.    After this I don't plan to run for Supreme Court

20     Justice either.

21     Q.    Let me try again.  After the contract was signed,

22     did you become aware of any information that raised a concern

23     for you about the ability of Mr. Allin to perform under this

24     contract?

25            MR. VALANZOLA:  Objection.  Go ahead.

1      A.   Yes, I did, but it was -- it was not particularly

2   Mr. Allin.  It was Snow Management.  And unless you're using

3   Mr. Allin and Snow Management as one and the same,

4   information I received was regarding Snow Management.

5      Q.   What was your understanding of the relationship

6   between Mr. Allin and Snow Management?

7      A.   It's my understanding that Mr. Allin owned Snow

8   Management.

9      Q.   What was the information you received about Snow

10   Management after the contract was signed?

11      A.   We received information that they were unable to pay

12   their subcontractors who had performed work -- snow removal

13   work for them during the previous year.

14      Q.   Did this information come in the form of a letter or

15   two?

16      A.   Yes.

17      Q.   Did it come in any other form?  I mean, like

18   conversation or e-mail or anything like that?

19      A.   I -- I can't remember.  I know there is -- there's

20   paper with writing on it about, you know, Snow Management

21   doesn't pay their contractors, and you should be aware of

22   what you're getting into.  Something to that nature.  I don't

23   know if those are the exact words.

24      Q.   Do you know where that came from?

25      A.   No, I don't.

1      Q.    Do you know how it was received?  Was it mailed?

2    Dropped off?  Handed to somebody?

3      A.    I don't recall.  That's what I said, I don't

4    remember if it was e-mail or -- I just remember it being on a

5    piece of paper.

6      Q.    Do you know if anyone at Heritage looked into it

7    beyond reading what was on the piece of paper?

8            MR. VALANZOLA:  Objection.  You can answer.

9      A.    I know someone did.

10     Q.    Who was that?

11     A.    I can't be sure.

12     Q.    Was this an investigation directed by you?

13           MR. VALANZOLA:  Objection.  Go ahead.

14     A.    I don't know if it was directed by me, but I know

15   someone in our company -- after we received it, we had a

16   discussion that we should look in to see if these -- if --

17   what was going on, if anything, with Snow Management.

18     Q.    Do you know when you received the letters?

19     A.    I can't be sure.  I don't think they're dated.

20     Q.    Do you know if they came straight to you or did

21   someone else receive them?

22     A.    I don't know.  I -- I can't remember if it was in my

23   mailbox or it might have been delivered to someone else who

24   brought it to me.

25     Q.    Do you know what was done at Heritage to investigate

1    the issue further?

2         MR. VALANZOLA:  Objection.  You can answer.

3    A.   I can't -- I don't remember or recall exactly how we

4    were able -- how we looked up the information, but we were

5    able to determine that Snow Removal was out looking to be

6    recapitalized because they had outstanding debts that were

7    owed to their subcontractors.

8    Q.   Is that information in a report of some kind or

9    memo?

10   A.   Yes.  It's in -- it's in some form of -- it's on a

11   piece of paper.  I don't know if it's a memo or attachment,

12   but I know it's on a piece of paper.

13   Q.   Is this piece of paper generated by someone at

14   Heritage, or again, is this something that was received by

15   Heritage?

16   A.   It's a piece of paper that we obtained somehow.  It

17   doesn't have our name on it, it's not an internal memo.  It's

18   a piece of paper that -- again, it could have been pulled

19   from a web site or somewhere else, I can't remember.  But it

20   wasn't a Heritage letterhead.

21   Q.   Do you know if there are any internal Heritage memos

22   dealing with the issue of Snow Management's financial

23   condition?

24        MR. VALANZOLA:  Objection.  You can answer.

25   A.   Not that I recall.

24

```
 1        Q.   Do you know if anyone at Heritage communicated with

 2   Snow Management, Mr. Vernon or Mr. Allin, about this

 3   particular issue of the financial difficulties they were

 4   having?

 5             MR. VALANZOLA:   Again, same objection as to form.

 6             You can answer.

 7        A.   I believe I spoke to Mr. Vernon about it.

 8        Q.   Do you recall when that was?

 9        A.   I would say it was between the time we signed the

10   contract and the time we terminated them.

11        Q.   So it was before the termination?

12        A.   I -- I believe so.  It was either -- I think it was

13   before the termination.

14        Q.   This was a telephone call?

15        A.   I believe so.

16        Q.   What was said in the call?

17        A.   Why didn't you tell us you were having these issues.

18   If you refer back to the e-mail that you put up there, on

19   August 3rd, one of our concerns that we had was the ability

20   of Snow Management to perform.  One of those obligations to

21   perform is to pay your subcontractors.  If you don't pay your

22   subcontractors, Heritage is in jeopardy of having liens filed

23   against it for moneys not being paid, and it could put us in

24   severe financial hardship.  And as a public company that's

25   probably the last thing you want to do is be brought to task
```

1    for hiring a company with -- without -- with -- who doesn't

2    have the ability to pay their subcontractors and puts the

3    company in peril.

4        Q.   What did Mr. Vernon say to this?

5        A.   He said that they were working on a way to fix it.

6        Q.   Did he explain fix what?  What was he fixing?

7        A.   They were working on a way to fix the debts and --

8    that they owed to the subcontractors by this capital

9    revitalization.

10       Q.   Do you remember anything else being said during that

11    call?

12       A.   I think I was upset because he didn't tell us the

13    truth about what was happening.  Because, if you remember,

14    again in that same August 3rd e-mail, we had asked for

15    information directly from Mr. Vernon regarding the financial

16    condition of his company.  And that is -- that is paramount

17    to his financial condition, and he didn't disclose it to us.

18       Q.   You don't know if you received anything from him

19    before the contract, do you?

20       A.   Again, I didn't.  Those things were asked to go to

21    Lou Zicht, and Lou Zicht apparently did not receive anything

22    from him either.

23       Q.   Is that what he told you?

24       A.   No.  I just said I assumed he didn't receive

25    anything either.

1  Q. Well, in this call what did Mr. Vernon say to that?

2  A. To what?

3  MR. VALANZOLA:  To what?

4  Q. When you raised the point that you didn't think he

5 was being honest or forthcoming with you.

6  MR. VALANZOLA:  Objection.  Go ahead.

7  A. I really don't recall what his answer was.

8  Q. Do you recall anything else that was said during

9 that call?

10  A. No.  If I remember, it was not -- it was not a very

11 long call.

12  Q. Did you have any communication with him after that?

13  A. I don't believe so.  Because I think their -- I

14 think I communicated to him -- well, I communicated to him

15 after we sent the termination letter that any further

16 communications go through our attorney, Ed VALANZOLA.

17  Q. I imagine after that you didn't have any

18 communications then with anyone else from Snow Management

19 Group?

20  MR. VALANZOLA:  Objection.  Go ahead.

21  A. I don't believe I did.

22  MR. MARKHAM:  Mr. Prendergast, that's all the

23    questions I have for you today.

24  MR. VALANZOLA:  Thank you.  We have no questions.

25  MR. MARKHAM:  We'll terminate.

1     (Deposition concluded at 3:06 p.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**'03**
[1] 5:2
**'04**
[6] 4:2 4:3 5:1 5:2 5:17 5:21

## 0

**02116**
[1] 1:19
**04-333**
[1] 1:4

## 1

**120**
[1] 1:16
**131**
[2] 3:14 14:19
**150**
[1] 1:22
**16501**
[2] 1:17 1:23
**16502**
[1] 1:12
**17**
[2] 20:10 20:16
**1990**
[1] 4:12
**1999**
[2] 3:19 4:12

## 2

**20**
[1] 1:10
**2000**
[1] 1:10
**2004**
[2] 6:20 12:15
**24**
[1] 14:11
**24-hour**
[1] 14:4
**2:18**
[1] 1:10

## 3

**3**
[1] 12:15
**302**
[1] 1:11
**3:06**
[1] 28:1
**3rd**
[3] 18:3 25:19 26:14

## 4

**45**
[1] 3:12

## 5

**535**
[1] 1:19

## 7

**70**
[1] 3:10

## A

**Ability**
[5] 9:2 20:20 21:23 25:19 26:2
**Able**
[5] 5:3 12:14 15:11 24:4 24:5
**Activities**
[1] 18:22
**Add**
[2] 7:23 7:25

**Additional**
[1] 5:12
**Address**
[1] 13:5
**Addressed**
[2] 14:23 15:2
**Ahead**
[10] 4:24 5:14 6:23 7:16 16:17 20:2 21:25 23:13 27:6 27:20
**Allin**
[13] 1:5 1:5 6:8 6:9 15:24 16:25 21:1 21:23 22:2 22:3 22:6 22:7 25:2
**Allin's**
[2] 4:17 9:22
**Allow**
[1] 19:18
**Alpine**
[1] 3:10
**Answer**
[13] 7:24 11:5 17:2 18:13 18:19 19:18 20:11 20:21 23:8 24:2 24:24 25:6 27:7
**Answered**
[1] 7:20
**Apart**
[1] 7:1
**Asset**
[2] 4:14 4:14
**Assistant**
[1] 4:14
**Association**
[1] 1:11
**Assumed**
[1] 26:24
**Assuming**
[1] 15:2
**Attached**
[1] 17:6
**Attachment**
[1] 24:11
**Attorney**
[1] 27:16
**August**
[5] 6:20 12:15 18:3 25:19 26:14
**Available**
[1] 6:25
**Average**
[2] 7:4 7:6
**Aware**
[7] 11:12 18:11 18:16 19:1 19:2 21:22 22:21

## B

**Bachelor**
[1] 4:5
**Background**
[1] 4:4
**Bar**
[1] 1:11
**Based**
[1] 4:10
**Become**
[2] 11:12 21:22
**Begin**
[1] 7:13
**Beginning**
[1] 19:17
**Below**
[2] 12:21 17:8
**Benefit**
[2] 12:20 17:9
**Better**
[2] 17:20 17:25
**Between**
[5] 5:13 7:10 20:25 22:6 25:9
**Beyond**
[1] 23:7

**Bid**
[1] 11:14
**Bidding**
[1] 13:22
**Bit**
[3] 13:8 13:9 17:14
**Black**
[2] 1:8 1:25
**Boston**
[4] 1:19 3:15 4:10 14:20
**Bottom**
[3] 14:16 14:17 14:22
**Boylston**
[1] 1:19
**Bradstreet**
[2] 16:8 16:23
**Bring**
[1] 17:14
**Broadest**
[3] 18:21 18:22 19:5
**Brought**
[2] 23:24 25:25
**Business**
[2] 10:19 20:13

## C

**Capital**
[1] 26:8
**Case**
[1] 1:4
**CEO**
[1] 3:20
**Check**
[1] 12:25
**Chicago**
[1] 4:10
**Chief**
[3] 3:17 3:24 4:1
**Circumstances**
[2] 6:13 13:21
**Clarify**
[1] 20:22
**Clause**
[1] 20:13
**Clear**
[1] 7:21
**Close**
[1] 8:1
**Comfortable**
[1] 15:11
**Commencing**
[1] 1:10
**Commonwealth**
[1] 1:9
**Communicate**
[1] 8:19
**Communicated**
[3] 25:1 27:14 27:14
**Communication**
[5] 8:6 8:9 8:14 14:22 27:12
**Communications**
[3] 6:10 27:16 27:18
**COMPANIES**
[1] 1:5
**Company**
[16] 4:8 4:15 4:25 5:5 6:17 6:18 9:22 10:25 11:10 16:2 20:25 23:15 25:24 26:1 26:3 26:16
**Complete**
[2] 12:3 14:1
**Completed**
[1] 14:2
**Concern**
[3] 8:17 8:19 21:22
**Concerned**
[1] 10:4
**Concerning**
[1] 9:21
**Concerns**

**[3]** 26:12 15:15 25:19
**[1]** 28:1
**Condition**
[3] 24:23 26:16 26:17
**Conference**
[2] 6:19 13:24
**Considering**
[1] 7:7
**Construction**
[2] 3:23 3:24
**Contact**
[1] 19:21
**Contacted**
[1] 8:13
**Contains**
[1] 18:5
**Context**
[1] 12:18
**Contract**
[49] 4:17 5:1 5:17 7:11 7:12 8:1 8:8 8:14 8:23 9:1 9:5 9:18 9:20 9:25 10:4 10:8 10:17 10:21 14:1 14:2 15:13 15:24 16:9 16:11 16:13 16:25 18:10 18:15 18:17 19:8 19:10 19:12 19:12 20:1 20:5 20:5 20:9 20:14 20:16 20:18 20:23 20:4 20:25 21:3 21:21 21:24 22:10 25:10 26:19
**Contractors**
[5] 8:3 8:7 8:13 19:22 22:21
**Conversation**
22:18
**Conversations**
[7] 7:17
**Copy**
[1] 12:4
**Correspondence**
[1] 9:18
**Cost**
[2] 5:19 15:13
**Costs**
[1] 7:7
**County**
[1] 1:11
**Couple**
[2] 18:24 19:2
**Court**
[2] 1:1 21:19
**Craig**
[4] 15:20 14:24 21:14
**Create**
[1] 16:14
**Critical**
[1] 5:12
**Cut**
[2] 12:9 14:24
**Cutting**
[2] 12:7 13:9
**CVS**
[1] 18:6

## D

**D/b/a**
[1] 1:5
**Dartmouth**
[1] 3:14
**Dated**
[2] 12:15 23:19
**Dealing**
[4] 3:20 5:20:13 24:22
**Debts**
[2] 24:6 26:7
**Defendant**
[2] 1:5 1:20
**Degree**
[4] 4:5
**Delivered**
[1] 23:23
**Deposition**

**Depot**
[2] 1:7 28:1
[1] 18:6
**Describe**
[1] 4:22
**Determine**
[1] 24:5
**Develop**
[1] 5:9
**Devlin**
[1] 1:15
**Diamond**
[1] 14:19
**Different**
[2] 11:24 12:16
**Difficult**
[1] 21:15
**Difficulties**
[1] 25:3
**Direct**
[2] 2:4 3:4
**Directed**
[2] 23:12 23:14
**Direction**
[1] 11:22
**Directly**
[2] 6:11 26:15
**Director**
[2] 3:23 3:23
**Disclose**
[1] 26:17
**Discussing**
[1] 5:15
**Discussion**
[3] 7:9 12:12 23:16
**Discussions**
[9] 5:9 6:14 9:21 9:22 10:3 10:6 10:10 20:4 20:15
**DISTRICT**
[2] 1:1 1:1
**Document**
[3] 12:21 24:24 17:10
**Done**
[4] 14:9 19:6 19:7 23:25
**Doubt**
[1] 10:13
**Doud**
[2] 18:6 18:7
**Down**
[5] 10:11 14:19 17:11 17:13 17:14
**Drive**
[1] 3:10
**Dropped**
[1] 23:2
**Duly**
[1] 3:2
**Dunn**
[2] 16:7 16:23
**During**
[3] 22:13 26:10 27:8

### E

**E-mail**
[13] 12:4 12:15 12:18 13:24 14:3 14:16 17:5 18:4 18:8 22:18 23:4 25:18 26:14
**Early**
[2] 5:2 6:20
**Easier**
[1] 15:6
**East**
[1] 1:22
**Ed**
[1] 27:16
**Educational**
[1] 4:4
**Edward**
[1] 1:18
**Eighth**

---

**Elderkin**
[1] 1:22
**Employees**
[1] 11:16
**Endeavors**
[1] 18:22
**Ends**
[1] 12:7
**Entertain**
[1] 9:7
**Entire**
[2] 12:24 17:9
**Equipment**
[1] 9:8
**Erie**
[5] 1:4 1:11 1:12 1:17 1:23
**Esquire**
[3] 1:15 1:18 1:21
**Exact**
[2] 6:2 22:23
**Exactly**
[1] 24:3
**Examination**
[2] 2:4 3:4
**Example**
[2] 19:9 19:11
**Execute**
[1] 14:9
**Executed**
[1] 7:11
**Execution**
[1] 21:3
**Exhibit**
[1] 17:5
**Explain**
[1] 26:6

### F

**Fact**
[2] 12:3
**Falls**
[1] 7:6
**Familiar**
[1] 5:6
**Far**
[3] 7:1 10:19 17:13
**Feasible**
[2] 5:16 10:14
**Ferguson**
[1] 1:25
**File**
[1] 14:2
**Filed**
[1] 25:22
**Financial**
[8] 15:9 15:23 17:3 24:22 25:3 25:24 26:15 26:17
**Fine**
[1] 21:17
**First**
[5] 3:1 4:20 4:25 7:3 14:3
**Fix**
[3] 26:5 26:6 26:7
**Fixed**
[1] 15:13
**Fixing**
[1] 26:6
**Focus**
[1] 17:15
**Follows**
[1] 3:2
**Form**
[7] 7:16 18:18 19:15 22:14 22:17 24:10 25:5
**Forthcoming**
[1] 27:5
**Forward**

---

**Frames**
[1] 15:3
**Friday**
[14] 5:11 5:21 5:22 5:25 6: 2 7:9 8:9 8:10 10:6 18:10 18:16
**Friday**
[1] 1:9
**Fulfill**
[1] 9:1
**Full**
[1] 3:7
**Fully**
[3] 14:6 14:7 14:8
**Fuzzy**
[2] 12:6 15:1

### G

**General**
[2] 4:20 4:22
**Generated**
[1] 24:13
**Given**
[1] 15:12
**Gornall**
[1] 1:16
**Group**
[5] 6:22 16:25 18:12 19:24 27:19
**Guess**
[1] 18:25

### H

**Hall**
[1] 4:5
**Handed**
[1] 23:2
**Handling**
[1] 14:5
**Hang**
[3] 4:2 13:13 17:11
**Hardship**
[1] 25:24
**Hear**
[1] 19:11
**Heard**
[2] 6:19 19:20
**Hearing**
[1] 19:9
**Held**
[3] 3:20 3:22 12:12
**Heritage**
[16] 1:2 3:14 3:18 3:22 4:7 7:13 11:16 15:16 23:6 23:25 24:14 24:15 24:20 24:21 25: 1 25:22
**Hired**
[3] 8:15 8:16 19:25
**Hiring**
[1] 9:21 26:1
**Holdnack**
[1] 1:25
**Holistan**
[1] 3:10
**Home**
[1] 18:6
**Honest**
[1] 27:5
**Honestly**
[1] 20:12
**Hours**
[1] 14:11

### I

**Idea**
[1] 5:19
**Ideas**
[1] 7:6
**Identified**
[1] 13:24
**Identifying**

---

**Framed**
[1] 13:5
**Inc**
[1] 27:17
**Inc**
[3] 1:2 1:18 1:25
**Incumbent**
[1] 19:22
**Indent**
[2] 13:7 13:7
**Indicate**
[1] 9:15
**Indicating**
[1] 19:12
**Info**
[1] 15:13
**Information**
[21] 14:4 15:9 15:16 15:23 16:1 16:3 16:14 16:18 16:21 16:24 17:4 17:7 20:19 21:22 22:4 22:9 22:11 22:14 24:4 24:8 26:15
**Input**
[2] 20:8 20:12
**Inquiries**
[5] 8:11 11:1 11:6 11:9 11: 19
**Instructions**
[1] 11:21
**Internal**
[2] 24:17 24:21
**Investigate**
[1] 23:25
**Investigation**
[1] 23:12
**Investment**
[1] 3:14
**Involved**
[4] 7:14 10:16 10:20 10:21
**Involvement**
[2] 4:16 4:23
**Involving**
[1] 6:20
**Issue**
[4] 20:19 24:1 24:22 25:3
**Issues**
[1] 25:17
**It'll**
[1] 17:6

### J

**January**
[1] 1:9
**Jeff**
[4] 15:2 15:2 15:8 18:5
**Jeopardy**
[1] 25:22
**Job**
[2] 3:16 4:13
**JOHN**
[1] 1:5
**June**
[3] 4:2 4:2 4:12
**Justice**
[1] 21:20

### K

**Keep**
[1] 17:21
**Kelly**
[1] 1:22
**Kind**
[1] 24:8
**Knox**
[1] 1:16

### L

**Language**
[2] 20:8 20:9
**Last**
[3] 7:7 7:24 25:25

Late
[1] 5:1
Less
[1] 5:12
Letter
[2] 22:14 27:15
Letterhead
[1] 24:20
Letters
[4] 18:24 19:3 19:6 23:18
Liens
[1] 25:22
Line
[3] 13:2 13:3 13:5
Lined
[4] 8:4 8:24 10:1 10:5
Lines
[1] 9:22
List
[1] 8:3
Live
[2] 3:9 15:11
Local
[4] 7:13 8:6 11:1 11:8
Lock
[2] 5:16 23:16
Locked
[2] 23:6 24:4
Locking
[4] 1:25 17:8 18:15 24:5
Lou
[5] 15:13 15:18 15:20 26:21
26:21

## M

Mail
[4] 12:19 13:24 18:8 26:14
Mailbox
[1] 23:23
Mailed
[2] 18:24 23:1
Managed
[1] 9:13
Management
[35] 1:2 1:18 3:24 6:5 6:22
7:14 8:1 8:15 8:19 9:9 13:
18 14:6 14:13 15:11 15:24
16:2 16:19 16:25 17:4 18:12
18:17 19:13 19:21 19:24 22:
2 22:3 22:4 22:6 22:8 22:10
22:20 23:17 25:2 25:20 27:18
Management's
[2] 20:20 24:22
Manager
[2] 4:14 4:14
Managers
[13] 8:7 8:12 9:12 11:8 11:
13 11:16 11:18 11:21 13:20
14:4 19:10 19:20 19:25
Managing
[1] 7:14
Margins
[2] 12:9 13:10
Mark
[1] 17:5
Markham
[19] 1:21 3:5 4:20 5:21 7:
21 12:9 12:23 12:25 14:25
17:5 17:11 17:17 17:19 17:
25 18:2 21:4 21:10 27:22 27:
25
Markham . . . . . . . . . . . . . . . . . . 3
[1] 2:4
Martin
[1] 1:22
Mary
[1] 18:4
Mass
[2] 5:12 14:20
Massachusetts
[2] 3:10 3:15
Matter

McLaughlin
[1] 1:16
Mean
[7] 5:9 18:20 18:21 19:6 20:
22 21:15 22:17
Meaning
[1] 20:15
Memo
[3] 24:9 24:11 24:17
Memos
[1] 24:21
Mentioned
[1] 19:9
Message
[2] 14:22 18:3
Messina
[1] 1:22
Method
[1] 8:8
Might
[5] 11:23 12:2 12:14 15:6
23:23
Mike
[1] 18:6
Moneys
[1] 25:23
Month
[1] 10:9
Most
[1] 13:25
Mostly
[1] 20:13
Move
[3] 13:6 13:7 14:21

## N

Name
[5] 3:7 6:7 13:5 18:4 24:17
Names
[1] 18:6
Nature
[4] 4:16 5:17 19:14 22:22
Neal
[1] 1:15
Necessarily
[1] 18:25
Need
[2] 10:1 14:8
Needed
[3] 13:18 13:19 14:9
Negotiate
[1] 9:7
Negotiating
[3] 6:24 10:13 10:17
Negotiations
[1] 6:22
Net
[1] 1:18
New
[1] 18:6
Ninth
[1] 1:11
Notary
[1] 1:8
Notes
[1] 13:23
November
[1] 3:19
Number
[3] 7:7 12:16 13:5

## O

Object
[2] 19:15 19:16
Objection
[22] 4:18 4:24 5:14 6:23 7:
16 10:18 11:5 16:17 17:2 18:
13 18:18 20:2 20:21 20:24 21:
21:25 23:8 23:13 24:2 24:24
25:5 27:6 27:20

Obligations
[4] 15:12 15:12 25:20 25:20
Obtained
[1] 24:16
Occasion
[1] 5:6
Occurred
[1] 19:2
October
[1] 4:12
Offered
[1] 8:3
Offering
[1] 5:2
Office
[1] 12:5
Officer
[3] 3:17 3:25 4:1
Offices
[1] 1:10
Old
[1] 3:11
Once
[2] 6:12 14:1
One
[3] 22:3 25:19 25:20
Ones
[1] 7:5
Open
[1] 14:10
Operating
[3] 3:17 23:4 4:1
Operations
[2] 7:15 14:5
Operators
[5] 7:13 9:21 9:23 11:1 19:
10
Order
[1] 14:8
Outstanding
[1] 24:6
Owed
[2] 24:7 26:8
Own
[1] 19:25
Owned
[1] 22:7

## P

Paid
[1] 25:23
Paper
[8] 22:20 23:5 23:7 24:11
24:12 24:13 24:16 24:18
Paragraph
[2] 20:10 20:16
Paramount
[1] 26:16
Part
[2] 17:8 19:17
Particular
[2] 13:20 25:3
Particularly
[2] 6:15 22:1
Past
[1] 8:4
Pat
[1] 18:7
Pay
[5] 22:11 22:21 25:21 25:21
26:2
PC
[1] 1:16
Pennsylvania
[3] 1:1 1:9 1:12
People
[6] 8:24 9:19 10:1 11:19 11:
22 12:16
Perform
[9] 9:5 9:8 18:17 19:25 20:

20 22:23 25:23 25:24 25:21
Performed
[1] 22:12
Peril
[1] 26:3
Period
[3] 4:11 4:19 21:2
Person
[2] 6:3 6:5 10:16
Phone
[1] 13:5
Piece
[7] 23:5 23:7 24:11 24:12
24:13 24:16 24:18
Piled
[2] 14:12 14:12
Pin
[1] 10:11
Place
[3] 7:9 7:18 9:12
Plaintiff
[2] 1:3 1:14
Plan
[2] 18:6 21:19
Plans
[2] 5:23 14:15
Plow
[1] 19:10
PM
[2] 1:10 28:1
Point
[9] 5:18 5:20 6:21 7:12 13:
16 19:22 20:18 21:17 27:4
Poorly
[1] 9:24
Position
[1] 3:20
Positions
[1] 3:22
Possibility
[1] 5:4
Possible
[1] 6:18
Prendergast
[4] 1:7 2:3 3:8 27:22
Prendergast's
[1] 18:8
Prepare
[1] 14:4
Prepared
[3] 14:6 14:7 14:8
Previous
[1] 22:13
Price
[5] 5:24 6:1 6:24 7:2 10:14
Pricing
[2] 5:15 7:5
Procedure
[1] 11:24
Processing
[1] 11:24
Properties
[11] 1:18 4:8 4:15 5:23 6:
24 7:8 13:19 13:21 14:10 14:
11 14:14
Property
[4] 3:14 3:23 8:6 11:8
Proposal
[1] 6:25
Proposals
[2] 9:7 19:14
Provide
[3] 11:21 15:8 15:9
Provision
[2] 20:5 20:16
Public
[1] 1:8 25:24
Pull
[1] 17:11
Pulled
[1] 24:18

**Purge**
[1] 14:1
**Push**
[1] 12:23
**Put**
[8] 5:24 8:9 8:10 10:6 13:
20 14:15 25:18 25:23
**Puts**
[1] 26:2
**Putting**
[2] 9:11 10:21

**Q**

**Questions**
[2] 27:23 27:24

**R**

**Raised**
[3] 20:19 21:22 27:4
**Reached**
[1] 5:11
**Read**
[10] 12:13 12:14 13:11 13:
15 15:3 15:4 15:5 15:6 17:
15 18:2
**Reading**
[4] 12:21 12:22 15:6 23:7
**Ready**
[5] 8:2 8:25 9:5 18:12 18:17
**Really**
[7] 5:15 10:11 14:1 18:5 21:
15 21:16 27:7
**REALTY**
[1] 1:2
**Recapitalized**
[1] 24:6
**Receipt**
[1] 5:25
**Receive**
[7] 8:11 11:6 16:3 20:19 23:
21 26:21 26:24
**Received**
[15] 9:18 11:1 15:16 16:7
16:11 16:20 16:24 22:4 22:9
22:11 23:1 23:15 23:18 24:
14 26:18
**Receiving**
[2] 16:1 17:3
**Record**
[1] 12:12
**Refer**
[1] 25:18
**References**
[1] 15:8
**Referring**
[1] 14:6
**Regard**
[1] 18:10
**Regarding**
[7] 13:21 15:9 16:2 17:4 20:
9 22:4 26:15
**Regards**
[1] 13:24
**Regional**
[6] 8:6 9:11 11:13 19:10 19:
20 19:25
**Relating**
[1] 15:24
**Relationship**
[1] 22:5
**Relying**
[1] 14:14
**Remember**
[12] 5:22 13:25 20:12 22:19
23:4 23:22 24:3 24:19
10:10 26:13 27:10
**Removal**
[10] 4:25 7:15 8:3 8:5 8:7
8:12 13:21 19:22 22:12 24:5
**Remove**
[1] 15:12
**Removed**

**Removing**
[1] 8:8
**Rephrase**
[2] 21:8 21:10
**Report**
[5] 16:7 16:14 16:19 16:23
24:8
**Reported**
[1] 1:25
**Reporting**
[1] 1:25
**Requested**
[4] 15:17 16:7 16:9 16:21
**Requests**
[1] 19:13
**Requirements**
[1] 14:5
**Response**
[1] 8:21
**Restrictions**
[1] 14:11
**Retail**
[2] 4:8 4:15
**Review**
[1] 15:10
**Revitalization**
[1] 26:9
**Robert**
[3] 1:7 2:3 3:8
**Run**
[1] 21:19
**Russell**
[1] 18:4

**S**

**Satisfy**
[1] 20:23
**Saw**
[1] 16:13
**Science**
[1] 4:5
**Season**
[2] 11:2 18:12
**Second**
[2] 4:2 13:13
**See**
[6] 12:8 14:13 14:16 14:19
17:12 23:16
**Seeing**
[3] 15:23 16:1 17:9
**Sending**
[1] 19:2
**Sennett**
[1] 1:16
**Sense**
[4] 4:20 18:21 18:23 19:5
**Sent**
[3] 5:23 14:15 27:15
**Sentence**
[1] 14:3
**Service**
[1] 6:18
**Services**
[3] 5:2 5:5 9:13
**Seton**
[1] 4:5
**Severe**
[1] 25:24
**Shot**
[1] 9:24
**Show**
[1] 12:4
**Side**
[1] 12:9
**Signature**
[3] 13:1 13:3 13:4
**Signed**
[22] 5:1 8:23 9:18 9:20 9:
25 10:4 15:25 16:9 16:12 16:

**Significantly**
[1] 7:4
**Signing**
[5] 7:12 8:1 8:11 8:14 10:8
**Site**
[2] 5:23 24:19
**Sites**
[1] 14:4
**Snow**
[49] 4:25 6:5 6:22 7:6 7:7
7:14 8:1 8:3 8:7 8:8 8:12 8:
14 8:19 9:9 13:18 13:21 14:
5 14:15 14:12 14:13 15:11 15:
12 15:24 16:2 16:19 16:25
17:4 18:11 18:12 18:16 19:
13 19:21 19:22 19:24 20:19
22:2 22:3 22:4 22:6 22:7 22:
9 22:12 22:20 23:17 24:5 24:
9 22:12 22:20 25:20 27:18
**Snowfall**
[1] 7:4
**Solicited**
[1] 4:25
**Solicitied**
[1] 5:8
**Someone**
[8] 6:6 7:13 10:20 23:9 23:
15 23:23 24:13
**Sometime**
[1] 6:20
**Somewhere**
[2] 7:10 24:19
**Sondra**
[2] 1:8 1:25
**Source**
[2] 16:4 16:6
**Special**
[1] 4:5
**Specific**
[4] 4:5 5:22 11:15 19:7
**Specifics**
[1] 4:21
**Speculate**
[1] 19:1
**Speculating**
[1] 19:4
**Started**
[2] 5:4 5:15
**State**
[1] 3:7
**STATES**
[1] 1:1
**Status**
[2] 6:21 11:2
**Still**
[4] 6:24 10:13 12:6 14:16
**Straight**
[1] 23:20
**Street**
[6] 1:11 1:16 1:19 1:22 3:
15 14:19
**Stuff**
[1] 13:25
**Subcontractors**
[8] 9:7 9:10 22:12 24:7 25:
21 25:22 26:2 26:8
**Submittal**
[1] 7:3
**Submitted**
[1] 7:5
**Submitting**
[1] 19:13
**Summertime**
[2] 10:12 10:15
**Supermarkets**
[1] 14:10
**Supplied**
[1] 9:9
**Supreme**

[13 17:1 18:14 18:23 24:11
25 21:21 22:10 25:9
**Sworn**
[1] 3:2

**T**

**Task**
[1] 25:25
**Telephone**
[2] 6:19 25:14
**Tenth**
[1] 1:16
**Terminate**
[1] 27:25
**Terminated**
[1] 25:10
**Termination**
[5] 20:6 25:11 25:13
27:15
**Terms**
[5] 7:2 10:17 10:19 10:20
20:13
**Terrible**
[1] 18:1
**Testified**
[1] 3:2
**Themselves**
[1] 11:15
**Thinking**
[1] 8:8
**Title**
[1] 3:16
**Today**
[1] 27:23
**Together**
[3] 5:24 10:22 13:20
**Took**
[1] 7:17
**Top**
[2] 17:12 18:3
**Transcript**
[1] 17:6
**Trust**
[1] 3:14
**Truth**
[1] 26:13
**Try**
[5] 12:4 17:19 21:14 21:18
21:21
**Trying**
[3] 11:23 11:24 15:4
**Turn**
[1] 12:25
**Twice**
[1] 6:12
**Two**
[3] 5:13 12:7 22:15
**Types**
[1] 9:4

**U**

**Unable**
[1] 22:11
**Under**
[5] 9:1 18:17 19:8 19:25 21:
23
**Undertaken**
[2] 18:11 18:16
**Undertakings**
[1] 18:22
**UNITED**
[1] 1:1
**University**
[1] 4:6
**Unless**
[2] 7:23 22:2
**Up**
[12] 8:5 8:10 8:24 9:14 9:
17 10:1 10:5 12:23 14:21 15:
17 25:18
**Upcoming**
[1] 11:2

Upset
[1] 26:12
Urban
[2] 4:8 4:15
Usual
[1] 8:7
Utilizing
[1] 5:5

## V

Valanzola
[51] 1:18 4:18 4:24 5:14 5:
20 6:23 7:16 7:20 7:23 10:
18 11:5 12:1 12:6 12:11 12:
20 12:24 13:6 14:19 14:24
15:1 15:5 16:17 17:2 17:7
17:13 17:18 17:21 17:24 18:
1 18:9 18:13 18:18 19:15 20:
2 20:11 20:21 21:2 21:6 21:
11 21:14 21:25 23:8 23:13
24:2 24:24 25:5 27:3 27:6
27:16 27:20 27:24
Vendors
[1] 11:15
Vernon
[17] 5:2 5:4 5:7 5:18 5:23
6:3 6:6 8:2 10:1 15:3 18:5
20:4 25:2 25:7 26:4 26:15
27:1
Vernon's
[1] 7:3

## W

Web
[1] 24:19
West
[2] 1:11 1:16
WESTERN
[1] 1:1
Westfield
[1] 18:7
Whole
[1] 12:8
WITNESS
[1] 17:23
Word
[2] 18:23 19:5
Worded
[1] 9:24
Words
[1] 22:23
Worse
[1] 17:21
Writing
[1] 22:20

## Y

Year
[2] 5:1 22:13
Years
[1] 7:8

## Z

Zicht
[8] 6:20 10:21 15:14 15:18
16:20 20:15 26:21 26:21
Zoom
[1] 12:10

C E R T I F I C A T I O N

I, Sondra A. Black, a Court Reporter and Notary

Public in and for the Commonwealth of Pennsylvania, do

hereby certify that the foregoing is a true and accurate

transcript of my stenographic notes in the

above-captioned matter.

Dated: January 30, 2006

From: Mary Russell [mary@allinco.com]
Sent: Wednesday, August 04, 2004 5:15 PM
To: 'Jeffrey Vernon'
Subject: RE: Snow Management


-----Original Message-----
From: Jeffrey Vernon [mailto:jeff@snowmanagementgroup.com]
Sent: Wednesday, August 04, 2004 4:56 PM
To: Mary Russell
Subject: FW: Snow Management

lzicht@heritagerealty.com

home depot
cvs
new plan - mike doud
westfield - pat?


-----Original Message-----
From: Prendergast, Bob [mailto:bprendergast@heritagerealty.com]
Sent: Tuesday, August 03, 2004 7:53 AM
To: Bush, Mark; Read, William; Wellman, Tom; Zicht, Louis C.; Jeffrey Vernon (E-mail); Lisa Edwards (E-mail)
Subject: Snow Management

Pursuant to our conference call yesterday with snow management please have your managers start to prepare any information on the sites as to 24 hour operations or any special snow handling requirements so snow mgmt can be fully prepared. As well please have your managers compile a list of any current vendors snow management should speak to regarding possible continuing services and anyone you feel they should not entertain proposals from due to past history.

Remember the regions that we have not included in this contract will be:

Florida (for obvious reasons)
Texas
St. Louis
Kentucky
Kansas
Michigan
Souteast
Tennessee
535 Boylston Street, Boston, MA
545 Boylston Street, Boston, MA
131 Dartmouth Street, Boston, MA

Lisa,
Mark Bush will be forwarding you the list of regions and properties with addresses.

Jeff,

Again please provide references and as well please provide any financial information regarding the company for our review. We want to make sure and fell comfortable that Snow Management will be able to live up to their obligations to us to remove the snow given we have a fixed cost contract. You can forward this info to Lou Zicht.

Thanks,

8/5/2004



EXHIBIT
Prendergast 1

JA00018

Bob Prendergast
Senior Vice President, COO
Heritage Property Investment Trust, Inc.
131 Dartmouth Street
Boston, MA 02116
617-247-2200 ext.2601
617-247-7997 fax

bprendergast@heritagerealty.com

8/5/2004

JA00019