IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| HERITAGE REALTY MANAGEMENT, INC., | ) Docket No. 04-333 ERIE |
| | ) (Judge Sean J. McLaughlin) |
| Plaintiff | ) ELECTRONICALLY FILED PLEADING |
| vs. | ) PRETRIAL STATEMENT |
| JOHN ALLIN d/b/a ALLIN COMPANIES and SNOW MANAGEMENT GROUP, | ) Filed on behalf of: Plaintiff, Heritage Realty Management, Inc. |
| | ) Counsel of record for this party: |
| Defendant | ) Richard A. Lanzillo, Esq. |
| | ) Knox McLaughlin Gornall |
| | ) & Sennett, P.C. |
| | ) 120 West 10th Street |
| | ) Erie, PA 16501 |
| | ) Telephone (814) 459-2800 |
| | ) Facsimile (814) 453-4530 |
| | ) Email rlanzillo@kmgslaw.com |
| | ) PA53811 |

## PLAINTIFF'S PRETRIAL STATEMENT

Plaintiff, Heritage Realty Management Inc., ("Heritage"), through its counsel, Knox, McLaughlin, Gornall & Sennett, P.C., files the following as its Pretrial Statement:

**I.   NARRATIVE STATEMENT OF THE CASE**

   **A.   The Snow Removal Contract between Heritage and Allin**

Heritage, a publicly traded company, is primarily engaged in the ownership and management of commercial real estate and owns properties throughout the United States. Historically, Heritage managed snow removal operations at its various properties by contracting directly with local subcontractors. In early 2004, Heritage was approached by a salesperson employed by John Allin ("Allin") regarding Allin's expertise and experience in the management of large-scale snow removal operations and the possibility of doing business with Heritage.

Serious negotiations concerning a possible contract between Heritage and Allin commenced sometime between May and August of 2004. These negotiations ultimately resulted in the parties' execution of a written contract dated October 12, 2004 (the "Contract"). In the Contract, Allin represented and warranted that he was "an experienced and professional organization that specializes in the management and supervision of snow and ice removal services for commercial properties provided under subcontractors with reputable commercial snow removal contractors." Under the Contract, Allin agreed to "provide all services required to manage, supervise and assure" the performance of all "snow and ice plowing, snow blowing, shoveling, salting, sanding and snow and ice removal operations" at each of the properties owned or managed by Heritage and identified pursuant to the Contract.

Section 13 of the Contract expressly prohibited Allin's assignment of his rights and interests under the Contract without Heritage's prior written consent. This provision was particularly important to Heritage because Heritage had contracted with Allin based upon the locally controlled-nature of Allin's business and the representations of Allin and his employees concerning the stability and expertise of his snow removal business.

In consideration of Allin's services under the Contract, Allin was to be paid an annual fee in seven installments payable each month from October through May of each contract year. On October 13, 2004, in anticipation of work that Allin was to perform under the Contract, Heritage paid an initial deposit to Allin in the amount of $340,482.90.

Section 17 of the Contract authorized Heritage "to terminate [the Contract] by giving [Allin] ten (10) days written notice …". . Heritage had the right to terminate the contract if Allin was "in default with respect to any of its obligations under [the Contract]" or "without

any cause whatsoever …"  In the event of a termination, Allin was entitled to be paid "for all work or services performed and equipment and materials supplied to the date of termination."

      **B.**      **The undisclosed financial distress of Allin's snow removal business and its ultimate sale to Symbiot.**

Unbeknownst to Heritage at the time, Allin's business was not a stable and professional organization as had been represented to Heritage during negotiations and in the express terms of the Contract.  Indeed, prior to the parties' execution of the Contract, Allin had failed to pay his snow removal subcontractors obligations totaling approximately $3,600,000.00.  Allin's business had also experienced severe internal accounting problems.  During the months preceding his execution of the Contract, the economic difficulties of Allin's Snow Management Group exacerbated to such an extent that he was forced to engage a "work-out" firm to seek a capital infusion for the company and to negotiate with his unpaid subcontractors.

By no later than September 2004, Allin was engaged in serious negotiations to sell his snow removal business to an entity known as Symbiot Business Group ("Symbiot").  Although his negotiations with Symbiot were occurring simultaneously with the negotiation and ultimate execution of the Contract with Heritage, Allin did not disclose any information to Heritage regarding his precarious financial condition, his search for a capital infusion or strategic buyer for his snow removal business, or his negotiations with Symbiot.

In October, 2004, shortly after executing the Contract with Heritage, Allin concluded a formal agreement to sell his snow removal business to Symbiot.  Under this agreement, Allin transferred all of the assets of his business that would have been required to perform his obligations to Heritage under the Contract.  Thus, Allin's sale of assets to Symbiot rendered him physically incapable of performing his obligations to Heritage under the Contract.  In addition, as part of his agreement with Symbiot, Allin executed a restrictive covenant that

precluded him from engaging in any snow removal activities.  By executing this covenant, Allin voluntarily deprived himself of the legal right and capacity to perform his obligations to Heritage under the Contract.

Allin never obtained or even requested Heritage's consent to any assignment of the Contract to Symbiot.

**C.    Heritage's termination of the Contract and demand for return of its money.**

On November 3, 2004, Heritage issued written notice to Allin that it was terminating the Contract and demanding the return of the $340,482.90 that Heritage had paid to Allin.  Under the Contract, Heritage's termination was effective no later than ten (10) days after written notice.  As of November 13, 2004, Allin had performed no services and provided no materials under the Contract.

Pursuant to the unambiguous terms of the Contract, Allin is obligated to return the $340,382.90 payment because he did not perform any services or provide any materials to Heritage.  Further, Allin's actions prior to Heritage's termination of the Contract constituted a material breach and anticipatory repudiation of the Contract, entitling Heritage to a return of the $340,382.90 payment.

**II.  WITNESSES:**

1. Robert G. Prendergast, Chief Operating Officer
   Heritage Realty Management, Inc.
   131 Dartmouth Street
   Boston, Massachusetts 02116

2. Louis C. Zicht, Esq., General Counsel
   Heritage Realty Management, Inc.
   131 Dartmouth Street
   Boston, Massachusetts 02116

3. Edward W. Valanzola, Esq., Associate General Counsel
   Heritage Realty Management, Inc.
   131 Dartmouth Street
   Boston, Massachusetts 02116

4. John Allin (as on cross)
   2319 South Shore Drive
   Erie, Pennsylvania 16505

5. Margaret Allin (as on cross)
   2319 South Shore Drive
   Erie, Pennsylvania 16505

   Custodians of records as needed to authenticate documents not admitted by stipulation.

Heritage reserves the right to call any witnesses listed in the Pretrial Statement of John Allin and to amend its witness list in accordance with applicable rules of court.

III. **EXHIBITS**

1. October 12, 2004 Contract between Heritage Realty Management, Inc. and John Allin

2. November 3, 2004 Termination Letter from Edward W. Valanzola

3. Deposition of John Allin

4. Deposition of Margaret Allin

5. Documents produced during discovery relating to the financial condition of John Allin d/b/a Allin Companies and Snow Management Group

6. All correspondence between Heritage and John Allin and/or his representatives and employees

7. Any and all documents produced in discovery by either party to this action.

Heritage reserves the right to utilize or offer any exhibit listed in Allin's Pretrial Statement and to amend its exhibit list in accordance with applicable rules of court.

Respectfully submitted,

KNOX McLAUGHLIN GORNALL & SENNETT, P.C.

BY: /s/ Richard A. Lanzillo, Esq.
Richard A. Lanzillo
Neal R. Devlin
120 West Tenth Street
Erie, PA  16501-1461
(814) 459-2800

Attorneys for plaintiff,
Heritage Realty Management, Inc.

# 661828