```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2

 3   HERITAGE REALTY MANAGEMENT, :
     INC.,                       :
 4           Plaintiff           :
                                 :
 5       vs.                     :   CASE NO. CA 04-333 ERIE
                                 :
 6   JOHN ALLIN d/b/a ALLIN      :   JUDGE SEAN MCLAUGHLIN
     COMPANIES,                  :
 7           Defendant           :

 8

 9            Deposition of JOHN ALLIN, taken before and
     by Carol A. Holdnack, RPR, Notary Public in and for
10   the Commonwealth of Pennsylvania, on Monday,
     January 23, 2006, commencing at 9:02 a.m., at the
11   offices of Knox McLaughlin Gornall & Sennett, P.C.,
     120 West Tenth Street, Erie, PA 16501.
12

13
     For the Plaintiff:
14
         Richard A. Lanzillo, Esq.
15       Knox McLaughlin Gornall & Sennett, P.C.
         120 West Tenth Street
16       Erie, PA 16501

17       Kristina L. Angus, Esq.
         Heritage Property Investment Trust, Inc.
18       131 Dartmouth Street
         Boston, MA 02116
19
     For the Defendant:
20
         Craig A. Markham, Esq.
21       Elderkin Martin Kelly & Messina
         150 East Eighth Street
22       Erie, PA 16501

23

24
                   Reported by Carol A. Holdnack, RPR
25                 Ferguson & Holdnack Reporting, Inc.
```

Ferguson & Holdnack Reporting, Inc.
357 WEST TENTH STREET
ERIE, PENNSYLVANIA 16502
(814) 452-4556   Fax (814) 454-4377

Page 29

1  what was formally Snow Management Group and is now part of
2  Symbiot's organization here in Erie? I read some articles
3  that there's been a contraction or reshuffling of
4  responsibilities with stuff being transferred over to Salt
5  Lake City.
6      A. I have not been in the building in a while. My
7  employment came to an end there December 15th. They have
8  downsized severely and considerably, and I'm probably not
9  the right person to ask that question of.
10     Q. Is it your understanding, though, that the
11 principal operations that were here in Erie have since been
12 transferred to Salt Lake?
13     A. Not yet, but they're in the middle of
14 transitioning that.
15     Q. What were the circumstances surrounding the end of
16 your employment with Symbiot on or about December 15th?
17     A. Symbiot felt that I was not meshing with the
18 culture in Salt Lake, and that it would be best if I pursued
19 other endeavors, and I agreed.
20     Q. Did you have an employment agreement following the
21 acquisition by Symbiot?
22     A. I did.
23     Q. And I take it, it was terminable on certain
24 conditions, either party or Symbiot had the right to
25 terminate on notice or upon payment of an amount?

Page 30

1      A. Yes, that's essentially correct.
2      Q. What was the nature of the transaction between you
3  as the proprietor of Snow Management Group and Allin
4  Companies and Symbiot? In other words, was it an asset
5  purchase agreement, was it a -- what was it?
6      A. They purchased assets and certain liabilities as
7  it related to the snow business. They did not purchase any
8  landscape, irrigation, deck, any of that work.
9      Q. When did that asset purchase occur?
10     A. The closing was on November 22nd of '04.
11     Q. When did you start negotiating with Symbiot
12 regarding that transaction?
13     A. September of '04.
14     Q. Had you been looking for a strategic buyer for
15 portions of your business prior to September of '04?
16     A. Yes.
17     Q. When did those efforts start?
18     A. February -- February of '04.
19     Q. What prompted you to decide to look for a
20 purchaser of some or all of the business?
21     A. We had been growing expedientially since the
22 Olympic project. And we had been growing from cash flow.
23 It became apparent in the winter of '03/'04 that in order to
24 continue to sustain the type of growth that we were
25 experiencing and anticipated, that we would need capital or

Page 31

1  we would need to become properly capitalized in order to
2  continue that growth. So there was an effort made to engage
3  either a venture partner or to allow someone to acquire a
4  portion of the business to provide us with the capital that
5  we would need.
6      Q. Were you experiencing financial problems in
7  connection with the operation of the Snow Management Group
8  when you started looking for a venture capital partner or a
9  strategic buyer?
10     A. No.
11     Q. Were you paying debts as they came due?
12     A. Yes.
13     Q. Did that include debts to your subcontractors?
14     A. Yes.
15     Q. At any time between February of 2004 when you
16 started looking for a strategic buyer and the date you
17 entered into the Heritage contract, did you fall into
18 arrears with a significant portion of your subcontractors?
19     A. We did fall into arrears, but not with a
20 significant portion of our subcontractors. We had thought
21 we had an arrangement to be acquired, and that did not come
22 to fruition. And by the time that had taken place, the
23 original purchaser decided against going through with the
24 agreement. By that point, we had fallen behind by
25 approximately 3.6 million to service providers only. All

Page 32

1  other debts were paid on time and were current.
2      Q. Who was the original anticipated purchaser of the
3  business?
4      A. We had had conversations with a number of
5  different individuals and entities. And I had been trying
6  to educate a number of different people about the snow
7  industry. And at the same time I had engaged an engineering
8  firm to design a snow melter that we wanted to use. And
9  that -- the parent company of that entity was interested in
10 acquiring all of SMG.
11     Q. Prior to Symbiot, did you have a letter of intent
12 from anyone to purchase the business, or a portion of the
13 business?
14     A. I don't know if we ever had an actual letter of
15 intent.
16     Q. I may have misinterpreted your testimony a few
17 moments ago, Mr. Allin. But I was under the impression that
18 the discussions were fairly serious with at least one or
19 more potential buyers. Would that be a fair assessment of
20 your testimony?
21     A. Yes, sir.
22     Q. What was the name of the potential purchasers with
23 which you had serious negotiations?
24     A. It was Park Ohio Holdings Company in Cleveland.
25     Q. Anyone else?