IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HERITAGE REALTY MANAGEMENT, INC., | ) | Case No. CA 04 - 333 ERIE |
| Plaintiff | ) | |
| | ) | Judge Sean McLaughlin |
| v. | ) | |
| | ) | |
| JOHN ALLIN d/b/a ALLIN COMPANIES, | ) | |
| Defendant-Third Party Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SYMBIOT BUSINESS GROUP, INC. and SYMBIOT SNOW MANAGEMENT NETWORK, LLC, | ) | |
| Third Party Defendants | ) | TRIAL BY JURY OF 12 DEMANDED |

**DEFENDANT'S BRIEF IN OPPOSITION TO
MOTION TO STRIKE OR, IN THE ALTERNATIVE,
MOTION TO DISMISS THIRD PARTY COMPLAINT**

I.   BACKGROUND

A.  Procedural History

On November 15, 2004, the Plaintiff filed its complaint which contained two counts. Count I alleged a claim of fraud based upon the Plaintiff's contention that prior to entering into the contract to furnish snow removal services to Plaintiff, the Defendant, John Allin, had "made material misrepresentations . . . concerning his financial condition." *Complaint, ¶6*.

Count II alleged a claim for breach of the contract arising from Mr. Allin's refusal to refund to the Plaintiff the first of seven installment payments which was made by the Plaintiff.

After Plaintiff retained new counsel, Plaintiff sought leave of court to amend the complaint to "eliminat[e] its original fraud count" and to assert "a single count sounding in breach of contract." *Motion for Leave, ¶5*. The first amended complaint was then filed on September 12, 2005.

On February 17, 2006, the Plaintiff filed a motion for leave to file a second amended complaint to now allege new claims arising from Mr. Allin's sale of his snow management business to Third Party Defendant, Symbiot Snow Management Network, LLC ("Symbiot"). That sale took place on or about November 22, 2004, approximately one month after Mr. Allin signed his contract with the Plaintiff and one week after Plaintiff filed its original complaint. On January 23, 2006, during Mr. Allin's deposition, Plaintiff had first became aware of this asset sale. *Motion for Leave, ¶6*.

In its second amended complaint, Plaintiff purported to assert a cause of action in anticipatory breach of contract based upon Plaintiff's claim that the specific terms of the asset sale to Symbiot rendered Mr. Allin "physically and legally unable to perform his obligations" to the Plaintiff. *Second Amended Complaint, ¶12*.[1] Plaintiff alleged no damages flowing from this

---

[1] Although Plaintiff's motion for leave asserted that the proposed amendment "merely amplifies the current allegations of the" first amended complaint (Motion, ¶14), it is clear that the second amended complaint alleged a completely new cause of action and an entirely new set of facts.

alleged anticipatory breach, but again demanded a return of its first installment payment. The Plaintiff's motion for leave was granted the same day on which it was filed.

On February 23, 2006, the Plaintiff also filed a separate action at no. 06-47 alleging seven (7) causes of action against Symbiot arising from Mr. Allin's asset sale. The causes of action against Symbiot included fraudulent transfer (actual fraud), fraudulent transfer (constructive trust), constructive trust, unjust enrichment, tortious interference with existing contractual relations, successor liability and unjust enrichment (second count). Based upon these causes of action, the Plaintiff asserted that Symbiot is liable to the Plaintiff for the very same installment payment which the Plaintiff seeks to recover from Mr. Allin in this action.

On March 8, 2006, Mr. Allin filed his answer to the Plaintiff's second amended complaint and denied any liability under Heritage's new cause of action. First, the theory of anticipatory breach has no application here because Heritage had terminated the contract with Mr. Allin weeks *prior* to the November 22, 2004 closing of the Symbiot asset purchase. Thus, where there is no contract there can be no breach, anticipatory or otherwise. Second, even if Heritage had not terminated the contract, the asset sale to Symbiot would not have prevented Mr. Allin from fulfilling the obligations under the Heritage contract. It was Mr. Allin's intent that, if the Symbiot closing was successfully completed, Heritage would have been requested to consent to the assignment of the Heritage contract to Symbiot. After the closing, Allin was a stockholder of Symbiot and Allin continued to work with Symbiot as an employee and, in these capacities, he would have managed the Heritage account. If Heritage had refused this request for consent of

3.

assignment, it was Mr. Allin's intention to perform the work required by engaging Symbiot and by hiring the subcontractors from whom Mr. Allin had previously received quotes and proposals for the work. Thus, the work required of the Heritage contract would have been fully and competently performed in any event.

On March 9, 2006, Mr. Allin filed a third party complaint against Symbiot on the ground that Symbiot must indemnify Mr. Allin for the Plaintiff's claims. Symbiot had agreed in writing to indemnify Mr. Allin for some of Heritage's claims.

On April 10, 2006, Symbiot filed its motion to strike and/or dismiss the third party complaint based upon the arguments that (1) Mr. Allin was required to seek leave of court to file the third party complaint, (2) that if such a motion was filed it should be denied as being untimely, (3) the third party complaint, in part, fails to assert a claim upon which relief may be granted, and (4) that the parties had agreed that the venue of disputes such as this would be restricted to Salt Lake City, Utah.

Mr. Allin respectfully files this brief in opposition to Symbiot's motion.

B.  Factual Background - Heritage's Contract

1.  Pre-Contract Activity in Regard to Heritage's Contract

At all times relevant, Plaintiff, Heritage Realty Management, Inc. ("Heritage"), operated and/or owned various commercial properties in no fewer than fifteen states.  In January, 2004, Heritage began discussions with Mr. Allin, to have Mr. Allin perform snow and ice removal work at approximately 115 of these commercial sites.  To perform this work Allin intended to locate, hire and then supervise local plow operators to perform the needed snow removal work at the various locations.

At a meeting of Heritage's regional managers in January, 2004, Heritage's president introduced Mr. Allin as *the* person who would be in charge of the snow removal operations during the winter of 2004-05.  Heritage and Mr. Allin then began working together to prepare for the upcoming winter season.  Detailed specifications and other needed information regarding the 115 sites were obtained from Heritage and Mr. Allin's employees worked on each site to more precisely delineate the boundaries designated for plowing, determine appropriate locations for the deposit of large accumulations of snow and to otherwise more precisely define the nature and scope of the various work assignments.  Additionally, names and addresses of prospective plow operators were obtained and requests for proposals were published.

During this time, the parties also worked together to prepare a written contract by first negotiating pricing and payment issues and then by the preparation of a written document to reflect the parties' agreement. However, during this time and before the agreement was signed, Heritage urged and pushed Mr. Allin to complete the tremendous amount of work and services which would be necessary for Mr. Allin to be ready and able to perform snow removal work at all of these sites at the sign of the first snowfall. As the 2004 winter season approached, the need for this preparatory work took on an added urgency.

2. The Heritage Contract Provides for Payment of a Fixed Fee

Heritage and Mr. Allin eventually signed a contract dated October 12, 2004 (Allin signed October 4, 2004). The contract provided for a fixed-fee, to be paid by Heritage in seven (7) periodic installments spread out from October, 2004 through May 15, 2005. See *Heritage Contract, ¶6(a)*, a copy of which is attached to the original Complaint. See also *Contract, ¶6 ("The annual contract price for the operations is a fixed annual price")*.

Since the contract provided for a fixed fee to be paid to Mr. Allin by Heritage, the fees had to be paid by Heritage regardless of the number of snow days and regardless of the volume of snow that was needed to be plowed by Mr. Allin. Thus, if less snow fell than normal and less plow work was performed, Mr. Allin would nevertheless be entitled to full payment under the contract. The specific amounts owed by Heritage under the contract were not to be calculated based upon the amount of work actually performed.

In October, 2004, after signing the contract, Heritage then made its first of seven scheduled payments to Mr. Allin. The amount of this first installment payment was set at ten percent of the total contract price, in the amount of $340,482.90. By letter dated November 3, 2004, Heritage wrote to Mr. Allin to terminate the contract. See *Heritage's Nov. 3, 2004 letter, a copy of which is attached to Defendant's Response in Opposition to Motion of Third Party Defendant as Exhibit "A."* The reason cited by Heritage was its alleged concerns over Mr. Allin's financial ability to pay his subcontractors. Apparently, this concern arose after Heritage received a letter from an anonymous source indicating that Mr. Allin had not paid all of his subcontractors in the previous year. Mr. Allin offered to provide access to financial information to satisfy Heritage's concerns but Heritage refused to give Mr. Allin any opportunity to set the record straight. In its termination letter, Heritage made no mention of Mr. Allin's asset sale to Symbiot because that sale had not yet occurred and Heritage had no knowledge of that matter.

Although Mr. Allin was not required to provide any minimum amount of work or materials under the contract as a condition precedent to Mr. Allin's entitlement to any of the seven installment payments, Heritage demanded a return of its first installment based upon the claim that Mr. Allin had not plowed any snow and thus had "not provided services or supplied any equipment or materials." See *Heritage's Nov. 3, 2004 letter, p. 2*. In addition to being irrelevant to the amounts owed under the contract, this claim is also factually incorrect as Mr. Allin had performed a great deal of services and provided materials in order to be ready and able to perform as required by the contract and as previously demanded by Heritage.

### 3. Heritage Cannot Transform Contract to Pay on a Per-Service Basis

Although Heritage could terminate the contract without cause (*Contract, ¶17*), the contract does not have a provision which mandates the return of any of the seven installment payments. In fact, the financial risk to Mr. Allin created by Heritage's ability to unilaterally terminate the contract for no cause at all, certainly explains why each of the installments is non-refundable if Heritage exercises its option to terminate the contract.

In addition, the contract states that "in all such events" of termination, Mr. Allin will not suffer a loss if the previously paid installments were insufficient to cover the work and services actually performed. *Contract, ¶17*. In such cases, Heritage must at least pay Mr. Allin "for all work and services performed and equipment and materials supplied to the date of the termination." This provision would be triggered if the contract was terminated by Heritage in between two of the scheduled installment payments. As an example, if Heritage terminated the contract on the eve of the due date for the second installment, Mr. Allin would be entitled to reimbursement for work and services rendered during the period between the first installment and the date of termination.

Heritage apparently reads this contract provision not as a means of protecting Mr. Allin but as bestowing upon Heritage the unilateral option of transforming the contract from a fixed-fee contract into a contract which pays only for that service actually provided. Heritage argues that, if it chooses to terminate the contract, Allin is *only* entitled to payment in an amount

8.

which reflects the work and services rendered by Allin up to the date of termination.  This is not a reasonable interpretation of the contract in light of the fact that Heritage had completely unfettered discretion to terminate the contract at any time, for no reason whatsoever.  Under Heritage's theory, if it terminated the contract in May, 2005, at the end of the snow season, it could then retroactively calculate a per service fee for that work which was actually performed from October, 2004 to the date of termination and, if that calculation produced a dollar figure less than the total of all installments actually paid to date, then Mr. Allin would have to reimburse that difference to Heritage.  Clearly, this was not the understanding of the parties and it is not a reasonable interpretation of the contract.

### C.  Factual Background - Symbiot's Contractual Obligations to Indemnify Mr. Allin

On November 22, 2004, Mr. Allin and Symbiot closed on the sale of the assets of Mr. Allin's snow removal business.  *See Allin deposition, p. 30, a copy of which is attached to Defendant's Response in Opposition to Motion of Third-Party Defendant to Dismiss as Exhibit B*.  As part of that sale, Mr. Allin conveyed to Symbiot certain physical assets, as well as executory contracts between Mr. Allin and his snow removal customers.

Prior to the closing on the sale, Heritage had filed this action against Mr. Allin. Thus, as part of the sale to Symbiot, Symbiot agreed that it "shall assume all obligations of [Allin], up to $170,000.00 in the aggregate, with respect to the litigation captioned Heritage Realty

9.

Management, Inc. v. John Allin, d/b/a Allin Companies and Snow Management Group, in the United States District Court for the Western District of Pennsylvania." See *Letter Agreement dated November 22, 2004, a copy of which is attached to Defendant's Response in Opposition to Motion of Third Party Defendant to Dismiss as Exhibit C.*

II.  DISCUSSION

A. Leave of Court was not Required

Symbiot concedes that the third party complaint was properly filed without leave of court if the Plaintiff's second amended complaint asserted new theories of liability. *Symbiot brief, p. 4.* This conclusion is supported by the pragmatic approach most reported decisions have adopted when determining whether the filing of an amended complaint starts anew the running of the ten day period under Rule 14(a) for the filing of a third party complaint. See United National Ins. v. Jefferson Downs Corp., 220 F.R.D. 456, 458 (M.D. La. 2003).

Here, Heritage's second amended complaint unquestionably added a completely new theory of liability against Mr. Allin. If it did not, there would have been no need to amend the complaint. The original complaint and the first amended complaint asserted that Mr. Allin's refusal to reimburse Heritage's first installment payment was *the* act which constituted a breach of contract. The second amended complaint, in contrast, asserted that the terms and conditions of Mr. Allin's asset sale to Symbiot constituted an anticipatory breach. *Second Amended Complaint,*

*¶12.* The cause of action for anticipatory breach is significantly different in its elements and in its proof from a cause of action for breach of contract which was originally asserted by Heritage. An anticipatory breach "occurs whenever there has been a definite and unconditional repudiation of a contract. . . [It is a] statement by a party that he will not or cannot perform." <u>Jonnet Development Corp. v. Dietrich Industries, Inc.</u>, 463 A.2d 1026, 1031 (Pa. Super. 1983). Thus, for the first time the second amended complaint alleges that the terms of Mr. Allin's sale to Symbiot was an anticipatory breach which also requires a return of the first installment payment.

Clearly, the second amended complaint raised an entirely new basis of liability, which for the first time brings into dispute the terms and conditions of Mr. Allin's asset sale to Symbiot. These terms and conditions include Symbiot's agreement to indemnify Mr. Allin with regard to Heritage's claims. Therefore, Mr. Allin properly filed his third party complaint against Symbiot without seeking leave of court.

### B.  The Delay in Joinder is not Prejudicial

If the court was to determine that leave of court was required, Mr. Allin has now filed a motion respectfully requesting such leave nunc pro tunc. Symbiot argues that such a motion should not be granted because it would be prejudiced. It must be remembered that the "requirement that leave of court must be obtained is not for the protection of the third-party defendant, but for the protection of the parties to the principal action who have a legitimate

11.

concern in the orderly and timely disposition of their litigation." <u>Hensley v. United States of America</u>, 45 FRD 352 (D. Montana 1968).

Symbiot's argument that it would be prejudiced by the filing of the third party complaint is based upon the unreasonable presumption that the court would not grant Symbiot a period of discovery. ("[A]ny efforts to curtail Symbiot's right to discovery would also be prejudicial." *Symbiot brief at p. 6*.) However, neither Heritage nor Mr. Allin has argued that Symbiot should not be permitted a reasonable period of time for its discovery. In fact, this case should be consolidated with the case recently filed by Heritage against Symbiot and an appropriate period of discovery should then be permitted with regard to both matters. Therefore, Symbiot will not suffer any undue prejudice.

<u>C.  There Exists Good Reason for the Delay in Joining Symbiot</u>

The issue of the effect, if any, of Mr. Allin's sale to Symbiot was raised for the very first time in Heritage's second amended complaint and in Heritage's recently filed separate action against Symbiot. Although it is Mr. Allin's position that Heritage's claims have no merit, the filing of these new claims directly involving Symbiot has now brought before the court all potentially responsible parties for an efficient and comprehensive adjudication of the matter. "It is well-settled that Rule 14 should be liberally construed to accomplish its intended aim of 'accomplishing in one proceeding the adjudication of the rights of all persons concerned in the

controversy and to prevent the necessity of trying several related claims in different lawsuits.'" Monarch Life Ins. Co. v. Donahue, 702 F. Supp. 1195, 1197 (E.D. Pa. 1989).

Therefore, the third party complaint should not be dismissed nor stricken.

### D.  The Third Party Complaint Asserts a Claim of Indemnity

Contrary to Symbiot's contention, the third party complaint clearly asserts that Symbiot is liable to Mr. Allin for Heritage's claims, and, thus, it properly asserts a claim of indemnity.  *Third Party Complaint, ¶8*.  Two grounds have been asserted in support of this indemnity obligation.  One ground is the written agreement between Mr. Allin and Symbiot pursuant to which Symbiot agreed to "accept some liabilities and debts which Allin may be found to owe to Plaintiff."  *Third Party Complaint, ¶6*.  As the other basis of indemnity, Mr. Allin has incorporated by reference the various "causes of action set forth in the civil action filed" by Heritage against Symbiot at no. 06-47.  *Third Party Complaint, ¶8*.

As to the first ground of the indemnity obligation (the written agreement to indemnify), Symbiot provides no explanation nor support of its contention that this cause of action should be dismissed under Rule 12(b)(6).  In fact, Symbiot offers no argument on this point but relies upon the bald statement that Symbiot "denies that the first ground is proper under Rule 14."  *Symbiot brief at p. 9, footnote 3*.  Clearly, Symbiot has failed to assert a legitimate basis to dismiss this cause of action for indemnity.

13.

As to the second ground supporting the indemnity obligation, it is true that Mr. Allin has incorporated those causes of action which Heritage also contends support a claim of direct liability of Symbiot to Heritage. However, this does not mean that the application of the same causes of action, as incorporated in the context of a third party complaint, could not render Symbiot liable to Mr. Allin in the event that Heritage was successful in obtaining a judgment against Mr. Allin. For instance, if supported by the facts, Symbiot could be liable for Heritage's judgment against Mr. Allin based upon the claim of Symbiot's successor liability. Therefore, Symbiot's motion to dismiss under Rule 12(b)(6) should be denied.

### E.  The Indemnity Agreement has no Forum Selection Clause

Symbiot is incorrect in its assertion that the indemnity agreement between Mr. Allin and Symbiot relating to Heritage's claim is "a written asset purchase agreement dated November 3, 2004." *Symbiot brief, p. 10*. To the contrary, Symbiot well knows that the written agreement which contains Symbiot's indemnity obligations to Mr. Allin on Heritage's claims is an agreement dated November 22, 2004 and that agreement contains no forum selection clause whatsoever. See *Defendant's Response in Opposition to Motion of Third-Party Defendant to Dismiss, Ex. C*. Therefore, the fact that a forum selection clause may appear in some other agreement between the parties is irrelevant and does not control Mr. Allin's claims of indemnity asserted herein.

III.	CONCLUSION

Based upon the foregoing, Symbiot's motion to strike and/or dismiss the third party complaint must be denied. The third party complaint was properly filed without leave of court and Symbiot will suffer no undue prejudice if the action is permitted to proceed. This is especially true in light of the fact that the Plaintiff has filed a separate action against Symbiot to recover the same funds which the Plaintiff seeks to recover from Mr. Allin herein.

Moreover, the third party complaint properly asserts a claim of indemnity and there is no forum selection clause which would prevent the case from moving forward before this Honorable Court.

Respectfully submitted,

ELDERKIN, MARTIN, KELLY & MESSINA


By  /s/ Craig A. Markham
    Craig A. Markham, Esquire
    Attorney for Defendant-Third Party Plaintiff
    150 East Eighth Street
    Erie, Pennsylvania 16501
    (814) 456-4000