IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HERITAGE REALTY MANAGEMENT, INC., | ) | Case No.  CA 04 - 333 ERIE |
| Plaintiff | ) | Judge Sean McLaughlin |
| | ) | |
| v. | ) | |
| | ) | |
| JOHN ALLIN d/b/a ALLIN COMPANIES, | ) | |
| Defendant-Third Party Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SYMBIOT BUSINESS GROUP, INC. and | ) | |
| SYMBIOT SNOW MANAGEMENT | ) | |
| NETWORK, LLC, | ) | |
| Third Party Defendants | ) | TRIAL BY JURY OF 12 DEMANDED |

## DEFENDANT'S RESPONSIVE CONCISE STATEMENT
## OF MATERIAL FACTS

AND NOW, the Defendant, John Allin d/b/a Allin Companies, by and through

their attorneys, ELDERKIN, MARTIN, KELLY & MESSINA, files the following Responsive

Concise Statement of Material Facts, respectfully representing as follows:

1.  Admitted.

2.  Admitted except that Mr. Allin is no longer doing business as Snow

Management Group or as Allin Companies.  *J. Allin depos., p. 6.*  A copy of Mr. Allin's

deposition transcript is attached to Plaintiff's Concise Statement as Exhibit "B."

3.  Admitted.

4. Admitted that Plaintiff's vice president so testified.

5. Denied. The president of Heritage Realty (Robert Prendergast), initiated telephone contact with Mr. Allin's office in or about April, 2003. *Peggy Allin depos., pp. 6-8.* A copy of the transcript of Peggy Allin's deposition is attached to Defendant's Appendix as Exhibit "A."

6. Denied as stated. As of February, 2004, Mr. Allin understood "that we already had their business." *J. Allin depos., p. 45.* "[A]t that meeting, Bob Prendergast [Heritage's CEO] stood up and told everybody, these are the people we're going to deal with next year." <u>*Id.*</u> *p. 44.* It is denied that Exhibit "C" to Plaintiff's Concise Statement is a full and complete copy of the Heritage contract. Exhibit "C" to Plaintiff's Concise Statement does not contain any of the documents which were originally attached to the contract.

7. Admitted, except that the contract document speaks for itself and to the extent that the Plaintiff's selected excerpts from the contract are alleged to reflect an intent or a meaning that is not consistent with the parties' agreement, the same is denied.

8. Admitted, except that the contract document speaks for itself and to the extent that the Plaintiff's selected excerpts from the contract are alleged to reflect an intent or a meaning that is not consistent with the parties' agreement, the same is denied.

9. Denied as stated. There is no record evidence to support Plaintiff's self-serving claim that this contract "provision was particularly important to Heritage."

10. It is admitted that the contract was a fixed-fee contract pursuant to which the amounts to be paid by Plaintiff to Mr. Allin were <u>not</u> dependent upon any minimum level of work or amount of snow removal. Thus, Mr. Allin did not have to perform any minimal amount of work as a condition precedent to his entitlement to any of the seven installment payments. <u>See</u> *Zicht depos., p. 32 "payments were not linked to when the work is performed."* A copy of Mr. Zicht's deposition transcript is attached to Plaintiff's Concise Statement as Ex. "A."

11. Denied as stated. There is no record evidence to support the self-serving conclusion that the initial installment payment owed under the contract was paid "in anticipation of work that Allin was to perform." Plaintiff paid the installment which was then due and owing. Under the terms of the contract, Mr. Allin was entitled to his fixed fee in exchange for his agreement to be prepared to perform snow removal operations and to perform such operations to the extent needed.

12. Admitted, except that the contract document speaks for itself and to the extent that the Plaintiff's selected excerpts from the contract are alleged to reflect an intent or a meaning that is not consistent with the parties' agreement, the same is denied.

13. Admitted, except that the contract document speaks for itself and to the extent that the Plaintiff's selected excerpts from the contract are alleged to reflect an intent or a meaning

that is not consistent with the parties' agreement, the same is denied.  There is no provision in this clause of the contract or in any clause of the contract which requires a refund of any of the seven installment payments to be made to Mr. Allin by the Plaintiff.

14.   Denied as stated.  Paragraph 14 asserts a gratuitous and derogatory conclusion that Mr. Allin's business was not a "stable and professional organization."  While it is true that sometime in 2004, Mr. Allin had postponed the payment of amounts owed to various subcontractors, all other debt was current and the subcontractors were eventually paid as a result of the asset sale to Symbiot.  *J. Allin depos., pp. 31-36*.

15.   Denied.  It is completely unfounded and reckless for the Plaintiff to assert that there was some sort of accounting irregularity which caused Mr. Allin's cash flow difficulties.  Mr. Allin retained the professional services of Centrus, Inc. to assist him in the effort to secure "capital infusion, a potential buyer or investor [and] to keep the service providers abreast of the situation."  *J. Allin depos., p. 34*.  There is no evidence of any accounting irregularities.

16.   Denied as stated.  The negotiations with Symbiot began in or around September, 2004, not in 2006 as alleged.  *J. Allin depos., p. 30*.

17.   Denied as stated.  Although Mr. Allin did not disclose to Plaintiff that he was negotiating with Symbiot, it is denied that Mr. Allin was in a "precarious financial condition."  It is further denied that Mr. Allin would have been unable to satisfy the obligations under the

Heritage contract even Heritage had not precipitously terminated the contract.  *See Allin*

*Affidavit, ¶¶4-7.*  Mr. Allin's affidavit is attached to Defendant's Appendix as Exhibit "B."

 

      18.  Denied as stated.  The sale agreement with Symbiot was signed on November

4, 2004.  A copy of excerpts of the Symbiot Agreement is attached to Defendant's Appendix as

Exhibit "C."  The Symbiot closing was held on November 22, 2004.  *J. Allin depos., pp. 6, 79.*

Heritage terminated its contract with Mr. Allin <u>before</u> Mr. Allin signed the Symbiot contract and

weeks <u>before</u> the sale to Symbiot was finalized and closed.

 

      19.  Denied as stated.  Mr. Allin would have been able to fully perform all of the

obligations required of him under the Heritage contract.  If the Symbiot sale was successfully

closed, it was Mr. Allin's intent to then solicit Heritage's consent to the assignment of its contract

to Symbiot.  However, since Heritage had terminated the contract with its letter of November 3,

2004, there was no need nor reason to request a consent of such an assignment.  However,

assuming that Heritage had not terminated the contract and if Heritage then refused Mr. Allin's

request for consent of the assignment, Mr. Allin would have performed the work by

subcontracting it through Symbiot.  "It was the understanding between Symbiot and [Mr. Allin]

that if any particular customer had refused consent to the assignment, that particular contract

would not have been assigned and [Mr. Allin] would have performed the work thereunder by

subcontracting the work to Symbiot.  *Allin affidavit, ¶6.*

 

      20.  Admitted, except that it was the understanding between Symbiot and Mr.

Allin that Symbiot would have relaxed the covenant to the extent it may have become necessary

to effectuate an assignment or to otherwise have the customer's contract performed by Mr. Allin in conjunction with Symbiot. *Allin affidavit, ¶¶6-7.* Symbiot did not want to lose any of the income to be derived from existing customers' contracts.

21. Denied. If Heritage had not terminated the contract, Mr. Allin would have been able to fulfill all of his obligations thereunder. It was the understanding between Symbiot and Mr. Allin "that if any particular customer had refused to consent to the assignment, that particular contract would not have been assigned and [Mr. Allin] would have performed the work thereunder by subcontracting the work to Symbiot. Virtually all of [his] work in SMG was performed through the use of subcontracts. In this way, the customer's contract with [Mr. Allin] would be fully performed and fulfilled even through the SMG assets had been sold to Symbiot. *Allin affidavit, ¶6.*

22. Admitted. Heritage had terminated the contract with Mr. Allin on or about November 3, 2004, which was several weeks before the November 22, 2004 closing of the Symbiot sale. Therefore, at the time of the Symbiot sale there was no longer any viable contract with Heritage to be assigned and no reason to request Heritage's consent.

23. Admitted. The Heritage termination letter was received on or about November 4, 2004. *Allin depos., p. 80.*

24. Denied. Mr. Allin had performed a substantial amount of work in preparation to his performance under the contract. See documents attached to Defendant's Appendix,

6.

including but not limited to Affidavits of Allin employees Christina Padilla-Albano (Ex. D),

Margaret Allin (Ex. E), Lisa Edwards (Ex. F.), Rudolph Rieder (Ex. G), Linda Spinelli (Ex. H), F.

Michael Suleski (Ex. I) and Chester Zelgowski (Ex. J), and see J. Allin deposition transcript, P.

Allin deposition transcript, Zicht deposition transcript, Prendergast deposition transcript, all as

referenced and discussed in Defendant's brief.


      25.  Admitted but Mr. Allin had prepared and sent requests for proposals to local

plow operators for the approximately 115 sites located throughout 15 states.  See Allin affidavit,

¶3 and documents attached to Defendant's Appendix.


           Respectfully submitted,

           ELDERKIN, MARTIN, KELLY & MESSINA


      By   /s/ Craig A. Markham          
           Craig A. Markham, Esquire
           Attorney for Defendant
           150 East Eighth Street
           Erie, Pennsylvania 16501
           (814) 456-4000