## Page 1

```
            IN THE UNITED STATES DISTRICT COURT
         FOR THE WESTERN DISTRICT OF PENNSYLVANIA

HERITAGE REALTY MANAGEMENT, :
INC.,                      :
        Plaintiff          :
                           :
    vs.                    : CASE NO. CA 04-333 ERIE
                           :
JOHN ALLIN d/b/a ALLIN     : JUDGE SEAN MCLAUGHLIN
COMPANIES,                 :
        Defendant          :

        Deposition of MARGARET ALLIN, taken before and
by Carol A. Holdnack, RPR, Notary Public in and for
the Commonwealth of Pennsylvania, on Monday,
January 23, 2006, commencing at 11:27 a.m., at the
offices of Knox McLaughlin Gornall & Sennett, P.C.,
120 West Tenth Street, Erie, PA 16501.

For the Plaintiff:

    Richard A. Lanzillo, Esq.
    Knox McLaughlin Gornall & Sennett, P.C.
    120 West Tenth Street
    Erie, PA 16501
    Kristina L. Angus, Esq.
    Heritage Property Investment Trust, Inc.
    131 Dartmouth Street
    Boston, MA 02116

For the Defendant:

    Craig A. Markham, Esq.
    Elderkin Martin Kelly & Messina
    150 East Eighth Street
    Erie, PA 16501

         Reported by Carol A. Holdnack, RPR
         Ferguson & Holdnack Reporting, Inc.
```

## Page 2

1  INDEX
2
3  MARGARET ALLIN
4    Direct Examination by Mr. Lanzillo . . . . 3
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 3

1   MARGARET ALLIN, first having
2   been duly sworn, testified as follows:
3
4            DIRECT EXAMINATION
5   BY MR. LANZILLO:
6
7   Q. Mrs. Allin, good morning.
8   A. Good morning.
9   Q. As you know from my introduction this morning, I'm
10  Rich Lanzillo. I'm representing Heritage in this case.
11  Could we just confirm for the record that you were present
12  for your husband's deposition.
13  A. Yes.
14  Q. Okay. So you heard the instructions that I gave
15  Mr. Allin at the beginning of his deposition?
16  A. Yes.
17  Q. All right. And did you understand those
18  instructions?
19  A. I did.
20  Q. And can we agree to follow those same instructions
21  for purposes of your deposition?
22  A. Yes.
23  Q. Would you state your full name and address.
24  A. Margaret J. Allin. I do go by Peggy. And it's
25  2319 South Shore Drive, Erie, PA 16505-2145.

## Page 4

1   Q. And how long have you been married to John Allin?
2   A. 21 years.
3   Q. How are you currently employed?
4   A. Through Symbiot Business Group, Incorporated.
5   Q. What is your position with Symbiot?
6   A. Currently?
7   Q. Um-hum.
8   A. I guess account manager for Erie snow.
9   Q. And what are your job responsibilities as the
10  account manager for Erie snow?
11  A. Well, right now my main focus is just handling the
12  Erie operations for snow. My role has changed
13  significantly.
14  Q. Do you direct the service providers here locally?
15  A. I do.
16  Q. And how have your job responsibilities changed?
17  A. Well, I was director of human resources and
18  administrative services.
19  Q. Until when?
20  A. Approximately November of '05. I don't think
21  there was ever an official date.
22  Q. So you were the director of human resources and
23  administration for Symbiot through that date?
24  A. Correct.
25  Q. And how long did you hold that position? Was it

**Page 5**

1 from the -- you would have been hired, I take it, by Symbiot
2 in or around October or November 2004 when it bought the
3 snow removal assets of your husband's company?
4   A. Correct.
5   Q. And were you director of HR administration during
6 that entire period of time?
7   A. With Symbiot?
8   Q. Yes.
9   A. Yes.
10  Q. And what was your position with the snow removal
11 aspect of your husband's business?
12  A. I've always done HR. Wore many, many hats as
13 being self-employed.
14  Q. And what is your understanding of the nature of
15 your husband's business, John Allin d/b/a Allin Companies
16 and Snow Removal Group?
17  A. We were a landscape --
18  Q. I'm sorry, Snow Management Group, SMG. Go ahead.
19  A. We were a landscape/snowplow contractor.
20  Q. Okay. And did you understand that your husband
21 was operating the business as a proprietorship?
22  A. Correct.
23  Q. Were you also a proprietor of the business?
24  A. No.
25  Q. How were you paid when you were working for your

**Page 6**

1 husband?
2   A. Well, eventually, I went on payroll. But for the
3 majority of the time that we worked together, I worked
4 there. Just because that's what I did. Noncompensated;
5 there's what I was looking for.
6   Q. And when did you go on payroll?
7   A. 2002 or 3. I don't know.
8   Q. Did you have any type of written employment
9 agreement with your husband?
10  A. No.
11  Q. Did you participate in any way in the negotiation
12 of the agreement with Heritage Property Investment Trust?
13  A. No.
14  Q. So, to the best of your recollection, you had no
15 direct contact with anyone at Heritage? Let me rephrase
16 that. Did you have any direct contract with anyone at
17 Heritage?
18  A. Yes.
19  Q. With whom did you have contact?
20  A. Bob Prendergast.
21  Q. And when did you have contact with
22 Mr. Prendergast?
23  A. Well, I couldn't tell you the exact date. But I
24 believe I was the first person to have contact with him when
25 he was inquiring about having us do work --

**Page 7**

1   Q. Okay.
2   A. -- for their company.
3   Q. Do you have a time frame approximately when you
4 had that contact?
5   A. I would say it was April of 2000 -- April of 2003.
6   Q. And tell me what you recall about that contact.
7 Was it by telephone?
8   A. Yes.
9   Q. And who called whom?
10  A. He called me. Well, let me rephrase it. He
11 called our company. I was given the call.
12  Q. Did he tell you how he became familiar with the
13 company?
14  A. As I recall, he received some promotional, for
15 lack of a better word, material from us, because we were
16 attending a trade show that he was attending. Or his
17 company was attending.
18  Q. And tell me what you recall as far as the content
19 of the conversation you had with Mr. Prendergast.
20  A. He just wanted to know general information, as I
21 recall, about our company, what we did. Received some
22 information. Was going to be attending the trade show that
23 we were exhibiting at. And that was -- that's all that I
24 really recall.
25  Q. Trade shows, participating at trade shows is part

**Page 8**

1 of the way your husband marketed the business; is that
2 correct?
3   A. Yes.
4   Q. What did you do in response to Mr. Prendergast's
5 inquiry?
6   A. Well, I would have explained to him about our
7 business, you know, generalities of what we do. Would pass
8 his name on to the appropriate parties who he would need to
9 be in contact with. I don't recall specifically, but I
10 would have probably indicated that we -- that we would be at
11 the trade show, and certainly would like to have the
12 opportunity to speak with him further. That was usually my
13 standard conversation.
14  Q. Okay. I take it that you're testifying now based
15 upon your standard practice. Given the passage of time, you
16 probably don't remember exactly what was said back and forth
17 other than the information that you told me as far as how he
18 learned about your company.
19  A. No, I couldn't tell you exactly what the
20 conversation was. But I would have definitely told him that
21 I would give his name to the appropriate people within our
22 company to have further contact, absolutely.
23  Q. Did you have any further contact with
24 Mr. Prendergast after that inquiry?
25  A. Yes.

Page 9

1  Q. For what purpose?
2  A. I was invited to attend the reception that his
3  company sponsored at the trade show, and I attended that
4  function.
5  Q. When was that trade show?
6  A. Well, the trade show that I initially referred to
7  was in 2003. But I believe the trade show that I saw him
8  at, at the reception, was in 2004.
9  Q. Any further contact with Mr. Prendergast after
10 that?
11 A. No.
12 Q. And it's fair to say these first -- well, these
13 initial two contacts, the ones that you had with
14 Mr. Prendergast, they weren't part of any contract
15 negotiation; they were general --
16 A. No.
17 Q. -- informational contacts?
18 A. Correct.
19 Q. All right. So as far as the negotiation of the
20 terms of the agreement that has been previously marked as
21 Exhibit A, you did not participate in those negotiations?
22 A. I did not.
23 Q. All right. What is your best recollection, Mrs.
24 Allin, concerning when your husband began the process of
25 looking for a strategic buyer for some or part of the

Page 10

1  business that he operated, particularly the Snow Management
2  Group part of the business?
3  A. It was probably in the spring.
4  Q. Of?
5  A. Of '04.
6  Q. Are you a party to the Symbiot transaction? In
7  other words, did you have to sign off on any of the contract
8  documents?
9  A. I did have to sign some of it, but I was not
10 actively a part of any of the negotiations or anything that
11 was involved with it because as not being an owner.
12 Q. Did you sign as a seller of the business, or was
13 that just your husband?
14 A. Just my husband.
15 Q. Did Symbiot require you to sign a covenant not to
16 compete? Do you know what that is?
17 A. I do know what it is. And I don't recall.
18 Q. We've touched on this already, but let me just ask
19 you directly. Did you participate in any way in the
20 negotiation of the transaction with Symbiot?
21 A. No.
22 Q. I'm going to show you what was previously marked
23 as Exhibit 6 to your husband's deposition. Are you familiar
24 with that document?
25 A. Yes.

Page 11

1  Q. I'm correct, am I not, that this is some
2  spreadsheets that were produced during the course of this
3  case. And let me ask you, did you participate in the
4  preparation of this document, Exhibit 6?
5  A. I participated only because I was asked to put
6  together what my role and time, if any, was involved in it.
7  Putting it together in this particular format, I was not.
8  Q. Tell me what you did to provide information that
9  was later incorporated in Exhibit 6.
10 A. Well, I had to go back and review my records of
11 when I traveled and the time frames, so that I could
12 accurately provide the information.
13 Q. Did you keep any records of the actual hours and
14 activities that you performed?
15 A. No.
16 Q. So what you were able to look at, then, would have
17 been only the transportation or travel expense records?
18 A. Yes. And knowing that if I was gone from Monday
19 through Wednesday, what my sole purpose was to be there, I
20 knew. Plus my interview schedule, knowing that I was there
21 for long periods of time.
22 Q. Looking at the information on Page 1 of Exhibit 6,
23 I don't believe there is any notations referencing you on
24 this page. My question is whether any of the information on
25 Page 1 relates to any of your activities.

Page 12

1  A. It does not.
2     MR. MARKHAM: Let me just -- so it's easier for
3     you, Rich. The travel of these three gentlemen,
4     Duane, Bryan and David, relates in a very general
5     way to her activity.
6  A. But they came to Erie.
7  Q. In other words -- and I'm not trying to trick the
8  witness here at all. In other words, this Page 1 is not an
9  effort to document what you did; is that correct?
10 A. Correct.
11 Q. All right. And am I also correct that you don't
12 have any personal knowledge concerning any of the hours
13 listed here on Page 1?
14 A. Correct.
15 Q. I mean, you don't have personal knowledge
16 regarding the number of hours Mr. Smallwood spent doing
17 anything related to Heritage; is that a fair statement?
18 A. That's a fair statement.
19 Q. And that would be true of the other individuals
20 listed here as well; is that correct?
21 A. That would be correct. But I would -- the three
22 guys that were hired specifically, they were here for a
23 short period of time. They were hired specifically for
24 Heritage. So their employment time of being here would be
25 100 percent Heritage. I would have that knowledge.

Ferguson & Holdnack Reporting, Inc.
814-452-4556

Page 13

1   Q.  Do you know how much John Allin actually paid
2   Mr. Dziuban, Mr. Rohe and Mr. Haataja?
3   A.  I do not. I am terrible at retaining people's
4   wages.
5   Q.  Do you recall for what period of time each of
6   those individuals was an employee of your husband?
7   A.  Well, Bryan and Duane were there a very short
8   period of time, anywhere from two weeks to no more than a
9   month, at the very most. And Dave Dziuban did continue on
10  with our company.
11  Q.  After the termination of the Heritage agreement?
12  A.  That is correct.
13  Q.  Do you recall what the salary was for each of
14  these individuals?
15  A.  I do not.
16  Q.  It is definitely fair to say, though, is it not,
17  that they weren't paid $9,500 for their time with you?
18  A.  Correct.
19  Q.  On the next page of the schedule, do you recognize
20  whether any of the time or activities listed here relates to
21  activities on your part?
22  A.  Yes. There's a section there with my name that
23  says interviews.
24  Q.  And what is meant by the label "interviews"? What
25  does that encompass?

Page 14

1   A.  That encompasses me doing phone interviews and
2   personal interviews.
3   Q.  And who were you interviewing?
4   A.  Prospective employees for the old managers within
5   the respective areas for Heritage.
6   Q.  The first activity there or first expense listed,
7   it says, "Airfare 8/23/04 Sun Country Airlines $129.10."
8   What was that for? Is that the flight to --
9   A.  Correct.
10  Q.  -- Minneapolis?
11  A.  It would be my flights, correct.
12  Q.  You have a per diem rate for meals.
13  A.  I do not.
14  Q.  Meals, 8/23/04 dash 8/25/04, 10/18 dash 10/23,
15  various, $25 per diem times three, as the third -- fourth --
16  excuse me, fourth entry. It's listed as meals. See it?
17  A.  Okay. I'm sorry. What is the question that I'm
18  to answer?
19  Q.  Is that a per diem rate that was assigned by you?
20  A.  Yes.
21  Q.  These trips that are listed here, the interview
22  expenses, did your husband have any other customers or
23  clients in the areas where you were traveling?
24  A.  We had -- we had some work in Chicago.
25  Q.  When you were there, did you do any work other

Page 15

1   than on Heritage matters?
2   A.  No.
3   Q.  And the next section of the document dealing with
4   Duane, Bryan and David, again, I'll just confirm. You don't
5   have personal knowledge concerning what these guys were
6   doing and the time they were spending and their expenses, do
7   you?
8       MR. MARKHAM:  You mean as reflected here?
9       MR. LANZILLO:  Yeah.
10      MR. MARKHAM:  Trips to Erie.
11  A.  Yes.
12  Q.  And your knowledge would be that they came here?
13  A.  They came here. I was a part of their
14  orientation. I put together their materials, their learning
15  materials. It's all part of HR.
16  Q.  And that was the purpose of their trip?
17  A.  Their purpose was to be trained in our ways of
18  doing business, expectations, Heritage contract.
19  Q.  Okay. And these would be the direct expenses paid
20  by your husband relative to these three new hires?
21  A.  Correct.
22  Q.  All right. What about the supplies listed here;
23  do you have personal knowledge regarding those expenses?
24  A.  No.
25  Q.  And how about the expenses listed under personnel

Page 16

1   as of 11/8/04; do you have any personal knowledge concerning
2   the hours and activities generally listed there?
3   A.  No.
4   Q.  Except, of course, to be fair to you, I think you
5   may be listed -- there might be a specific --
6   A.  For the 200 hours, other than for myself.
7   Q.  Where did that number come from? How did you
8   arrive at 200 hours? Well, first of all, did you tell
9   someone you worked 200 hours?
10  A.  I probably did tell somebody that, so that they
11  were able to put this information together. And my 200
12  hours would -- I believe is the last page of this exhibit.
13  Q.  This is the page that has the heading, "Dates,
14  hours, reason?"
15  A.  Correct.
16  Q.  Did you prepare the last page of Exhibit 6?
17  A.  I did.
18  Q.  When did you prepare it?
19  A.  I don't recall.
20  Q.  And am I correct that you did not have any
21  business records, time records, to review at the time that
22  you prepared the last page of Exhibit 6? In other words,
23  you were working from memory?
24  A.  Correct. In some cases, because of my travel, I'm
25  able to narrow it down.

Page 17

1   Q.  In terms of when you were traveling, sure, I
2  follow that.
3   A.  And from an interview schedule.  I mean, I've
4  indicated interviews in Iowa were from 12:00 noon until
5  8:00 p.m.
6   Q.  You have, for example, middle of the page,
7  "October 11, '04 through October 15, '04, 25 hours for call
8  center personnel training."  Correct?
9   A.  Correct.
10   Q.  How did you come up with those 25 hours that you
11  were doing that?
12   A.  Well, I would have probably gone back and looked
13  in through some of my calendars of area that I had blocked
14  out of time.
15   Q.  You say you probably would have.  Did you do that?
16   A.  Well, I don't recall exactly how I put this
17  together.
18   Q.  And at the same time you were undertaking the
19  tasks listed here, you were still in charge of personnel
20  overall for your husband's business, correct?
21   A.  Correct.
22   Q.  There's no way you could tell me, for example,
23  what you did relative to the Heritage contract on
24  October 12, 2004; is that a fair statement?
25   A.  It's a fair statement.

Page 18

1   Q.  And throughout the period of time covered by these
2  schedules listing your time, you continued to receive the
3  same salary you had prior to your involvement with the
4  Heritage contract; is that fair?
5   A.  Yes.
6   Q.  Do you know the name of the individual your
7  husband was struggling with, Julie, the other administrative
8  assistant?
9   A.  Keep.
10   Q.  Keep.  Julie Keep?
11   A.  K-E-E-P.
12       (Discussion held off the record.)
13   Q.  Did you have any telephone or direct contact with
14  any of the individuals listed on these schedules in an
15  effort to compile the information set forth in these
16  schedules, the schedules that are now Exhibit 6?  In other
17  words, did you make any of the phone calls, do any of the
18  interviewing after the fact to try to gather the information
19  for Exhibit 6?
20   A.  Listing the people like Casey and Terrance?
21   Q.  Yeah.
22   A.  No.
23   Q.  Were you involved in the effort to secure
24  subcontracts relative to the Heritage business?
25   A.  No.

Page 19

1   Q.  Do you know whether your husband's business
2  obtained any signed subcontracts for any of the properties
3  that would have been covered by the Heritage contract?
4   A.  No.
5   Q.  No, you don't know, or, no, they did not?
6   A.  No, I do not know.
7   Q.  Just want to be fair to you.  I didn't ask your
8  husband this, but maybe you would know.  Who acted as the
9  internal CFO at your husband's business?
10   A.  At what time frame?
11   Q.  How about the CFO at the time of the sale of the
12  business to Symbiot.
13   A.  Mike Suleski, S-U-L-E-S-K-I.
14   Q.  And how long did he serve as CFO prior to the sale
15  to Symbiot?
16   A.  He started in December of 2003.
17   Q.  Who was his predecessor?  Who came before him as
18  CFO?
19   A.  Her name was Sandy, and I'll think of it at the
20  most inopportune time.  And she was there three months.
21   Q.  Things didn't work out with Sandy?
22   A.  They did not.
23   Q.  Did she have some problems with the job?
24   A.  Yes.
25   Q.  What were the nature of her problems?

Page 20

1   A.  She was inadequate for the position.
2   Q.  Is it your understanding that some of her
3  inadequacies were related or resulted in the problems --
4  payment problems you were having with subcontractors?
5   A.  I don't know.
6   Q.  Where are the personnel records, including the
7  payroll records for your husband's business, at this point?
8  Do you still have them?
9   A.  I do.
10   Q.  Would it be possible to retrieve the W-2 records
11  for the three individuals that were hired for the Heritage
12  contract?
13   A.  Yes.
14   Q.  So it's possible to ascertain exactly how much
15  they were paid by the company?
16   A.  Yes.
17   Q.  Who handled the checkbook for the business?
18   A.  Mike Suleski.
19   Q.  Did you have check signing authority?
20   A.  Absolutely.
21   Q.  Do you have knowledge regarding the use of the
22  proceeds, the payment from Heritage, the $340,000 and
23  change?
24   A.  I know that the money went in the bank.  How it
25  was disbursed, I couldn't tell you that off the top of my

Page 21

1  head, no.
2  Q. Do you know whether portions of the funds were
3  used to pay subcontractors with which your husband's
4  business was in arrears?
5  A. I don't recall.
6  Q. Other than yourself, who else had check signing
7  authority; Mr. Suleski?
8  A. Yes.
9  Q. Your husband, I assume.
10 A. Yes.
11 Q. Anyone else?
12 A. No.
13 Q. Other than the subcontractors that I discussed at
14 length with your husband, were there any other unpaid
15 creditors/vendors of the business? I know that some of the
16 subcontractors -- actually, I guess 99 percent of them with
17 whom there was as arrearage accepted 75 percent -- or 75
18 cents on the dollar, I think your husband told us.
19 A. Correct.
20 Q. Were there any other unpaid creditors or creditors
21 who were not paid in full by the company?
22 A. Not that I'm aware of.
23 Q. Were payroll taxes paid in a timely fashion?
24 A. Yes.
25 Q. What was your salary when you worked for the

Page 22

1  business, when you went on payroll?
2  A. Approximately 82,000 a year.
3  Q. And Mr. Allin's, your husband's salary, do you
4  recall what he was making?
5  A. He was not on payroll.
6  Q. He just received distributions?
7  A. He received a draw.
8  Q. And what was his draw?
9  A. $200 a week.
10 Q. Did he work on commission as well?
11 A. I'm sorry?
12 Q. Did he also work on a commission basis?
13 A. No.
14 Q. So he received $200 a week. And I assume he
15 received additional monies at times, depending on how the
16 business was doing; is that inaccurate?
17 A. Anything that we took out of the business went
18 into his draw.
19 Q. Sure. It's his business. So whatever the company
20 made, he made.
21 A. Correct.
22 Q. All right. Otherwise, he would be paying himself
23 a salary, which doesn't make a lot of sense.
24     MR. LANZILLO: Why don't you give me one minute.
25 I would like to talk to Attorney Angus, and I'll

Page 23

1  be right back.
2  (Brief recess.)
3  MR. LANZILLO: Mrs. Allin, those are all the
4  questions that I have. Thank you for coming in.
5  THE WITNESS: You're quite welcome.
6  MR. MARKHAM: When you were out, Mrs. Allin was
7  telling me she had -- may have made a mistake in
8  testifying about the noncompete issue with
9  Symbiot. She kind of recalls, but it is kind of a
10 vague recollection, that her employment agreement
11 with Symbiot, that agreement may contain a
12 noncompete. If you need to ask her questions
13 about that.
14 MR. LANZILLO: I appreciate the clarification.
15 BY MR. LANZILLO:
16 Q. Very briefly. When you accepted employment with
17 Symbiot after they purchased your husband's snow removal
18 business, they had you sign some sort of an employment
19 agreement?
20 A. Correct.
21 Q. And as part of that agreement, did it include a
22 clause precluding or limiting your ability to engage in
23 similar business after your employment with Symbiot ends?
24 A. I believe that it does, yes.
25 MR. LANZILLO: Okay. Thank you.

Page 24

1  THE WITNESS: You're welcome.
2  MR. MARKHAM: I do not have any questions, and
3  we'll have her read also.
4
5  (Deposition concluded at 12:04 p.m.)

Ferguson & Holdnack Reporting, Inc.
814-452-4556