IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HERITAGE REALTY MANAGEMENT, INC., | ) ) | Case No. CA 04 - 333 ERIE |
| Plaintiff | ) ) | Judge Sean McLaughlin |
| v. | ) ) | |
| JOHN ALLIN d/b/a ALLIN COMPANIES, Defendant | ) ) ) | TRIAL BY JURY OF 12 DEMANDED |

### AFFIDAVIT OF JOHN ALLIN IN OPPOSITION TO PLAINTIFF'S SUMMARY JUDGMENT MOTION

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | ) |
| | ) ss. |
| COUNTY OF ERIE | ) |

1. I, John Allin, am an adult individual who, until on or about November 22, 2004, operated a business known as Snow Management Group ("SMG"). The nature of SMG's business included such things as managing snow and ice removal services for large commercial entities such as banks and shopping centers.

2. In or around January or February, 2004, I attended a meeting held by Plaintiff, Heritage Realty Management, Inc., which was attended by thirty or so of Heritage's real estate property managers. Heritage owned and/or controlled a large number of commercial sites, spanning a number of states. Prior to this meeting, SMG had discussed with Heritage the

EXHIBIT B

proposal that SMG would be hired to manage the snow removal services for Heritage. The purpose of my attendance at this meeting was to discuss the manner in which SMG conducts and operates its management services. It was at this meeting that the president of Heritage, Robert Prendergast, announced to all of his property managers that we were "the people [Heritage was] going to deal with next" snow season. At that point, it was clearly my understanding that Heritage wanted and intended for SMG to manage snow and ice removal operations in the upcoming winter season.

3. From the time of that meeting until the signing of the formal written contract in October, 2004, Heritage insisted that SMG undertake the work which was necessary for SMG to be up and running at all approximately 115 different Heritage sites which were located in some 15 states. Heritage and SMG understood that the size of such an operation required a great deal of work and effort to become familiar with and knowledgeable of each commercial site, to locate and engage needed supervisory personnel and plow operators and to strategically place necessary equipment as needed. In response to Heritage's insistence and in reliance upon their representations regarding the decision to hire SMG, SMG undertook this preparatory work.

4. On or about November 22, 2004, I sold and conveyed to Symbiot Business Group, Inc. and/or Symbiot Snow Management Network, LLC the assets of the business which I had conducted under the name Snow Management Group. As part of the consideration of that sale, I assigned to Symbiot all existing customer contracts. In the event that a customer's

2.

contract with me required the customer's consent to any such assignment, we contacted that customer to secure consent. Every last one of my customers consented to the assignment.

5. As part of this asset sale to Symbiot, I became an employee of Symbiot and, part of my job duties would have been to supervise and/or provide consulting services for all customer contracts which had been assigned to Symbiot. I also remained a major shareholder in Symbiot, owning the fifth largest share in that company.

6. It was the understanding between Symbiot and me that if any particular customer had refused consent to the assignment, that particular contract would not have been assigned and I would have performed the work thereunder by subcontracting the work to Symbiot. Virtually all of my work in SMG was performed through the use of subcontracts. In this way, the customer's contract with me would be fully performed and fulfilled even though the SMG assets had been sold to Symbiot.

7. We did not approach Heritage regarding the proposed assignment of its contract because Heritage had terminated its contract by letter dated November 3, 2004, which was several weeks before the Symbiot asset sale. In fact, none of my customers were contacted by me or by Symbiot regarding a proposed assignment until after the completion of the Symbiot closing which occurred on November 22, 2004. However, I have no doubt that if the Heritage contract had not been terminated by Heritage, I would have been able to perform fully all of the duties and obligations of that contract either by virtue of a direct assignment of the contract to

3.

Symbiot or, if Heritage would not have consented to such an assignment, then I would have performed the Heritage work by subcontracting it in my normal fashion.

FURTHER THE AFFIANT SAYETH NOT.

_____
John Allin

COMMONWEALTH OF PENNSYLVANIA  )
                             : SS.
COUNTY OF ERIE               )

ON THIS, the 20TH day of MARCH, 2006, before me a Notary Public, the undersigned officer, personally appeared John Allin, known to me (or satisfactorily proven) to be the person whose name is subscribed to the within instrument, and acknowledged that he executed the same for the purposes therein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Mary-Helen Russell, Notary Public
City Of Erie, Erie County
My Commission Expires Jan. 30, 2008
Member, Pennsylvania Association Of Notaries

4.