IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HERITAGE REALTY MANAGEMENT, INC., | ) ) | Case No.  CA 04 - 333 ERIE |
| Plaintiff | ) | Judge Sean McLaughlin |
| | ) | |
| v. | ) | |
| | ) | |
| JOHN ALLIN d/b/a ALLIN COMPANIES, | ) | |
| Defendant-Third Party Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SYMBIOT BUSINESS GROUP, INC. and | ) | |
| SYMBIOT SNOW MANAGEMENT | ) | |
| NETWORK, LLC, | ) | |
| Third Party Defendants | ) | TRIAL BY JURY OF 12 DEMANDED |

**DEFENDANT'S BRIEF IN OPPOSITION TO PLAINTIFF'S
SUMMARY JUDGMENT MOTION AND IN SUPPORT
OF DEFENDANT'S SUMMARY JUDGMENT MOTION**

I.          BACKGROUND

A.  PROCEDURAL HISTORY

On November 15, 2004, the Plaintiff filed its complaint which contained two

counts.  Count I alleged a claim of fraud based upon the Plaintiff's contention that prior to

entering into the contract to furnish snow removal services to Plaintiff, the Defendant, John Allin,

had "made material misrepresentations . . . concerning his financial condition."  *Complaint, ¶6.*

Count II alleged a claim for breach of the contract arising from Mr. Allin's refusal to refund to the Plaintiff the first of seven installment payments which was made by the Plaintiff. Plaintiff claimed that, as of the date of termination, Mr. Allin had not performed any snow plowing work and that, therefore, he was not entitled to keep the installment payment.

After Plaintiff retained new counsel, Plaintiff sought leave of court to amend the complaint to "eliminat[e] its original fraud count" and to assert "a single count sounding in breach of contract." *Motion for Leave, ¶5*. Clearly, there was no evidentiary support for this cause of action. The first amended complaint was then filed on September 12, 2005.

On February 17, 2006, the Plaintiff filed a motion for leave to file a second amended complaint to add a new claim arising from Mr. Allin's sale of his snow management business to Third Party Defendant, Symbiot Snow Management Network, LLC ("Symbiot"). In its second amended complaint, Plaintiff purported to assert a cause of action in anticipatory breach of contract based upon Plaintiff's claim that the specific terms of the asset sale to Symbiot rendered Mr. Allin "physically and legally unable to perform his obligations" to the Plaintiff. *Second Amended Complaint, ¶12*.

That sale to Symbiot took place on or about November 22, 2004 (J. Allin depos., pp. 6, 79), approximately one month after Mr. Allin signed his contract with the Plaintiff (the Heritage contract was signed by Allin on October 4, 2004) and one week after Plaintiff filed its original complaint in this matter. On January 23, 2006, during Mr. Allin's deposition, Plaintiff

had first became aware of this asset sale. *Plaintiff's Motion for Leave, ¶6.* Plaintiff alleged no damages flowing from this alleged anticipatory breach, in the nature of the cost of cover or of having someone else perform the work which Mr. Allin had agreed to perform. Plaintiff only demanded a return of its first installment payment. The Plaintiff's motion for leave was granted the same day on which it was filed.

On March 8, 2006, Mr. Allin filed his answer to the Plaintiff's second amended complaint and denied any liability to Heritage. First, Heritage is not entitled to a refund of its installment payment. Although Heritage terminated the contract approximately one month after it was signed, Mr. Allin had performed a substantial amount of preparatory work in reliance on the contract. *Answer to Second Amended Complaint, ¶¶7, 14, 29.* Moreover, Mr. Allin's right to any installment was not dependent upon having performed any level of work or any amount of snow plowing. *Id.* The contract was a fixed-fee contract and all installments were due and owing regardless of whether it had snowed.

Second, the theory of anticipatory breach, allegedly arising from Mr. Allin's asset sale to Symbiot, has no application here because Heritage had terminated the contract weeks *prior* to the November 22, 2004 closing of the Symbiot asset purchase. *Id. ¶¶12, 18.* Since the Heritage contract had been terminated, the subsequent sale to Symbiot cannot be considered a breach by Mr. Allin. In any event, even if Heritage had not terminated the contract, the asset sale to Symbiot would not have prevented Mr. Allin from fulfilling the obligations under the Heritage contract. *Id.* It was Mr. Allin's intent that, if the Symbiot closing was successfully completed,

3.

Heritage would have been requested to consent to the assignment of the Heritage contract to

Symbiot.  After the Symbiot closing, Allin remained a stockholder of Symbiot and Allin continued

to work with Symbiot as an employee and, in these capacities, he would have managed the

Heritage account.  If Heritage had refused this request for consent of assignment, it was Mr.

Allin's expectation to perform the work required by working through Symbiot, as a

subcontractor.  Mr. Allin would have then engaged the same local operators from whom he had

solicited quotations.  Thus, the work required of the Heritage contract would have been fully and

competently performed in any event.

        Plaintiff has filed a summary judgment motion alleging that it is entitled to a full

refund of its first installment payment based upon the contentions that:

>        1.  The contract must be interpreted as providing that, upon
>        termination by Heritage, Mr. Allin is entitled to payment "only for
>        the work or services performed and the equipment and materials
>        supplied to the date of termination."
>
>        2.  There are no factual issues as to whether Mr. Allin had provided
>        any work or services prior to the receipt of the November 3, 2004
>        termination notice.

        Both of the Plaintiff's contentions are without merit.  First, Plaintiff's obligation to

make any installment payment is not dependent upon the amount of work or services which Mr.

Allin has performed up to the time of payment.  Plaintiff cannot demand a refund based upon the

argument that Mr. Allin had not yet had to plow snow.  Plaintiff cannot retroactively transform

the contract into one under which Plaintiff is only required to pay a fee for each service actually performed by Mr. Allin.

Second, Mr. Allin had performed an extensive amount of work and provided services in preparation to plow snow at the approximately 115 sites which were within the scope of the work under his contract with the Plaintiff.  Although some of this preparation work was performed before the contract was signed, this was only because Plaintiff insisted that the preparatory work be performed.  Moreover, much of the work was performed after the contract had been signed.  Thus, there remain genuine questions of material fact relating to the value of the work performed by Mr. Allin prior to termination.

Moreover, the newly advanced theory of anticipatory breach is of no help to Plaintiff because neither the facts nor the law support the application of such a claim here. Plaintiff terminated the contract before the Symbiot sale and only learned of the sale earlier this year.

Mr. Allin respectfully submits this brief in opposition to Plaintiff's summary judgment motion and in support of his own summary judgment motion.

## B. FACTUAL BACKGROUND - HERITAGE'S CONTRACT

### 1. Pre-Contract Activity

At all times relevant, Plaintiff, Heritage Realty Management, Inc. ("Heritage"),

operated and/or owned various commercial properties in no fewer than fifteen states. In January

or February, 2004, Heritage began discussions with Mr. Allin, to have Mr. Allin perform snow

and ice removal work at approximately 115 of these commercial sites. *Allin affidavit, ¶3.*[1] To

perform this work Allin intended to locate, hire and then supervise local plow operators to

perform the needed snow removal work at the various locations. *J. Allin depos., p. 23.*

At a meeting of Heritage's regional managers in February, 2004, Heritage's

president introduced Mr. Allin as *the* person who would be in charge of the snow removal

operations during the winter of 2004-05. *Allin affidavit, ¶2; J. Allin depos., pp. 44-45.* At that

point, Mr. Allin concluded that "we already had their business." *Id., p. 45.* Heritage and Mr.

Allin then began working together to prepare for the upcoming winter season. Detailed

specifications and other needed information regarding the 115 sites were obtained from Heritage

and Mr. Allin's employees worked on each site to more precisely delineate the boundaries

designated for plowing, determine appropriate locations for the deposit of large accumulations of

snow and to otherwise more precisely define the nature and scope of the various work

---

[1] Mr. Allin's affidavit is attached to Defendant's Appendix as Exhibit "B."

assignments.  *Allin affidavit, ¶3*.  Additionally, names and addresses of prospective plow

operators were obtained and requests for proposals were published.  *Id.*

        During this time, the parties also worked together to prepare a written contract by

first negotiating pricing and payment issues and then by the preparation of a written document to

reflect the parties' agreement.  However, during this time and before the agreement was signed,

Heritage urged and pushed Mr. Allin to complete the tremendous amount of work and services

which would be necessary for Mr. Allin to be ready and able to perform snow removal work at all

of these sites.  As the 2004 winter season approached, the need for this preparatory work took on

an added urgency.  *J. Allin depos., p. 63*.  Mr. Allin has described this push from Heritage as

follows:

> Oh, my goodness, that started back in August
> [2004].  They were just unmerciful about ["] have
> you hired anybody yet, and do you have people yet,
> and have you contacted service providers, and we
> need to get this going, and you're not going to be
> able to perform.["]

*Id.*

## 2.  The Heritage Contract Provides for Payment of a Fixed Fee

Heritage and Mr. Allin eventually signed a contract dated October 12, 2004 (Allin signed October 4, 2004).  It is not disputed that the contract provided for an annual fixed-fee, to be paid by Heritage in seven (7) periodic installments spread out from October, 2004 through May 15, 2005.  See *Heritage Contract, ¶6(a), a copy of which is attached to the original Complaint ("The annual contract price for the operations is a fixed annual price"); Zicht depos, pp. 28-29.*  A copy of the Zicht deposition transcript is attached to Plaintiff's Concise Statement.

Since the contract provided for a fixed fee, the fees had to be paid by Heritage regardless of the number of snow days and regardless of the volume of snow that was needed to be plowed by Mr. Allin.  Thus, if less snow fell than normal and less plow work was performed, Mr. Allin would nevertheless be entitled to full payment under the contract.  The specific amounts owed by Heritage under the contract were <u>not</u> to be calculated based upon the amount of work actually performed.  Heritage does not dispute this fact.  In fact, Heritage's vice president and general counsel, Louis C. Zicht, has confirmed that it was agreed by the parties that none of the installment "payments are linked to when the work is performed."  *Zicht depos., p. 32.*

In October, 2004, upon signing the contract, Heritage then made its first of seven scheduled payments to Mr. Allin.  The amount of this first installment payment was in the amount of $340,482.90 which was ten percent of the total contract price.  By letter dated November 3, 2004, Heritage then wrote to Mr. Allin to terminate the contract.  See *Heritage's Nov. 3, 2004*

*letter, a copy of which is attached to Plaintiff's Concise Statement.*  At that point, approximately 14% of that snow season had elapsed.  (The contract required payments for a period of seven (7) months, October to May).  Thus, the ten percent (10%) payment coincided roughly with this elapse of time.  During the period of time from the signing of the contract until the date of termination, Mr. Allin's employees stepped up their efforts to prepare.  This work is detailed in pages 13-18 below and as confirmed by the testimony, documents and records submitted herewith.

The reason cited by Heritage in support of its termination of the contract was its alleged concerns over Mr. Allin's financial ability to pay his subcontractors.  Apparently, this concern arose after Heritage received a letter from an anonymous source indicating that Mr. Allin had not paid all of his subcontractors in the previous year.  *Prendergast depos., pp. 21-26.*  A copy of Prendergast deposition transcript is attached to Plaintiff's Concise Statement.  Mr. Allin offered to provide access to financial information to satisfy Heritage's concerns but Heritage refused to give Mr. Allin any opportunity to set the record straight.  In its termination letter, Heritage made no mention of Mr. Allin's asset sale to Symbiot because that sale had not yet occurred and Heritage had no knowledge of that matter until January, 2006.

Although Mr. Allin was not required to perform any minimum amount of work under the contract as a condition precedent to Mr. Allin's entitlement to any of the seven installment payments, Heritage demanded a return of its first installment based upon the claim that Mr. Allin had not yet plowed any snow and thus had "not provided services or supplied any

9.

equipment or materials." <u>See</u> *Heritage's Nov. 3, 2004 letter, p. 2.*[2]  In addition to being irrelevant

to the amounts owed under the contract, this claim is also factually incorrect as Mr. Allin had

performed a great deal of services and provided materials in order to be ready and able to perform

as required by the contract and as previously demanded by Heritage.


II.            <u>DISCUSSION</u>


        A.   <u>PLAINTIFF CANNOT REWRITE THE CONTRACT</u>


        "In construing a contract, the intention of the parties is paramount and the court

will adopt an interpretation which under all circumstances ascribes the most reasonable, probable,

and natural conduct of the parties, bearing in mind the objects manifestly to be accomplished."

<u>Tuscarora Wayne Mutual Ins. Co. v. Kadlubosky</u>, 889 A.2d 557, 560 (Pa. Super. 2005).  The

court should "not rewrite the contract."  <u>Lindstrom v. Pennswood Village</u>, 612 A.2d 1048, 1051

(Pa. Super. 1992).


        The contract between the parties has an initial term of one year with "a fixed

annual price."  Heritage is required to pay Mr. Allin the annual price in seven (7) set installments,

the first of which was due on October 15, 2004 and the last of which was due May 15, 2005.

*Contract, ¶6*.  The contract does not require any level of work by Mr. Allin as a condition

_____

[2]  Although the termination letters also claim that Heritage was "fraudulently induced" to enter the
contract, Heritage has abandoned all causes of action based upon accusations of fraud because of the absence of
evidence of fraud.

precedent to his receipt of any of the installment payments. *Zicht depos., p. 32 (payments are not "linked to when the work is performed")*. Mr. Allin was only obligated to be ready to perform that amount of snow removal work which was required by the amount of snowfall actually experienced. The Plaintiff does not dispute these facts.

As part of this deal, Heritage had the right to terminate the contract at any time, for any reason. *Contract, ¶17*. Mr. Allin did not have this same unilateral right to terminate the contract at will. However, regardless of the reasons for Heritage's termination, the contract also provided that, "Heritage shall pay [Mr. Allin] for all work or services performed and equipment and materials supplied to the date of termination." *Contract, ¶17*. Heritage cites this clause as the contractual basis supporting its demand for a full refund of the first installment payment. Heritage claims that since Mr. Allin did not plow any snow before the date of termination, Mr. Allin provided no work or services, and thus, he is not entitled to keep the installment payment.

Essentially, Heritage says that once it elects to terminate the contract, this clause grants it the right to retroactively calculate the dollar value of the "work or services performed" by Mr. Allin and, if that after-the-fact calculation results in a dollar figure lower than the amount of the installments paid to date, then Mr. Allin must refund to Heritage the difference. Under this theory, Heritage could wait until the last installment was due in May, 2005, and safely terminate the contract without fear of additional snowfall and then it could demand a refund based upon some type of fee-per-service formula. If this reading of the contract is accepted, then at the time

Mr. Allin signed the contract, he could not know for sure the amount of money he would ultimately receive.

Heritage's interpretation of this clause of the contract is unreasonable and is not supported by the facts. First, this contract clause does not refer to nor does it make any reference to any sort of refund of any of the seven installment payments. In fact, there is no provision anywhere in the contract which makes any reference to any type or sort of refund of the installments. Thus, to accept Heritage's position one must be willing to add through creative interpretation a great deal of additional language to the contract.

Second, in light the financial risk to Mr. Allin which was created by Heritage's ability to unilaterally terminate the contract at will, it makes no sense to interpret this clause of the contract as an agreement by Mr. Allin to also grant Heritage the unfettered power to, after the fact, choose between either paying the specified annual fee or paying an amount based upon some yet-to-be defined formula for the value of the "work or services performed." Given the size of Mr. Allin's start-up investment in this project, and his running expenses to maintain the network of men and materials to cover all 115 sites, this would be an unreasonable reading of the contract.

Clearly, the more reasonable interpretation of this contract clause is that it guarantees nothing more than that Mr. Allin will be made whole "for all work and services performed and equipment and materials supplied" if Heritage exercised its right to terminate. The clause was written for Mr. Allin's benefit and not as a means for Heritage to rewrite the payment

terms to its advantage. Certainly it is not an agreement that Heritage may, in its sole discretion, unilaterally and retroactively revise the amounts owed under the contract. Rather, the clause offers some protection to Mr. Allin if the contract was terminated by Heritage under circumstances where the dollar amount of the installment payments which had been tendered to date did not cover all of the work performed. As an example, if Heritage terminated the contract on the eve of the due date for the second installment, Mr. Allin may be entitled to reimbursement for work and services rendered during the period between the first installment and the date of termination.

Therefore, Heritage's summary judgment motion must be denied and Mr. Allin's motion for summary judgment must be granted. If Mr. Allin's motion is not granted then, at the very least, there is a sufficient basis for reasonable and varying interpretations of this clause so as to preclude entry of summary judgment in favor of Heritage.

## B. FACTUAL DISPUTES REMAIN AS TO THE VALUE OF WORK AND SERVICES PERFORMED

Assuming without conceding that Heritage's interpretation of the contract is correct, which it is not, there remain many questions of material fact relating to the amounts which would be owed for the "work and services performed and equipment and materials supplied through the date of termination." *i.e.* through November 3, 2004.

Heritage argues that there is no evidence that Mr. Allin provided any service or equipment prior to the termination of the contract. This is an inaccurate statement. It must first be noted that the contract does not define the clause of paragraph 17, which requires that Heritage pay for "all work or services performed and equipment and materials provided." (emphasis added). Presumably, this clause refers to services and work in addition to actual snow plowing and ice removal work which the contract specifically defines as "Operations." *Contract, p. 1 "Description of Operations."* If the parties intended to limit the reference to "services or work" in paragraph 17 to include only snow plowing work, they would have used the word "Operations." Since they did not, clearly they intended to be all inclusive in terms of the operation of paragraph 17.

As to "all work or services performed," Mr. Allin testified about the preparations which his company had to undertake in order to be ready to conduct the snow plowing operations at the sign of the first snowfall. For instance, Mr. Allin testified about three new supervisory employees who were hired and paid as regional managers. *J. Allin depos., pp. 17-19*. See also R. Rieder e-mail Nov. 4, 2004, confirming the hiring of three field managers for the Midwest sites and confirming that each has been "trained and briefed on the scope of work for Heritage properties." A copy of Rieder's e-mail is attached to Defendant's Appendix as Exhibit "K." Mr. Allin also identified equipment which was purchased specifically for the Heritage contract. *J. Allin depos., pp. 24-25*. He also confirmed that expenses were incurred in the nature of supplies, paper and postage used to prepare and distribute requests for proposals submitted to numerous plow operators in approximately fifteen states. *J. Allin depos., p. 73*.

14.

Mr. Allin has further produced a detailed itemization of all time and expenses which could be tracked to work performed by various Allin employees on the Heritage contract. *A copy of this itemization is attached to Defendant's Appendix as Exhibit "L."* This itemization was prepared by an employee who was specifically and specially assigned to the particular task of assembling this data. *J. Allin depos., p. 58.* That assistant was instructed to contact "the various people who had input into the Heritage contract and find out how much time they've got. Ascertain direct costs, and put it all together so that I can submit it to counsel." *J. Allin depos., p. 58.* An e-mail from employee Rudy Rieder dated November 8, 2004 provides a preliminary listing of time invested by eight (8) employees. *A copy of this e-mail is attached to Defendant's Appendix as Exhibit "M."* Mr. Allin also identified some of the employees who had worked on the Heritage project and described their various job functions and duties. He also confirmed that the information regarding the time and effort they invested in the project was either provided by each employee or by that employee's supervisor. *J. Allin depos., p. 67.* Seven of these employees have filed affidavits which confirm that the listing of time spent on this project is "correct and accurate." *Defendant's Appendix Ex. D-J.*

Mr. Allin also confirmed the need of his staff to input data into the computer system for each site so that work activities could be tracked. *J. Allin depos., p. 73.* In an e-mail from Allin employee Brian Marshall dated April 16, 2004, he outlined the preparatory work completed by that early date including data input relating to 147 sites, research of yearly snowfall totals, research of equipment rates in the various locales. *A copy of this e-mail is attached to Defendant's Appendix as Exhibit "N."* By October 28, 2004, Mr. Allin's employees also

15.

prepared and dispatched requests for proposals to prospective plow operators "for all 110 sites." *Rieder e-mail Oct. 28, 2004, a copy of which is attached to Defendant's Appendix as Exhibit "O."* In an e-mail from employee Mary Russel dated October 28, 2004, supervisory employees are instructed on the procedures to be completed to establish contacts with local property managers at each site to bring them up to date on preparations. In a response e-mail of that same date, employee Chet Zelgowski confirms that all property managers except one has been contacted. *A copy of this e-mail is attached to Defendant's Appendix as Exhibit "P."*

Likewise, Mrs. Peggy Allin testified that she had provided information confirming the amount of her time and investment in the Heritage contract for purposes of providing an accurate listing. *P. Allin depos., p. 11.*[3] She also confirmed that the listing of time for the three regional managers spent on the Heritage project was accurate. *P. Allin depos., pp. 12-13.* She further confirmed that expenses relating to her interviews of job applicants for the manager's position were accurately stated. *P. Allin depos., p. 14.*

Additionally, a number of employees have submitted affidavits to confirm the nature and extent of the work which they undertook so that Mr. Allin was "ready and able to perform the snow and ice removal work under the" Heritage contract. For instance, Christina Padilla-Albano confirmed that she performed data entry of the various sites into the computer data base and made telephone calls to find plow operators. (Defendant's Appendix Exhibit D). Mrs. Allin confirmed that she performed research regarding the costs for newspaper ads to recruit

---

[3] The transcript of Peggy Allin's deposition is attached to Defendant's Appendix as Exhibit "A."

field managers in the various Heritage markets, made hotel arrangements to conduct these interviews and undertook various human resource responsibilities for new hires, putting together training manuals, policies and assisting them with actual training when they came to Erie to meet with her.  (Defendant's Appendix Exhibit E).  Lisa Edwards confirmed that she performed data entry of information for the requests for proposals submitted to various snow plow operators and she oversaw the entire process involving the dispatch and receipt of those proposals. (Defendant's Appendix Exhibit F).  Mr. Rudolph Rieder was the production manager and in that capacity oversaw all field managers.  This work included confirmation that the managers made visits to each and every site and received quotations from respective plow operators for each site, including requirements for equipment.  He also assisted in finding snow plow operators in various areas and training three newly-hired field managers.  (Defendant's Appendix Exhibit G).  Ms. Linda Spinelli also performed data entry regarding the requests for proposals and made phone calls to locate snow plow operators.  (Defendant's Appendix Exhibit H).  Mr. F. Michael Suleski performed cash projections and prepared budgets for the project.  (Defendant's Appendix Exhibit I).  Mr. Chester Zelgowski worked with the field managers to confirm pricing on each site, together with confirming the accuracy for the projected need for specific equipment at each site. (Defendant's Appendix Exhibit J).

It is also very clear that Heritage knew and recognized that Mr. Allin would have to perform a lot of preparatory work in order to get ready to perform under the contract.  Even before the contract was signed, Heritage had directed Mr. Allin to begin this preparation. Heritage's chief operating officer testified that before the contract was signed he had directed Mr.

17.

Allin "to make sure that they were ready to fulfill the obligations under the contract including

entertain[ing] proposals or negotiat[ing] with subcontractors to perform the work. *Prendergast

depos., pp. 8-9.*

 

       In an e-mail from Mr. Prendergast dated August 3, 2004, which he sent to

Heritage's various managers, he directed his employees to prepare information regarding "any

special snow handling requirements so [SMG] can be <u>fully</u> <u>prepared</u>" for each site.  (emphasis

added).  *A copy of Prendergast's e-mail is attached to Defendant's Appendix as Exhibit "Q.*

Prendergast also confirmed that after the contract was signed, SMG "was in contact with some of

our incumbent snow removal contractors" to elicit proposals from them. *Prendergast depos., p.

19.*  Similarly, in an August, 2004 conference call, there was a general discussion with Snow

Management Group concerning the need for preparatory work, including "getting people in place

to manage the various sites." *Zicht depos., p. 10.  <u>See also</u> J. Allin depos., p. 63 (Heritage was

"just unmerciful about" the demand for preparatory work).*

 

       It cannot be disputed that the law provides that Mr. Allin would be entitled to

recover all expenses incurred in preparing for performance under the contract.  <u>Shovel Transfer

and Storage, Inc. v. Pennsylvania Liquor Control Board</u>, 739 A.2d 133, 140 (even where contract

is repudiated, a party is entitled to recover costs incurred when he "changed his position in

reliance on the contract by, for example, incurring expenses in preparing to perform").  "In other

words, he is entitled to be reimbursed for the money actually paid out and for all reasonable and

proper expenses incurred on the faith of the contract."  <u>Harman v. Chambers</u>, 57 A.2d 842, 845

(Pa. 1948).  In fact, Heritage does not dispute Mr. Allin's entitlement to such a recovery, although it takes issue with the weight of the evidence supporting the dollar calculation for the value of that work.

Of course, arguments over the weight of the evidence is a matter to be resolved by the jury, not by the court on a motion for summary judgment.  Based upon the foregoing, Heritage's summary judgment motion must be denied.

### C.  THE CLAIM OF ANTICIPATORY BREACH HAS NO SUPPORT IN THE LAW OR IN THE FACTS

Heritage argues that even if cannot recover under the theory of a breach of contract, Mr. Allin committed an anticipatory breach of contract which provides "an independent cause of action to recover its payment." *Heritage Brief, p. 10*.  This argument fails on several grounds.

First, the act which Heritage contends constituted an anticipatory breach of its contract was Mr. Allin's asset sale to Symbiot.  That sale was closed on November 22, 2004, pursuant to a contract signed on November 4, 2004.  *J. Allin depos., pp. 6, 79; Defendant's Appendix Exhibit "C."*  Heritage terminated the contract with Mr. Allin by letter dated November 3, 2004.  Thus, the contract was no longer in effect and the sale to Symbiot was weeks away.  There can be no breach of a contract which has already ended.

In this regard, anticipatory breach of contract arises from actions which, by necessity, transpire before the date of performance and of which the non-breaching party must be fully aware. There is no such thing as a stealth anticipatory breach. The essence of the cause of action is that the defendant conveys to the plaintiff "an absolute and unequivocal refusal to perform or a distinct and positive statement of an inability to do so." McCloskey & Co. v. Minweld Steel Co., 220 F.2d 101, 104 (3rd Cir. 1955). Even the receipt by plaintiff of such an unequivocal and direct statement is not the end of the matter because the plaintiff can choose to either accept this notice and consider the contract at an end or disregard this notice and wait for the date of performance. "If [the Plaintiff] does not promptly and unequivocally accept the tender, the contract remains in full force and effect according to its terms, for the benefit of both parties to it." McCormick v. Fidelity & Casualty Co. of New York, 161 A. 532, 533 (Pa. 1932); See also Huessener v. Fishel & Marks Co., 127 A. 139, 140 (Pa. 1924) ("mere notice of an intended breach [of contract] is not of itself a breach of the contract. It may become so if accepted and acted upon by the other party."); Franconia Assoc. v. United States, 536 U.S. 129, 143 (2002) ("such a repudiation ripens into a breach prior to the time for performance only if the promisee 'elects to treat it as such'"). Therefore, in order to sustain this claim, the facts must show that, before the contract came to an end, Heritage was fully aware of those actions it now alleges support a claim for anticipatory breach.

It is undisputed that the Heritage contract was terminated well before the Symbiot sale. It is further undisputed that Heritage had no knowledge of Mr. Allin's intent to sell or of the actual sale itself. In fact, Heritage only learned about the sale during Mr. Allin's deposition which

was conducted on January 23, 2006.  Therefore, as a matter of law, this cause of action must be dismissed.[4]

      Second, even if Heritage could overcome this obstacle, which it cannot, Mr. Allin's sale to Symbiot did not render him unable to perform.  It was Mr. Allin's intent that, if the Symbiot closing was successfully completed, Heritage would have been requested to consent to the assignment of the Heritage policy to Symbiot.  "In fact, [e]very last one of [his] customers consented to the assignment" of their contract to Symbiot.  *Allin Affidavit, ¶4.*  Of course, since the Heritage contract was terminated before the sale, no such request was made of Heritage. However, assuming that Heritage had not earlier terminated the contract, and if Heritage then refused to consent to the assignment, it was Mr. Allin's intent to perform the work under the Heritage contract by working through Symbiot as a subcontractor.  Certainly, Symbiot would not have wanted to lose this contract opportunity.

> It was the understanding between Symbiot and [Mr. Allin] that if any particular customer had refused to consent to the assignment, that particular contract would not have been assigned and [Mr. Allin] would have performed the work thereunder by subcontracting the work to Symbiot.  Virtually all of [his] work in SMG was performed through the use of subcontracts.  In this way, the customer's contract with [Mr. Allin] would be fully performed

---

[4] It would appear that Heritage added this cause of action so that it could argue to the jury that Mr. Allin fraudulently induced it into entering into the contract.  Since Heritage had previously withdrawn its claim of fraud, it concocted the ill-fitting theory of anticipatory beach in an attempt to create a foundation for the introduction of otherwise irrelevant evidence regarding the timing of the Symbiot sale.

> and fulfilled even though the SMG assets have been
> sold to Symbiot.

*Allin affidavit, ¶6.*

As Mr. Allin explained, he had "no doubt that if the Heritage contract had not been terminated by Heritage, [he] would have been able to perform fully all of the duties and obligations of that contract either by virtue of a direct assignment of the contract to Heritage or, if Heritage would not have consented to such an assignment, then [he] would have performed the Heritage work by subcontracting in [his] normal fashion." *Id., ¶7.* Therefore, the sale to Symbiot does not support a claim for anticipatory breach because the sale did not render Mr. Allin unable to perform.

Therefore, Heritage's summary judgment motion must be denied and Mr. Allin's motion for summary judgment must be granted.

Respectfully submitted,

ELDERKIN, MARTIN, KELLY & MESSINA

By___/s/ Craig A. Markham_____
          Craig A. Markham, Esquire
          Attorney for Defendant
          150 East Eighth Street
          Erie, Pennsylvania 16501
          (814) 456-4000

22.