IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HERITAGE REALTY MANAGEMENT, INC., | ) ) | |
|     Plaintiff | ) ) | |
|     v. | ) ) | Case No. CA 04-333 ERIE |
| JOHN ALLIN d/b/a ALLIN COMPANIES, | ) | Judge Sean McLaughlin |
|     Defendant-Third Party Plaintiff | ) ) | |
|     v. | ) ) | |
| SYMBIOT BUSINESS GROUP, INC. and SYMBIOT SNOW MANAGEMENT NETWORK, LLC, | ) ) ) | |
|     Third Party Defendants | ) | |

**BRIEF OF THIRD PARTY DEFENDANTS, SYMBIOT BUSINESS GROUP, INC., AND SYMBIOT SNOW MANAGEMENT NETWORK, LLC IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

**I.   BACKGROUND**

Third Party Defendants, Symbiot Business Group, Inc. and Symbiot Snow Management Network, LLC (collectively "Symbiot"), respectfully submit this brief in opposition to the Motion for Summary Judgment filed by Plaintiff, Heritage Realty Management, Inc. ("Heritage"). Symbiot submits this brief in reliance upon the court's statement made at the settlement conference conducted on April 12, 2006, that Symbiot's submission of a brief on Heritage's Motion for Summary Judgment will not prejudice Heritage's position on any defenses it may have to the claims against it, including but not limited to challenges to the propriety of the joinder of Symbiot, or jurisdiction over Symbiot, or the appropriateness of venue.

Symbiot submits that the facts relevant to this motion are relatively simple and straightforward. Many of the facts discussed by Heritage are not necessary or relevant to the

disposition of this motion.  The only issue presented by Heritage's motion is whether, under the terms of the contract between Heritage and John Allin ("Allin") dated October 12, 2004, Heritage is entitled to return of any part of the first payment it made under the contract in the amount of $340,482.90.

Pursuant to the contract between Heritage and Allin, Allin was to be responsible for snow plowing at numerous Heritage properties across the country.  The contract specifically contemplated that Allin would sub-contract the work. (Contract, ¶4).  With respect to the payment, the contract specifically provided that "[t]he annual contract price for the Operations is a fixed annual price itemized on a per property basis for each year under the term of the contract . . . ." (Contract, ¶6).  Although Heritage had the right to potentially adjust the contract amount in subsequent years of the contract, it did not have the right to adjust the contract price in the first year of the contract. (*Id.*). The contract also provided that Allin was to submit written invoices to Heritage on the first day of October, November, December, January, February, March and May, and Heritage was to pay the invoices by the 15th day of that month. (Contract, ¶6(a)).  The amount due in each of these seven months fluctuated from 10% in October, November and May, to 20% in January and February. (*Id.*).

It is unclear whether the payments were for work already performed, or for work to be performed.  For example, it is unclear whether the invoice Allin was to submit by October 1, and the payment Heritage was to make by October 15, was for Allin's work prior to October 1, or for Allin's work during the month of October.  Since Heritage terminated the agreement by letter dated

November 3, under either construction Heritage owed Allin the first payment, whether it was for work done prior to October 1, or for work done during October.[1]

If under the contract the payments were for work performed the preceding month, then Heritage's first payment to Allin was for work performed prior to October 1, Heritage also owed Allin the second payment for work done during October, Allin could have invoiced Heritage for the second payment by November 1, and Heritage owed that payment November 15, even though it cancelled after November 1. This construction would require Heritage to make two payments. Symbiot will assume for purposes of this motion that at least Heritage will take the position that its payment due October 15, 2004 was for work done during October, and that is why it does not owe Allin the November payment.

As clearly stated in the contract, the contract was for a "fixed annual price." This payment method allocated the risk between the parties, where Allin took the risk that he would be underpaid if it was a heavy snow year, and Heritage took the risk that it would over-pay if it was a light snow year. The parties understood that regardless of the amount of snow, or the amount of work Allin did, or the amount Allin had to pay subcontractors to perform the work, Heritage would pay Allin an agreed amount, at set times, during the snow season.

The contract was for an initial term of five years. (Contract, ¶5). The contract also gave Heritage, but not Allin, the right to terminate the contract early. Paragraph 17 of the contract between Heritage and Allin explains Heritage's right to terminate as follows:

> Heritage shall have the right to terminate this Agreement by giving Contractor [*i.e.,* Allin] ten (10) days written notice in the following events: (a) Contractor is in default with respect to any of its

---

[1] Heritage mischaracterizes its payment as a "prepayment." (Heritage Brief, p. 2). Under any construction of the contract, Heritage owed Allin the first payment by October 15, and even if it was for work to be done during October, Heritage did not even attempt to cancel the contract until November 3, 2004, so Allin earned the October payment.

> obligations under this Agreement; (b) if any property or properties covered by this Contract are scheduled to be sold; (c) without any cause whatsoever, provided, in all such events, Heritage shall pay Contractor for all work or services performed and equipment and materials supplied to the date of termination.

On November 3, 2004, Heritage sent a letter to Allin terminating the contract pursuant to paragraph 17 of the contract. The letter was written by Edward Valanzola, an attorney who is associate general counsel for Heritage. Mr. Valanzola explained the basis for Heritage's termination as follows:

> [S]ince you fraudulently induced Heritage to enter into the above-referenced agreement with you, it is the position of Heritage that the agreement is null and void and Heritage has no further obligations thereunder. It is hereby requested that you immediately refund to Heritage the payment made to you in the amount of $340,482.90, pursuant to Article 6(a)(i). In the event the agreement is found to be valid and enforceable, then this letter shall also constitute notice pursuant to Article 17(c) of the agreement, that Heritage hereby elects to terminate the agreement and demands an immediate return of its first installment payment to you in the amount of $340,482.90.

After Allin refused to return Heritage's first payment, Heritage commenced this action. Heritage originally asserted a two count complaint against Allin. Those two counts were consistent with Mr. Valanzola's November 3, 2004 termination letter. The first count was a claim that Allin fraudulently induced Heritage into entering into the contract. The second count was that Heritage had the right to terminate the contract for any reason, that it did so, and that it was entitled to return of its payment under the terms of the contract. Heritage subsequently abandoned the fraudulent inducement count. (*See* Heritage's Motion for Leave to Amend Complaint, ¶5). Recently, Heritage again amended its complaint to include a claim (but not a separate count) that Allin committed an anticipatory breach of the contract, even though Heritage did not terminate the contract with Allin on this basis.

In its brief, Heritage cites to numerous facts and events that occurred subsequent to November 3, 2004. The events subsequent to the date Heritage gave unequivocal notice of its intent to terminate the contract are irrelevant. Once Heritage gave notice of its intent to terminate the contract, the contract ended either on that date, or on November 13, 2004, with the expiration of the ten (10) day notice provided under paragraph 17 of the contract. Heritage could not have relied on any of the events that occurred after November 3, 2004 in making its decision to terminate the contract and what occurred after Heritage terminated the contract cannot be relevant.

The specific reason why Heritage terminated the contract also appears to be irrelevant for purposes of disposition of this motion. Even if Heritage were still claiming that Allin fraudulently induced it into entering into the contract, Heritage still asks only for return of its October payment made under the contract.[2] Similarly, although Heritage now apparently asserts an anticipatory breach claim, again it seeks only the return of its deposit. (*See* Second Amended Complaint).[3] As Heritage acknowledges in its brief, "[t]he contract between Heritage and Allin authorized Heritage

---

[2] Heritage's fraudulent inducement claim is based on the assertion that "unbeknownst to Heritage at the time, Allin's business was not a stable and professional organization as had been represented to Heritage during the negotiations and under the express terms of the Contract." (Heritage's Brief, p. 4). In fact, the contract has an integration clause and expressly states that all prior representations are integrated into the written contract. (*See* Contract, ¶2). The only representation Allin made in the contract was that Allin "is an experienced and professional organization that specializes in the management and supervision of snow and ice removal services for commercial properties provided under sub-contracts with reputable commercial snow removal contractors . . . ." (Contract, p. 1, "Description of Operations.") Heritage has not offered any evidence that Allin was not an experienced and professional organization that specialized in snow removal. In addition, Allin did not represent, as Heritage suggests, that Allin was "a *stable* and professional organization"; he represented only that he was a professional organization. In the contract Allin made no representation about his financial situation.

[3] As explained in Allin's Brief in Opposition to Heritage's Motion, there is no basis for Heritage's claim of anticipatory breach. Heritage's in-house counsel explained the basis for Heritage's termination of the contract, and it was not that Heritage believed Allin committed an anticipatory breach. The facts demonstrate that the reason the contract ended was because Heritage terminated the contract. The fact that Heritage subsequently discovered facts which it now claims constituted an anticipatory breach by Allin does not change the fact that the contract ended solely because Heritage elected to terminate the contract.

to terminate the contract with or without cause. Heritage exercised that right . . . ." (Heritage Brief, p. 2). Since Heritage elected to terminate the contract, and it had the right to do so even for no cause, why it elected to do so is not relevant.

**II.     ARGUMENT**

Heritage argues that the contract language is unambiguous. (Heritage Brief, p. 6). Symbiot agrees that the court can determine the proper construction of the contract, but Symbiot submits that the proper construction of the contract is inconsistent with the construction Heritage advances.

There are two possible interpretations of the contract language. The first interpretation, advanced by Heritage, is that if Heritage cancels at any time, the entire contract converts from a fixed fee contract to a time and materials contract.[4] The second interpretation, which Symbiot submits is proper, is that the contract is a fixed fee contract, where Heritage must make each payment when due regardless of the time or materials spent as of the termination date, and if Heritage cancels between invoice dates, then Heritage owes Allin for time and materials from the last invoice date to the date of termination.

The interpretation Heritage advances is unreasonable and fails to give effect to all the terms of the contract. The contract clearly states that "the annual contract price for Operations is a fixed annual price." Heritage's interpretation of the contract grants Heritage, but not Allin, the ability to write out of the contract the fixed price language, and unilaterally convert the entire contract into a time and materials contract.

---

[4] For ease of reference, Symbiot refers to "time and materials" to describe the requirement in paragraph 17 of the contract. The complete language in the contract requires Heritage to pay Allin for "work or services performed and equipment and materials supplied."

Under its interpretation of the contract, Heritage could employ this tactic in a number of ways. For example, during the snow season Heritage could negotiate with a new provider to replace Allin, or make the decision to return to arranging the plowing itself, as it had done before hiring Allin.  Once it decided it would not want Allin to perform the next snow season, Heritage could just wait until April 20 to decide if it would be to its advantage to pay Allin under the contract, or pay only time and materials. If Heritage concluded it would cost less to pay only time and materials (for example, if it was a light snow year), Heritage could then give Allin a ten notice that the agreement will end April 30 (just before Allin could invoice for the final May payment). Heritage could then take the position, as it takes in its motion, that since the contract ended before the contract year expired, Allin is entitled to payment only for what Allin can prove were his documented time and materials. This is patently unreasonable.

Under Heritage's interpretation, Heritage has the right to cancel the contract, and pay only documented time and materials, even though Allin had no reason to document his time and expenses because the contract provided for a fixed annual payment.  Heritage could then, as it is doing in this case, claim that Allin is not entitled to recover for any time or materials which he did not properly document.  If Heritage cancelled in April, although Allin could likely document what he paid his subcontractors, he could have considerable difficulty documenting time and materials for his own personnel and his own purchases, especially since it appears Allin did not normally bill on a time and materials basis and his employees worked on other jobs in addition to the Heritage work.  Thus, under Heritage's interpretation, Allin would be forced to document all his time and materials throughout the year just to be sure he could recover those costs back if Heritage would happen to cancel during the year.  If Allin failed to document all his time and materials for Heritage during the season, then Heritage could demand that Allin give back some or (as in this case) all the

fixed payments Heritage already made under the contract. Again, this is unreasonable construction of the contract.

The contract clearly contemplated that Heritage would pay to Allin a fixed annual sum, spread out in seven clearly defined payments. The payments were due Allin regardless of how much it snowed, and regardless of how much time or expense Allin incurred. The contract clearly provided that Heritage's first payment was due October 15, even though typically it does not snow prior to that date. The contract clearly provided that Allin was entitled to be paid 10% of the total contract amount by October 15, regardless of the amount of time and expenses incurred. Heritage is now trying to rewrite the contract by asserting that even though it clearly owed 10% to Allin on October 15, if it thereafter cancels the agreement, it is entitled to get all of its money back. The contract should not be interpreted to permit this outcome.

Symbiot submits that the more reasonable construction of the contract, which gives effect to all its terms, is that Allin was entitled to payment on each of the due dates under the contract, and once those payments were made, they are non-refundable. If Heritage elected to terminate the contract between invoice dates, Allin was also entitled to payment "for all work or services performed and equipment and materials supplied to the date of termination." This construction gives meaning to both the fixed fee provisions of the contract, and the language in paragraph 17 that if Heritage terminates, Allin is entitled to payment for time and materials. Under this interpretation of the contract, Allin is entitled to be paid, consistent with the schedule set out in paragraph 6(a) of the agreement, on the due date for each payment. Those payments are non-refundable, consistent with the fixed fee provisions of the agreement. Allin is entitled to be paid those amounts regardless of whether there was little snow or excessive amounts of snow.

The provision in paragraph 17 that Allin is entitled to be paid for time and materials to the date of termination protects Allin in the event Heritage would terminate between invoice dates. Under this interpretation, and using the example above, if Heritage gave notice on April 20 that it was canceling the contract effective April 30, Allin would be entitled to retain the October through March payments. Allin would also be entitled to payment for time and materials from April 1 through April 30. Allin would never have to document more than one month's time and materials, and he would be assured that he would be paid for all completed months in accordance with the payment schedule under the contract. Heritage could not convert the entire contract year from a fixed fee to a time and materials contract; it could convert only the month in which it terminated the contract.

Under Symbiot's construction, Allin earned the October payment made by Heritage (whether that payment was for the preceding month or the month of October), regardless of the amount of time or expense Allin incurred. Heritage has no right to return of the October payment. Allin has the right to payment for time and materials from November 1, 2004 through November 13, 2004, the effective date of the contract termination.

### III.   CONCLUSION

Symbiot submits that of the two possible constructions of the contract, the construction proposed by Heritage is not reasonable. The contract should be interpreted to provide that once an invoice is due and a payment is made, the payment is not refundable, and if the contract is terminated between invoice dates, Allin is entitled to payment for time and materials for that part of the month between the first day of the month and the termination date. Under this interpretation, Allin is entitled to retain the $340,482.90, and Heritage has no basis for seeking return of that

payment. The court should, therefore, deny Heritage's motion for summary judgment and grant Allin's cross motion for summary judgment on Heritage's claims.

                                                Respectfully submitted,

                                                THE McDONALD GROUP, L.L.P.
                                                By:  /s/ *Daniel J. Pastore*
                                                        Daniel J. Pastore
                                                         Pa. I.D. No. 44619
                                                        456 West 6th Street
                                                         P. O. Box 1757
                                                         Erie, PA 16507-0757
                                                         Phone: (814) 456-5318
                                                         Email: dpastore@tmgattys.com

                                                Attorneys for Third Party Defendants

f:\cfd\3100\3119 (symbiot)\thrid party brief.doc