**EXHIBIT A**

# ASSET PURCHASE AGREEMENT

## AMONG

Symbiot Business Group, Inc.,

Symbiot Snow Management Network, LLC

## AND

John Allin

November 3, 2004

SaltLake-238257.11 0041111-00001

EXHIBIT A

## TABLE OF CONTENTS

                                                                        Page
1. Definitions.................................................................................1

2. Basic Transaction. ........................................................................7

     (a) Purchase and Sale of Assets..............................................7

     (b) Assumption/Exclusion of Liabilities......................................7

     (c) Purchase Price. .............................................................9

     (d) Adjustment For Payables/Receivables. .................................11

     (e) The Closing. ..............................................................11

     (f) Deliveries at the Closing. ...............................................12

     (g) Allocation...................................................................13

     (h) Legends. ....................................................................13

3. Representations and Warranties of Seller......................................13

     (a) Operation of Business. ...................................................14

     (b) Authorization of Transaction.............................................14

     (c) Noncontravention. ........................................................14

     (d) Brokers' Fees. .............................................................14

     (e) Title to Assets; Sufficiency of Assets...................................14

     (f) Financial Statements. .....................................................15

     (g) Events Subsequent to Most Recent Fiscal Month End. ...............15

     (h) Undisclosed Liabilities; Limited Liabilities. ..........................16

     (i) Legal Compliance. ........................................................17

     (j) Tax Matters.................................................................17

     (k) Real Property. .............................................................17

     (l) Intellectual Property.......................................................19

     (m) Tangible Assets............................................................21

     (n) Inventory. ..................................................................21

     (o) Contracts....................................................................21

     (p) Notes and Accounts Receivable/Payable...............................23

     (q) Powers of Attorney. ......................................................23

     (r) Insurance....................................................................23

     (s) Litigation....................................................................24

(t) Service Warranty. ............................................................... 24

(u) Employees. ....................................................................... 24

(v) Employee Benefits. ............................................................ 25

(w) Guaranties. ...................................................................... 25

(x) Environmental, Health, and Safety Matters. ............................ 25

(y) Certain Business Relationships With Seller. ............................ 26

(z) Disclosure. ....................................................................... 26

(aa) Investment. ..................................................................... 26

(bb) Customers and Suppliers. .................................................. 27

(cc) No Other Agreement to Sell Assets. ..................................... 27

4. Representations and Warranties of the Buying Parties. ................. 27

(a) Organization of Buyer. ........................................................ 27

(b) Authorization of Transaction. ............................................... 27

(c) Noncontravention. ............................................................. 27

(d) Brokers' Fees. ................................................................... 28

(e) Validly Issued Shares. ......................................................... 28

5. Pre-Closing Covenants. ........................................................... 28

(a) General. ........................................................................... 28

(b) Notices and Consents. ......................................................... 28

(c) Operation of Business. ......................................................... 28

(d) Preservation of Business; Termination of Employment Relationships. ............. 29

(e) Full Access. ...................................................................... 29

(f) Notice of Developments. ...................................................... 29

(g) Exclusivity. ....................................................................... 29

(h) Supplements to Schedules. .................................................. 29

(i) Comerica Financing Arrangement. ......................................... 30

6. Conditions to Obligation to Close. ............................................ 30

(a) Conditions to Obligation of Buyer. ........................................ 30

(b) Conditions to Obligation of Seller. ........................................ 32

7. Post-Closing Covenants. .......................................................... 32

(a) General. ........................................................................... 33

(b) Litigation Support. ............................................................. 33

ii

(c) Transition. ............................................................................. 33

(d) Confidentiality. ...................................................................... 33

(e) Covenant Not to Compete. ...................................................... 33

(f) Jurisdiction for Noncompetition/Nondisclosure Covenants. ............................ 35

(g) Unassigned Assets. ................................................................. 35

(h) Capitalization of the Business. ................................................. 35

8. Remedies for Breaches of This Agreement. ................................... 35

(a) Survival of Representations and Warranties. ............................. 36

(b) Indemnification Provisions for Benefit of Buyer. ....................... 36

(c) Indemnification Provisions for Benefit of Seller. ....................... 36

(d) Matters Involving Third Parties. ............................................... 37

(e) Characterization of Payments. ................................................. 38

(f) Other Indemnification Provisions. ............................................ 38

9. Termination. .............................................................................. 38

(a) Termination of Agreement. ...................................................... 38

(b) Effect of Termination. ............................................................. 39

10. Miscellaneous. ......................................................................... 39

(a) Press Releases and Public Announcements. .............................. 39

(b) No Third-Party Beneficiaries. .................................................. 39

(c) Entire Agreement. .................................................................. 39

(d) Succession and Assignment. .................................................... 39

(e) Counterparts. ......................................................................... 39

(f) Headings. .............................................................................. 39

(g) Notices. ................................................................................. 39

(h) Governing Law. ..................................................................... 40

(i) Amendments and Waivers. ...................................................... 41

(j) Severability. ........................................................................... 41

(k) Expenses. .............................................................................. 41

(l) Construction. .......................................................................... 41

(m) Incorporation of Exhibits and Schedules. ................................ 41

(n) Specific Performance. ............................................................. 41

(o) Submission to Jurisdiction. ..................................................... 41

## Exhibits

Exhibit A – Excluded Assets
Exhibit B – [blank]
Exhibit C – Allocation Schedule
Exhibit D – Financial Statements
Exhibit E-1 – Bill of Sale
Exhibit E-2 – Assignment and Assumption Agreement
Exhibit E-3 – Consent, Assignment and Assumption Agreement
Exhibit F-1 – Seller Employment Agreement
Exhibit F-2 – Jeff Vernon Employment Agreement
Exhibit F-3 – Form of Execution Employment Agreement
Exhibit G – Required Service Provider Consents

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement") is entered into as of November 3, 2004, by and among Symbiot Business Group, Inc., a Delaware corporation ("Parent"), Symbiot Snow Management Network, LLC, a Utah limited liability company ("Buyer"; collectively with Parent, the "Buying Parties"), and John Allin, an individual ("Seller"). The Buying Parties and Seller are referred to collectively herein as the "Parties."

This Agreement contemplates a transaction in which Buyer will purchase substantially all of the assets (and assume certain of the Liabilities) of Seller related to the Business in return for cash and shares of common stock of Parent.

Now, therefore, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties, and covenants herein contained, the Parties agree as follows:

1.    **Definitions**. For purposes of this Agreement, the following terms have the meanings set forth below:

"Accredited Investor" has the meaning set forth in Regulation D promulgated under the Securities Act.

"Acquired Assets" means all right, title, and interest of Seller in and to all of the assets owned by or used by Seller in the operation of the Business or necessary to conduct the Business as it has been conducted other than any Unassigned Asset, including, without limitation, all of the following that have been used by Seller in the operation of the Business or necessary to conduct the Business as it has been conducted: (a) real property, leaseholds and subleaseholds therein, improvements, fixtures, and fittings thereon, and easements, rights-of-way, and other appurtenants thereto (such as appurtenant rights in and to public streets); (b) tangible personal property (such as machinery, equipment, inventories of raw materials and supplies, manufactured and purchased parts, furniture, automobiles, trucks, tractors, trailers, tools, and replacement parts); (c) Intellectual Property, goodwill associated therewith, licenses and sublicenses granted and obtained with respect thereto, and rights thereunder, remedies against infringements thereof, and rights to protection of interests therein under the laws of all jurisdictions; (d) rights and benefits under leases, subleases, and rights thereunder; (e) rights and benefits under Acquired Contracts, agreements, contracts, indentures, mortgages, instruments, Security Interests, guaranties, other similar arrangements, and rights thereunder; (f) accounts, notes, and other receivables; (g) securities; (h) claims, deposits, prepayments, refunds, causes of action, choses in action, rights of recovery, rights of setoff, and rights of recoupment (including any such item relating to the payment of Taxes); (i) approvals, permits, licenses, orders, registrations, certificates, variances, and similar rights obtained from governments and governmental agencies; (j) books, records, ledgers, files, documents, correspondence, lists, plats, plans, drawings, specifications, creative materials, advertising and promotional materials, studies, reports, and other printed or written materials; (k) Cash; and (l) accounts receivable and the rights to operate the Business; provided, however, that the Acquired Assets shall not include any of the foregoing to the extent expressly included in the Excluded Assets.

"Acquired Contracts" means all contracts, leases (including, without limitation, leases of real estate), accounts receivable, licenses and other agreements or arrangements of Seller used by Seller in the operation of the Business or necessary to conduct the Business as it has been conducted (including confidentiality and nondisclosure provisions of agreements benefiting Seller with employees, agents or independent contractors) other than any Unassigned Asset; notwithstanding the foregoing, Acquired Contracts shall not include any contracts, leases, accounts receivable, licenses, instruments and other agreements or arrangements that are material (as defined in this paragraph) and that are not listed on Section 3(o) of the Disclosure Schedule as Acquired Contracts unless (a) such contracts, leases, accounts receivable, licenses, instruments and other agreements or arrangements were required to be listed on Section 3(o) of the Disclosure Schedule, and (b) Buyer delivers, in its discretion, written notice to Seller stating that such contract, lease, accounts receivable, license, instrument or other agreement or arrangement shall be included among the Acquired Contracts. For purposes of this paragraph only, contracts, leases, licenses, instruments and other agreements or arrangements shall be deemed to be material if the amount paid by Seller under such contract, lease, account receivable, license, instrument, other agreement or arrangement between November 1, 2003 and the date hereof exceeded $1,000 or the contract, lease, license, instrument, other agreement or arrangement by its terms requires, or would reasonably be expected to require, payment of $1,000 or more over the life of the contract, lease, license, instrument, other agreement or arrangement; provided, however, in no event shall Seller be required to assume obligations under immaterial contracts, leases, licenses, instruments, other agreements or arrangements that, in the aggregate, would reasonably be expected to require payment of $5,000 or more throughout the life of such contract, lease, license, instrument, other agreement or arrangement (with Buyer selecting which contracts, leases, licenses, instruments, other agreements or arrangements come in under, and which are deemed to exceed, the $5,000 limit).

"Adverse Consequences" means all actions, suits, proceedings, hearings, investigations, charges, complaints, claims, demands, injunctions, judgments, orders, decrees, rulings, damages, dues, penalties, fines, costs, amounts paid in settlement, Liabilities, obligations, Taxes, liens, losses, expenses, and fees, including court costs and attorneys' fees and expenses.

"Affiliate" has the meaning set forth in Rule 12b-2 of the regulations promulgated under the Securities Exchange Act.

"Agreement" has the meaning set forth in the preface above.

"Assumed Liabilities" shall have the meaning set forth in Section 2(b)(i) below.

"Assumed Payables" shall have the meaning set forth in Section 2(b)(i)(A) below.

"Basis" means any past or present fact, situation, circumstance, status, condition, activity, practice, plan, occurrence, event, incident, action, failure to act, or transaction that forms or could form the basis for any specified consequence.

"Business" means the snow management business of Seller, including all business conducted by Seller and his Affiliates under the trade names Snow Management Group and all other activities related thereto. Business shall not including the Snow Melting Business or the

Landscaping Business; provided, however, assets that (a) are used in the operation of the Business or necessary to conduct the Business as it has been conducted, and (b) are also used in the operation of the Snow Melting Business or the Landscaping Business shall, unless listed on Exhibit A hereto, be deemed to be Acquired Assets.

"Business Day" means any day other than a Saturday, Sunday or legal holiday in the state of Utah.

"Buyer" has the meaning set forth in the preface above.

"Buying Parties" has the meaning set forth in the preface above.

"Buying Parties Disclosure Schedule" has the meaning set forth in Section 4 below.

"Cash" means cash and cash equivalents (including marketable securities and short-term investments) calculated in accordance with GAAP applied on a basis consistent with the preparation of the Financial Statements.

"Closing" has the meaning set forth in Section 2(e) below.

"Closing Date" has the meaning set forth in Section 2(e) below.

"Closing Date Balance Sheet" has the meaning set forth in Section 2(d) below.

"Code" means the Internal Revenue Code of 1986, as amended.

"Committed Revenue" means the minimum amount of revenue generated for the Business by performance under an Acquired Contract for snow management and snow removal services during the 2004-2005 snow season assuming all parties to the Acquired Contract comply with all obligations thereunder.

"Confidential Information" means and includes any information, including a formula, pattern, compilation, program, source code, device, method, technique, plan, list, or process, that has not been disclosed to the public by the owner of such information (which, following the Closing, shall be Buyer, with respect to Confidential Information of Seller) and derives independent economic value, actual or potential, from not being generally known to other persons. Information that may be included in Confidential Information includes matters of a technical nature (including know-how, computer programs, software, source-code, accounting methods, and documentation), matters of a business nature (such as information about contract forms, costs, profits, employees, promotional methods, markets, market or marketing plans, sales, and client accounts), plans for further development, and any other information meeting the definition of Confidential Information set forth above. For the avoidance of doubt, Seller shall not be required to provide any "Confidential Information" that (a) is related to the Snow Melting Business or the Landscaping Business, and (b) is not related to the Business.

"Disclosure Schedule" has the meaning set forth in Section 3 below.

"Employee Benefit Plan" means any (a) nonqualified deferred compensation or retirement plan or arrangement, (b) qualified defined contribution retirement plan or arrangement that is an Employee Pension Benefit Plan, (c) qualified defined benefit retirement plan or arrangement that is an Employee Pension Benefit Plan (including any Multiemployer Plan), or (d) Employee Welfare Benefit Plan or material fringe benefit or other retirement, bonus, or incentive plan or program.

"Employee Pension Benefit Plan" has the meaning set forth in ERISA Section 3(2).

"Employee Welfare Benefit Plan" has the meaning set forth in ERISA Section 3(1).

"Environmental, Health, and Safety Requirements" shall mean all federal, state, local, and foreign statutes, regulations, ordinances and other provisions having the force or effect of law; all judicial and administrative orders and determinations; all contractual obligations and all common law concerning public health and safety, worker health and safety, and pollution or protection of the environment, including, without limitation, all those relating to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, distribution, labeling, testing, processing, discharge, release, threatened release, control, or cleanup of any hazardous materials, substances or wastes, chemical substances or mixtures, pesticides, pollutants, contaminants, toxic chemicals, petroleum products or byproducts, asbestos, polychlorinated biphenyls, noise or radiation, each as amended and as now or hereafter in effect.

"Equipment Leases" has the meaning set forth in Section 3(o)(i)(A) below.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Excluded Assets" means (a) any of the rights of Seller under this Agreement or other Transaction Document (or under any side agreement between Seller on the one hand and Buyer on the other hand entered into on or after the date of this Agreement), and (b) the assets listed on Exhibit A attached hereto.

"Excluded Liabilities" has the meaning set forth in Section 2(b)(ii) below.

"Financial Statements" has the meaning set forth in Section 3(f) below.

"GAAP" means United States generally accepted accounting principles as in effect from time to time.

"Gross Margin" means "gross profit," "margin" or the equivalent determined in accordance with GAAP, provided that, notwithstanding any requirements of GAAP to the contrary, (a) the costs of sales shall include, in addition to any cost items required by GAAP, all costs associated with the following costs categories as historically calculated by Seller: Purchases-Snowplowing, Salt Purchases, Salaries and Wages of full time employees not located in Erie, Pennsylvania or Salt Lake City, Utah (i.e. all field employees), Overtime, Payroll Taxes, Subcontractor Labor, Insurance – Workers Comp and Equipment Rental, and (b) the revenues and costs of sales associated with Network Contracts.

"Indemnified Party" has the meaning set forth in Section 8(d)(i) below.

"Indemnifying Party" has the meaning set forth in Section 8(d)(i) below.

"Intellectual Property" means (a) all inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto, and all patents, patent applications, and patent disclosures, together with all reissuances, continuations, continuations-in-part, revisions, extensions, and reexaminations thereof; (b) all trademarks, service marks, trade dress, logos, trade names, and DBA names, together with all translations, adaptations, derivations, and combinations thereof and including all goodwill associated therewith, and all applications, registrations, and renewals in connection therewith, including the trade name Snow Management Group; (c) all copyrightable works, all copyrights, and all applications, registrations, and renewals in connection therewith; (d) all mask works and all applications, registrations, and renewals in connection therewith; (e) all trade secrets and confidential business information (including ideas, research and development, know-how, formulas, compositions, manufacturing and production processes and techniques, technical data, designs, drawings, specifications, customer and supplier lists, pricing and cost information, and business and marketing plans and proposals); (f) all computer software (including data, source code, and related documentation); (g) all other proprietary rights; and (h) all copies and embodiments thereof (in whatever form or medium). For the avoidance of doubt, "Intellectual Property" shall not include anything that (y) is related to the Snow Melting Business or the Landscaping Business, and (z) is not related to the Business.

"Knowledge" means actual knowledge after making reasonable inquiry and reasonable diligence with respect to the matter in question.

"Landscaping Business" means the landscape design and maintenance business of John Allin (generally conducted under the dba "Allin Companies").

"Liability" means any liability (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due), including any liability for Taxes.

"Most Recent Balance Sheet" means the balance sheet contained within the Most Recent Financial Statements.

"Most Recent Financial Statements" has the meaning set forth in Section 3(f) below.

"Most Recent Fiscal Month End" has the meaning set forth in Section 3(f) below.

"Multiemployer Plan" has the meaning set forth in ERISA Section 3(37).

"National City Bank Credit Facility" means any Liability of Seller to National City Bank of Pennsylvania or its successors or assigns under the Promissory Note dated August 7, 2002 by Seller in favor of National City Bank of Pennsylvania, as amended by the Note Modification Agreement dated February 3, 2004.

"Network Contracts" means customer agreements entered into by Seller or an Affiliate of Seller with respect to the Business to be serviced through its snow management network under

an arrangement in which Seller or its Affiliate is entitled to only a percentage (usually between 1% and 5%) of the contract revenue.

"Ordinary Course of Business" means the ordinary course of business consistent with past custom and practice (including with respect to quantity and frequency).

"Parent" has the meaning set forth in the preface above.

"Parent Common Stock" means shares of common stock, $.001 par value, of Parent.

"Party" has the meaning set forth in the preface above.

"Payables" has the meaning set forth in Section 2(d)(ii) below.

"Payables Gap" has the meaning set forth in Section 2(d)(ii) below.

"Person" means an individual, a sole proprietorship, a partnership, a limited liability company, limited partnership, a limited liability partnership, a corporation, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, or a governmental entity (or any department, agency, or political subdivision thereof).

"Purchase Price" has the meaning set forth in Section 2(c) below.

"Purchase Shares" has the meaning set forth in Section 2(c)(ii) below.

"Real Property Leases" has the meaning set forth in Section 3(k)(ii) below.

"Receivables" has the meaning set forth in Section 2(d)(i) below.

"Receivables Gap" has the meaning set forth in Section 2(d)(i) below.

"Restricted Period" has the meaning set forth in Section 7(e)(i) below.

"Restrictions" has the meaning set forth in Section 7(f) below.

"Securities Act" means the Securities Act of 1933, as amended.

"Securities Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Security Interest" means any mortgage, pledge, lien (including liens for Taxes due and payable), encumbrance, charge, or other security interest, other than (a) mechanic's, materialmen's, and similar liens; (b) liens for Taxes not yet due and payable; and (c) purchase money liens and liens securing rental payments under capital lease arrangements.

"Seller" has the meaning set forth in the preface above. For purposes of clarification, Seller includes Seller or any Affiliate of Seller conducting, or acting on behalf of, the Business under the DBA "Snow Management Group" or other assumed name.

"Snow Melting Business" means the business of John Allin involving the manufacturing, production and sale of snow melting equipment.

"Tangible Assets" has the meaning set forth in Section 3(m)(i) below.

"Tax" means any federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Code Section 59A), customs, duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

"Tax Return" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Third Party Claim" has the meaning set forth in Section 8(d)(i) below.

"Transaction Documents" means this Agreement and all agreements attached as Exhibits hereto or required pursuant to the terms hereof to be delivered at Closing from one or more Parties to one or more Parties.

"Unassigned Asset" means anything that would be an Acquired Contract or other Acquired Asset (including any claim, contract, commitment, sales order or purchase order or any right or any benefit arising thereunder or resulting therefrom) except for the fact that an attempted transfer or assignment thereof without the consent of any other Person would constitute a breach of such Acquired Contract (or the agreement governing use of such Acquired Asset) or adversely affect the rights to be transferred or assigned; provided however, at the time the required consent of the other Person is obtained, such Unassigned Asset shall immediately and automatically become, as applicable, an Acquired Asset and/or Acquired Contract.

2.    **Basic Transaction.**

(a)    <u>Purchase and Sale of Assets</u>.  On and subject to the terms and conditions of this Agreement, Buyer agrees to purchase from Seller, and Seller agrees to sell, transfer, convey, and deliver to Buyer, all of the Acquired Assets at the Closing in exchange for the consideration specified below in this Section 2.

(b)    <u>Assumption/Exclusion of Liabilities</u>.

(i)    <u>Assumed Liabilities</u>.  Subject to the conditions specified in this Agreement, on the Closing Date, Buyer will assume and agree to pay, defend, discharge and perform as and when due the following Liabilities and obligations of Seller (the "Assumed Liabilities"):

(A)    the trade payables and other Liabilities and obligations listed in Section 3(p)(ii) of the Disclosure Schedule (the "Assumed Payables") but in no case shall the amounts assumed exceed $4,000,000; provided, however, Seller acknowledges that Buyer intends to, and agrees that Buyer may, negotiate reductions of, or a deferred payment schedule for, the Assumed Payables;

(B)    the amounts owed, up to a maximum of $2,000,000, under the National City Bank Credit Facility;

(C)    the Liabilities and obligations under the Acquired Contracts arising or accruing after the Closing Date but only to the extent that Seller's rights and benefits under such Acquired Contracts have been or will be validly assigned to Buyer pursuant to this Agreement; and

(D)    Seller's legal expenses up to $10,000 arising out of the negotiation, preparation, approval or authorization of this Agreement or the consummation (or preparation for the consummation) of the transactions contemplated hereby.

(ii)    Excluded Liabilities.  Notwithstanding anything to the contrary contained in this Agreement, Buyer will not assume or be liable for any of the following Liabilities or obligations of Seller (the "Excluded Liabilities") and none of the following Liabilities or obligations will be Assumed Liabilities for purposes of this Agreement:

(A)    any of Seller's Liabilities or obligations not related to the Business;

(B)    any of Seller's Liabilities or obligations under this Agreement or any other Transaction Document;

(C)    except as provided in Section 2(b)(i)(D) above, any of Seller's Liabilities or obligations for expenses, income taxes or fees incident to or arising out of the negotiation, preparation, approval or authorization of this Agreement or the consummation (or preparation for the consummation) of the transactions contemplated hereby (including, without limitation, all attorneys' and accountants' fees);

(D)    except as expressly included in the Assumed Liabilities, any of Seller's Liabilities or obligations for indebtedness for borrowed money, indebtedness secured by liens on its assets or guarantees of any of the foregoing;

(E)    any obligations or Liabilities of Seller or any Affiliate of Seller that relate to any Employee Benefit Plan or any other profit sharing, pension, retirement, option, bonus, deferred compensation, group insurance or other benefit or compensation plan (including unemployment insurance and any severance pay arrangement), whether or not such obligation is of a legally binding nature or in the nature of an informal understanding, providing benefits for the employees or independent

contractors of Seller, and any obligation to maintain any such plan or to take on any liability arising under any such plan or as the result of this Agreement;

(F) any Liabilities or obligations of Seller or any Affiliate of Seller with respect to wages, salaries, retainers, fees or other compensation (including vacation pay) payable to employees, consultants, advisors or other Persons employed or retained in connection with the Business by Seller (even if such individuals are subsequently hired by the Buying Parties);

(G) any Liabilities or obligations with respect to any amount of federal, state or local Taxes (including interest, penalties and additions to such Taxes) that are imposed on or measured by Seller's income or gross receipts for any period or that arose or accrued before the Closing Date with respect to the Acquired Assets on or before the Closing Date;

(H) any of Seller's Liabilities or obligations arising by reason of any violation or alleged violation by Seller, or its agents or affiliates of any federal, state, local or foreign law or any requirement of any governmental authority or by reason of any breach or alleged breach by Seller, or its agents or affiliates of any agreement, contract, lease, commitment, instrument, judgment, order or decree (regardless of when any such violation or breach is asserted or alleged to have occurred);

(I) any Liabilities and obligations of Seller for product liability claims (including, without limitation, claims for destruction of property, personal injury or death), negligent or nonconforming service claims and related lawsuits (i) arising on or prior to the Closing Date or (ii) arising after the Closing Date with respect to services rendered prior to the Closing Date (without regard to the date of any alleged accident);

(J) any Liability or obligation against which Seller is insured or otherwise indemnified;

(K) any Liability or obligation of Seller to any Affiliate or former Affiliate of Seller;

(L) any Liability or obligation of Seller under any Acquired Contract arising on or before the Closing Date, except the amount of any such liability or obligation that is described on Section 3(p)(ii) of the Disclosure Schedule and included in the Assumed Liabilities;

(M) except to the extent that Buyer receives, pursuant to Section 7(g) below all benefits with respect with an Unassigned Asset, any Liability arising out of or with respect to such Unassigned Asset; and

(N) any other Liability or obligation of Seller not expressly assumed by Buyer under Section 2(b)(i) or 2(b)(ii) above.

(c)     Purchase Price. As consideration for the Acquired Assets, Buyer shall assume the Assumed Liabilities at Closing to the extent set forth in Section 2(b) above and Parent shall pay or issue to Seller the following additional consideration (the "Purchase Price") on the terms and subject to the conditions set forth in this Section 2(c):

(i)     Parent agrees to pay to Seller or his designee $250,000 in cash at Closing.

(ii)     Parent agrees to issue in the name of Seller and deliver to Seller, with such legends and other restrictions as are described in Section 2(h) below, at the Closing, 500,000 shares of Parent Common Stock (the "Purchase Shares").

(iii)     If total revenue, determined in accordance with GAAP, attributable to the Acquired Assets between October 31, 2004 and March 31, 2005 equals or exceeds $12,300,000, Buyer agrees to pay to Seller or his designee an additional $200,000 in cash. Such payment shall be made on or before April 30, 2005 if such payment will not violate any loan covenant of Parent; in any event, such payment to be made on or before June 30, 2005; for the avoidance of doubt, total revenue shall only include revenue generated under Seller's revenue model (which excludes Network Contracts).

(iv)     If total revenue, determined in accordance with GAAP, attributable to the Acquired Assets between November 1, 2005 and April 30, 2006, equals or exceeds $24,000,000 with a Gross Margin of $7,900,000, Buyer agrees to pay to Seller or his designee an additional $650,000 in cash. Such payment shall be made on or before June 30, 2006; for the avoidance of doubt, total revenue shall only include revenue generated under Seller's revenue model (which excludes Network Contracts);

(v)     If total revenue, determined in accordance with GAAP, attributable to the Acquired Assets between November 1, 2006 and April 30, 2007, equals or exceeds $32,000,000 with a Gross Margin of $10,560,000, Buyer agrees to pay to Seller or his designee an additional $650,000 in cash. Such payment shall be made on or before June 30, 2007; for the avoidance of doubt, total revenue shall only include revenue generated under Seller's revenue model (which excludes Network Contracts)

(vi)     In exchange for Seller's compliance with the covenants set forth in Section 7(e) below, Buyer shall pay to Seller an aggregate of $250,000, payable in five installments of $50,000 on each of the first five anniversaries of Closing.

Any failure to satisfy one of the conditions listed in (iii) through (v) above will not prejudice the rights of the Seller under any of the other conditions listed in (iii) through (v).

(d)     Adjustment For Payables/Receivables.

(i)     Between 90 and 120 days after Closing, Buyer shall reconcile, and deliver a report detailing, the difference (the "Receivables Gap") between (A) the amount that Buyer has collected as of the date of such report of the accounts receivable and current assets ("Receivables") listed on the balance sheet delivered at, and as of, the Closing date (the "Closing

Date Balance Sheet") and (B) the amount of Receivables listed on the Closing Date Balance Sheet. If collected Receivables exceed stated Receivables, the Receivables Gap shall be a positive number; if stated Receivables exceed collected Receivables, the Receivables Gap shall be a negative number.

(ii)    Between 90 and 120 days after Closing, Buyer shall reconcile, and deliver a report detailing, the difference (the "Payables Gap") between (A) actual accounts payable and current liabilities ("Payables") as of the Closing (with actual amounts being deemed to equal amounts that are demanded by creditors after giving effect to all agreed-upon discounts and that are supported by reasonable documentation and adjusted accordingly to any negotiated reductions pursuant to Section 2(b)(i)(A) above), and (B) the amount of Payables as of Closing described in Section 3(p)(ii) of the Disclosure Schedule. If actual Payables exceed scheduled Payables, the Payables Gap shall be a negative number; if scheduled Payables exceed actual Payables, the Payables Gap shall be a positive number.

(iii)    If the sum of the Receivables Gap and the Payables Gap is less than zero, Seller shall reimburse Buyer for the amount by which zero exceeds that sum. Any amounts that Seller shall be required to reimburse Buyer shall be deducted out of any payments to Seller that are due or may become due under Section 2(c) above as of June 30, 2006 and, only if such amounts are insufficient as of June 30, 2006, such amounts shall be due and payable from Seller to Buyer on August 31, 2006.

(iv)    Buyer and Seller shall mutually agree upon the amount of any reimbursement required under this Section 2(d) not later than the 150th day following the Closing. If the Parties are unable to agree upon the amount, the matter shall be resolved by an independent auditor mutually agreed upon by the parties, who will be asked to render a decision on the matter in writing within 30 days following submission of the dispute to them and whose fees and expenses shall be borne equally by the Parties and whose decision shall be binding upon the parties. If the Parties are unable to mutually agree upon an independent auditor to resolve the dispute, the matter shall be submitted to arbitration to be conducted by a single arbitrator in accordance with the rules and procedures of the American Arbitration Association, whose decision shall be binding upon the Parties with the Party whose amount is furthest from the final amount determined by the arbitrator to bear all costs of the arbitrator and the reasonable attorney's fees incurred by the other Party in connection therewith.

(e)    The Closing. The closing of the transactions contemplated by this Agreement (the "Closing") shall take place at the offices of Stoel Rives LLP in Salt Lake City, Utah commencing at 10:00 a.m. local time on the Business Day following the satisfaction or waiver of all conditions to the obligations of the Parties to consummate the transactions contemplated hereby (other than conditions with respect to actions the respective Parties will take at the Closing itself) or such other date as the Parties may mutually determine (the "Closing Date").

(f)    Deliveries at the Closing. At the Closing,

(i) Seller will deliver to Buyer and Parent, or cause the respective employee of Seller to deliver to Buyer or Parent, the following:

     (A)    The executed certificate required by Section 6(a)(vii) below, together with (if not previously delivered) all consents, approvals, schedules and other documents required to evidence satisfaction of the conditions identified in the certificate (including the Disclosure Schedules required by Section 6(a)(x));

     (B)    Executed copies of the bills of sale and other assignment and assumption documents referenced in Section 6(a)(viii) below; and

     (C)    Counterparts to the employment agreements referenced in Sections 6(a)(xi), (xii) and (xiii) below executed by the employees referred to therein; and

     (D)    Such lien releases, assignment documents and other agreements or documents that Buyer reasonably requests in order to reflect and effect the Closing of the transactions contemplated by this Agreement;

     (ii) Buyer and Parent (as applicable) will deliver to Seller (or other designated Person), or cause their representatives to deliver to Seller (or other designated Person), the following:

     (A)    Counterparts to the assignment and assumption documents referenced in Section 6(b)(vi)(A) and (B) executed by Buyer;

     (B)    Counterparts to the employment agreements referenced in Sections 6(b)(iii) below executed by Parent;

     (C)    Certificates representing the Purchase Shares;

     (D)    the $250,000 in Cash required by Section 2(c)(i) above and the $10,000 necessary to pay the Assumed Liability identified in Section 2(b)(i)(D) above, all of which shall be wire transferred to an account designated by Roetzel & Andress, counsel for Seller; and

     (E)    Such assumption documents and other agreements or documents that Seller reasonably requests in order to reflect and effect the Closing of the transactions contemplated by this Agreement.

     (g)    <u>Allocation</u>. The Parties agree to allocate the Purchase Price (and all other capitalizable costs) among the Acquired Assets for all purposes (including financial accounting and tax purposes) in accordance with the allocation schedule attached hereto as <u>Exhibit C</u>.

     (h)    <u>Legends</u>. Each Purchase Share will be imprinted with a legend substantially in the following form:

"THE SECURITY REPRESENTED BY THIS CERTIFICATE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAWS. THE TRANSFER OF THE SECURITY REPRESENTED BY THIS INSTRUMENT IS SUBJECT TO THE CONDITIONS SPECIFIED IN THE ASSET PURCHASE AGREEMENT, DATED AS OF NOVEMBER 3, 2004, AMONG THE ISSUER OF SUCH SECURITY (THE 'COMPANY') AND THE OTHER PARTIES REFERRED TO THEREIN, AS AMENDED AND MODIFIED FROM TIME TO TIME, AND THE COMPANY RESERVES THE RIGHT TO REFUSE THE TRANSFER OF SUCH SECURITY UNTIL SUCH CONDITIONS HAVE BEEN FULFILLED WITH RESPECT TO SUCH TRANSFER. A COPY OF SUCH CONDITIONS SHALL BE FURNISHED WITHOUT CHARGE BY THE COMPANY TO THE HOLDER HEREOF UPON WRITTEN REQUEST."

Each holder desiring to transfer a Purchase Share first must furnish Parent with (i) a written opinion reasonably satisfactory to Parent in form and substance from counsel reasonably satisfactory to Buyer by reason of experience to the effect that the holder may transfer the Purchase Share as desired without registration under the Securities Act and (ii) a written undertaking executed by the desired transferee reasonably satisfactory to Parent in form and substance agreeing to be bound by the restrictions on transfer contained herein.

3.    **Representations and Warranties of Seller.** Seller represents and warrants to the Buying Parties that the statements contained in this Section 3 are true, correct and complete as of the date of this Agreement and will be true, correct and complete as of the Closing Date (as though made then and as though the Closing Date were substituted for the date of this Agreement throughout this Section 3), except as set forth in the disclosure schedule accompanying this Agreement and initialed by the Parties (the "Disclosure Schedule"). The Disclosure Schedule will be arranged in paragraphs corresponding to the lettered and numbered paragraphs and subparagraphs contained in this Section 3. Without limiting the generality of the foregoing, the mere listing (or inclusion of a copy) of a document or other item shall not be deemed adequate to disclose an exception to a representation or warranty made herein (unless the representation or warranty has to do with the existence of the document or other item itself). The Parties intend that each representation, warranty, and covenant contained herein shall have independent significance. If any Party has breached any representation, warranty, or covenant contained herein in any respect, the fact that there exists another representation, warranty, or covenant relating to the same subject matter (regardless of the relative levels of specificity) which the Party has not breached shall not detract from or mitigate the fact that the Party is in breach of the first representation, warranty, or covenant.

(a)    Operation of Business. Seller has operated the Business under no trade names other than Snow Management Group, and at no time has any Person other than Seller owned or operated the Business. Seller neither conducts nor is associated with the conduct of any snow management or snow removal activities other than through the Business.

(b)    Authorization of Transaction. Seller has full power and authority to execute and deliver this Agreement and other Transaction Documents to which Seller is a party and to perform his obligations hereunder and thereunder. This Agreement and the other

Transaction Documents to which Seller is a party constitute the valid and legally binding obligations of Seller, enforceable in accordance with their terms and conditions.

(c)    Noncontravention.  Neither the execution and the delivery of this Agreement or any of the other Transaction Documents to which Seller is a party, nor the consummation of the transactions contemplated hereby, will (i) violate any constitution, statute, regulation, rule, injunction, judgment, order, decree, ruling, charge, or other restriction of any government, governmental agency, or court to which Seller or the Business is subject or (ii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, cancel, or require any notice under any agreement, contract, lease, license, instrument, or other arrangement to which Seller or the Business is a party or by which it is bound or to which any of its assets is subject, including any Acquired Contract (or result in the imposition of any Security Interest upon any of its assets). Except as set forth in Section 3(c) of the Disclosure Schedule, Seller is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of any person in order for the Parties to consummate the transactions contemplated by this Agreement or any other Transaction Documents to which Seller is a party (including the assignments and assumptions of the Acquired Contracts).  Except as set forth in Section 3(c) of the Disclosure Schedule (as delivered at Closing), there will be no Unassigned Assets immediately following Closing.

(d)    Brokers' Fees.  Seller has no Liability or obligation to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated by this Agreement for which Buyer could become liable or obligated.

(e)    Title to Assets; Sufficiency of Assets.  Seller has good and marketable title to, or a valid leasehold interest in, the properties and assets used by Seller in the operation of the Business, necessary to conduct the Business as it has been conducted, located on its premises, or shown on the Most Recent Balance Sheet or acquired after the date thereof, free and clear of all Security Interests, except for properties and assets disposed of in the Ordinary Course of Business since the date of the Most Recent Balance Sheet.  Without limiting the generality of the foregoing, Seller has good and marketable title to all of the Acquired Assets, free and clear of any Security Interest or restriction on transfer, and, at the Closing, will convey to Buyer good and marketable title to all of the Acquired Assets, free and clear of any Security Interest or restriction on transfer.  The Acquired Assets include all properties and assets (tangible and intangible) used by Seller in the operation of the Business or necessary to conduct the Business as it has been conducted.

(f)    Financial Statements.  Attached hereto as Exhibit D are the following financial statements (collectively the "Financial Statements"): (i) audited consolidated and unaudited consolidating balance sheets and statements of income, and cash flow as of and for the fiscal year ended December 31, 2003 for the Business; and (ii) unaudited consolidated and consolidating balance sheets and statements of income, and cash flow (the "Most Recent Financial Statements") as of and for the nine months ended September 30, 2004 (the "Most Recent Fiscal Month End") for the Business.  The Financial Statements (including the notes thereto) have been prepared in accordance with GAAP applied on a consistent basis throughout the periods covered thereby, present fairly the financial condition of the Business as of such

dates and the results of operations of the Business for such periods, are correct and complete, and are consistent with the books and records of the Business (which books and records are correct and complete); provided, however, that the Most Recent Financial Statements are subject to normal year-end adjustments (which will not be material individually or in the aggregate) and lack footnotes and other presentation items.

  (g) <u>Events Subsequent to Most Recent Fiscal Month End</u>.  Since the Most Recent Fiscal Month End, there has not been any material adverse change in the business, financial condition, operations, results of operations, or future prospects of Seller and the Business.  Without limiting the generality of the foregoing, since that date:

    (i) Seller has not sold, leased, transferred, or assigned any assets, tangible or intangible, related to the Business, other than for fair consideration in the Ordinary Course of Business;

    (ii) Seller has not entered into any agreement, contract, lease, or license (or series of related agreements, contracts, leases, and licenses) related to the Business either involving more than $10,000 or outside the Ordinary Course of Business;

    (iii) no Party (including Seller) has accelerated, terminated, modified, or cancelled any agreement, contract, lease, or license (or series of related agreements, contracts, leases, and licenses) related to the Business involving more than $10,000 to which Seller is a party or by which it is bound;

    (iv) Seller has not imposed any Security Interest upon any of its assets, tangible or intangible;

    (v) Seller has not made any capital expenditure (or series of related capital expenditures) either involving more than $10,000 or outside the Ordinary Course of Business;

    (vi) Seller has not made any capital investment in, any loan to, or any acquisition of the securities or assets of, any other Person (or series of related capital investments, loans, and acquisitions) either involving more than $10,000 or outside the Ordinary Course of Business;

    (vii) Seller has not issued any note, bond, or other debt security or created, incurred, assumed, or guaranteed any indebtedness for borrowed money or capitalized lease obligation involving either more than $10,000 singly or $100,000 in the aggregate;

    (viii) Seller has not delayed or postponed the payment of accounts payable and other Liabilities outside the Ordinary Course of Business;

    (ix) Seller has not cancelled, compromised, waived, or released any right or claim (or series of related rights and claims) either involving more than $10,000 or outside the Ordinary Course of Business;

(x)     Seller has not granted any license or sublicense of any rights under or with respect to any Intellectual Property;

(xi)    Seller has not experienced any damage, destruction, or loss (whether or not covered by insurance) to its property;

(xii)   Seller has not made any loan to, or entered into any other transaction with, any of its officers, employees or Affiliates outside the Ordinary Course of Business;

(xiii)  Seller has not entered into any employment contract or collective bargaining agreement, written or oral, or modified the terms of any such existing contract or agreement;

(xiv)   Seller has not granted any increase in the base compensation of any of its officers, employees or Affiliates outside the Ordinary Course of Business;

(xv)    Seller has not adopted, amended, modified, or terminated any bonus, profit-sharing, incentive, severance, or other plan, contract, or commitment for the benefit of any of its officers and employees (or taken any such action with respect to any other Employee Benefit Plan);

(xvi)   Seller has not made any other change in employment terms for any of its officers and employees outside the Ordinary Course of Business;

(xvii)  Seller has not made or pledged to make any charitable or other capital contribution outside the Ordinary Course of Business;

(xviii) Seller has not paid any amount to any third party with respect to any Liability or obligation (including any costs and expenses Seller has incurred or may incur in connection with this Agreement and the transactions contemplated hereby) that would not constitute an Assumed Liability if in existence as of the Closing;

(xix)   there has not been any other occurrence, event, incident, action, failure to act, or transaction outside the Ordinary Course of Business involving Seller; and

(xx)    Seller has not committed to any of the foregoing.

(h)     Undisclosed Liabilities; Limited Liabilities. Seller does not have any Liability related to the Business (and there is no Basis for any present or future action, suit, proceeding, hearing, investigation, charge, complaint, claim, or demand against Seller giving rise to any Liability related to the Business), except for (A) Liabilities set forth on the face of the Most Recent Balance Sheet (rather than in any notes thereto), (B) Liabilities that do not exceed $80,000 in the aggregate and have arisen after the Most Recent Fiscal Month End in the Ordinary Course of Business (none of which results from, arises out of, relates to, is in the nature of, or was caused by any breach of contract, breach of warranty, tort, infringement, or violation of law); and (C) Liabilities related to civil litigation that are within the scope of an

existing insurance policy of Seller and that the relevant insurance company has acknowledged the Liabilities are within the scope of the respective policy and has agreed to assume.

(i)    Legal Compliance.  Seller and its Affiliates have complied with all applicable laws (including rules, regulations, codes, plans, injunctions, judgments, orders, decrees, rulings, and charges thereunder) of federal, state, local, and foreign governments (and all agencies thereof), and no action, suit, proceeding, hearing, investigation, charge, complaint, claim, demand, or notice has been filed or commenced against any of them alleging any failure so to comply.

(j)    Tax Matters.

(i)    Seller has filed all Tax Returns that Seller was required to file.  All such Tax Returns were correct and complete in all respects.  All Taxes owed by Seller (whether or not shown on any Tax Return) have been paid.  Seller currently is not the beneficiary of any extension of time within which to file any Tax Return.  Except for claims that have been definitively resolved, no claim has ever been made by an authority in a jurisdiction where Seller does not file Tax Returns that Seller is or may be subject to taxation by that jurisdiction.  There are no Security Interests on any of the assets of Seller that arose in connection with any failure (or alleged failure) to pay any Tax.

(ii)   Seller has withheld and paid all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, stockholder, or other third party.

(iii)  There is no dispute or claim concerning any Tax Liability of Seller either (A) claimed or raised by any authority in writing or (B) as to which Seller or any employees responsible for Tax matters of Seller has Knowledge based upon personal contact with any agent of such authority.  No Tax Returns filed with respect to Seller for taxable periods ended on or after December 31, 2001 are currently the subject of audit.  Seller has delivered to Buyer correct and complete copies of all federal income Tax Returns, examination reports, and statements of deficiencies assessed against or agreed to by Seller since December 31, 2002.

(k)    Real Property.

(i)    No real property owned by Seller or an Affiliate of Seller has been, or presently is, used by Seller in the operation of the Business or necessary to conduct the Business as it has been conducted.

(ii)   Section 3(k)(ii) of the Disclosure Schedule lists and describes briefly all real property used by Seller in the operation of the Business or necessary to conduct the Business as it has been conducted.  Seller uses all such real property (including the termination provisions thereof and annual amounts payable thereunder) pursuant to the terms of a valid written lease and has described all leases related to such real property in Section 3(k)(ii) of the Disclosure Schedule (the "Real Property Leases").  Seller has delivered to Buyer correct

and complete copies of the Real Property Leases (as amended to date).  With respect to each Real Property Lease:

        (A)    the lease or sublease is legal, valid, binding, enforceable, and in full force and effect;

        (B)    the lease or sublease will continue to be legal, valid, binding, enforceable, and in full force and effect on identical terms following the consummation of the transactions contemplated hereby and by all of the Transaction Documents (including the assignments and assumptions contemplated thereby);

        (C)    to Seller's Knowledge, no party to the lease or sublease is in breach or default, and no event has occurred that, with notice or lapse of time, would constitute a breach or default or permit termination, modification, or acceleration thereunder;

        (D)    to Seller's Knowledge, no party to the lease or sublease has repudiated any provision thereof;

        (E)    there are no disputes, oral agreements, or forbearance programs in effect as to the lease or sublease;

        (F)    with respect to each sublease, the representations and warranties set forth in subsections (A) through (E) above are true and correct with respect to the underlying lease;

        (G)    Seller has not assigned, transferred, conveyed, mortgaged, deeded in trust, or encumbered any interest in the leasehold or subleasehold;

        (H)    all facilities leased or subleased thereunder have received all approvals of governmental authorities (including licenses and permits) required in connection with the operation thereof and have been operated and maintained in accordance with applicable laws, rules, and regulations;

        (I)    all facilities leased or subleased thereunder are supplied with utilities and other services necessary for the operation of said facilities;

        (J)    to the Knowledge of Seller, the owner of the facility leased or subleased has good and marketable title to the parcel of real property, free and clear of any Security Interest, easement, covenant, or other restriction, except for installments of special easements not yet delinquent and recorded easements, covenants, and other restrictions that do not impair the current use, occupancy, or value, or the marketability of title, of the property subject thereto; and

        (K)    no obligation to pay money, absolute or contingent, other than the obligation to pay rent, could arise under these leases and subleases.

    (l)    <u>Intellectual Property</u>.

(i)    Seller owns or has the right to use pursuant to license, sublicense, agreement, or permission, and the Acquired Assets include, all Intellectual Property used by Seller in the operation of the Business or necessary to conduct the Business as it has been conducted. Each such item of Intellectual Property owned or used by Seller during the 12 months preceding the Closing hereunder will be owned or available for use by Buyer on identical terms and conditions immediately subsequent to the Closing hereunder. Seller has taken all necessary action to maintain and protect each item of Intellectual Property that it owns or uses.

(ii)    Seller has not interfered with, infringed upon, misappropriated, or otherwise come into conflict with any Intellectual Property rights of third parties, and Seller has never received any charge, complaint, claim, demand, or notice alleging any such interference, infringement, misappropriation, or violation (including any claim that Seller must license or refrain from using any Intellectual Property rights of any third party). To the Knowledge of Seller, no third party has interfered with, infringed upon, misappropriated, or otherwise come into conflict with any Intellectual Property rights of Seller.

(iii)    Section 3(l)(iii) of the Disclosure Schedule identifies each patent or registration that has been issued to Seller with respect to any of its Intellectual Property, identifies each pending patent application or application for registration that Seller has made with respect to any of its Intellectual Property, and identifies each license, agreement, or other permission that Seller has granted to any third party with respect to any of its Intellectual Property (together with any exceptions). Seller has delivered to Buyer correct and complete copies of all such patents, registrations, applications, licenses, agreements, and permissions (as amended to date) and has made available to Buyer correct and complete copies of all other written documentation evidencing ownership and prosecution (if applicable) of each such item. Section 3(l)(iii) of the Disclosure Schedule also identifies each trade name or unregistered trademark used by Seller in the operation of the Business or necessary to conduct the Business as it has been conducted. With respect to each item of Intellectual Property required to be identified in Section 3(l)(iii) of the Disclosure Schedule:

(A)    Seller possesses all right, title, and interest in and to the item, free and clear of any Security Interest, license, or other restriction;

(B)    the item is not subject to any outstanding injunction, judgment, order, decree, ruling, or charge;

(C)    to Seller's Knowledge, no action, suit, proceeding, hearing, investigation, charge, complaint, claim, or demand is pending or is threatened that challenges the legality, validity, enforceability, use, or ownership of the item; and

(D)    Seller has never agreed to indemnify any Person for or against any interference, infringement, misappropriation, or other conflict with respect to the item.

(iv)    Section 3(l)(iv) of the Disclosure Schedule identifies each item of Intellectual Property that is used by Seller in the operation of the Business or necessary to conduct the Business as it has been conducted that any third party owns and that Seller uses

pursuant to license, sublicense, agreement, or permission. Seller has delivered to Buyer correct and complete copies of all such licenses, sublicenses, agreements, and permissions (as amended to date). With respect to each item of Intellectual Property required to be identified in Section 3(l)(iv) of the Disclosure Schedule:

(A)    the license, sublicense, agreement, or permission covering the item is legal, valid, binding, enforceable, and in full force and effect;

(B)    the license, sublicense, agreement, or permission will continue to be legal, valid, binding, enforceable, and in full force and effect on identical terms following the consummation of the transactions contemplated hereby and by the other Transaction Documents (including the assignments and assumptions contemplated thereby);

(C)    to Seller's Knowledge, no party to the license, sublicense, agreement, or permission is in breach or default, and no event has occurred that with notice or lapse of time would constitute a breach or default or permit termination, modification, or acceleration thereunder;

(D)    to Seller's Knowledge, no party to the license, sublicense, agreement, or permission has repudiated any provision thereof;

(E)    to Seller's Knowledge, with respect to each sublicense, the representations and warranties set forth in subsections (A) through (D) above are true and correct with respect to the underlying license;

(F)    the underlying item of Intellectual Property is not subject to any outstanding injunction, judgment, order, decree, ruling, or charge;

(G)    to Seller's Knowledge, no action, suit, proceeding, hearing, investigation, charge, complaint, claim, or demand is pending or threatened that challenges the legality, validity, or enforceability of the underlying item of Intellectual Property; and

(H)    Seller has not granted any sublicense or similar right with respect to the license, sublicense, agreement, or permission.

(v)    Seller will not interfere with, infringe upon, misappropriate, or otherwise come into conflict with any Intellectual Property rights of third parties as a result of the continued operation of the Business.

(m)    Tangible Assets. Seller owns or leases, and the Acquired Assets include, all buildings and related heating, ventilation and air conditioning systems, machinery, equipment, and other tangible assets used by Seller in the operation of the Business or necessary to conduct the Business as it has been conducted (the "Tangible Assets"). Except for such Tangible Assets that are leased under real property leases described in Section 3(k)(ii) of the Disclosure Schedule, all such Tangible Assets are described on Section 3(m) of the

Disclosure Schedule (with owned assets and leased assets listed separately). Each such Tangible Asset is free from any material defects (patent and latent), has been maintained in accordance with normal industry practice, is in good operating condition and repair (subject to normal wear and tear), and is suitable for the purposes for which it has been used, is used, or is proposed to be used.

(n)    Inventory. The inventory of Seller consists of raw materials and supplies, manufactured and purchased parts, including spare and replacement parts, goods in process, and finished goods, all of which is merchantable and fit for the purpose for which it was procured or manufactured, and none of which is slow-moving, obsolete, damaged, or defective, subject only to the reserve for inventory writedown set forth on the face of the Most Recent Balance Sheet (rather than in any notes thereto) as adjusted for the passage of time through the Closing Date in accordance with the past custom and practice of Seller.

(o)    Contracts.

(i)    Section 3(o) of the Disclosure Schedule lists the following contracts and other agreements related to the Business to which Seller is a party:

(A)    any agreement (or group of related agreements) for the license or lease of tangible personal property to or from any Person (the "Equipment Leases"), and any agreement (or group of related agreements) for the license or lease of intangible personal property to or from any Person;

(B)    any agreement (or group of related agreements) for the purchase or sale of raw materials, commodities, supplies, products, or other personal property, or for the furnishing or receipt of services;

(C)    any agreement concerning a partnership or joint venture;

(D)    any agreement (or group of related agreements) under which it has created, incurred, assumed, or guaranteed any indebtedness for borrowed money, or any capitalized lease obligation, under which it has imposed a Security Interest on any of its assets, tangible or intangible;

(E)    any agreement concerning confidentiality or noncompetition;

(F)    any Employee Benefit Plan, profit sharing, deferred compensation, severance, or other plan or arrangement for the benefit of its current or former employees;

(G)    any collective bargaining agreement;

(H)    any agreement for the employment of any individual on a full-time, part-time, consulting, or other basis or providing severance benefits;

(I)    any agreement under which it has advanced or loaned any amount to any of its current or former employees outside the Ordinary Course of Business;

(J)    any agreement under which the consequences of a default or termination could have a material adverse effect on the business, financial condition, operations, results of operations, or future prospects of Seller;

(K)    any other contract, lease, license or other agreement or arrangement that is used by Seller in the operation of the Business or necessary to conduct the Business as it has been conducted.

(ii)    The documents listed on Section 3(o) of the Disclosure Schedule and identified as Acquired Contracts constitute all of the contracts, leases, accounts receivable, licenses, instruments and other agreements or arrangements, other than the Excluded Assets, used by Seller in the operation of the Business or necessary to conduct the Business as it has been conducted.

(iii)    Seller has delivered to Buyer a correct and complete copy of each written agreement listed in Section 3(o) of the Disclosure Schedule and a written summary setting forth the terms and conditions of each oral agreement referred to in Section 3(o) of the Disclosure Schedule. With respect to each such agreement: (A) the agreement is legal, valid, binding, enforceable, and in full force and effect; (B) the agreement will continue to be legal, valid, binding, enforceable, and in full force and effect on identical terms following the consummation of the transactions contemplated hereby (including the assignments and assumptions contemplated thereby); (C) to Seller's Knowledge, no party is in breach or default, and no event has occurred that with notice or lapse of time would constitute a breach or default, or permit termination, modification, or acceleration, under the agreement; and (D) to Seller's Knowledge, no party has repudiated any provision of the agreement.

(p)    Notes and Accounts Receivable/Payable.

(i)    All notes and accounts receivable of Seller (A) are reflected properly on its Most Recent Balance Sheet and in its books and records; (B) are valid receivables arising from bona fide transactions in the Ordinary Course of Business; (C) to the Knowledge of Seller, are subject to no setoffs, claims or refusals to pay; (D) are current; and; (E) are collectible in accordance with their terms at their recorded amounts, subject only to the reserve for bad debts set forth on the face of the Most Recent Balance Sheet (rather than in any notes thereto) as adjusted for the passage of time through the Closing Date in accordance with the past custom and practice of Seller. Section 3(p)(i) of the Disclosure Schedule contains a listing of all of the accounts receivable of Seller as of the date hereof and as of the Closing Date. Except as set forth in Section 3(p)(i) of the Disclosure Schedule, as of the date hereof and as of the Closing Date, (Y) no account or note debtor of Seller and its Subsidiaries is delinquent in payment by more than 60 days and (Z) the aging schedule of the accounts receivable and notes receivable of Seller included in Section 3(p)(i) of the Disclosure Schedule attached hereto is complete and accurate.

(ii)    Section 3(p)(ii) of the Disclosure Schedule contains a listing of all accounts payable and notes payable that Seller owes (or has any Liability with respect to) as of the date hereof and as of the Closing Date. Except as set forth in Section 3(p)(ii) of the Disclosure Schedule, as of the date hereof and as of the Closing Date, all such accounts payable and notes payable arose from bona fide transactions in the Ordinary Course of Business and, no such account payable or note payable is delinquent by more than 60 days in its payment.

(q)    Powers of Attorney. There are no outstanding powers of attorney executed on behalf of Seller.

(r)    Insurance.

(i)    Section 3(r) of the Disclosure Schedule sets forth the following information with respect to each insurance policy, (including policies providing property, casualty, liability, and workers' compensation coverage and bond and surety arrangements) to which Seller has been a party, a named insured, or otherwise the beneficiary of coverage at any time within the past two years:

(A)    the name, address, and telephone number of the agent;

(B)    the name of the insurer, the name of the policyholder, and the name of each covered insured;

(C)    the policy number and the period of coverage;

(D)    the scope (including an indication of whether the coverage was on a claims made, occurrence, or other basis) and amount (including a description of how deductibles and ceilings are calculated and operate) of coverage; and

(E)    a description of any retroactive premium adjustments or other loss-sharing arrangements.

(ii)    With respect to each such insurance policy: (A) the policy is legal, valid, binding, enforceable, and in full force and effect; (B) the policy will continue to be legal, valid, binding, enforceable, and in full force and effect on identical terms following the consummation of the transactions contemplated hereby and by the other Transaction Documents (including the assignments and assumptions referred to therein); (C) neither Seller nor any other party to the policy is in breach or default (including with respect to the payment of premiums or the giving of notices), and no event has occurred that, with notice or the lapse of time, would constitute such a breach or default, or permit termination, modification, or acceleration, under the policy; and (D) to the Knowledge of Seller no party to the policy has repudiated any provision thereof. Seller has been covered during the past five years by insurance in scope and amount customary and reasonable for the Business in which it has engaged during the aforementioned period and has never been denied coverage. Section 3(r) of the Disclosure Schedule describes any self-insurance arrangements affecting Seller.

(s)    Litigation. Section 3(s) of the Disclosure Schedule sets forth each instance, (involving an Assumed Liability or a claim or potential claim in excess of $50,000) in which Seller (i) is subject to any outstanding injunction, judgment, order, decree, ruling, or charge or (ii) is a party or to the Knowledge of Seller, is threatened to be made a party to any action, suit, proceeding, hearing, or investigation of, in, or before any court or quasi-judicial or administrative agency of any federal, state, local, or foreign jurisdiction or before any arbitrator. None of the actions, suits, proceedings, hearings, and investigations set forth in Section 3(s) of the Disclosure Schedule could result in any adverse change in the business, financial condition, operations, results of operations, or future prospects of Seller.

(t)    Service Warranty. Each service provided by Seller has been in conformity with all applicable contractual commitments and all express and implied warranties, and Seller does not have any Liability (and there is no Basis for any present or future action, suit, proceeding, hearing, investigation, charge, complaint, claim, or demand against it giving rise to any Liability) for consequential or other damages in connection therewith, subject only to the reserve for warranty claims set forth on the face of the Most Recent Balance Sheet (rather than in any notes thereto) as adjusted for the passage of time through the Closing Date in accordance with the past custom and practice of Seller. No service provided by any of Seller and its Affiliates is subject to any guaranty, warranty, or other indemnity beyond the applicable standard terms and conditions set forth in governing agreements. There are no outstanding credits for future services resulting from service warranty claims.

(u)    Employees.

(i)    To the Knowledge of Seller, no key employee or group of employees has any plans to terminate employment with Seller and the employment relationship with each and every employee of Seller is terminable at will by Seller. Seller is not a party to or bound by any collective bargaining agreement, nor has it experienced any strikes, grievances, claims of unfair labor practices, or other collective bargaining disputes. Seller has not committed any unfair labor practice. Seller has no Knowledge of any organizational effort presently being made or threatened by or on behalf of any labor union with respect to employees of Seller.

(ii)    Seller has not at any time during the past 12 months employed 100 or more employees in connection with all businesses operated by Seller.

(iii)    Section 3(u) of the Disclosure Schedule sets forth the name of each employee of Seller, and separately sets forth each such individual's current annual salary, and for the 12-month period ended September 30, 2004, the amount of each such individual's salary, bonus payments and any other indirect compensation as well as the paid time off (in dollar value), holiday time and sick pay due each employee of Seller as of the date of this Agreement (and in the Disclosure Schedule delivered at Closing, as of a date within five days of the Closing Date).

(v)    Employee Benefits.  Except as set forth in Section 3(v) of the Disclosure Schedule, Seller is not the sponsor of, or otherwise obligated to contribute to, any Employee Benefit Plan.  Without limiting the foregoing, except as set forth in Section 3(v) of the Disclosure Schedule, there are no profit sharing, pension, retirement, bonus, deferred compensation, group insurance or other benefit plans or obligations in which any employee of Seller is a participant, whether or not such obligation is of a legally binding nature or in the nature of an informal understanding.  With respect to any Employee Benefit Plan of which Seller is the sponsor, or which Seller is otherwise obligated to contribute to, Seller has no outstanding Liability with respect to, and has made all required contributions to, such Employee Benefit Plan.

(w)    Guaranties.  Seller is not a guarantor or otherwise liable for any Liability or obligation (including indebtedness) of any other Person.

(x)    Environmental, Health, and Safety Matters.

(i)    Seller has complied and is in compliance with all Environmental, Health, and Safety Requirements.

(ii)    Without limiting the generality of the foregoing, Seller has obtained and complied with, and is in compliance with, all permits, licenses and other authorizations that are required pursuant to Environmental, Health, and Safety Requirements for the occupation of Seller's facilities and the operation of the Business; a list of all such permits, licenses and other authorizations is set forth in Section 3(x)(ii) of the Disclosure Schedule.

(iii)    Seller has not received any written or oral notice, report or other information regarding any actual or alleged violation of Environmental, Health, and Safety Requirements, or any Liabilities or potential Liabilities (whether accrued, absolute, contingent, unliquidated or otherwise), including any investigatory, remedial or corrective obligations, relating to it or its facilities arising under Environmental, Health, and Safety Requirements.

(iv)    None of the following exists at any property or facility owned or operated by Seller:  (A) underground storage tanks; (B) to the Knowledge of Seller, asbestos-containing material in any form or condition; (C) to the Knowledge of Seller, materials or equipment containing polychlorinated biphenyls; or (D) landfills, surface impoundments, or disposal areas.

(v)    Seller has not treated, stored, disposed of, arranged for or permitted the disposal of, transported, handled, or released any substance, including without limitation any hazardous substance, or owned or operated any property or facility (and no such property or facility is contaminated by any such substance) in a manner that has given or would give rise to Liabilities, including any Liability for response costs, corrective action costs, personal injury, property damage, natural resources damages or attorneys' fees, pursuant to the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, the Solid Waste Disposal Act, as amended, or any other Environmental, Health, and Safety Requirements.

(vi)    Neither this Agreement nor the consummation of the transaction that is the subject of this Agreement will result in any obligations for site investigation or cleanup, or notification to or consent of government agencies or third parties, pursuant to any of the so-called "transaction-triggered" or "responsible property transfer" Environmental, Health, and Safety Requirements.

(vii)    Seller has not, either expressly or by operation of law, assumed or undertaken any liability, including without limitation any obligation for corrective or remedial action, of any other Person relating to Environmental, Health, and Safety Requirements.

(viii)    No facts, events or conditions relating to the past or present facilities, properties or operations of Seller will prevent, hinder or limit continued compliance with Environmental, Health, and Safety Requirements, give rise to any investigatory, remedial or corrective obligations pursuant to Environmental, Health, and Safety Requirements, or give rise to any other Liabilities (whether accrued, absolute, contingent, unliquidated or otherwise) pursuant to Environmental, Health, and Safety Requirements, including without limitation any relating to on-site or off-site releases or threatened releases of hazardous materials, substances or wastes, personal injury, property damage or natural resources damage.

(y)    Certain Business Relationships With Seller. No former or current employee or other Affiliate of Seller or any individual related by blood, marriage or adoption to any such individual or any entity in which any such Person or individual owns any beneficial interest, is a party to any agreement, contract, commitment, or transaction with Seller or owns (or has a direct interest in) any asset, tangible or intangible, that is used by Seller in the operation of the Business or necessary to conduct the Business as it has been conducted.

(z)    Disclosure. The representations and warranties contained in this Section 3 do not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements and information contained in this Section 3 not misleading.

(aa)    Investment. Seller (i) understands that the Purchase Shares have not been, and will not be, registered under the Securities Act, or under any state securities laws, and are being offered and sold in reliance upon federal and state exemptions for transactions not involving any public offering; (ii) is acquiring the Purchase Shares solely for his own account for investment purposes, and not with a view to the distribution thereof; (iii) is a sophisticated investor with knowledge and experience in business and financial matters; (iv) is able to bear the economic risk and lack of liquidity inherent in holding the Purchase Shares; (v) is an Accredited

Investor for the reasons set forth in Section 3(aa) of the Disclosure Schedule; (vi) acknowledges that the Purchase Shares are subject to the restrictions on transfer set forth in Section 2(h) above; and (vii) in making the decision to acquire the Purchase Shares has relied solely upon (A) representations and warranties of the Buying Parties contained in this Agreement and the other Transaction Documents and (B) written information provided by Parent or Buyer directly to Seller.

      (bb)    <u>Customers and Suppliers</u>.

      (i)    Section 3(bb)(i) of the Disclosure Schedule sets forth (A) a complete and accurate list of the name of each customer of the Business, (b) the amount of revenue generated by such customer during the 12-month period ended September 30, 2004, (C) the Committed Revenue related to such customer, and (D) a list of the contact information of each such Business customer.

      (ii)    Section 3(bb)(ii) of the Disclosure Schedule contains a listing of all suppliers and vendors of the Business (including providers of capital or leasing services), together with complete contact information and the amount of expense incurred to such vendor or supplier during the 12-month period ended September 30, 2004.

      (cc)    <u>No Other Agreement to Sell Assets</u>.  Seller has not, since October 1, 2004, (i) solicited, initiated, or encouraged the submission of, or agreed to any proposal or offer from any Person relating to the acquisition of any substantial portion of the assets of Seller or (ii) participated in any discussions or negotiations regarding, furnished any information with respect to, assisted or participated in, or facilitated in any other manner any effort or attempt by any Person to do or seek any of the foregoing.

      4.    **Representations and Warranties of the Buying Parties**.  The Buying Parties, jointly and severally, represent and warrant to Seller that the statements contained in this Section 4 are correct and complete as of the date of this Agreement and will be correct and complete as of the Closing Date (as though made then and as though the Closing Date were substituted for the date of this Agreement throughout this Section 4), except as set forth in the Buying Parties Disclosure Schedule.  The Buying Parties Disclosure Schedule will be arranged in paragraphs and subparagraphs corresponding to the lettered and numbered paragraphs contained in this Section 4.

      (a)    <u>Organization of Buyer</u>.  Parent is a corporation duly organized, validly existing, and in good standing under the laws of the jurisdiction of its incorporation.  Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization.

      (b)    <u>Authorization of Transaction</u>.  Each of Parent and Buyer has full power and authority (including full company power and authority) to execute and deliver this Agreement and the other Transaction Documents to which it is a party and to perform its obligations hereunder and thereunder.  This Agreement and the other Transaction Documents to which it is a party constitute the valid and legally binding obligation of each of the Buying Parties, enforceable in accordance with their terms and conditions.

(c)    Noncontravention.  Neither the execution and the delivery of this Agreement or the other Transaction Documents to which Parent or Buyer is a party, nor the consummation of the transactions contemplated hereby and thereby (including the assignments and assumptions referred to herein and therein), will (i) violate any constitution, statute, regulation, rule, injunction, judgment, order, decree, ruling, charge, or other restriction of any government, governmental agency, or court to which Buyer or Parent is subject or any provision of its charter or bylaws or (ii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any agreement, contract, lease, license, instrument, or other arrangement to which Buyer or Parent is a party or by which it is bound or to which any of their assets is subject.  Neither Buyer nor Parent needs to give any notice to, make any filing with, or obtain any authorization, consent, or approval of any person in order for the Parties to consummate the transactions contemplated by this Agreement and the other Transaction Documents.

(d)    Brokers' Fees.  Neither Parent nor Buyer has any Liability or obligation to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated by this Agreement for which Seller could become liable or obligated.

(e)    Validly Issued Shares.  When issued in compliance with the provisions of this Agreement, the Parent Common Stock will be validly issued, fully paid and nonassessable, will rank pari passu in all respects with all existing issued common stock, par value $0.001, and will be free of any restrictions, limits, claims, liens or other encumbrances (other than such encumbrances that may arise from an action or omission of Seller); provided, however, that the Parent Common Stock may be subject to restrictions on transfer under state and/or federal securities laws as set forth herein or as otherwise required by such laws at the time a transfer is proposed.

5.    **Pre-Closing Covenants**.  The Parties agree as follows with respect to the period between the execution of this Agreement and the Closing.

(a)    General.  Each of the Parties will use its best efforts to take all action and to do all things necessary, proper, or advisable in order to consummate and make effective the transactions contemplated by this Agreement and the other Transaction Documents (including satisfaction, but not waiver, of the closing conditions set forth in Section 6 below).

(b)    Notices and Consents.  Seller will give any notices to third parties, and Seller will use its best efforts to obtain any third party consents, that the Buying Parties reasonably may request in connection with the matters referred to in Section 3(c) above.  Each of the Parties will give any notices to, make any filings with, and use its reasonable best efforts to obtain any authorizations, consents, and approvals of governments and governmental agencies in connection with the matters referred to in Section 3(c) and Section 4(c) above.

(c)    Operation of Business.  Seller will not engage in any practice, take any action, or enter into any transaction outside the Ordinary Course of Business.  Without limiting the generality of the foregoing, Seller will not (i) pay any amount to any third party with respect to any Liability or obligation (including any costs and expenses Seller has incurred or may incur

in connection with this Agreement and the transactions contemplated hereby) that would not constitute an Assumed Liability if in existence as of the Closing or (ii) without prior written consent of Parent, otherwise engage in any practice, take any action, or enter into any transaction of the sort described in Section 3(g) above.

        (d)      <u>Preservation of Business; Termination of Employment Relationships.</u>

        (i)      Seller will keep the Business and its properties substantially intact, including its present operations, physical facilities, working conditions, and relationships with lessors, licensors, suppliers, customers, and employees; provided, however, prior to closing, Seller shall terminate its employment relationship with all persons currently engaged primarily in the conduct of the Business. Seller shall be responsible for all severance costs and other Liabilities associated with such termination. Buyer shall use good faith to extend to as many of such persons as is commercially practicable offers of employment at a rate of compensation comparable to that being paid by Buyer for similar positions within Buyer's company, on an at-will basis and subject to Buyer and such persons otherwise being able to negotiate such terms as are mutually acceptable.

        (ii)      Seller shall use commercially reasonable efforts to establish contracts on terms and conditions consistent with past practice with service providers and customers for the coming snow management seasons; provided, that, Seller shall not enter into any such contract with service providers and customers without obtaining Parent's written consent to the terms of such contract.

        (e)      <u>Full Access.</u>  Seller will permit representatives of Buyer to have full access at all reasonable times, and in a manner so as not to interfere with the normal business operations of Seller, to all premises, properties, personnel, books, records (including Tax records), contracts, and documents of or pertaining to Seller.

        (f)      <u>Notice of Developments.</u>  Each Party will give prompt written notice to the other Party of any material adverse development causing a breach or likely to cause a breach through the passage of time of any of its own representations and warranties in Section 3 and Section 4 above. No disclosure by any Party pursuant to this Section 5(f), however, shall be deemed to amend or supplement the Disclosure Schedule or to prevent or cure any misrepresentation, breach of warranty, or breach of covenant.

        (g)      <u>Exclusivity.</u>  Seller will not (i) solicit, initiate, or encourage the submission of any proposal or offer from any Person relating to the acquisition of any substantial portion of the assets of Seller or (ii) participate in any discussions or negotiations regarding, furnish any information with respect to, assist or participate in, or facilitate in any other manner any effort or attempt by any Person to do or seek any of the foregoing. The remedy for a knowing breach of any of the obligations or covenants under this Section 5(g) prior to the 30th day after termination of this Agreement shall be $300,000 in cash, due and payable to Buyer upon Buyer's submission of undisputed proof to Seller that Seller has breached any of the obligations or covenants of this Section 5(g). Seller will notify Buyer immediately if any Person makes any proposal, offer, inquiry, or contact with respect to any of the foregoing.

(h)    <u>Supplements to Schedules</u>.  From time to time prior to the Closing, Seller will promptly supplement or amend the Disclosure Schedules with respect to any matter hereafter arising that, if existing or occurring at the date of this Agreement, would have been required to be set forth or described in any Disclosure Schedule and will promptly notify Buyer of any breach by either of them that Seller discovers of any representation, warranty or covenant contained in this Agreement.  No supplement or amendment of any Schedule or notice of breach made pursuant to this Section 5(h) will be deemed to cure any breach of any representation, warranty or covenant made in this Agreement or to impair any right of any party with respect thereto unless that party specifically agrees thereto in writing.

(i)    <u>Comerica Financing Arrangement</u>.  The Buying Parties shall take reasonable steps to negotiate and sign as soon as practicable a financing arrangement with Comerica Bank sufficient to enable Buyer to close the transactions contemplated by this Agreement.  For purposes of clarification, a decision by Comerica Bank not to consummate such a financing shall not be a breach of this document.

6.    **Conditions to Obligation to Close.**

(a)    <u>Conditions to Obligation of Buyer</u>.  The obligation of the Buying Parties to consummate the transactions to be performed by them in connection with the Closing is subject to satisfaction of the following conditions:

(i)    the representations and warranties set forth in Section 3 above shall be true, correct and complete in all material respects at and as of the Closing Date;

(ii)    Seller shall have performed and complied with all of its covenants hereunder in all material respects through the Closing;

(iii)    no action, suit, or proceeding shall be pending or threatened before any court or quasi-judicial or administrative agency of any federal, state, local, or foreign jurisdiction or before any arbitrator wherein an unfavorable injunction, judgment, order, decree, ruling, or charge would (A) prevent consummation of any of the transactions contemplated by this Agreement, (B) cause any of the transactions contemplated by this Agreement to be rescinded following consummation, or (C) affect adversely the right of Buyer to own the Acquired Assets or to operate the Business; provided however, Buyer acknowledges and agrees that litigation matters arising from Seller's nonpayment of creditors shall not be a breach of this condition to Closing provided that the aggregate damages requested in such litigation do not exceed $50,000;

(iv)    the service providers listed on the list of Required Service Provider Consents attached hereto as <u>Exhibit G</u> shall have executed agreements with Buyer (or Seller with consent to transfer to Buyer) under which the service providers accept Buyer's proposed payment terms on Assumed Liabilities and, if requested by Buyer, agree to provide service during the upcoming snow removal season;

(v)    The Acquired Contracts as of Closing shall include customer contracts representing Committed Revenue equal to or exceeding $15,000,000;

(vi)    Seller shall have received all authorizations, consents or approvals required to permit Seller to assign and Buyer to assume the Real Property Leases and the Equipment Leases;

(vii)    Seller shall have delivered to Buyer a certificate executed by Seller to the effect that each of the conditions specified in Section 6(a)(i)-(vi) above and Section 6(a)(ix)-(x) below are satisfied in all respects;

(viii)    Seller and the other parties thereto, other than the Buying Parties, shall have executed and delivered, or be prepared to deliver at Closing:

(A)    the Bill of Sale attached hereto as Exhibit E-1;

(B)    the Assignment and Assumption Agreement attached hereto as Exhibit E-2; and

(C)    a Consent, Assignment and Assumption Agreement for each Equipment Lease and Real Property Lease substantially in the form attached hereto as Exhibit E-3 (with such changes as required by the lessor and agreed to by the parties).

(ix)    Seller shall have terminated its employment relationship with all individuals currently engaged in the conduct of the Business;

(x)    Seller shall have delivered to the Buying Parties a Disclosure Schedule dated as of the Closing Date and such Disclosure Schedule shall not contain any disclosures not included in the Disclosure Schedule delivered on the date of this Agreement that the Buying Parties deem, in their discretion, to represent a material change in the financial condition, business, or prospects of the Business;

(xi)    Seller shall have executed an Employment Agreement in the form attached hereto as Exhibit F-1;

(xii)    Jeff Vernon shall have executed an Employment Agreement in the form attached hereto as Exhibit F-2;

(xiii)    each of Lisa Edwards, Rudy Rieder and Peggy Allin will have executed an Employment Agreement substantially in the form attached hereto as Exhibit F-3 (but with separate compensation filled in for each);

(xiv)    all conditions precedent to Comerica Bank providing the financing contemplated by the definitive term sheet (and related agreement) supplied by Comerica Bank shall have been satisfied, and Comerica Bank shall be prepared to fund all amounts contemplated thereunder; and

(xv)    all actions to be taken by Seller in connection with consummation of the transactions contemplated hereby and all certificates, opinions, instruments, and other

documents required to effect the transactions contemplated hereby will be reasonably satisfactory in form and substance to Buyer.

The Buying Parties may waive any condition specified in this Section 6(a) if an authorized officer of Parent executes a writing so stating at or prior to the Closing.

      (b)    <u>Conditions to Obligation of Seller</u>.  The obligation of Seller to consummate the transactions to be performed by it in connection with the Closing is subject to satisfaction of the following conditions:

      (i)    the representations and warranties set forth in Section 4 above shall be true and complete in all material respects at and as of the Closing Date;

      (ii)    Buyer shall have performed and complied with all of its covenants hereunder in all material respects through the Closing;

      (iii)    Buyer shall have executed the Employment Agreements in the form attached hereto as <u>Exhibits F-1</u>, <u>F-2</u>, and <u>F-3</u> (F-3 with respect to each of Lisa Edwards, Rudy Rieder, and Peggy Allin);

      (iv)    no action, suit, or proceeding shall be pending or threatened before any court or quasi-judicial or administrative agency of any federal, state, local, or foreign jurisdiction or before any arbitrator wherein an unfavorable injunction, judgment, order, decree, ruling, or charge would (A) prevent consummation of any of the transactions contemplated by this Agreement or (B) cause any of the transactions contemplated by this Agreement to be rescinded following consummation (and no such injunction, judgment, order, decree, ruling, or charge shall be in effect);

      (v)    the Buying Parties shall have received all other authorizations, consents and approvals referred to in Section 4(c) above; and

      (vi)    the Buying Parties shall have executed and delivered, or be prepared to deliver at Closing:

      (A)    the Assignment and Assumption Agreement attached hereto as <u>Exhibit E-2</u>;

      (B)    a Consent, Assignment and Assumption Agreement for each Equipment Lease and Real Property Lease substantially in the form attached hereto as <u>Exhibit E-3</u> (with such changes as are required by the lessor and agreed to by the parties);

      (C)    Stock certificates to Seller for the Purchase Shares; and

      (D)    the $250,000 in Cash required by Section 2(c)(i) above and the $10,000 necessary to pay the Assumed Liability identified in Section 2(b)(i)(D)

above, all of which shall be wire transferred to an account designated by Roetzel & Andress, counsel for Seller.

Seller may waive any condition specified in this Section 6(b) if it executes a writing so stating at or prior to the Closing.

7.    **Post-Closing Covenants**.  The Parties agree as follows with respect to the period following the Closing.

(a)    General.  If at any time after the Closing any further action is necessary or desirable to carry out the purposes of this Agreement, each of the Parties will take such further action (including the execution and delivery of such further instruments and documents) as any other Party reasonably may request, all at the sole cost and expense of the requesting Party (unless the requesting Party is entitled to indemnification therefor under Section 8 below).  Seller acknowledges and agrees that from and after the Closing, Parent and Buyer will be entitled to possession of all documents, books, records (including Tax records), agreements, and financial data of any sort relating to the Business other than those constituting Excluded Assets.

(b)    Litigation Support.  In the event and for so long as any Party actively is contesting or defending against any action, suit, proceeding, hearing, investigation, charge, complaint, claim, or demand in connection with (i) any transaction contemplated under this Agreement or (ii) any fact, situation, circumstance, status, condition, activity, practice, plan, occurrence, event, incident, action, failure to act, or transaction on or prior to the Closing Date involving Seller or the Acquired Assets, each of the other Parties will cooperate with the contesting or defending Party and his or its counsel in the contest or defense, make available his or its personnel, and provide such testimony and access to his or its books and records as shall be necessary in connection with the contest or defense, all at the sole cost and expense of the contesting or defending Party (unless the contesting or defending Party is entitled to indemnification therefor under Section 8 below).

(c)    Transition.  Seller will not take any action that is designed or intended to have the effect of discouraging any lessor, lender, licensor, customer, supplier, or other business associate of the Business from maintaining the same business relationships with the Buying Parties after the Closing as it maintained with Seller prior to the Closing.  Seller will refer all customer inquiries relating to the Business to Buyer from and after the Closing.

(d)    Confidentiality.  Seller will treat and hold as such all of the Confidential Information, refrain from using any of the Confidential Information except in connection with this Agreement or to promote Buyer's business as part of his employment with Buyer following Closing, and deliver promptly to Buyer or destroy, at the request and option of Buyer, all embodiments and copies (in whatever form or medium) of the Confidential Information that are in its possession.  In the event that Seller is requested or required (by oral question or request for information or documents in any legal proceeding, interrogatory, subpoena, civil investigative demand, or similar process) to disclose any Confidential Information, Seller will notify Buyer and Parent promptly of the request or requirement so that Buyer and Parent may seek an appropriate protective order or waive compliance with the provisions of this Section 7(d).  If, in the absence of a protective order or the receipt of a waiver hereunder, Seller is, on the advice of

counsel, compelled to disclose any Confidential Information to any tribunal or else stand liable for contempt, Seller may disclose the Confidential Information to the tribunal; provided, however, that Seller shall use its reasonable best efforts to obtain, at the reasonable request of Buyer or Parent, an order or other assurance that confidential treatment will be accorded to such portion of the Confidential Information required to be disclosed as Buyer or Parent shall designate.

(e)      Covenant Not to Compete.  Seller acknowledges that (A) Seller is among a limited number of Persons who have developed a business like that of the Business; (B) the Business of Seller is, in part, national in scope; (C) the agreements and covenants of Seller contained in this Section 7(e) are essential to the business and goodwill of the Business of Seller and the use by the Buying Parties of the Acquired Assets and the conduct by the Buying Parties of the Business; and (D) the Buying Parties would not have entered into this Agreement and would not have purchased the Acquired Assets but for the covenants and agreements set forth in this Section 7(e).  Accordingly, Seller covenants and agrees that:

(i)      During the period commencing on the Closing Date and ending five years following the Closing Date (the "Restricted Period"), Seller shall not directly or indirectly, own, operate, manage, control, participate in, consult with, advise, permit its name to be used by, provide services for, lease, or in any manner engage in any business that manufactures or sells any products or provides any services that are in competition with any products or services of the Business anywhere in the United States, as such business existed during the year prior to the Closing Date.

(ii)      During the Restricted Period, Seller shall not, without the prior written consent of the Buying Parties, directly or indirectly, (A) induce or attempt to induce any employee of any Buying Party to leave the employ of any Buying Party, (B) employ any employee of any Buying Party when employed by any Buying Party, (C) in any other way interfere with the relationship between any Buying Party and any employee of any Buying Party, (D) employ during the period commencing from the date hereof and ending two years following the Closing Date any Person who is employed by any Buying Party during such period, or (E) induce or attempt to induce any customer, supplier, licensee, licensor, reseller, partner or franchisee of any Buying Party (including any customer of the Business) to cease doing business with any Buying Party, or in any way interfere with the relationship between any such customer, supplier, licensee, licensor, reseller, partner or franchisee or business relation and any Buying Party.

(iii)      Seller shall not, at any time, directly or indirectly, verbally or in writing, publicly or in private, disparage, slander, denigrate or criticize the business, operations, properties, assets, activities, management, shareholders or performance of the Buying Parties or Seller and shall refrain from all communications that have as their effect, whether intended or unintended, the denigration, disparagement or deprecation of the Buying Parties or Seller or their respective business, operations, properties, assets, activities, management, shareholders or performance.

(iv)      Seller further acknowledges and agrees that:

(A)    the covenants set forth in this Section 7(e) are reasonable in geographical and temporal scope and in all other respects;

(B)    the Buying Parties would not have entered into this Agreement but for the covenants contained herein; and

(C)    the covenants contained herein have been made in order to induce the Buying Parties to enter into this Agreement and purchase the Acquired Assets from which Seller will receive substantial benefit.

(v)    If, at the time of enforcement of the covenants contained in this Section 7(e), a court shall hold that the duration, scope or geographic restrictions stated therein are unreasonable under circumstances then existing, the Parties agree that the maximum duration, scope or geographic area reasonable under such circumstances shall be substituted for the stated duration, scope or geographic area (and any court or other adjudicator interpreting these provision is hereby authorized to so amend this Agreement).

(f)    Jurisdiction for Noncompetition/Nondisclosure Covenants. Notwithstanding anything in Section 10(o) below to the contrary, for the sole purpose of enforcement of rights arising under Sections 7(d) and 7(e) above, the Parties intend to and hereby confer jurisdiction to enforce the restrictions set forth in Sections 7(d) and 7(e) above (the "Restrictions") upon the courts of any jurisdiction within the geographical scope of the Restrictions. If the courts of any one or more of such jurisdictions hold the Restrictions unenforceable by reason of the breadth of such scope or otherwise, it is the intention of the Parties that such determination not bar or in any way affect the parties' respective rights to the relief provided above in the courts of any other jurisdiction within the geographical scope of the Restrictions, as to breaches of such covenants in such other respective jurisdictions, such covenants as they relate to each jurisdiction being, for this purpose, severable into diverse and independent covenants.

(g)    Unassigned Assets. With respect to any Unassigned Asset, until all consents necessary to cause such asset or agreement to become an Acquired Asset are obtained, (i) Seller shall use its best efforts in order to obtain the consents necessary to cause such asset to become an Acquired Asset, and (ii) Seller on the one hand, and Buyer, on the other hand, will cooperate in a reasonable arrangement designed to provide for Buyer the economic benefits, to the extent of Buyer's performance of Seller's obligations on behalf of Seller, with respect to such Unassigned Asset, including, to the extent any Unassigned Asset is an agreement or lease, or used pursuant to an agreement or lease, enforcement at the request and expense of Buyer for the benefit of Buyer of any and all rights of Seller against any Person under the respective agreement or lease or arising out of the breach or cancellation of the respective agreement or lease. In connection with the foregoing, Seller may take such action as Seller deems appropriate to satisfy the obligations with respect to any Unassigned Asset, including, without limitation, assigning any Unassigned Asset that is a contract or lease to a third party or arranging for a third party to perform the obligations thereunder, and Buyer shall not be liable for any damages incurred by Seller in connection therewith.

(h)    <u>Capitalization of the Business</u>.  The Parties acknowledge that Buyer's acquisition of the Acquired Assets and assumption of the Assumed Liabilities is expected to be financed primarily with long-term debt and accounts receivable financing from Comerica Bank and that revenue from the operation of the Business after Closing will be used in order to repay such long-term debt and other financing.  Subject to the foregoing Buyer agrees that Buyer will not divert net income from the Business to purposes unrelated to the Business if such diversion would leave Buyer without the resources necessary to continue operation of the Business during the 2005-2006 and 2006-2007 snow management seasons.

8.    **Remedies for Breaches of This Agreement.**

(a)    <u>Survival of Representations and Warranties</u>.  All of the representations and warranties of Seller contained in Section 3(a)-(w) and Section 3(y)-(cc) above shall survive the Closing (even if the Buying Parties knew or had reason to know of any misrepresentation or breach of warranty at the time of Closing) and continue in full force and effect for a period of two years thereafter.  All of the other representations and warranties of Seller contained in Section 3(x) above shall survive until the expiration of the applicable statute of limitations.  All of the representations and warranties of the Buying Parties shall survive through the Closing Date.

(b)    <u>Indemnification Provisions for Benefit of Buyer</u>.

(i)    In the event Seller breaches (or in the event any third party alleges facts that, if true, would mean Seller has breached) any of its representations, warranties, and covenants contained in this Agreement, and, if there is an applicable survival period pursuant to Section 8(a) above, provided that Buyer makes a written claim for indemnification against Seller pursuant to Section 8(d) below within such survival period, then Seller agrees to indemnify the Buying Parties from and against the entirety of any Adverse Consequences the Buying Parties or any Affiliates of the Buying Parties may suffer through and after the date of the claim for indemnification (including any Adverse Consequences the Buying Parties may suffer after the end of any applicable survival period) resulting from, arising out of, relating to, in the nature of, or caused by the breach (or the alleged breach).

(ii)    Seller agrees to indemnify the Buying Parties from and against the entirety of any Adverse Consequences the Buying Parties may suffer resulting from, arising out of, relating to, in the nature of, or caused by:

(A)    any Excluded Liability or other Liability of Seller that is not an Assumed Liability (including any Liability of Seller that becomes a Liability of the Buying Parties under any bulk transfer law of any jurisdiction, under any common law doctrine of de facto merger or successor liability, under Environmental, Health, and Safety Requirements, or otherwise by operation of law);

(B)    any Liability of Seller for unpaid Taxes with respect to any Tax year or portion thereof ending on or before the Closing Date (or for any Tax year beginning before and ending after the Closing Date to the extent allocable to the portion of such period beginning before and ending on the Closing Date);

(C)    any Liability of Seller for the unpaid Taxes of any Person (other than Seller) under Treas. Reg. Section 1.1502-6 (or any similar provision of state, local, or foreign law), as a transferee or successor, by contract, or otherwise; or

(D)    any costs directly associated with the service of, or preparations necessary to service, any customer agreement that remains an Unassigned Assets 60 days after the Closing if, and to the extent, Buyer is not receiving the economic benefits of such customer contract (as result of a termination or otherwise).

(c)    <u>Indemnification Provisions for Benefit of Seller.</u>

(i)    In the event either Buying Party breaches (or in the event any third party alleges facts that, if true, would mean either Buying Party has breached) any of its representations, warranties, and covenants contained in this Agreement and, if there is an applicable survival period pursuant to Section 8(a) above, provided that Seller makes a written claim for indemnification against the Buying Party pursuant to Section 8(d) below within such survival period, then the Buying Parties jointly and severally agree to indemnify Seller from and against the entirety of any Adverse Consequences Seller may suffer through and after the date of the claim for indemnification (including any Adverse Consequences Seller may suffer after the end of any applicable survival period) resulting from, arising out of, relating to, in the nature of, or caused by the breach (or the alleged breach).

(ii)    The Buying Parties jointly and severally agree to indemnify Seller from and against the entirety of any Adverse Consequences Seller may suffer resulting from, arising out of, relating to, in the nature of, or caused by any Assumed Liability or the or use of any Acquired Asset following Closing.

(d)    <u>Matters Involving Third Parties.</u>

(i)    If any third party shall notify any Party (the "Indemnified Party") with respect to any matter (a "Third Party Claim") that may give rise to a claim for indemnification against any other Party (the "Indemnifying Party") under this Section 8, then the Indemnified Party shall promptly notify each Indemnifying Party thereof in writing; provided, however, that no delay on the part of the Indemnified Party in notifying any Indemnifying Party shall relieve the Indemnifying Party from any obligation hereunder unless (and then solely to the extent) the Indemnifying Party thereby is prejudiced.

(ii)    Any Indemnifying Party will have the right to defend the Indemnified Party against the Third Party Claim with counsel of its choice reasonably satisfactory to the Indemnified Party so long as (A) the Indemnifying Party notifies the Indemnified Party in writing within 15 days after the Indemnified Party has given notice of the Third Party Claim that the Indemnifying Party will indemnify the Indemnified Party from and against the entirety of any Adverse Consequences the Indemnified Party may suffer resulting from, arising out of, relating to, in the nature of, or caused by the Third Party Claim; (B) the Indemnifying Party provides the Indemnified Party with evidence reasonably acceptable to the Indemnified Party that the Indemnifying Party will have the financial resources to defend against the Third Party Claim and fulfill its indemnification obligations hereunder; (C) the Third Party

Claim involves only money damages and does not seek an injunction or other equitable relief; (D) settlement of, or an adverse judgment with respect to, the Third Party Claim is not, in the good faith judgment of the Indemnified Party, likely to establish a precedential custom or practice materially adverse to the continuing business interests of the Indemnified Party; and (E) the Indemnifying Party conducts the defense of the Third Party Claim actively and diligently.

(iii)    So long as the Indemnifying Party is conducting the defense of the Third Party Claim in accordance with Section 8(d)(ii) above, (A) the Indemnified Party may retain separate co-counsel at its sole cost and expense and participate in the defense of the Third Party Claim, (B) the Indemnified Party will not consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim without the prior written consent of the Indemnifying Party (not to be withheld unreasonably), and (C) the Indemnifying Party will not consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim without the prior written consent of the Indemnified Party (not to be withheld unreasonably).

(iv)    In the event any of the conditions in Section 8(d)(ii) above is or becomes unsatisfied, however, (A) the Indemnified Party may defend against, and consent to the entry of any judgment or enter into any settlement with respect to, the Third Party Claim in any manner it reasonably may deem appropriate (and the Indemnified Party need not consult with, or obtain any consent from, any Indemnifying Party in connection therewith); (B) the Indemnifying Parties will reimburse the Indemnified Party promptly and periodically for the costs of defending against the Third Party Claim (including reasonable attorneys' fees and expenses); and (C) the Indemnifying Parties will remain responsible for any Adverse Consequences the Indemnified Party may suffer resulting from, arising out of, relating to, in the nature of, or caused by the Third Party Claim to the fullest extent provided in this Section 8.

(e)    Characterization of Payments. All indemnification payments under this Section 8 shall be deemed adjustments to the Purchase Price and shall be used to offset any amounts yet remaining to be paid under this Agreement.

(f)    Other Indemnification Provisions. The foregoing indemnification provisions are in addition to, and not in derogation of, any statutory, equitable, or common law remedy (including, without limitation, any such remedy arising under Environmental, Health, and Safety Requirements) any Party may have with respect to Seller or the transactions contemplated by this Agreement.

9.    Termination.

(a)    Termination of Agreement. Certain of the Parties may terminate this Agreement as provided below:

(i)    Parent and Seller may terminate this Agreement by mutual written consent at any time prior to the Closing;

(ii)    Parent may terminate this Agreement by giving written notice to Seller at any time prior to the Closing (A) in the event Seller has breached any material

representation, warranty, or covenant contained in this Agreement in any material respect, Parent has notified Seller of the breach, and the breach has continued without cure for a period of 20 days after the notice of breach or (B) if the Closing shall not have occurred on or before November 30, 2004 by reason of the failure of any condition precedent under Section 6(a) above (unless the failure results primarily from Buyer or Parent itself breaching any representation, warranty, or covenant contained in this Agreement); and

(iii)     Seller may terminate this Agreement by giving written notice at any time prior to the Closing (A) in the event Buyer or Parent has breached any material representation, warranty, or covenant contained in this Agreement in any material respect, Seller has notified Parent of the breach, and the breach has continued without cure for a period of 20 days after the notice of breach or (B) if the Closing shall not have occurred on or before November 30, 2004, by reason of the failure of any condition precedent under Section 6(b) above (unless the failure results primarily from Seller itself breaching any representation, warranty, or covenant contained in this Agreement).

(b)     Effect of Termination.  If any Party terminates this Agreement pursuant to Section 9(a) above, all rights and obligations of the Parties hereunder shall terminate without any Liability of any Party to any other Party (except for any Liability of any Party then in breach).

10.     **Miscellaneous.**

(a)     Press Releases and Public Announcements.  No Party shall issue any press release or make any public announcement relating to the subject matter of this Agreement without the prior written approval of the other Party; provided, however, that any Party may make any public disclosure it believes in good faith is required by applicable law or any listing or trading agreement concerning its publicly traded securities (in which case the disclosing Party will use its reasonable best efforts to inform the other Party prior to making the disclosure).

(b)     No Third-Party Beneficiaries.  This Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

(c)     Entire Agreement.  This Agreement (including the Exhibits hereto and the documents and certificates required to be delivered hereby) constitutes the entire agreement between the Parties and supersedes any prior understandings, agreements, or representations by or between the Parties, written or oral, to the extent they related in any way to the subject matter hereof.

(d)     Succession and Assignment.  This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors and permitted assigns. No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of the other Party; provided, however, that Buyer may (i) assign any or all of its rights and interests hereunder to one or more of its Affiliates and (ii) designate one or more of its Affiliates to perform its obligations hereunder (in any or all of which cases Buyer nonetheless shall remain responsible for the performance of all of its obligations hereunder).

(e)    Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.  A facsimile copy of this Agreement or any counterpart hereto shall be valid as an original.

(f)    Headings.  The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

(g)    Notices.  All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given when delivered personally to the recipient or when sent by facsimile followed by delivery by reputable overnight courier service (charges prepaid), one day after being sent to the recipient by reputable overnight courier service (charges prepaid) or five days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid.  Any notice, demand or other communication hereunder may be given by any other means (including telecopy or electronic mail), but shall not be deemed to have been duly given unless and until it is actually received by the intended recipient.  Such notices, demands and other communications shall be sent to the addresses indicated below:

If to Seller:        John Allin
                     1406 West 21st Street
                     Erie, PA 16502-2203
                     Facsimile No. (814) 454-7358

with a copy (which shall not constitute notice to Seller) to:

                     Roetzel & Andress
                     1375 E. 9th St., Ninth Floor
                     Cleveland, OH 44114
                     Facsimile No.:  (216) 623-1034
                     Attn:  Cathy B. Horton, Esq.

If to Parent or Buyer:

                     Symbiot Business Group, Inc.
                     8180 South Highland Drive
                     Suite B-2
                     Sandy, Utah 84093
                     Facsimile No.: (801) 733 6902
                     Attn: Chief Executive Officer

with a copy (which shall not constitute notice to Parent or Buyer) to:

> Stoel Rives LLP
> 201 South Main Street, Suite 1100
> Salt Lake City, Utah 84111
> Facsimile No.: 801-578-6999
> Attn: Bryan T. Allen, Esq.

or to such other address, to the attention of such other Person and/or with such other copy or copies as the recipient party has specified by prior written notice to the sending party. If any time period for giving notice or taking action expires on a day that is not a Business Day, such time period shall automatically be extended to, the next Business Day immediately following such Saturday, Sunday or legal holiday.

(h)    <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the domestic laws of the state of Utah without giving effect to any choice or conflict-of-law provision or rule (whether of the state of Utah or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the state of Utah.

(i)    <u>Amendments and Waivers</u>. No amendment or waiver of any provision of this Agreement shall be valid unless the same shall be in writing and signed by an authorized officer of Parent and Seller. No waiver by any Party of any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by an authorized officer of Parent and Seller, nor shall any such waiver be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.

(j)    <u>Severability</u>. Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

(k)    <u>Expenses</u>. Except as provided in Section 2(b)(i)(D) above, each of Buyer and Seller will bear his or its own costs and expenses (including legal fees and expenses) incurred in connection with this Agreement and the transactions contemplated hereby. Seller agrees that it has not paid any amount to any third party, and will not pay any amount to any third party until after the Closing, with respect to any of the costs and expenses of Seller in connection with this Agreement or any of the transactions contemplated hereby.

(l)    <u>Construction</u>. The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement. Any reference to any federal, state, local, or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. The word "including" shall mean including without limitation.

(m)    Incorporation of Exhibits and Schedules.  The Exhibits and Schedules identified in this Agreement are incorporated herein by reference and made a part hereof.

(n)    Specific Performance.  Each of the Parties acknowledges and agrees that the other Party would be damaged irreparably in the event any of the provisions of this Agreement are not performed in accordance with their specific terms or otherwise are breached. Accordingly, each of the Parties agrees that the other Party shall be entitled to an injunction or injunctions to prevent breaches of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof in any action instituted in any court of the United States or any state thereof having jurisdiction over the Parties and the matter (subject to the provisions set forth in Section 10(o) below), in addition to any other remedy to which it may be entitled, at law or in equity.

(o)    Submission to Jurisdiction.

(i)    Each of the Parties submits to the jurisdiction of any federal court sitting in Salt Lake County, Utah in any action or proceeding arising out of or relating to this Agreement, agrees that all claims in respect of the action or proceeding may be heard and determined in any such court and agrees that, except as permitted by Section 7(f) above, such jurisdiction shall be exclusive with respect to disputes arising under the Transaction Documents or the transaction contemplated thereby;

(ii)    except as permitted by Section 7(f) above, each Party also agrees not to bring or seek removal of any action or proceeding arising out of or relating to this Agreement in or to any other court; and

(iii)    except as permitted by Section 7(f) above, each of the Parties waives any defense of inconvenient forum to the maintenance of any action or proceeding so brought and waives any bond, surety, or other security that might be required of any other Party with respect thereto.

Each Party agrees that a final judgment in any action or proceeding brought in accordance with this Section 10(o) shall be conclusive and may be enforced by suit on the judgment or in any other manner provided by law or in equity.

[signature page follows; intentionally left blank]

11/03/2004   15:27   THE WESTIN BUSINESS CENTER → 18015786999         NO.568   P002

11/03/2004 10:07 FAX 801 578 6999          STOEL RIVES          ☒002

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

PARENT

SYMBIOT BUSINESS GROUP, INC.

By: _____
Title: _____CEO_____

BUYER

SYMBIOT SNOW MANAGEMENT
NETWORK, LLC

By: Symbiot Business Group, Inc., Manager

By: _____
Title: _____President_____

SELLER

_____
John Allin

43

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

PARENT

SYMBIOT BUSINESS GROUP, INC.

By: _____
Title: _____

BUYER

SYMBIOT SNOW MANAGEMENT
NETWORK, LLC

By:  Symbiot Business Group, Inc., Manager

By: _____
Title: _____

SELLER

_____
John Allin