IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| HERITAGE REALTY MANAGEMENT, INC., | Docket No. 04-333 ERIE |
| | (Judge Sean J. McLaughlin) |
| Plaintiff | ELECTRONICALLY FILED PLEADING |
| vs. | BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |
| JOHN ALLIN d/b/a ALLIN COMPANIES and SNOW MANAGEMENT GROUP, | Filed on behalf of: Plaintiff, Heritage Realty Management, Inc. |
| Defendant | Counsel of record for this party: |
| | Richard A. Lanzillo, Esq. |
| | Knox McLaughlin Gornall |
| | & Sennett, P.C. |
| | 120 West 10th Street |
| | Erie, PA 16501 |
| | Telephone (814) 459-2800 |
| | Facsimile (814) 453-4530 |
| | Email rlanzillo@kmgslaw.com |
| | PA53811 |

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT[1]**

**I.     The Contract unambiguously states upon termination, Allin is entitled to payment only for work or services performed or materials supplied to the date of termination.**

The Contract unambiguously states the terms that govern any termination. Pursuant to the terms that Allin not only agreed to, but modified during negotiations, Heritage had the right to terminate the Contract upon ten days notice in the following events: (1) "[Allin]

---

[1] Allin's cross-motion is untimely. The deadline for the filing of dispositive motions expired on March 6, 2006. Heritage filed its motion for summary judgment in a timely fashion. While Heritage agreed to an extension for Allin's filing of a response to its motion for summary judgment, Allin neither requesting nor received an extension to file his own dispositive motion.

is in default with respect to any of its obligations under this Agreement;" (2) "if any property or properties covered by this Contract are scheduled to be sold;" (3) "without any cause whatsoever." (Contract, ¶ 17). In the event Heritage terminated the Contract under any of these circumstances, its payment obligations were clear: "Heritage shall pay [Allin] for all work or services performed and equipment and materials supplied to the date of termination." (Id.)

This clause defines the extent of Heritage's payment obligation in the event Heritage terminated the Contract. Heritage had to pay for the services and materials it received -- nothing more or less. Allin did not dispute the meaning or effect of this language until it became apparent that Allin could not produce any evidence to support his claim that he provided work, services or materials under this Contract.

As this Court is well aware, up until Allin's motion for summary judgment, this case had focused on only one issue – did Allin provide any work, services or materials to Heritage that would allow him to keep any part of the $340,482.90 that Heritage had paid to him prior to the Contract's termination? As discussed in Heritage's brief in support of its motion for summary judgment, and in Section II of this brief, Allin has failed to produce any competent evidence to prove that he is entitled to such an offset. Having failed what is the central issue in this case, Allin has now changed course and is attacking the unambiguous language of the Contract. The timing of this attack also directly corresponds with Symbiot Management Group, a party in a related action but a stranger to the Contract, becoming more involved in the defense of this case. Thus, paragraph 17 of the Contract is being attacked only now that Allin's primary defense has failed and a stranger to the Contract is involved in arguing its meaning.

Regardless of Allin's attempts, paragraph 17 dictates that Heritage was only required to pay Allin for work or services he performed or materials he provided. Allin's

argument against the correct application of paragraph 17 comes down to his unsupported belief that the relevant clause in paragraph 17 "was written for Mr. Allin's benefit . . .." This belief is entirely unsupported. Paragraph 17, as a whole, provides an unambiguous procedure to be followed when the contract is terminated – as written it does not favor either party. If Allin defaulted, if properties were sold, or if Heritage determined that it was going to terminate the Contract, the payment terms of the contract were established – Heritage was required to pay for work and services performed and materials provided. These payment requirements do not address and have nothing to do with the payment sequence established in paragraph 6 of the Contract. Paragraph 6 defines how Heritage is to pay the Contract fixed annual price, it does not address what happens if the contract is terminated within a contract year. In the event of a termination, Paragraph 17 holds that Allin is entitled to payment for the work he did. Under some circumstances this would require Heritage to pay Allin sums in addition to amounts already paid per the payment schedule in paragraph 6. For instance, if Allin defaulted and Heritage terminated pursuant to paragraph 17 on February 14th of a given year. Far more than 55% of the snow season would have passed at that point. Paragraph 6, however, calls for Heritage to have only paid 55% of the annual fee by that date. Thus, it is likely that a termination on February 14, even a termination for cause, would have required Heritage to pay Allin sums in addition to the amount it had already received.

      Certainly, Allin would not dispute this effect of paragraph 17 as it is clear that paragraph requires payment for all work and services performed. However, payment for those services is both the beginning and end of Heritage's obligation. Paragraph 17 does not talk about only work from the date of last payment, or work in addition to work for which Heritage has

3

already paid.  Paragraph 17 sets forth a simple and unambiguous payment obligation in the event of a termination, Heritage is required to pay for work and services performed.

Allin's argument that the absence of "refund" language in paragraph 17 is without merit; the payment obligation is clear and is limited to the amount of work and service performed and materials supplied.  Allin appears to argue that despite the clarity of this obligation, and the absence of any exceptions to it, Heritage is somehow obligated to pay more than that obligation if the timing of the termination is at a point in time when Heritage has made payments to Allin in excess of the work he has performed.  There is simply nothing in the Contract to support this interpretation.  The Contract has a fixed annual fee with a payment schedule designed to give Allin cash flow.  Thus, at the end of a given contract year, Allin will have earned and been paid this fixed fee.  However, in the event of a termination within a contract year, the specific language of Paragraph 17 controls.  That language does not condition Heritage's payment obligation on the timing of its termination or the percentage of payments that had been made.  Instead, paragraph 17 ensures that in the event of a termination, including a termination caused by Allin's default, Allin is entitled to payment for the work he did, regardless of what payments against the annual fixed fee Heritage may have already made.

In this case, Heritage uncovered Allin's financial instability and duplicity early enough to mitigate most of the damage that Allin would have caused to Heritage's business relationships.  Heritage terminated at a point in time when Allin had not performed any work or services or provided any materials to Heritage.  Therefore, Paragraph 17 does not obligate Heritage to pay anything to Allin and Allin must return the $340,482.90 payment he received but did not earn.

**II.    Allin did not perform any work or services or provide any equipment or materials under the Contract.**

Allin has not presented a shred of evidence to support his claim that he performed work or services or provided materials or equipment to Heritage.  It is undisputed that at the point in time that Heritage terminated the Contract, not a single snowflake had fallen on any property covered by the Contract.  Allin had not even produced a single signed subcontract showing his ability to perform, much less the actual performance, of any work or services.  Allin was required to produce all signed subcontracts prior to October 31, 2004, but failed to do so.

Despite the absence of any actual work, services or materials supplied to Heritage, Allin has attempted to show expenses through an "itemization of costs and expenses" that is devoid of any evidentiary support and facially incapable of supporting Allin's claim.  (See Exhibit L in support of Allin's Motion for Summary Judgment).

Initially, the name Allin has chosen for this summary is indicative of the way he has approached this entire case.  Paragraph 17 obligates Heritage to pay for work and services performed and equipment and materials provided, it does not obligate Heritage to pay for Allin's costs and expenses.  Yet, Allin has consistently failed to produce any evidence that he actually performed any work or supplied any materials, but has instead acted as if he were the party entitled to damages in this case, despite the absence of any breach on the part of Heritage.

Allin has done nothing more than produce a spreadsheet listing "expenses and costs" he claims to have incurred for work done <u>prior</u> to the execution of the contract.  Allin's consistent position has been that he should be paid for the time he and his employees spent

soliciting Heritage's business and negotiating the contract, including times when Allin and his employees were asleep.[2]  This position fails for at least three reasons.

First, Allin is not entitled to payment for work he did prior to the execution of the Contract.  The work and services that were to be performed under the Contract were clearly defined:  Allin was "required to manage, supervise and assure that [Allin] or the Subcontractors shall accomplish [all snow and ice removal and activities]."  (Contract, Description of Operations).  Neither this definition of work nor any other portion of the Contract entitles Allin to payment for activities such as pitching his company to Heritage in February of 2004, investigating sites for the purpose of determining the pricing of the contract, negotiating with Heritage over the terms of the Contract or other pre-contract activities that were part of Allin's necessary due diligence.  Allin has, however, claimed that Heritage is obligated to pay for all of these activities. (See Exhibit L in support of Allin's Motion for Summary Judgment).

Second, there is no legal basis upon which doctrine Allin can recover for pre-contract activities.  Allin asserts that, "It cannot be disputed that the law provides that Allin would be entitled to recover all expenses incurred in preparation for performance under the contract." (Allin's Brief in Support of Motion for Summary Judgment, p. 18).  However, this bold assertion is simply wrong and completely unsupported by the two cases cited by Allin.  The cases cited by Allin involve claims for "reliance damages' by a non-breaching party against a breaching party to a contract.  In <u>Shovel Transfer and Storage, Inc. v. Pennsylvania Liquor Control Bd.</u>, 739 A.2d 133, 140-41 (Pa. 1999) the Court stated "The law makes clear that reliance damages may be available, **following the breach of a contract**, in order to put [a party]

---

[2] Within its itemization, Allin has identified certain trips taken by John Allin and certain employees.  For each of these trips, Allin has claimed time in some multiple of 24 hours.  Thus, as an example from Exhibit L, if Jeff Vernon took a trip from February 22 -24 to "present SMG to Heritage", Allin has claimed costs associated with 48 hours of Jeff Vernon's time.  Clearly, Allin is charging for time Jeff Vernon, and all employees, spent sleeping.

6

back in the position in which he would have been had the contract not been made." Id. (internal quotations and citations omitted) (emphasis added). Shovel involved the Pennsylvania Supreme Court holding that a valid contract existed between the plaintiff and defendant, that the defendant breached that contract and that the plaintiff was entitled to reliance damages as an appropriate measure for the consequences of the breach. Allin's posture in this case has no correspondence to the facts or legal principles at issue in Shovel.

Similarly, Harman v. Chambers, 57 A.2d 842 (Pa. 1948) also addressed the measure of damages recoverable by the non-breaching party in breach of contract action:

> Generally speaking, the measure of damages applicable in a case of **breach of contract** is that the aggrieved party should be placed as nearly as possible in the same position he would have occupied had there been no breach. In other words, he is entitled to be reimbursed for the money actually paid out and for all reasonable and proper expenses incurred on the faith of the contract

57 A.2d at 845. (emphasis supplied). Harman is inapposite to the present case. There is not a single claim against Heritage. To the contrary, Heritage has lodged and proved its breach of contract claim against Allin. The Contract controls the work or services for which Allin is entitled to payment, and the pre-contract activity identified by him is not that type of work.

Third, Allin's "evidence" to support his alleged costs and expenses is woefully insufficient to create a material issue of fact. Contrary to Allin's assertion, this is not a weight of the evidence issue, but involves the fundamental competency of his evidence. The universe of proof for Allin's expenses is a summary itemization of his claimed costs and expenses. Allin admitted that he did not prepare this document, but that his administrative assistant called various individuals to determine how much time they spent working on the Heritage project. From this information, she apparently compiled the itemization. This is not a business record. F.R.E. 803(6). Both the hours and activities indicated, and the rates charged under that

7

itemization lack evidentiary support. As to the hours and activities, the only activities that are specified with any level of detail are the activities allegedly conducted by John Allin, Peggy Allin, Brian Rohe, Daune Haataja, David Dzubian and Jeff Vernon. Allin has not produced any admissible evidence, either in the form of testimony or documents, to support his claimed expenses related to Rohe, Haataja, Dzubian or Vernon. Further, Allin has admitted that this itemization was not a record that was produced in the normal course of his business. Therefore, the expense claim with respect to Haataja, Rohe, Dzubian, and Vernon is completely lacking in evidentiary support.

       The remaining activities that Allin claims as costs and expenses are not identified with respect to any specific description or date. As described above, Allin is not entitled to payment for pre-contract activities or for expenses and costs unrelated to the work or services identified in the Contract. Thus, an itemization for "sites entered into system;" training" or "number calculations," as illustrative examples, are insufficient to support any claimed cost.

       Finally, Allin has not presented a single piece of evidence to support the rates he purports to charge for himself or any employee. Allin has admitted that the rates indicated in the itemization are not the rates actually paid to each identified employee and they are unrelated to the terms of the Contract. (Deposition of John Allin, pp. 55-56, attached as Exhibit C to Heritage's Concise Statement of Material Facts)[3]. The parties certainly never agreed to any such rate structure for pre-contract activities. He used these types of rates based on an instruction

---

Q    So then the only way the Heritage contract could be serviced would be through Symbiot after the [Snow Management Group] part of the business was sold to Symbiot.
Allin:    That would be accurate.
Q:    In other words, there was no way you were going to be able to do that business as John Allin doing business as Allin Companies and Snow Management Group after you sold the snow removal business to Symbiot.
Allin:    I was contractually obligated not to compete with the acquired company, with Symbiot.

from his previous counsel. (<u>Id.</u> at 60). Allin has not presented any evidence to support these rates, not even his own testimony.

The Contract unambiguously provides that Heritage is only obligated to pay Allin for the work or services he performed and the materials he provided under the Contract. Allin has failed to present any competent evidence that he performed any work or supplied any materials under the Contract. Therefore, Heritage is entitled to judgment as a matter of law.

**III.    Allin anticipatorily breached the Contract.**

The facts of this matter unequivocally establish the following:

(1)    The Contract was not assignable without Heritage's written consent. (Contract, ¶ 13);

(2)    By October 31, 2004, Allin owed at least 3.6 million in past-due payments to his subcontractors. (Depo of Allin, pp. 31-32);

(3)    By October 31, 2004, Heritage had received information that Allin was in financial distress and was seeking a sale or capital infusion. (Depo. of Robert G. Prendergast, pp. 20-22, attached as Exhibit D to Heritage's Concise Statement of Material Facts);

(4)    In November 2004, Allin sold his entire snow removal business to Symbiot Management Group, including the assets necessary to perform his contract with Heritage. (Depo. of Allin, p.55-56);

(5)    Under his agreement with Symbiot, Allin signed a covenant not to compete that prohibited his from performing snow removal services. (Depo. of Allin, p. 56); and

   (6) Pursuant to his agreement with Symbiot, Allin was physically and legally incapable of performing his contract with Heritage.  (Id.)

  Thus, by November, 2004, Allin had rendered himself unable to perform his obligations under the Contract.  Not surprisingly, Allin did not advertise this information to Heritage.  However, through information it received from third parties, Heritage discovered that Allin was in a position of financial distress.  (Depo. of Prendergast, pp. 20-22).  Heritage later learned that Allin was not only in financial distress, but was physically unable to perform under the Contract.

  Allin does not dispute any of the above facts.  Instead, his argument against Heritage's anticipatory breach claim is two-fold.  First, he claims that Heritage did not know enough about the facts of his deal with Symbiot to know that he had rendered himself unable to perform.  Second, he argues that if Heritage had not terminated and later refused to assign the Contract to Symbiot, he and Symbiot would have constructed a contractual relationship that would have accomplished this assignment notwithstanding Heritage's objection. [4]

  Allin's argument essentially asks this Court to ignore Allin's obvious duplicity and breach of contract. Anticipatory repudiation exists when an obligor engages in "a voluntary affirmative act which renders the obligor unable or apparently unable to perform . . ."  Jonnet Development Corp. v. Dietrich Indus., 463 A.2d 1026, 1031 (Pa. Super. Ct. 1981).  Allin's argument is that because Heritage did not have full knowledge of Allin's actions, Allin could not have anticipatorily breached the contract.  This is simply not true.  After signing a multi-million dollar contract with Heritage, Allin promptly entered into an arrangement with Symbiot that

---

[4] Allin's argument appears fixated on the anticipatory nature of his breach.  Heritage stands by its position that Allin's actions resulted in an anticipatory breach.  However, by rendering himself physically and legally incapable of performing under the Contract and failing to secure a single sub-contract by October 31, 2004, Allin also simply breached the contract.  Thus, whether or not it is considered anticipatory, Allin's breach is clear.

rendered him legally and physically unable to perform his obligations under the contract. This was a "voluntary affirmative act which render[ed him] unable . . . to perform." While, most anticipatory breach cases involve statements indicating that an obligor is going to refuse or be unable to perform under a contract. Allin's actions adequately communicated this fact notwithstanding his efforts to conceal this information and defraud Heritage. His refusal to be forthright with Heritage is not defense to fact that he was rendering himself incapable of performance. Thus, regardless of what Heritage knew, the facts establish that Allin could not perform his contractual obligations.

Additionally, Allin's hypothetical plan to circumvent the no-assignment clause of the Contract is also flawed. The Contract dictates the subcontracts that Allin must use under the agreement and these subcontracts must be provided to Heritage. (Contract, ¶ 4) These subcontracts do not allow Allin to rid himself of the obligations of the Contract. To the Contrary, the Contract expressly provides that "[Allin] shall be responsible for the management and payment of subcontractors . . . [and] shall remain fully responsible for any and all of its obligations and responsibilities under this Contract and shall not be relieved of any such obligations and responsibilities in the event that any Operations are subcontracted." Based on Allin's own admission, he signed a non-compete with Symbiot that rendered him unable to satisfy his obligations under the Contract. Therefore, he breached those obligations through his own affirmative, voluntary action.

**III.   CONCLUSION**

Based on the foregoing, and on Heritage's Brief in Support of its Motion for Summary Judgment, Heritage is entitled to judgment as a matter of law in the amount of $340,482.90. plus applicable interest and costs.

>Respectfully submitted,
>
>KNOX McLAUGHLIN GORNALL & SENNETT, P.C.
>
>
>BY: /s/ Richard A. Lanzillo, Esq.
>   Richard A. Lanzillo
>   Neal R. Devlin
>   120 West Tenth Street
>   Erie, PA  16501-1461
>   (814) 459-2800
>
>   Attorneys for plaintiff,
>   Heritage Realty Management, Inc.

# 675590