IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HERITAGE REALTY MANAGEMENT, INC., | ) | Case No. CA 04 - 333 ERIE |
| Plaintiff | ) | Judge Sean McLaughlin |
| v. | ) | |
| JOHN ALLIN d/b/a ALLIN COMPANIES, | ) | |
| Defendant | ) | TRIAL BY JURY OF 12 DEMANDED |

**DEFENDANT'S PRETRIAL NARRATIVE STATEMENT**

I.        BACKGROUND

This is a contract action in which Plaintiff ("Heritage") has demanded a full refund of the first of seven (7) installments payable to Defendant ("Mr. Allin") under the parties' contract. Mr. Allin has not refunded this installment for two reasons. First, the installment is not refundable under the contract. Second, even if the installment is refundable, Mr. Allin is entitled to payment for all work and services he performed and materials he provided prior to the termination of the contract.

II.        CONTRACT

        A.  Initial Relationship - Reliance on Heritage's Contract

Heritage operated and/or owned various commercial properties in no fewer than fifteen states.  In January or February, 2004, Heritage began discussions with Mr. Allin, to have Mr. Allin perform snow and ice removal work at approximately 115 of these commercial sites.  To perform this work Allin intended to locate, hire and then supervise local plow operators to perform the needed snow removal work at the various locations.

At a meeting of Heritage's regional managers in February, 2004, Heritage's president introduced Mr. Allin as *the* person who would be in charge of the snow removal operations during the winter of 2004-05.  At that point, Mr. Allin concluded that "we already had their business."  Heritage and Mr. Allin then began working together to prepare for the upcoming winter season.  Detailed specifications and other needed information regarding the 115 sites were obtained from Heritage and Mr. Allin's employees worked on each site to more precisely delineate the boundaries designated for plowing, determine appropriate locations for the deposit of large accumulations of snow and to otherwise more precisely define the nature and scope of the various work assignments.  Additionally, names and addresses of prospective plow operators were obtained and requests for proposals were published.

During this time, the parties also worked together to prepare a written contract by first negotiating pricing and payment issues and then by the preparation of a written document to reflect the parties' agreement. However, during this time and even before the agreement was signed, Heritage urged and pushed Mr. Allin to complete the tremendous amount of work and services which would be necessary for Mr. Allin to be ready and able to perform snow removal work at all of these sites. As the 2004 winter season approached, the need for this preparatory work took on an added urgency. Mr. Allin relied upon the expectation and promise of the contract to justify all of this preparatory work.

### B.  The Heritage Contract Provides for Payment of a Fixed Fee

Heritage and Mr. Allin eventually signed a contract dated October 12, 2004 (Allin signed October 4, 2004). It is not disputed that the contract provided for an annual fixed-fee, to be paid by Heritage in seven (7) periodic installments spread out from October 15, 2004 through May 15, 2005.

Since the contract provided for a fixed fee, the fees had to be paid by Heritage regardless of the number of snow days and regardless of the volume of snow that was needed to be plowed by Mr. Allin. Thus, if less snow fell than normal and less plow work was performed, Mr. Allin would nevertheless be entitled to full payment under the contract. The specific amounts owed by Heritage under the contract were <u>not</u> to be calculated based upon the amount of work actually performed. Heritage does not dispute this fact.

3.

In October, 2004, upon signing the contract, Heritage then made its first of seven scheduled payments to Mr. Allin. The amount of this first installment payment was in the amount of $340,482.90 which was ten percent of the total contract price. By letter dated November 3, 2004, Heritage then wrote to Mr. Allin to terminate the contract. At that point, approximately 14% of that snow season had elapsed. (The contract required payments for a period of seven (7) months, October to May). Thus, the ten percent (10%) payment coincided roughly with this elapse of time. During the period of time from the signing of the contract until the date of termination, Mr. Allin's employees had stepped up their efforts to prepare.

The reason cited by Heritage in support of its termination of the contract was its alleged concerns over Mr. Allin's financial ability to pay his subcontractors. Allegedly, this concern arose after Heritage received a letter from an anonymous source indicating that Mr. Allin had not paid all of his subcontractors in the previous year. In response, Mr. Allin offered to provide access to financial information to satisfy Heritage's concerns but Heritage unreasonably refused to give Mr. Allin any opportunity to set the record straight. In its termination letter, Heritage made no mention of Mr. Allin's asset sale to Symbiot because that sale had not yet occurred and Heritage had no knowledge of that matter until January, 2006.

Although Mr. Allin was not required to perform any minimum amount of work under the contract as a condition precedent to Mr. Allin's entitlement to any of the seven installment payments, Heritage demanded a return of its first installment based upon the claim that Mr. Allin had not yet plowed any snow and thus had "not provided services or supplied any

equipment or materials." In addition to being irrelevant to the amounts owed under the contract, this claim is also factually incorrect as Mr. Allin had performed a great deal of services and provided materials in order to be ready and able to perform as required by the contract and as previously demanded by Heritage. Some of this work was performed before the contract was signed and some was performed after the contract was signed. Mr. Allin's Brief in Opposition to Plaintiff's Summary Judgment Motion, pp. 13-19 is incorporated herein by reference as a further description of these services and materials. Heritage had demanded that Mr. Allin perform all of this work and it cannot now ignore its obligations to pay Mr. Allin for the same.

III.     WITNESSES

Mr. Allin may call any or all of the following witnesses at the time of trial:

| Name | Damage | Liability |
| --- | --- | --- |
| 1. Mr. John Allin | X | X |
| 2. Mrs. Margaret Allin | X | X |
| 3. Mr. Rudy Rieder | X | X |
| 4. Mr. Brian Marshall | X | X |
| 5. Ms. Mary Russell | X | X |
| 6. Mr. Chet Zelgowski | X | X |
| 7. Ms. Christina Pidilla-Albano | X | X |
| 8. Ms. Lisa Edwards | X | X |

| Name | Damage | Liability |
|---|---|---|
| 9. Ms. Linda Spinelli | X | X |
| 10. Mr. F. Michael Suleski | X | X |
| 11. Mr. Jeff Vernon | X | X |
| 12. Ms. Julie Keep | X | X |

Mr. Allin reserves the right to call as a witness any of the individuals identified in the Plaintiff's pretrial narrative statement.

IV.    EXHIBITS

Mr. Allin may offer any or all of the following exhibits at the time of trial:

1. Rudolph Reider e-mail 11/4/04;

2. Itemization of costs and expenses incurred and/or paid regarding work, services and materials provided under the contract;

3. Rudolph Reider e-mail 11/8/04;

4. Brian Marshall e-mail 4/16/04, 8/2/04, 8/12/04, 10/4/04, 10/15/04, 10/27/04;

5. Rudolph Reider e-mail 10/28/04;

6. Mary Russell e-mail 10/19/04, 10/28/04;

7. Chet Zulgowski e-mail 10/28/04;

8. Snow Management Group site information book;

9. Requests for proposals sent to prospective plow operators and responses received;

10. Site maps and site data records and reports;

11. Records, receipts and documents reflecting travel arrangements and travel expenses;

12. Payroll records and/or documents;

13. Employment contracts with David Dziuban, Duane Haataja and Bryan Rohe;

14. John Allin e-mail 8/26/04, 9/2/04, 11/10/04;

15. Bob Prendergast letter 10/6/04, e-mail 7/27/04, 8/3/04, 9/17/04, 9/22/04;

16. Jeff Vernon e-mail 8/18/04, 9/10/04, 9/22/04, 11/4/04, 11/14/04;

17. Lisa Edwards e-mail 8/30/04, 9/23/04, 10/26/04, letter 10/21/04;

18. Terri Pancurak e-mail 10/26/04;

19. Heritage memos 9/21/04, 9/22/04, 09/23/04;

20. Peggy Allin e-mail 10/29/04;

21. Snow Removal Information Survey;

22. William Prendergast e-mail 9/17/04;

23. Mark Bush e-mail 8/3/04; and

24. All documents produced in discovery.

Mr. Allin reserves the right to offer into evidence any of the exhibits identified in the Plaintiff's pretrial narrative statement.

Respectfully submitted,

ELDERKIN, MARTIN, KELLY & MESSINA

By /s/ Craig A. Markham

Craig A. Markham, Esquire
Attorney for Defendant
150 East Eighth Street
Erie, Pennsylvania 16501
(814) 456-4000