

# HERITAGE PROPERTY
### INVESTMENT TRUST, INC.

*Corporate Office:* 131 Dartmouth Street, Boston, Massachusetts 02116
Telephone: (617) 247-2200 • Fax: (617) 266-0885 • Legal Dept. Fax: (617) 267-4557
www.heritagerealty.com

August 13, 2004

**_VIA NEXT DAY DELIVERY_**

Jeffrey Vernon
Vice President
Business Development and Production
Snow Management Group, Inc.
1 Waterside Lane, 3rd Floor
Essex, CT 06426-1056

**Re:** **Proposed Contract between Heritage Realty Management, Inc. ("Heritage") and Snow Management Group, Inc. and John Allin d/b/a Allin Companies ("Contractor")**

Dear Jeff:

In accordance with our conversation last week, enclosed is the first draft of the proposed contract referenced above. Please accept this letter as confirmation that Heritage is willing to enter into the above-referenced contract, provided we can reach agreement on the essential business terms and execute a contract within the next 10 days. It is our understanding that this a non-binding expression of Heritage's intent and that neither Heritage or Contractor are obligated in any way unless and until such time as the contract is signed by both parties.

Please contact me in the event you have any questions.

Sincerely,

Louis C. Zicht
Vice President and General Counsel
LCZ/cej

Enclosure
    cc:  Robert Prendergast
           Mark Bush
           Bill Read *(Mequon WI)*
           Tom Wellman *(Speedway IN)*

**EXHIBIT**

A

Contract dated _October 12, 2004_    between **Heritage Realty Management, Inc.**
(the "Owner")
and **John Allin, d/b/a Allin Companies, d/b/a Snow Management Group** (the
"Contractor")

PROPERTIES:  The properties (hereinafter referred to as "Properties"), property addresses and fixed annual snow removal fees are enumerated on Exhibit A attached to this Contract.

OWNERS AND GENERAL PARTNERS OF OWNERS:  The Owners and General Partners of Owners are enumerated on Exhibit B attached to this Contract (hereinafter referred to as "Owner" or "Owners and General Partners").

MANAGING AGENT:  Heritage Realty Management, Inc. (hereinafter referred to as "Heritage"), a Maryland corporation.

ADDRESS:        131 Dartmouth Street, 6th Floor
                Boston, MA 02116-5134

CONTRACTOR:  John Allin, d/b/a Allin Companies, d/b/a Snow Management Group (hereinafter collectively referred to as "Contractor").

ADDRESS:        1406 West 21st Street
                Erie, PA 16502

DESCRIPTION OF OPERATIONS:  Contractor is an experienced and professional organization that specializes in the management and supervision of snow and ice removal services for commercial properties provided under subcontracts with reputable commercial snow removal contractors (the "Subcontractors").  The Contractor shall provide all services required to manage, supervise and assure that Contractor or the Subcontractors shall accomplish the following at the Properties covered by this Agreement: Snow and ice plowing, snow blowing, shoveling, salting, sanding and snow and ice removal operations in accordance with this Contract, including the attached Exhibit C.  Snow and ice plowing, snow blowing, shoveling, salting, sanding and snow and ice removal operations (hauling operations are only included if specified on Exhibit D), including all labor, machinery, materials, services, equipment and supervision provided in connection therewith, are hereinafter referred to, individually and collectively, as "Operations."  Additional specifications, if any, for each of the Properties, shall be agreed upon by Contractor and Heritage and attached hereto as Exhibit D within thirty (30) days of the date of this Agreement.

In consideration of the mutual covenants contained in this Contract, Heritage and Contractor agree as follows:

1.    ACCEPTANCE OF CONTRACT:  This contract must be accepted and executed by both parties within fifteen (15) days of the date of this Contract.



RECEIVED

SEP 3 0 2004

2.    CONTRACT DOCUMENTS:  The Contract documents consist of this Contract which includes the Exhibits and Addenda referred to herein and attached hereto, all of which are incorporated herein by reference and form this Contract.  This Contract represents the entire and integrated agreement between Heritage and Contractor and supersedes all prior negotiations, representations or agreements, either written or oral.

3.    THE OPERATIONS:  Contractor shall perform or cause the Subcontractors to perform the Operations, as described in this Contract, in a good workmanlike and expeditious manner and in compliance with all laws, codes and ordinances.  Contractor shall obtain all required permits and approvals to perform the Operations.

4.    SUBCONTRACTS:  Contractor shall retain Subcontractors to perform the Operations with respect to each of the Properties and shall enter into subcontracts in the form of Exhibit E attached hereto and incorporated herein by reference (the "Subcontracts").  Contractor shall deliver copies of the signed Subcontracts for each Property to Owner prior to October 31, 2004.  Contractor may redact the payment amount and terms of any Subcontract prior to delivering copies to Owner.  However, in the event Owner becomes the assignee of any Subcontract provided in this Agreement, Contractor shall immediately provide Owner with an unredacted copy of any Subcontract, including the payment amount and terms.  All portions of the Operations that Contractor does not perform directly shall be performed under the Subcontracts by Subcontractors approved in advance by Heritage, which approval shall not be unreasonably withheld or delayed.  Contractor shall be responsible for the management and payment of the Subcontractors and shall comply with all of its obligations under the Subcontracts.  Contractor shall remain fully responsible for any and all of its obligations and responsibilities under this Contract and shall not be relieved of any such obligations and responsibilities in the event that any Operations are subcontracted.

5.    TERM:  The initial term of this Contract shall be five (5) years commencing on October 1, 2004 and terminating on September 30, 2009 (the "Initial Term").  Following the Initial Term, if Contractor is not in default of any terms of the Contract and this Contract has not been terminated by Heritage, the term of the Contract will be extended on a month-to-month basis until cancelled by either party given thirty (30) days written notice of cancellation to the other party.

6.    CONTRACT PRICE AND PAYMENT:  The annual contract price for the Operations is a fixed annual price itemized on a per property basis for each year of the term of this Contract, as shown on Exhibit A.  Contractor acknowledges that Heritage reserves the right to review the annual contract amounts on an annual basis, specifically with respect to Colonial Commons and Long Meadow Shopping Centers, which are recent acquisitions and for any Properties affected by material changes in size, tenant obligations or otherwise.  In the event Heritage's analysis indicates support for an adjustment in the annual contract amounts for the years two through five of this Agreement, Contractor agrees to negotiate in good faith in an effort to agree upon equitable annual amounts for the Properties under review.  Payments shall be made by Heritage to Contractor according to the following procedure:

(a)    Contractor shall submit written invoices to Owner for payment by the first day of the month in which the payment is due, with separate invoices for each Property and a summary invoice for each billing period and Heritage shall deliver payment to Contractor, on the following dates and in the following amounts:

    (i)    October 15: 10% of the fixed annual amount due for each Property;

    (ii)    November 15: 10% of the fixed annual amount due for each Property

    (iii)    December 15: 15% of the fixed annual amount due for each Property;

    (iv)    January 15: 20% of the fixed annual amount due for each Property;

    (v)    February 15: 20% of the fixed annual amount due for each Property;

    (vi)    March 15: 15% of the fixed annual amount due for each Property; and

    (vii)    May 15: 10% of the fixed annual amount due for each Property.

(b)    Contractor's invoices, subsequent to the commencement of the Operations, shall include the following:

    (i)    signed original mechanic's lien waivers or affidavits from the Subcontractors, certifying that all amounts due to the Subcontractors for performance of the Operations have been paid in full through the invoice date and final lien waivers prior to Owner releasing the final annual payment (notwithstanding the foregoing, Owner may elect to waive the requirement of partial mechanic's lien waivers or affidavits from any subcontractors in the event of a dispute between Contractor and Subcontractor if Contractor provides adequate assurance that the dispute will be resolved and the mechanic's lien waiver will be issued on a timely basis); and

    (ii)    Contractor's affidavit certifying that all the Subcontractors have been paid in full for the Operations performed by the Subcontractors through the invoice date.

If Heritage fails to pay Contractor in a timely manner, and Contractor has given Heritage ten (10) days written notice of such late payment, then Contractor may charge a finance charge of one percent (1%) per month with an annual rate of twelve percent (12%) on any past due balances.

3

7.    INSURANCE: Contractor shall purchase and maintain such insurance as will protect Contractor, Heritage, Heritage Property Investment Trust, Inc., Owner(s), General Partner(s) of the Owners and the tenants at the Property(ies) from the claims set forth below which may arise out of or result from Operations, attempted Operations or failure to perform Operations under the Contract, whether such Operations are performed or attempted by Contractor or by any Subcontractor or by anyone directly or indirectly employed by any of them or by anyone else for whose acts any of them may be liable.

(a)    Claims under Worker's or Workmen's Compensation Benefits, Disability Benefits and other employee benefit acts;

(b)    Claims for damages because of bodily injury, occupational sickness or disease or death of any person employed by Contractor;

(c)    Claims for damages because of bodily injury, sickness or disease, or death of any person other than a person employed by Contractor;

(d)    Claims for damages, other than to Contractor's work itself because of injury to or destruction of property, including loss of use resulting there from;

(e)    Claims from damages because of bodily injury or death of any person or persons or property damage arising out of the ownership, maintenance, use, loading or unloading of any motor vehicle;

(f)    Claims involving contractual liability applicable to Contractor's obligations under the Contract;

(g)    Claims which include the foregoing (a) though (f), but not limited thereto, which may occur while Operations are being performed or while Operations are being attempted which may occur as a result of the failure to perform Operations and claims which may occur after Operations are completed.

The limits of liability and coverage shall be as required by law, but not less than as set forth on the attached Insurance Requirements Schedule attached hereto as Exhibit F. Contractor shall supply a current Certificate of Insurance and certified copies of its insurance policies, if requested by Owner, prior to the execution of this Contract. Insurance coverages must be provided by an insurance company or companies acceptable to Heritage and in a format acceptable to Heritage. Heritage, Heritage Property Investment Trust, Inc., Owner(s), General Partner(s) of the Owner(s), and the tenants at the Property(ies) must be included as insureds on Contractor's liability policies. The minimum limits of liability insurance required pursuant to this Contract shall in no way limit or diminish Contractor's liability under this Contract, including Contractor's indemnification obligations.

Notwithstanding anything to the contrary in this Agreement, although Contractor shall be obligated to obtain Umbrella/Excess Liability Insurance ("Excess Coverage") with limits of up to $50,000,000 general aggregate and $50,000,000 per occurrence, Contractor

4

shall only be required to pay the premiums for the Excess Coverage in the amount of $5,000,000 general aggregate and $5,000,000 per occurrence. Based upon Exhibit G attached hereto, Heritage and Contractor acknowledge that the additional premium to increase the Excess Coverage to $50,000,000 from $5,000,000 for the period October 1, 2004 through April 27, 2005 is $40,500. ~~Contractor agrees to pay the additional~~ ~~premium on or before the due date and~~ Heritage agrees to reimburse Contractor within ten (10) days of receipt of Contractor's annual premium invoice. Based upon Exhibit G, Heritage and Contractor anticipate that the renewal premium commencing April 28, 2005 will not exceed $54,500 and Heritage agrees to reimburse Contractor for such additional premium within ten (10) days after receipt of Contractor's invoice evidencing payment of the additional premium to cover the period from April 28, 2005 through September 30, 2005. With respect to years two through five of this Agreement, Contractor, through its professional insurance consultants and brokers (subject to the reasonable approval of Heritage), shall competitively bid for the Excess Coverage under this Agreement and provide copies of the competitive bids to Heritage at least twenty (20) days prior to the commencement of each year. The bids shall include Excess Coverage in increments of $5,000,000 from $10,000,000 to $50,000,000, together with premium quotes for each level of insurance. Heritage shall have the option of selecting the amount of Excess Coverage for each year of this Agreement by written notice to Contractor. Heritage shall reimburse Contractor for the corresponding premium in accordance with the terms of this Article 7

8.      INDEMNIFICATION: To the fullest extent permitted by law, Contractor shall indemnify, defend and hold harmless Heritage, Heritage Property Investment Trust, Inc., Owner(s), General Partner(s) of the Owner(s), and their respective agents, officers, trustees, shareholders, employees, servants, members, partners, tenants, successors and assigns from and against any and all claims, demands, suits, proceedings, liabilities, judgments, awards, losses, damages, costs and expenses, including reasonable attorneys fees, investigative fees and consulting fees on account of bodily injury, sickness, disease, or death sustained or alleged by any person or persons, personal injury sustained or alleged by any person or persons and/or damage to or destruction or any property (including loss of use thereof) directly or indirectly arising out of or resulting from or in any way connected with or related to Operations, attempted Operations, failure to perform Operations, completed Operations or the work of any Subcontractor, whether or not due or claimed to be due in whole or in part to the active, passive or concurrent negligence or fault of a party indemnified hereunder and/or any other person or persons, and whether or not the performance of Operations, attempted performance of Operations or failure to perform Operations shall be in accordance with or in violation of the provisions of this Contract and/or the obligations with respect to Operations and whether or not such claims, demands, suits or proceedings are just, unjust, groundless, false or fraudulent; and Contractor shall and does hereby assume and agrees to pay for the defense of all such claims, demands, suits and proceedings, provided, however, that the Contractor shall not be required to indemnify Heritage, Heritage Property Investment Trust, Inc., Owner(s), General Partner(s) of the Owner(s), their respective agents, officers, directors, trustees, shareholders, employees, servants, members, partners, tenants, successors, and assigns against any such damages occasioned solely by the negligent acts or omissions of Heritage, Heritage Property

Investment Trust, Inc., Owner(s), or General Partner(s) of the Owner(s). If any action or proceeding is brought against any party indemnified hereunder by reason of any such claim, demand, suit or proceeding, Contractor, upon notice, shall at Contractor's expense, resist or defend such claim, demand, action, suit or proceeding by counsel reasonably acceptable to the indemnified party.

If for any reason any part of this Indemnification shall be in contravention of any statute, ordinance, regulation or rule, or any decision of any court or ad judicatory body, then this Indemnification provision shall survive to the fullest extent permitted thereby.

Contractor hereby acknowledges its obligations under the foregoing paragraph to assume the cost of defending, indemnifying and holding harmless Heritage, Heritage Property Investment Trust, Inc., Owner(s), General Partner(s) of the Owner(s) and their respective agents, officers, directors, trustees, shareholders, employees, servants, members, partners, tenants, successors and assigns from and against all claims, demands, suits and proceedings as described in this Indemnification. It is understood and agreed that Contractor is an independent contractor. Contractor agrees to indemnify and hold Heritage, Heritage Property Investment Trust, Inc., Owner(s), General Partner(s) of the Owner(s) and their respective agents, officers, directors, trustees, shareholders, employees, servants, members, partners, tenants, successors and assigns harmless from any and all liability whatsoever in any connection with Operations performed or to be performed, regardless of fault, and Contractor shall be solely responsible for any such claims.

Contractor acknowledges receipt of consideration for the undertakings in this Contract, including this Section 8.

9.      CHANGES IN OPERATIONS: Heritage may order Changes in Operations within the general scope of this Contract consisting of additions, deletions or other revisions. The Contract Price shall be adjusted after a written Change Order is approved and signed by Heritage and Contractor.

10.     CONFLICTS: In the event of a conflict between the terms of the Contract and the terms of any acceptance order issued by Contractor and/or Contractor's bid proposal or any other documents, the terms and conditions of this Contract shall control.

11.     CONTRACTOR'S ACKNOWLEDGMENT: Contractor expressly agrees that in the event of any claims by an employee of Contractor, an employee of Contractor's Subcontractors or Suppliers, anyone directly or indirectly employed by any of them or anyone for whose acts any of them may be liable against Heritage, Heritage Property Investment Trust, Inc., Owner(s), General Partner(s) of the Owner(s) and/or any parent, affiliated or subsidiary entity, company, corporation, partnership, limited partnership, limited liability company, partners, officers, directors, trustees, shareholders, employees, members, agents, tenants, successors and/or assigns (hereinafter referred to in this paragraph collectively as "HERITAGE"), Contractor acknowledges that its indemnification and contribution obligations, pursuant to the Contract or otherwise, shall not be limited in any way by any amount or type of damages, compensation or benefits

6

to in this paragraph collectively as "HERITAGE"), Contractor acknowledges that its indemnification and contribution obligations, pursuant to the Contract or otherwise, shall not be limited in any way by any amount or type of damages, compensation or benefits payable by or for Contractor, its Insurer(s) or any of its Subcontractors or Suppliers or their Insurer(s) under workers' compensation acts, disability benefit acts or other employee benefit acts. Contractor further expressly agrees that in the event of a claim by an employee of Contractor or an employee of Contractor's Subcontractors or Contractor's Suppliers against HERITAGE, Contractor acknowledges that, notwithstanding any federal, state or local laws, ordinances, acts, including worker's compensation acts, including the New York Omnibus Worker's Compensation Reform Act signed into law on September 16, 1996, disability acts, employee benefits acts or otherwise, Contractor expressly aggress to permit a claim for contribution and/or indemnification by HERITAGE against Contractor.

Contractor acknowledges receipt of consideration for the undertakings in this Contract, including this Section 11.

12.    CONTRACTOR'S INSPECTON:  By submitting a bid, Contractor acknowledges that Contractor has examined the Property(ies), including all areas outlined in Paragraph VI of Exhibit C of this Contract and found the Property(ies) in good order and condition and that there are no special conditions or defects of any kind which would prevent the property and complete performance of Operations and obligations under this Contract.

13.    ASSIGNMENT:  Contractor agrees not to assign or otherwise convey any interest or rights under this Contract without the prior written consent of Heritage which may be withheld in its sole discretion.

14.    TAXES AND LICENSES:  Contractor shall pay all governmental taxes, excises and/or any other charges and license fees that are required to be paid in connection with Operations.

15.    TITLE AND WARRANTY:  Contractor warrants that all material, equipment and services to be provided by Contractor under this Contract shall be free from defects in title, labor, material or fabrication; conform to applicable specifications, drawings, samples or other descriptions given; be suitable for the purpose intended; be of merchantable quality and free from defects in design.  Contractor warrants that the materials and equipment supplied under this Contract are fit for the purposes for which they are intended to be used and otherwise conform to the specifications required by this Contract.  Contractor, at its sole cost and expense, agrees to replace, install or correct promptly any material, equipment or services not conforming to the foregoing requirement upon receipt of notice from Heritage.  In the event Contractor fails to correct or replace any material, equipment or services as required, Heritage may correct any such deficiency and charge Contractor the costs thereof or deduct the cost thereof from payments that would otherwise be due to Contractor.

7

17.    TERMINATION: Heritage shall have the right to terminate this Agreement by giving Contractor ten (10) days written notice in the following events: (a) Contractor is in default with respect to any of its obligations under this Agreement; (b) if any property or properties covered by this Contract are scheduled to be sold; (c) without any cause whatsoever, provided, in all such events, Heritage shall pay Contractor for all work or services performed and equipment and materials supplied to the date of termination. In the event Heritage terminates this Agreement for cause as set forth in subsection (a), Contractor hereby automatically assigns and conveys its interest under all Subcontracts to Heritage and Heritage shall have the right to assume Contractor's position with respect to all Subcontracts and to require performance of the Subcontracts by the Subcontractors, in accordance with the provisions of each of the Subcontracts. Contractor agrees not to modify Section 44 of the Subcontract or any of the terms of the Subcontracts in any way which would diminish Heritage's rights thereunder.

AGREED AND ACCEPTED BY:

HERITAGE REALTY MANAGEMENT, INC.
Managing Agent

By: _____
LOUIS G. ZIGHT, VICE PRESIDENT

Title: _____

Date: _____
10/12/04

CONTRACTOR:
JOHN ALLIN, d/b/a ALLIN COMPANIES, d/b/a SNOW MANAGEMENT GROUP

JOHN ALLIN

Date: _____ 10-4-04
WITH CHANGES IN RED

8

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

HERITAGE REALTY MANAGEMENT,   :
INC.,                          :
        Plaintiff             :
                              :
    vs.                       :  CASE NO. CA 04-333 ERIE
                              :
JOHN ALLIN d/b/a ALLIN        :  JUDGE SEAN MCLAUGHLIN
COMPANIES,                    :
        Defendant             :

        Deposition of JOHN ALLIN, taken before and
by Carol A. Holdnack, RPR, Notary Public in and for
the Commonwealth of Pennsylvania, on Monday,
January 23, 2006, commencing at 9:02 a.m., at the
offices of Knox McLaughlin Gornall & Sennett, P.C.,
120 West Tenth Street, Erie, PA 16501.

For the Plaintiff:

        Richard A. Lanzillo, Esq.
        Knox McLaughlin Gornall & Sennett, P.C.
        120 West Tenth Street
        Erie, PA 16501
        Kristina L. Angus, Esq.
        Heritage Property Investment Trust, Inc.
        131 Dartmouth Street
        Boston, MA 02116

For the Defendant:

        Craig A. Markham, Esq.
        Elderkin Martin Kelly & Messina
        150 East Eighth Street
        Erie, PA 16501

        Reported by Carol A. Holdnack, RPR
        Ferguson & Holdnack Reporting, Inc.

## Page 2

1               I N D E X

2

3  JOHN ALLIN

4     Direct Examination by Mr. Lanzillo . . . . 3

5

6  EXHIBITS:

7     J. Allin Deposition Exhibit 1 . . . . . . 47

8     J. Allin Deposition Exhibit 2 . . . . . . 48

9     J. Allin Deposition Exhibit 3 . . . . . . 49

10    J. Allin Deposition Exhibit 4 . . . . . . 51

11    J. Allin Deposition Exhibit 5 . . . . . . 51

12    J. Allin Deposition Exhibit 6 . . . . . . 52

13    J. Allin Deposition Exhibit 7 . . . . . . 77

14    J. Allin Deposition Exhibit 8 . . . . . . 79

15

16

17

18

19

20

21

22

23

24

25

## Page 3

1    J O H N   A L L I N, first having been

2    duly sworn, testified as follows:

3

4              DIRECT EXAMINATION

5  BY MR. LANZILLO:

6

7    Q.  Mr. Allin, my name is Rich Lanzillo. I represent

8  Heritage Realty in this lawsuit. I'm going to be asking you

9  a series of questions today regarding the basis for the

10 lawsuit. Both my questions and your responses will be taken

11 down by our court reporter, Carol. To ensure that the

12 transcript is clear, there are a couple of basic ground

13 rules you and I will need to keep in mind.

14      First, it's important that we don't talk at the

15 same time. So if you would wait until I finish my question

16 before attempting to respond to it, and I'll wait until you

17 finish your response before I ask you my next question.

18 That will make Carol's job a bit easier.

19      If you need a break during the deposition, just

20 let us know. Most importantly, if at any time you do not

21 hear my question or do not understand it, I need you to tell

22 me that so that I can either repeat or rephrase the

23 question. If you respond to my question, I will assume that

24 you both heard it and understood it. Is that fair enough?

25    A.  Yes.

## Page 4

1    Q.  Would you state your full name and your address.

2    A.  John A. Allin, A-L-L-I-N. Home address is 2319

3  South Shore Drive, Erie 16505.

4    Q.  And you're married to Peggy Allin?

5    A.  Yes.

6    Q.  And Mrs. Allin is here at the end of the table

7  with us today in the deposition room, correct?

8    A.  Yes.

9      MR. LANZILLO:  All right. Mrs. Allin will be

10     testifying today pursuant to which of our notices,

11     the notice directly to her or the corporate

12     designee notice, Craig?

13     MR. MARKHAM:  I think directly to her. I mean,

14     some of the information you're asking for is

15     overlapped principally between Mr. and Mrs. Allin.

16     Mr. Allin -- well, it depends on the area of

17     inquiry. But, principally, her individual

18     deposition notice is why she's here.

19   Q.  Okay. Are you currently employed?

20   A.  Yes.

21   Q.  And how are you employed?

22   A.  I am employed by Snow Dragon, LLC in Euclid, Ohio.

23   Q.  And what is the nature of the business of Snow

24 Dragon, LLC?

25   A.  It manufactures and markets and sells snow melting



EXHIBIT
C

## Page 5

1  equipment.
2  Q.  What's your position with Snow Dragon?
3  A.  I am the president.
4  Q.  Are you also an owner, or a member?
5  A.  I have an equity position in that company, yes.
6  Q.  Are you the majority?
7  A.  No.  I'm sorry, I should wait until you finish.
8  Q.  Are you the majority equity holder of that entity?
9  A.  No.
10  Q.  What percentage do you own?
11  A.  20 percent.
12  Q.  How long have you been employed as the president
13  of Snow Dragon?
14  A.  One week.
15  Q.  How long have you been a part owner of Snow
16  Dragon?
17  A.  One week.
18  Q.  How were you employed prior to joining Snow
19  Dragon?
20  A.  I was employed by Symbiot Business Group.
21  Q.  Was that as their corporate vice president of
22  operations?
23  A.  That's correct.
24  Q.  How long did you hold that position?
25  A.  13 months.

## Page 6

1  (Discussion held off the record.)
2  Q.  You joined Symbiot as its corporate vice president
3  of operations at the time that either the business of Snow
4  Management Group or the assets of Snow Management Group were
5  sold to Symbiot; is that correct?
6  A.  That's correct.
7  Q.  When did that transaction take place, the sale
8  to --
9  A.  The closing was November 22nd.
10  Q.  Of '04?
11  A.  That's correct.
12  Q.  Do you still conduct business as John Allin doing
13  business as Allin Companies?
14  A.  No.
15  Q.  When did you cease to do business as Allin
16  Companies?
17  A.  Allin Companies -- what was left after the Symbiot
18  acquisition was landscape contracting, and that was acquired
19  by an entity out of Ohio.
20  Q.  What's the name of that entity?
21  A.  Yardmaster, Inc.
22  Q.  And when did that occur?
23  A.  April 15th, '05.
24  Q.  Allin Companies, is that a proprietorship,
25  partnership, LLC, corporate entity, when it was in business?

## Page 7

1  A.  It was a sole proprietorship.
2  Q.  It would be your sole proprietorship?
3  A.  That's correct.
4  Q.  Does your wife have an ownership interest in that
5  entity?
6  A.  No.
7  Q.  The nature of the business of Allin Companies, as
8  I understand it, included snow removal services, landscape
9  contracting; is that correct?  And was there any other
10  aspect to the business?
11  A.  That's correct.  We also built decks, did
12  irrigation, installation and maintenance for lawns.
13  Q.  As far as the breakdown of the different aspects
14  of Allin Companies business, could you give me an estimate
15  of how much of your work was devoted to landscape
16  contracting, versus snow removal, versus irrigation, versus
17  decks?
18  A.  Including the work that was done by the sole
19  proprietor known as Snow Management Group, 10 percent of the
20  work was landscape, the balance was snow.
21  Q.  So I take it that a very small portion of the
22  business was devoted to irrigation and decks?
23  A.  Yes.
24  Q.  Roughly 90 percent would have been snow removal?
25  A.  Correct.

## Page 8

1  Q.  What was the principal place of business of Allin
2  and Companies when it was in operation?
3  A.  1406 West 21st Street, Erie 16502.
4  Q.  Did Allin and Companies, including any of the, for
5  lack of a better term, divisions of Allin Companies maintain
6  any other places of business other than the 21st Street
7  address?
8  A.  No.
9  Q.  Did Snow Management ever have a place of business
10  or an address located in Essex, Connecticut?
11  A.  Essex, Connecticut would have been the location of
12  one of our employees.
13  Q.  And who was that?
14  A.  Jeffrey Vernon.
15  Q.  What was Mr. Vernon's position?
16  A.  He was in charge of sales and production.
17  Q.  Was he a vice president?
18  A.  Yes, we had that title.
19  Q.  How long was Mr. Vernon employed by you?
20  A.  Sometime in late spring 2002 until we sold the
21  company.
22  Q.  Till November of '04?
23  A.  Correct.
24  Q.  Did he work principally in the snow removal part
25  of the business or did he also do anything with landscape

## Page 9

1  contracting?

2      A.  He was responsible only for snow.

3      Q.  What were his job responsibilities?  I think you

4  mentioned he was involved in marketing or sales.

5      A.  Sales.  And he oversaw all of the field managers.

6      Q.  What was the function of the field managers?

7      A.  Field managers had specified regions that they

8  were responsible for overseeing the snow removal on specific

9  sites within that region.

10      Q.  So he was both on the operational side and on the

11  sales side of the business?

12      A.  That's correct, although his operational

13  responsibilities were in the field, not here in the office.

14      Q.  Was he involved in the subcontracting portion of

15  the business?

16      A.  To a certain extent, yes.

17      Q.  What were his job responsibilities in that area?

18      A.  In certain instances he would interview and hire

19  subcontractors to work on various sites.  But he was not

20  hiring all the subcontractors on all the sites.

21      Q.  What would determine whether Mr. Vernon would get

22  involved in the interviewing and hiring process?

23      A.  The geographic region.  He took responsibility for

24  the area that was immediately surrounding his residence.

25      Q.  Okay.  What was the range that he covered as far

## Page 10

1  as his interviewing and hiring of subcontractor

2  responsibilities?

3      A.  There was a regional field manager that lived

4  fairly close to him, and he would assist that individual.

5  He wouldn't have total responsibility.  In some cases he

6  would go as far away as New Jersey, depending upon the scope

7  of work and the intricacy of the site.

8      Q.  Would you have been Mr. Vernon's direct

9  supervisor?

10      A.  Yes.

11      Q.  And when I refer to employees of Allin and

12  Companies, am I correct that I'm really talking about your

13  employees since you were a proprietorship?

14      A.  That's correct.

15      Q.  And Mr. Vernon's compensation, how was it

16  determined?  Was it hourly, salary?

17      A.  He was paid --

18      Q.  -- commission?

19      A.  -- a salary plus a draw against commission.

20      Q.  What were the terms of his draw against

21  commission?

22      A.  We paid him a draw.  And then once a year we were

23  to reconcile against commissions that he would be owed.

24      Q.  What was his draw amount?

25      A.  52,000 per year.

## Page 11

1      Q.  And he received a commission of what percentage?

2      A.  I don't recall.  I would have to review his

3  employment agreement.

4      Q.  He did have a written employment agreement?

5      A.  He did.

6      Q.  He did not stay on when Symbiot purchased the

7  company?

8      A.  That's not correct.

9      Q.  Okay.  I see.  He became a direct employee of

10  Symbiot at that point.

11      A.  That's correct.

12      Q.  When he cease to be -- of course, I'm talking

13  about Mr. Vernon now.  When did Mr. Vernon cease to be an

14  employee of Symbiot sometime in the summer of 2005?  Did he

15  resign?  Was he terminated?  Do you know the circumstance

16  surrounding his departure from Symbiot?

17      A.  It's my understanding he did resign.

18      Q.  Where is he now?

19      A.  Today?

20      Q.  Generally.  Is he living in Connecticut still?

21      A.  Yes, he is still living in Connecticut.

22      Q.  When is the last time you had any contact with

23  Mr. Vernon?

24      A.  Last week.

25      Q.  Do you still conduct business with him in any

## Page 12

1  regard?

2      A.  No.

3      Q.  Have you discussed this case or your deposition

4  with Mr. Vernon since he left Symbiot?

5      A.  We have had discussion about Heritage.  We have

6  had no discussion about the deposition today.

7      Q.  What was the nature of the discussion regarding

8  Heritage?

9      A.  Asking him if he had any documentation that we

10  could supply to our attorneys.

11      Q.  What did he tell you?

12      A.  He supplied us with what he had, although it was

13  my understanding he had a corrupted hard drive that he could

14  not get into.

15      Q.  What did he provide you with as far as written

16  documentation?  Was he able to give you anything at all?

17      A.  I don't know.

18      Q.  Was it transmitted through you, Mr. Allin, or

19  directly to Attorney Markham?

20      A.  I don't know if anything has been given directly

21  to Attorney Markham.  But it would have come through our

22  office to the law firm we initially retained.

23      Q.  That was the --

24      A.  They were over in the Cleveland area.

25      Q.  Would it be fair to say that, to your knowledge,

## Page 13

1  Mr. Vernon did not have any time records as far as his
2  activities relative to Heritage?
3      A.  I don't know that.
4      Q.  Are you aware of any time records that he had?  I
5  understand you don't know whether he had them and what he
6  may have provided through others.  But to your personal
7  knowledge, have you ever seen any time records that were
8  purportedly supplied by Mr. Vernon?
9      A.  I have not.
10     Q.  Mr. Vernon told you that he had a corrupted hard
11  drive on his computer that prevented him from generating
12  information that he thought he might otherwise be able to
13  provide?
14     A.  That's correct.
15     Q.  And when did he tell you that?
16     A.  Sometime in the last month to six weeks.
17     Q.  About how many individuals were employed by Allin
18  Companies, by you, prior to the acquisition by Symbiot?
19     A.  The number would fluctuate depending upon the time
20  of year.
21     Q.  What's the range?
22     A.  Anywhere from 30 to 75, depending upon how many
23  temps were working at the call center and things of that
24  nature.
25     Q.  Would it be accurate for me to conclude that

## Page 14

1  during the winter months your employee ranks would increase
2  and then during the summer they would decrease?
3      A.  That would be accurate.
4      Q.  You mentioned a call center.  What's that?
5      A.  It is a room in the building where people answer
6  phones, reports from various service providers, requests
7  from customers, and dispatching of service providers to
8  customer locations as or if needed.
9      Q.  So as the snow would be falling in a particular
10  locale there might be a call from a client or customer, it
11  would come in through your call center.  And then your call
12  center would contact the service provider.  Is that the
13  basic routine?
14     A.  That's not generally how it happened, but that
15  could happen from time to time.
16     Q.  Generally, what would happen at the call center?
17  What would the nature of the calls that would come into the
18  center encompass?
19     A.  If you plowed a site, you would call us to report
20  that you had performed service, and we would keep record of
21  that.
22     Q.  I see.  So the call center's principal function,
23  if I'm following you correctly, was to monitor the
24  performance of services by your subcontractors?
25     A.  That was one of the responsibilities.

## Page 15

1      Q.  What were the others, other responsibilities?
2      A.  Take calls from customers who required additional
3  service or callback service.
4      Q.  Anything else?
5      A.  They would make the outbound call to a service
6  provider to dispatch them to that particular site to address
7  the issue that may have arisen.
8      Q.  And approximately how many of the 30 to 75
9  employees would be devoted to the call center?
10     A.  I can't answer that.  I could if I would [sic].
11     Q.  Was the call center 24 hours?
12     A.  Certain times of the year, yes.
13     Q.  And, typically, what would the staffing be, say,
14  in the winter months?  Would there be one person in the call
15  center, five people in the call center?
16     A.  It would vary depending upon the severity of the
17  winter and the prediction of snow in various markets.
18     Q.  Of the -- well, let me ask you this.  The 30 to 75
19  employees -- and I know that their identities changed during
20  the course of the year.  But would those folks be
21  responsible for the snow removal side and other aspects of
22  the business such as landscape contracting?
23     A.  In the numbers I gave you, that's correct.
24     Q.  And when the numbers would swell to 75 in the
25  winter, those additional employees, would they be working

## Page 16

1  primarily on the snow removal aspect of the business?  That
2  seems reasonable.
3      A.  Yes.
4      Q.  In that range, 30 to 75 employees, was that fairly
5  typical over the last several years prior to the sale to
6  Symbiot, or did that range grow over time?
7      A.  It grew over time.
8      Q.  I take it the snow removal aspect of your business
9  has grown for a number of years prior to the merger -- or
10  excuse me, the sale?
11     A.  Yes.
12     Q.  Other than Mr. Vernon, who was apparently based in
13  Connecticut, did you have any employees based in other
14  locations prior to the sale of -- I assume it was a sale of
15  assets; I'll get to that in a minute -- but prior to the
16  transaction with Symbiot?
17     A.  Yes.
18     Q.  Where were your other employees based?
19     A.  In various locations.  This list may not be
20  all-inclusive.
21     Q.  Give me your best recollection, please.
22     A.  Two to three in New Jersey.  One in Massachusetts.
23  Two or three in Connecticut.  Two or three in New York.  One
24  in Iowa.  One in Minneapolis.  One in Chicago.  That may not
25  be all-inclusive.

## Page 17

1  Q. Of the ones that you were able to recall, were
2  these employees of yours at the time that you executed the
3  agreement with Heritage Realty Management? In other words,
4  were they already existing employees or did you add any of
5  these folks at the time of the contract?
6      MR. MARKHAM: At the time he signed it, you mean?
7      MR. LANZILLO: Um-hum.
8  Q. At or after the time you signed it.
9  A. Three were hired after the signing. The balance,
10 to the best of my recollection, were already on staff.
11 Q. And who were the three employees who were signed
12 at or after the execution of the contract with Heritage?
13 A. Duane.
14 Q. Could you give --
15 A. Dave.
16 Q. I know who Duane is from reading the documents,
17 but for the record could you give his name, full name,
18 please.
19 A. No. If you've read the documents, you understand
20 why.
21 Q. Yeah.
22 A. It's Haataja. And you can guess at the spelling.
23     MR. LANZILLO: I'll give it to you.
24     H-A-A-T-A-J-A.
25 Q. And Dave, is that last name D-Z-I-U-B-A-N?

## Page 18

1  A. That's correct.
2  Q. Anyone else? There was a third person.
3  A. Yeah, there is a third individual, and I cannot
4  recall his name.
5  Q. Was it Bryan Rohe, R-O-H-E?
6  A. That sounds correct.
7  Q. And these are individuals who prior to the
8  contract with Heritage had not ever provided any services to
9  or through Allin Companies?
10 A. That's correct. Some other individuals were
11 hired, but we were anticipating that they would have
12 other -- or responsibilities for other customers other than
13 Heritage. An example would be the fellow in Massachusetts.
14 He was not hired solely for the Heritage contract. He
15 was -- it was anticipated that Heritage become part of his
16 portfolio.
17 Q. How were the three employees hired after the
18 Heritage contract to be compensated, or how were they
19 compensated? Salary, hourly, commission?
20 A. I believe that they were paid a salary, and
21 incentivized in some fashion.
22 Q. And the incentives would be what?
23 A. To secure additional sites for us to maintain
24 around the -- or within the immediate vicinity of the
25 Heritage portfolio.

## Page 19

1  Q. Okay. And the three individuals, Duane, Dave, and
2  I believe the other one was Bryan, where was each based?
3  A. I don't know the exact cities that they lived in.
4  Dave Dziuban was in the Chicago-land area. Duane was in the
5  Minneapolis vicinity. Bryan was in Des Moines, I think.
6  Q. Were those areas where you had previously done any
7  business or were these brand new sites for you?
8  A. Brand new sites, Heritage sites.
9  Q. Do you have any employment records for these
10 individuals showing precisely what they were paid?
11 A. I do not. The company would have.
12 Q. The company does. And I say the company, I guess
13 they're your business records, correct?
14 A. Correct.
15 Q. There are business records that would show either
16 1099 wages or W-2 wages.
17 A. We followed the laws of the land, and a W-2 would
18 have been issued for them.
19 Q. I'm not trying to trick you. I don't know what --
20 whatever it is, those records still exist?
21 A. We played by the rules, and, yes, they would still
22 exist.
23 Q. Did these individuals continue as employees after
24 Heritage terminated the contract?
25 A. They were terminated approximately one week after

## Page 20

1  the Heritage termination.
2  Q. By these employees, I'm referring to the three we
3  have been discussing.
4  A. That's correct.
5  Q. So they would have been employees for a very short
6  period of time.
7  A. That's correct.
8  Q. They were hired after the execution of the
9  contract, which I believe was October -- the contract is
10 dated October 12th. And I know that the signature date is a
11 little different for each of the parties. There's an
12 Exhibit A; I believe it's from the Complaint. For the
13 record, I've showed you a document that was previously
14 marked as Exhibit A. I believe that comes from either the
15 pleadings or perhaps from a motion filed earlier in this
16 case.
17 Am I correct, Mr. Allin, this is a copy of the
18 contract dated October 12, 2004 between Heritage Realty
19 Management and you, without exhibits?
20 A. It appears to be that, yes.
21 Q. And it appears that the contract is dated
22 October 12, 2004. And it's dated with your signature on the
23 last page, Page 8, October 4, 2004?
24 A. Yes.
25 Q. Is that your signature and handwriting on the last

## Page 21

1  page?
2      A.  It is.
3      Q.  Am I reading that correctly?  It says John A.
4  Allin, 10/4/04, with changes in red?
5      A.  That's what it says.
6      Q.  All right.  So going back to these three employees
7  who were hired after the execution of this contract.  It's
8  your testimony that each was hired after October 4, '04 and
9  then terminated within approximately one week following
10  Heritage's termination of the agreement on November 4, 2004;
11  is that correct?
12      A.  No.
13      Q.  How am I incorrect in that summary?
14      A.  I do not know their exact dates of employment.
15      Q.  Is it possible that some were hired prior to the
16  execution of the agreement?
17      A.  It's possible it's snowing outside now, but I
18  don't know that for a fact.
19      Q.  That's something we could ascertain from the
20  business employment records that you still maintain?
21      A.  I believe so, yes.  And so we're clear, I do need
22  to add one thing.  Dave Dziuban was not terminated.  We kept
23  him.
24      Q.  How long did Mr. Dziuban remain with Allin?
25      A.  He was there when it was sold to Symblot and for a

## Page 22

1  period of time thereafter.
2      Q.  Who was Allin Companies/Snow Management Group's
3  accountant and auditor?  Who did the accounting work for
4  you?
5      A.  I'm not sure I understand what you're asking me.
6      Q.  Did your business have an accounting firm?
7      A.  We did.  And it was right about in that time frame
8  that we changed accounting firms.
9      Q.  Who was your prior firm prior to the change?
10      A.  Kramer Smith and Bish.
11      Q.  I'm not familiar with them.  Are they in town?
12      A.  712 Kahkwa.
13      Q.  And who was the successor to Kramer Smith and
14  Bish?
15      A.  I don't know the name of the firm.  I can't
16  remember it.  But if I heard it, I would know it.
17      Q.  Is it an Erie firm?
18      A.  Yes.
19      Q.  Does that firm remain your personal accountant
20  today?
21      A.  Yes.
22      Q.  Is it one of the larger firms?
23      A.  Yeah.  Dennis Grow is doing our taxes in that
24  firm.  They're at -- I think they're at 10th and State.
25      Q.  That would be Schaffner Knight Minnaugh and

## Page 23

1  Company?
2      A.  That's it.
3      Q.  And those firms, Kramer Smith and Schaffner
4  Knight, they worked for the business, they did accounting
5  work for the business, as well as any personal accounting
6  matters that you had; is that accurate?
7      A.  Yes.
8      Q.  All right.  The actual removal of snow by -- and
9  I'm going to call it SMG for ease, Snow Management Group.
10  Fair enough?
11      A.  Yes.
12      Q.  The actual removal of snow by SMG, was that
13  performed solely through subcontractors, or did you do some
14  of that yourself?
15      A.  99 percent of it would have been done with
16  subcontractors.  That was the model.
17      Q.  Did SMG have snow moving and removal equipment
18  that it owned, that you owned personally?
19      A.  Yes.
20      Q.  What types of equipment did you own?
21      A.  Skid steers, snow pushers, which are essentially
22  large plows, box plows.  Trucks with plows on them, and salt
23  spreaders.  Some specialized equipment, meaning ATVs with
24  plows and salt spreaders on them for clearing sidewalks.
25  Power brooms, both walk-behind and mechanized.  There could

## Page 24

1  be some other minor equipment, but that's the bulk of it.
2      Q.  Was that equipment situated here in Erie or was it
3  spread out in other locations?
4      A.  Spread out in other locations.  A good portion of
5  it was located here in Erie and brought back here between
6  winter seasons.  And some was stored on customer sites and
7  at other common areas that we could rent/keep.
8      Q.  But, again, about 99 percent of the actual snow
9  removal work would have been performed by subcontractors?
10  As you said, that was the business model?
11      A.  Yes.  However, we would supply snow pushers, skid
12  steers, some of the mechanized equipment, for the
13  subcontractors to use.  The snow pushers themselves, we
14  would not traditionally allow a subcontractor to own.
15      Q.  I see.  Did you acquire any new equipment based on
16  the Heritage contract?
17      A.  Yes.
18      Q.  What did you purchase?
19      A.  We purchased some more pushers.  No, I take that
20  back.  That's not correct.  We did not acquire pushers for
21  the Heritage contract.  We had enough left over from
22  contracts that we did not renew, that we were going to
23  relocate that equipment to the Heritage sites.
24      Q.  So then no new equipment was purchased based on
25  the Heritage contract?

## Page 25

1    A.  Trucks for the field managers, they were
2 purchased.  Those trucks had plows and salt spreaders on
3 them.
4    Q.  Would those be standard pickup-type trucks with
5 some special equipment?
6    A.  Three-quarter ton Dodges with D blades and salt
7 spreaders.
8    Q.  What happened to those trucks after the
9 termination of the Heritage contract?
10   A.  They sat in Erie, doing nothing.
11   Q.  Were they sold to Symbiot?
12   A.  Yes.
13   Q.  And how many trucks did you purchase?
14   A.  I purchased six that year, I believe.  And they
15 would have been for all the new employees that we hired.
16 There were no replacement trucks.  And as I previously
17 stated, some of the employees were hired in markets where
18 the addition of the Heritage sites required additional
19 managerial staffing.  But once we lost the Heritage
20 contract, we still had enough work that we thought we could
21 muddle through paying their salaries and keeping them on
22 board.
23   Q.  So those new hires in those areas, they were not
24 terminated after the Heritage contract was terminated; you
25 continued with them doing other work?

## Page 26

1    A.  As I previously stated, there was one in
2 Massachusetts, one in New Jersey.  Those people were kept.
3    Q.  The six new trucks, then, were any trucks traded?
4 In other words, when you got the six new trucks, were you
5 trading in any older trucks?
6    A.  No.
7    Q.  And where did you buy those?
8    A.  Humes.
9    Q.  Humes in Waterford?
10   A.  That's correct.
11   Q.  Where are those trucks now?  Are they with
12 Symbiot?
13   A.  That's correct.
14   Q.  Are there any business records concerning the
15 purchase of those trucks?  Do you have the paperwork on
16 them?
17   A.  I believe so.
18   Q.  Who would be the custodian of those records?
19   A.  Peggy Allin.
20   Q.  Other than the trucks that were later sold to
21 Symbiot, any other equipment purchased based upon the
22 Heritage contract?
23   A.  Not that I can recall at this time.
24   Q.  The subcontractors who did 99 percent of the snow
25 removal work for Allin, were those -- those were not

## Page 27

1 employees, those were independent contractors, I assume; is
2 that correct?
3    A.  That is correct.
4    Q.  Prior to Heritage, how many clients or customers
5 did you have in the snow removal area?
6    A.  I wouldn't -- I would be guessing if I gave you a
7 number.
8    Q.  Would it be fair to say hundreds?
9    A.  There would have been hundreds of sites.  I don't
10 know that there would be hundreds of customers.  And it's
11 more like thousands of sites.
12   Q.  Okay.  Any particular geographic region or all
13 over the country?
14   A.  The business was focused predominantly east of the
15 Mississippi.  However, that does not mean we did not have
16 customers west of the Mississippi.
17   Q.  I assume Florida was probably not a very lucrative
18 market for you.
19   A.  Well, it does snow in all 50 states at some point
20 every decade.  That's a reasonable assumption.
21   Q.  But probably not enough to justify a substantial
22 marketing effort on your behalf.
23   A.  That's correct.
24   Q.  What's your best recollection, approximately, of
25 the number of subcontractors that you would have in any

## Page 28

1 given year?
2    A.  It would be under 1,000 and over 200.
3    Q.  Okay.
4    A.  And that's as close as I can narrow it down.
5    Q.  Who within your business was responsible for
6 recruiting and interacting with the subcontractors?
7    A.  There's a number of different people that were
8 involved in the direct contact with subcontractors.  They
9 would have -- they were all housed in Erie, and would
10 include the field managers that were stationed in the
11 various regions.
12   Q.  Who can you recall here in Erie who was
13 responsible for recruiting and maintaining relationships
14 with subcontractors?
15   A.  About the only thing I can give you definitive
16 would be the person who was responsible for that department,
17 and that would be Lisa Edwards.
18   Q.  Is she still in Erie?
19   A.  Yes.
20   Q.  Did she go to work for Symbiot after that
21 transaction?
22   A.  Yes, she did.
23   Q.  When did she cease working for Symbiot?
24   A.  It's my understanding she is still working now.
25   Q.  She is still working for them.  What's left of

## Page 29

1  what was formally Snow Management Group and is now part of
2  Symbiot's organization here in Erie? I read some articles
3  that there's been a contraction or reshuffling of
4  responsibilities with stuff being transferred over to Salt
5  Lake City.
6      A.  I have not been in the building in a while. My
7  employment came to an end there December 15th. They have
8  downsized severely and considerably, and I'm probably not
9  the right person to ask that question of.
10     Q.  Is it your understanding, though, that the
11  principal operations that were here in Erie have since been
12  transferred to Salt Lake?
13     A.  Not yet, but they're in the middle of
14  transitioning that.
15     Q.  What were the circumstances surrounding the end of
16  your employment with Symbiot on or about December 15th?
17     A.  Symbiot felt that I was not meshing with the
18  culture in Salt Lake, and that it would be best if I pursued
19  other endeavors, and I agreed.
20     Q.  Did you have an employment agreement following the
21  acquisition by Symbiot?
22     A.  I did.
23     Q.  And I take it, it was terminable on certain
24  conditions, either party or Symbiot had the right to
25  terminate on notice or upon payment of an amount?

## Page 30

1      A.  Yes, that's essentially correct.
2      Q.  What was the nature of the transaction between you
3  as the proprietor of Snow Management Group and Allin
4  Companies and Symbiot? In other words, was it an asset
5  purchase agreement, was it a -- what was it?
6      A.  They purchased assets and certain liabilities as
7  it related to the snow business. They did not purchase any
8  landscape, irrigation, deck, any of that work.
9      Q.  When did that asset purchase occur?
10     A.  The closing was on November 22nd of '04.
11     Q.  When did you start negotiating with Symbiot
12  regarding that transaction?
13     A.  September of '04.
14     Q.  Had you been looking for a strategic buyer for
15  portions of your business prior to September of '04?
16     A.  Yes.
17     Q.  When did those efforts start?
18     A.  February -- February of '04.
19     Q.  What prompted you to decide to look for a
20  purchaser of some or all of the business?
21     A.  We had been growing expeditionally since the
22  Olympic project. And we had been growing from cash flow.
23  It became apparent in the winter of '03/'04 that in order to
24  continue to sustain the type of growth that we were
25  experiencing and anticipated, that we would need capital or

## Page 31

1  we would need to become properly capitalized in order to
2  continue that growth. So there was an effort made to engage
3  either a venture partner or to allow someone to acquire a
4  portion of the business to provide us with the capital that
5  we would need.
6      Q.  Were you experiencing financial problems in
7  connection with the operation of the Snow Management Group
8  when you started looking for a venture capital partner or a
9  strategic buyer?
10     A.  No.
11     Q.  Were you paying debts as they came due?
12     A.  Yes.
13     Q.  Did that include debts to your subcontractors?
14     A.  Yes.
15     Q.  At any time between February of 2004 when you
16  started looking for a strategic buyer and the date you
17  entered into the Heritage contract, did you fall into
18  arrears with a significant portion of your subcontractors?
19     A.  We did fall into arrears, but not with a
20  significant portion of our subcontractors. We had thought
21  we had an arrangement to be acquired, and that did not come
22  to fruition. By the time that had taken place, the
23  original purchaser decided against going through with the
24  agreement. By that point, we had fallen behind by
25  approximately 3.6 million to service providers only. All

## Page 32

1  other debts were paid on time and were current.
2      Q.  Who was the original anticipated purchaser of the
3  business?
4      A.  We had had conversations with a number of
5  different individuals and entities. And I had been trying
6  to educate a number of different people about the snow
7  industry. And at the same time I had engaged an engineering
8  firm to design a snow melter that we wanted to use. And
9  that -- the parent company of that entity was interested in
10  acquiring all of SMG.
11     Q.  Prior to Symbiot, did you have a letter of intent
12  from anyone to purchase the business, or a portion of the
13  business?
14     A.  I don't know if we ever had an actual letter of
15  intent.
16     Q.  I may have misinterpreted your testimony a few
17  moments ago, Mr. Allin. But I was under the impression that
18  the discussions were fairly serious with at least one or
19  more potential buyers. Would that be a fair assessment of
20  your testimony?
21     A.  Yes, sir.
22     Q.  What was the name of the potential purchasers with
23  which you had serious negotiations?
24     A.  It was Park Ohio Holdings Company in Cleveland.
25     Q.  Anyone else?

## Page 33

1    A.  When we began negotiating with Park Ohio, they
2    asked us not to have conversations with any other entities,
3    and we did not.  But there were other interested parties.
4    Q.  You did fall behind, though, to the tune of
5    $3.6 million to service providers at one point?
6    A.  That's correct.
7    Q.  When did that occur?
8    A.  Over the course of the negotiations with Park
9    Ohio.
10   Q.  Are you implying there was some cause and effect
11   to -- between the negotiations on the one hand and the
12   falling behind with your service providers?
13   A.  I don't think they were directly related, no.
14   Q.  You said earlier that there was a need to raise
15   capital based on your growth.  Would it be fair for me and
16   accurate for me to conclude that you did not have the cash
17   flow sufficient to service, at least at one point, $3.6 in
18   debt to your service providers?
19   A.  That would be accurate.
20   Q.  Did you at some point retain a workout firm?
21   A.  After the Park Ohio deal came apart, they
22   recommended that -- the CEO of Park Ohio recommended that we
23   engage Bob Cohen from Centrus to assist us in going forward
24   so that we could continue to concentrate on the business and
25   not on the problems that might arise from not being able to

## Page 34

1    get a capital infusion in the company.
2    Q.  I mean, those were existing problems.  I mean, at
3    the time you had -- well, let me back up.  Tell me if this
4    statement is correct.  When you retained Centrus and Bob
5    Cohen, you did not have funds sufficient to pay your service
6    contractors; is that accurate?
7    A.  That's accurate.
8    Q.  And one of the reasons why you retained Centrus
9    was to have Centrus assist you in negotiating some
10   accommodation from your service provider creditors?
11   A.  Centrus' -- Bob Cohen's charge was to assist us on
12   a number of fronts.
13   Q.  What were those fronts?
14   A.  Getting a capital infusion, a potential buyer or
15   investor, to keep the service providers abreast of the
16   situation and what was taking place.  We didn't have anybody
17   who was threatening anything at that point in time.  And we
18   were doing this as a precursor to any problems that might
19   arise.
20   Q.  When you sold the snow removal business to
21   Symbiot, was there some arrangement made for the payment of
22   your subcontractors, at least the subcontractors with which
23   there was an arrearage?
24   A.  Symbiot did make arrangements to assume that
25   liability and to make the service providers whole.

## Page 35

1    Q.  Were they made whole, or did they accept -- were
2    the service providers required to accept less than full
3    payment?
4    A.  I don't believe the service providers were
5    required to do anything.  They were asked to accept 75 cents
6    on the dollar.
7    Q.  Did your service providers accept that 75 cents?
8    A.  Overwhelmingly.  The response was positive.  And
9    all but only a couple gladly accepted it.
10   Q.  What happened to the service providers who
11   declined to accept the 75 cents?
12   A.  I don't know.  That was taken out of my hands.
13   But there were -- if there were one or two, that was a lot.
14   Q.  Did any service provider ever sue you?
15   A.  We have one who has filed suit against us.
16   Q.  Which one is that?
17   A.  Karioty (phonetic), something or other.
18   Q.  Karioty?
19   A.  Yeah.
20   Q.  Where are they based?
21   A.  Connecticut.
22   Q.  And how much were they owed?
23   A.  I don't know.
24   Q.  Let me ask you a couple questions about the
25   structure of the agreement with Symbiot.  Did they assume

## Page 36

1    any debt other than the -- some or all of the debt to the
2    service providers?
3    A.  Yes.
4    Q.  Bank debt, things of that nature, secured debt?
5    A.  Yes.
6    Q.  And did they -- did Symbiot assume all of the debt
7    to the service providers, or up to a certain amount?
8    A.  It was written to be up to $4 million.
9    Q.  And then was there cash to you as part of that
10   deal?
11   A.  At closing I got $50,000 that went to my lawyer.
12   Q.  And nothing beyond that?
13   A.  That's correct.
14   Q.  Is there any payout going forward?
15   A.  I hope so.
16   Q.  Is there like an earn-out type of arrangement?
17   A.  Yes.
18   Q.  And that, obviously, is tied to the performance of
19   what was formally SMG and now part of Symbiot?
20   A.  Yes.  However, Symbiot has had some material
21   direction change in how they're operating.  So it would be
22   next to impossible for them to achieve the earn-out goals
23   that have been set forth, and we're in the process of
24   negotiating that.
25        (Discussion held off the record.)

## Page 37

1    Q.  I just made the comment that typically earn-outs
2  are aspirational.
3    A.  We've kind of figured that out.
4    Q.  Heritage paid $340,000 roughly, $340,482 to you.
5  Where did that money go?
6    A.  Into the checking account.
7    Q.  Were those proceeds transferred to Symbiot as part
8  of the transaction?
9    A.  Well, we had to operate the business up until the
10  closing took place, and we used those funds for that.
11    Q.  How much was in the checking account at or about
12  the time of the receipt of Heritage's payment?
13    A.  I don't know.
14    Q.  How rapidly were the proceeds of Heritage's
15  payment depleted after they were received?  Did they go out
16  the door pretty quickly?
17    A.  I don't know that.
18    Q.  There certainly would be bank records to show
19  that, would there not?
20    A.  I would hope so.
21    Q.  The checking account records.
22    A.  I would hope so.
23    Q.  Where did you do your banking?  Who had your
24  checking account?
25    A.  National City.

## Page 38

1    Q.  Did you do any banking at any other financial
2  institutions other than National City?
3    A.  Not that I'm aware.
4    Q.  The assets that were owned by -- used as part of
5  SMG's business and that were ultimately sold to Symbiot,
6  were they titled in your name individually?
7    A.  Some were titled in my name.  Some were titled in
8  Allin Company's name.  Some were titled in Snow Management
9  Group's name.  Some were titled in Peggy's name.
10    Q.  Were all of the tangible assets that were formally
11  used as part of the business of Snow Management Group
12  transferred to Symbiot?
13    A.  Everything except the landscaping assets.
14    Q.  What about the real estate; did real estate stay
15  with you?
16    A.  I had no real estate.  We leased everything.
17    Q.  What were the annual revenues in the last years of
18  Snow Management Group from snow removal?  What did you guys
19  gross?
20    A.  It's been a while since I've looked at those
21  records.  It strikes me that it was in the vicinity of
22  $15 million.
23    Q.  In the last year of operation, did expenses exceed
24  revenues?
25    A.  In '04, yes, we showed a loss.

## Page 39

1    Q.  I assume that -- I mean, if you had at one point
2  3.6 million owed to service providers/subcontractors, it
3  sounds that you would have had at least an off year.
4    A.  '04, yes.  '03 was profitable.
5    Q.  What about existing contracts that were in your
6  name or the names of Allin and Companies or Snow Management
7  Group; how were they handled as part of the Symbiot
8  transaction?  Were they assigned, assumed?
9    A.  Those that had assignment clauses in them were all
10  assigned, and all customers agreed to the assignment.  Those
11  that did not have assignment language, they were notified of
12  the transaction, and we had no issues or problems with any
13  of them.
14    Q.  And when you say that, were those terminated,
15  then, at that point?
16    A.  No, they were assigned also.
17    Q.  They consented.
18    A.  Yes.  Some, we needed their consent.  Some, we did
19  not.  We had no problems with any of them.
20    Q.  Who were your principal contacts at Symbiot as
21  part of that transaction, the sale of the SMG business?
22    A.  I dealt with Bruce Wilson, Matt Glover and Steve
23  Glover.  And Mark Webb.
24    Q.  What was Webb's title?
25    A.  He was a CFO.  Although, to be accurate, he was

## Page 40

1  not actually the CFO at the time of the closing.  They were
2  contemplating hiring him.  And he had reviewed the
3  transaction prior to the closing.
4    Q.  Did your agreement with Symbiot address your
5  contract with Heritage?
6    A.  No.
7    Q.  It was silent as to Heritage?
8    A.  Yes.
9    Q.  Did you have any discussions with Wilson, either
10  of the Glovers or Mr. Webb regarding Heritage?
11    A.  Oh, yes.
12    Q.  Tell me about those.
13    A.  We had to advise them of the cancellation.
14  Because it could have materially affected the completion of
15  the transaction, although ultimately it did not.
16    Q.  And was there any discussion of the Heritage
17  contract prior to its termination?
18    A.  Yeah, it was a contract that was -- I'm going to
19  turn this off.  It was a contract that was part of the
20  listing of all contracts that we had.
21    Q.  So you disclosed the Symbiot -- excuse me, you
22  disclosed the Heritage contract to Symbiot as part of the
23  negotiations of your buyout?
24    A.  Yes.
25    Q.  And was it contemplated that Symbiot would assume

## Page 41

1 the responsibility for that contract?
2   A.  Yes.
3   Q.  And I know I asked you this before; I apologize.
4 When did you begin your discussions with Symbiot?  Was it
5 September?
6   A.  Yes.
7   Q.  Was there a letter of intent executed at some
8 point prior to the asset purchase agreement that was closed
9 on November 15, 2004?
10   A.  Yes.
11   Q.  And when was the letter of intent signed?
12   A.  I don't know the date.
13   Q.  Was it September?
14   A.  No.
15   Q.  Was it before or after the contract with Heritage?
16   A.  It would have probably been before.
17   Q.  Did Symbiot receive or assume the accounts
18 receivable of the business?  Is that part of the assets that
19 went over to Symbiot?
20   A.  Yes.
21   Q.  Whatever was left in the bank accounts went to
22 Symbiot; is that accurate?
23   A.  I don't know.
24   Q.  What liabilities remained with you as part of the
25 Symbiot transaction?

## Page 42

1   A.  Anything associated with the landscape portion of
2 the business.
3   Q.  Were there any pending lawsuits against you at the
4 time of the Symbiot transaction?
5   A.  Yeah.
6   Q.  What were they?
7   A.  Yours.
8   Q.  And in addition to that, any others?
9   A.  There were insurance-related slip-and-fall type
10 suits, but that would have been it.
11   Q.  Was there some sort of a problem with
12 subcontractors or one or more subcontractors falsifying an
13 insurance certificate?
14   A.  Oh, we've had that happen on a number of
15 occasions.
16   Q.  Which left the subcontractor and you, pursuant to
17 your agreements, uninsured for that particular loss?
18   A.  We have insurance.
19   Q.  Well, when you say insurance-related type
20 lawsuits, were those all being defended by your insurance
21 company, or did your carrier deny coverage on any of the
22 suits?
23   A.  We had an issue with a carrier from the '02/'03
24 season, that they had initially denied coverage for various
25 snow-related incidents.  And we initiated a lawsuit against

## Page 43

1 them.
2   Q.  And how did that resolve?  Did they later
3 assume --
4   A.  Soon.
5       MR. MARKHAM:  It's still pending.
6   Q.  It's still pending.  I see.  Am I correct that the
7 denial of coverage left you partially uninsured, at least
8 pending the outcome of the coverage dispute?  If you lose
9 that case, is it your -- is it on your dime, I guess is the
10 question.
11   A.  Yes.
12   Q.  Did Symbiot assume any of that exposure or did
13 that stay with you?
14   A.  That stayed with me.
15   Q.  Who at Snow Management Group had the first contact
16 with anyone on behalf of Heritage?  Did you have the first
17 contact?
18   A.  It was not me.
19   Q.  Was it Vernon, Mr. Vernon?
20   A.  I don't know who had the first contact.
21   Q.  Do you have an understanding as to how that
22 contact occurred?
23   A.  I don't know specifically how that occurred.
24   Q.  Do you know who approached whom?
25   A.  I don't know that.

## Page 44

1   Q.  Personally, what was your first contact with
2 anyone on behalf of Heritage?
3   A.  Fort Lauderdale, Florida, at a meeting that we
4 were invited to attend.
5   Q.  Was that a meeting of the property managers?
6   A.  That's my understanding of what it was, yes.
7   Q.  When did that meeting occur?
8   A.  I think it was in February of '04.
9   Q.  And who accompanied you on that trip?
10   A.  Jeff Vernon.
11   Q.  Tell me what happened on that trip.  What was
12 the -- what was your interaction with individuals from
13 Heritage?
14   A.  We did have dinner with a number of the Heritage
15 individuals, and we were invited to make a presentation
16 about Snow Management Group and what we could offer
17 Heritage.
18   Q.  And by presentation, I take it, it was a sales
19 pitch, here's what we can do for you?
20   A.  No, it wasn't a sales pitch.  We were invited to
21 educate the property managers about Snow Management Group
22 and what we do.  At the -- that meeting, Bob Prendergast
23 stood up and told everybody, these are the people we're
24 going to deal with next year, and we want you to be educated
25 as to how they do business.

## Page 45

1    Q.  Now, this is several months before the contract.
2  Were you looking to obtain Heritage's business when you made
3  that presentation?
4    A.  It was my understanding that we already had their
5  business. This was a formality to bring other people within
6  Heritage on board and to buy into the idea of consolidating
7  the contract.
8    Q.  Did you have a contract with Heritage at that
9  time?
10    A.  No, just a verbal commitment.
11    Q.  And I take it since this was your first contact
12  with Heritage, that whatever verbal commitment you
13  understood to exist would have been between someone at
14  Heritage and another representative of SMG; is that
15  accurate?
16    A.  I was there when he made -- the initial comment
17  that I heard, the first time that I heard a commitment was
18  when Bob Prendergast stood up in front of the 30 or 35
19  people that were there and said, these are the people we're
20  doing business with.
21    Q.  Okay. But you knew at that point you didn't have
22  a contract with Heritage, correct?
23    A.  We did not have a written correct.
24    Q.  And you hadn't negotiated terms of any other
25  arrangement, had you?

## Page 46

1    A.  That's correct.
2    Q.  Did SMG send any promotional materials to Heritage
3  before or after that meeting?
4    A.  I don't know.
5    Q.  Would that have been Mr. Vernon's scope of
6  employment, his responsibility?
7    A.  It would have fallen within his responsibility to
8  do so, yes.
9    Q.  Between the meeting in Fort Lauderdale and the
10  execution of the contract, did you have any direct
11  negotiations or dealings with individuals at Heritage?
12    A.  Not by voice. I reviewed certain documents that
13  were forwarded to me from Jeff Vernon, and made comments and
14  suggestions.
15    Q.  So what would happen is Vernon -- Vernon was your
16  interface with Heritage?
17    A.  Essentially, yes.
18    Q.  All right. And as things would develop, he would
19  share information or documents with you?
20    A.  Not every document. But when he needed advice, he
21  would contact me. There was, as I recall, one or two
22  e-mails directly between myself and Bob Prendergast late in
23  the game.
24    Q.  Okay. Other than that, though, between Fort
25  Lauderdale and the execution of the agreement, you did not

## Page 47

1  interact with -- directly with anyone at Heritage?
2    A.  That's correct.
3    Q.  Had you or SMG done any work at all for Heritage
4  prior to Fort Lauderdale?
5    A.  Not that I'm aware of. Or not that I recall.
6    Q.  Recognizing that it would have been Mr. Vernon
7  involved, when did actual negotiations of terms of an
8  agreement commence between SMG and Heritage? Do you have an
9  understanding?
10    A.  My recollection is that that began in either May
11  or June.
12    Q.  '04?
13    A.  Yes.
14    Q.  Did you have an understanding as to who was
15  Mr. Vernon's principal contact or contacts at Heritage?
16    A.  The only name that I heard on a regular basis up
17  until the actual contract execution was Bob Prendergast.
18    (J. Allin Deposition Exhibit 1 marked for
19    identification.)
20    Q.  Mr. Allin, I previously marked -- or had
21  previously marked an Exhibit A, which was the contract,
22  which we'll come back to. I'm now showing you a document
23  we've identified as your Deposition Exhibit 1. Do you
24  recognize this document?
25    A.  I have seen it before.

## Page 48

1    Q.  This was apparently a letter authored by Jeffrey
2  Vernon directed to Heritage -- I'm sorry, strike that. This
3  is a letter from Heritage to Mr. Vernon. That's what I
4  would call a nonbinding letter of intent. Were you shown
5  this at or about the time it was received?
6    A.  I don't know when I saw it specifically.
7    Q.  When you did review it, did you understand at that
8  time that it was a nonbinding expression of Heritage's
9  intent to enter into a contract with you?
10    A.  I see what it says.
11    Q.  Is that the way you understood it when it arrived?
12    A.  I can't say as I understood it one way or the
13  other.
14    (J. Allin Deposition Exhibit 2 marked for
15    identification.)
16    Q.  Let me show you what we'll mark as your Deposition
17  Exhibit 2. This is a compilation of documents. The one I'm
18  going to show the witness now is the last two pages. Have
19  you seen this document before?
20    A.  Yeah.
21    Q.  Who authored Exhibit 2?
22    A.  I did.
23    Q.  Am I correct that this document relates to the
24  arrearages owed to your subcontractors?
25    A.  There's other things, but it does address that,

Page 49

1    yes.
2        Q.  You had mentioned that one of the subcontractors
3    ultimately did commence an action against you.  When was
4    that filed?  Was it before or after the Symbiot transaction?
5        A.  After.  Long after.
6        MR. MARKHAM:  Just so it's clear, it's an AAA
7        arbitration.  It's not what you and I would
8        consider a lawsuit.
9        A.  I'm not a lawyer.
10       Q.  That's fine.  Appreciate the clarification.  The
11   document we've marked as your Exhibit 2 is a letter dated
12   April 15, 2004 to SMG Service Providers all over the United
13   States, Re:  This past winter season.  And it was executed
14   signed by you, Jeff Vernon, Lisa Edwards and Mike Suleski.
15       A.  Correct.
16       (J. Allin Deposition Exhibit 3 marked for
17        identification.)
18       Q.  Take a look at Exhibit 3.  Tell me if you've seen
19   that one before.  I've handed you Exhibit 3, which appears
20   to be a letter dated October 2, 2004 on the letterhead of
21   Centrus Group, Incorporated, business planning and
22   turnaround management, Re:  Allin Companies/Snow Management
23   Group.  Signed by Robert L. Cohen.  Is that correct?
24       A.  Yes.
25       Q.  Have you seen this one before?

Page 50

1        A.  At one point I would have seen it, yes.
2        Q.  Was this sent to your service providers?
3        A.  I can't tell who this one was sent to.
4        Q.  It appears to have been redacted.  By whom, I
5    don't know.
6        A.  I don't know what redacted is.
7        Q.  That means the addressee has been obliterated, has
8    been blocked out.
9        A.  Okay.
10       Q.  But am I correct that you were aware on or about
11   October 2, 2004 that Centrus Group was sending out a letter
12   in this form to at least your service providers and perhaps
13   other creditors on behalf of Allin and Companies?
14       A.  Yes.
15       Q.  And you understood at the time that the letter
16   sent by Centrus was proposing or advising these creditors
17   that there were a couple of possible avenues or options for
18   addressing debt owed by Allin and Companies and Snow
19   Management Group, one of which was the possibility that
20   Allin and Companies would be acquired, which would create
21   some additional cash.  The second was to solicit the support
22   of the company's creditors to accept a payout of debt based
23   upon profit performance of the company over a period of
24   time.  And then the third was a sweat -- a swap of debt for
25   equity by the creditors.

Page 51

1        A.  Yes.
2        (J. Allin Deposition Exhibit 4 marked for
3        Identification.)
4        Q.  I show you what we've marked as Exhibit 4.  It's a
5    letter dated October 21, 2004 also from Centrus Group.  The
6    addressee is covered up again.  Re:  Allin and Companies and
7    Snow Management Group.  The author of the letter apparently
8    was a Robert L. Cohen again.  Have you seen this letter
9    before?
10       A.  Yes.
11       Q.  This refers to a letter of intent regarding the
12   purchase of assets of Snow Management Group by an
13   unidentified entity.  Do you understand this to be in
14   reference to Symbiot?
15       A.  Yes.
16       (J. Allin Deposition Exhibit 5 marked for
17        identification.)
18       Q.  I show you now a note or a notice that I
19   understand came to Heritage anonymously.  And I've marked
20   this as Deposition Exhibit 5.  Have you ever seen that
21   before today?
22       A.  No.
23       Q.  Recognizing that you're only seeing that for the
24   first time today, do you have any knowledge of who may have
25   sent this notice to Heritage?

Page 52

1        A.  We suspect we know who sent it.
2        Q.  Who do you suspect?
3        A.  Karioty.
4        Q.  That's the entity that asserted the claim against
5    you and is currently in AAA arbitration?
6        A.  Yes.
7        (J. Allin Deposition Exhibit 6 marked for
8        identification.)
9        Q.  Mr. Allin, I've presented you with what we've now
10   marked as your Deposition Exhibit 6.  This is a compilation
11   of documents that we received from you as part of the
12   discovery in this case.  It appears to be spreadsheets and
13   schedules of expenses.  And I have several questions
14   regarding these documents.  Let me ask you this.  Who was
15   responsible for generating these documents?
16       A.  The initial work was done by an administrative
17   assistant who worked for us for a short period of time, and
18   then passed on to the administrative assistant who was with
19   us until I was separated from Symbiot.
20       Q.  Okay.  Who was the original administrative
21   assistant?
22       A.  Julie somebody.
23       Q.  Can't recall her last name?
24       A.  I don't pay attention to other women in my office.
25       Q.  That's a smart and diplomatic answer.  But in all

## Page 53

1  seriousness, do you have any recollection of her last name?
2      A.  I do not.  That doesn't mean she didn't have a
3  last name, I just don't know what it was.
4      Q.  When did Julie leave the company?
5      A.  Oh, I don't think she was there about a week.
6      Q.  So she was a short-termer?
7      A.  When I said a short period of time, I mean short.
8      Q.  And was her principal responsibility for the week
9  that she was there to work on this?
10     A.  Actually, I do believe that's exactly what it was.
11     Q.  When was she employed?
12     A.  It would have been right about the time Heritage
13  filed the lawsuit.
14     Q.  Was she hired to do this?
15     A.  No.
16     Q.  Heritage employees, are they required to keep any
17  type of time cards or time sheets or other time records?
18     A.  I would have no idea what Heritage's policy is for
19  that.
20     Q.  That's my mistake.  I misspoke.  At Allin and
21  Companies and SMG, are your employees required to maintain
22  or keep any time records?
23     A.  Generally, no.
24     Q.  Are there exceptions?  When you say generally.
25     A.  There might be from time to time, when we want to

## Page 54

1  bill a customer on a per-hour basis.  But it would be few
2  and far between.
3      Q.  How about the office or administrative staff; are
4  they required to maintain any time records?
5      A.  No.  As I've said to others previously, we're not
6  a law firm and we don't keep track to the minute of what
7  everybody is doing.
8      Q.  As a percentage, had the Heritage contract gone
9  forward, how large of a portion of your business would it
10  have been?
11     A.  Probably somewhere between 15 and 20 percent.
12     Q.  When you contracted with Heritage, were you
13  concerned at all, based upon the prior problems you had had
14  with cash flow and service providers who had not been paid
15  at that time -- in other words, did it cause you any concern
16  that you were taking on what sounds, to me, to be a very
17  substantial new customer at a time where you didn't -- you
18  had not had the cash flow to stay current with your service
19  providers to date?
20     A.  Not in the least.
21     Q.  Why not?
22     A.  We had multiple parties who were interested in
23  either becoming equity partners or acquiring SMG.  And we
24  had done some in-depth analysis of certain customers, and
25  had not renewed contracts that we knew were not profitable.

## Page 55

1  We were making, along with Bob Cohen's assistance,
2  considerable progress into determining what had created the
3  issues and what we would do to make sure that it didn't
4  happen again.
5      Q.  So you were calling and reducing unprofitable
6  business, not renewing unprofitable business, and at the
7  same time trying to grow in other areas?
8      A.  Yes.  But that wasn't all of it.  We were
9  addressing certain procedural and operational issues on
10  certain sites in order to ensure profitability.
11     Q.  Did you discuss Symbiot with anyone from Heritage
12  prior to the execution of the agreement?
13     A.  No.  But we didn't discuss Symbiot with any of our
14  customers.
15     Q.  Okay.  With the sale of substantially all of SMG's
16  assets to Symbiot, the snow removal assets, would it be fair
17  to say that Allin and Companies did not retain any
18  significant snow removal capacity after that transaction?
19     A.  That would be accurate.
20     Q.  So then the only way the Heritage contract could
21  be serviced would have been through Symbiot after the SMG
22  part of the business was sold to Symbiot.
23     A.  That would be accurate.
24     Q.  In other words, there was no way you were going to
25  be able to do that business as John Allin doing business as

## Page 56

1  Allin Companies and Snow Management Group after you sold the
2  snow removal business to Symbiot.
3      A.  I was contractually obligated not to compete with
4  the acquired company, with Symbiot.
5      Q.  So not only did you not retain the capacity, the
6  equipment or the ability to perform that contract, the
7  arrangement that you entered into with Symbiot expressly
8  precluded you from doing so?
9      A.  On my own, correct.
10     Q.  Going back to Exhibit 6.  Did Mr. Haataja maintain
11  any time records, to your knowledge?
12     A.  I don't know.
13     Q.  How about Mr. Rohe, R-O-H-E?
14     A.  I don't know that either.
15     Q.  How about David Dziuban; did he maintain any time
16  records, to your knowledge?
17     A.  I don't know.
18     Q.  On the right-hand side of the first page of
19  Exhibit 6 you'll see hours at a fixed rate.  For example, it
20  looks like for Mr. Dziuban, it says, "Regional manager,
21  dash" -- well, I take that back, I may be misinterpreting
22  this.
23         Do you see about midway down the page now on the
24  left-hand side it says, "Regional manager, dash, SPs, comma,
25  site reviews, comma, budgeting."  And if you follow that

## Page 57

1  line across, you'll see an amount, $3,800. It looks like,
2  "RM, dash, Smallwood." And then 40 hours at $95 per. Let
3  me ask you first. Do you know the identity of the person to
4  whom this entry relates?
5      A.  Yes.
6      Q.  And who is that?
7      A.  Mike Smallwood.
8      Q.  And who is Mike Smallwood?
9      A.  He would have been the regional field manager for
10  New England.
11     Q.  Was he required to keep time records?
12     A.  No.
13     Q.  On what terms was he paid?
14     A.  Salary plus commission.
15     Q.  So you weren't paying him $95 an hour, were you?
16     A.  No.
17     Q.  And the 40 hours that's referenced here, do you
18  know where that number came from?
19     A.  It would have been an IM. I am surmising that he
20  was contacted and asked how much time he had put into the
21  Heritage contract over the course of our dealings with
22  Heritage.
23     Q.  On what basis do you surmise that? Has anyone
24  told you that?
25     A.  Nobody has told me that specifically.

## Page 58

1      Q.  When you -- let me back up as a foundational
2  matter. Did you give the assignment to the administrative
3  assistants to prepare these schedules?
4      A.  Yes.
5      Q.  And what were your instructions to the
6  administrative assistants regarding the preparation of these
7  schedules?
8      A.  Contact the various people who had input into the
9  Heritage contract and find out how much time they've got.
10  Ascertain direct costs. And put it all together so that I
11  can submit it to counsel.
12     Q.  I talked to you a moment ago about Julie -- the
13  first administrative assistant who only worked for you for a
14  short time. What was the name of the second administrative
15  assistant?
16     A.  Mary Russell.
17     Q.  Where is Mary now; still in Erie?
18     A.  Yes.
19     Q.  Does she still work for Symbiot?
20     A.  No.
21     Q.  Did she cease to work for Symbiot at or about the
22  same time that your employment ended?
23     A.  The same day.
24     Q.  On the right-hand side -- I won't go through each
25  one of these, each one of these entries. But you'll see

## Page 59

1  that the hours are fairly even:  40, 8, 10, 100, 100, 25,
2  200, 80, 40, 100, 100, 100, 100, on Page 1. Is it your
3  understanding that those are numbers that were actually
4  supplied by each of the individuals listed on the schedule?
5  For example, there's Mr. Smallwood at 40, Mr. -- it looks
6  like a J. Casey at 8, J. Terrance at 10, Mr. Hrovat at 100
7  hours. It's your understanding that those are numbers
8  supplied by those individuals?
9      A.  Yes.
10     Q.  To your knowledge -- recognizing you didn't
11  prepare this. But to your personal knowledge, are there any
12  other time records reflecting the activities of the
13  individuals listed here other than the schedules?
14     A.  No.
15     Q.  And the new hires that you mentioned earlier in
16  your deposition, Dziuban, Rohe and Haataja -- Haataja.
17  Whatever. Duane.
18     A.  That's what we called him.
19     Q.  I can see why. Those are listed here as the last
20  three entries on the first page; is that correct?
21     A.  That's the way it reads, yes.
22     Q.  We'll leaf through this exhibit here in a moment.
23  But as to the individuals listed on Page 1, am I correct
24  that there's no detail as far as when they performed the
25  hours listed on the first page of Exhibit 6?

## Page 60

1      A.  Not to my knowledge.
2      Q.  So it's basically a round number at a particular
3  hourly rate for each of the affected individuals?
4      A.  That's the way it reads, yes.
5      Q.  The $95 an hour, how was that determined?
6      A.  My instructions were that we would use rates --
7  no, that's a mistake. The instructions to me were to
8  utilize rates that we would charge a customer if we were
9  doing the work on an hourly rate basis.
10     Q.  And where did you receive those instructions, from
11  whom?
12     A.  From counsel at the time.
13     Q.  We've talked about -- well, we've talked a little
14  bit about the three new hires. But if you would be kind
15  enough on Page 1 to just run down the individuals listed in
16  the second column from the right. And tell me their full
17  names, if you recall them, and what their positions were
18  with Allin and Companies, just so I know who these folks
19  are.
20     A.  Okay.
21     Q.  Smallwood.
22     A.  Michael Smallwood. He was a regional field
23  manager for the northeast region. Jessie Casey was a field
24  manager who lived in Connecticut and worked in Connecticut
25  and New York. Jason Terrance lived in Connecticut and

## Page 61

1 worked Connecticut; field manager. Ralph Hrovat was the
2 regional manager based in New Jersey covering the
3 midAtlantic from roughly Delaware up to lower New York.
4        Ralph Santoro was based in New Jersey and worked
5 mostly in New Jersey. However, Ralph was one of those
6 individuals if we said, drive to Albuquerque and measure a
7 site, he would do it, and not stop until he got home.
8        Dave Gallagher is a production coordinator. And
9 Dave Gallagher lives in Allentown, and his job was to visit
10 sites to interact with service partners or service providers
11 in order to properly educate them about the methodologies we
12 wanted to use in clearing of the sites.
13        Terry Pancura was -- she worked in Erie for Rudy
14 Rieder, and handled the producing of the production sheets.
15 And those sheets would tell service partners where the snow
16 was to be stacked and the different obstacles that were on
17 sites.
18        Chet Zelgowski also worked for Rudy Rieder. And
19 Chet would function as a supervisor to Terry. And he also
20 interacted with service providers on a direct basis.
21        Rudy Rieder was in charge of production. So it
22 was his job to make sure the sites were maintained and
23 equipment got to different locations. Chet and Terry worked
24 for him.
25        Brian Marshal, strategic account manager. He was

## Page 62

1 ultimately going to be responsible for Heritage, and, in
2 fact, did a lot of the leg work putting together --
3 validating the pricing structure that Heritage had provided
4 us with. And he too had interaction with Bob and other
5 individuals at Heritage.
6        Dave, Bryan and Duane we've had discussion about.
7 Do you want me to say that again?
8    Q.  That's all right, we've already identified them.
9    A.  And for me, that's pretty good, because I'm bad
10 with names.
11    Q.  That's not bad. All the individuals except for
12 Dave, Bryan and Duane at the bottom here, though, those were
13 existing employees who were already working on a salaried or
14 a salary commission mixed basis as of the time you entered
15 into the contract with Heritage?
16    A.  That's correct. I do not believe any of these
17 individuals were hired as a result of the Heritage contract,
18 but I can't be absolutely certain about that.
19    Q.  On the third page of Exhibit 6 there's a notation
20 here, "Business development, $22,500. J. Allin, 100 hours
21 at $225 per." Do you see that about three-quarters of the
22 way down the page?
23    A.  I do.
24    Q.  What does that represent?
25    A.  Time that I spent interacting with Jeff and

## Page 63

1 advising him; and near the end of the contract, negotiation;
2 and the interaction I had with the insurance company and
3 Heritage. And it's my time spent.
4    Q.  Now, the contract was signed on -- by you on or
5 about October 4, 2004, and terminated one month later. Did
6 those hours take place during that one-month time, or does
7 it cover a broader period of time?
8    A.  It covers a broader period of time.
9    Q.  What period of time is covered by that?
10    A.  From the time Heritage was beginning to insist
11 that we hire people and put them in place, regardless of
12 whether we had a written contract in place, up through the
13 decision to terminate the three individuals who had been
14 hired strictly from Heritage.
15    Q.  And when you say at the time Heritage was
16 insisting that you hire people even though you didn't have a
17 written contract, when did that occur?
18    A.  Oh, my goodness, that started back in August.
19 They were just unmerciful about, have you hired anybody yet,
20 and do you have people yet, and have you contacted service
21 providers, and we need to get this going, and you're not
22 going to be able to perform.
23    Q.  And who said that?
24    A.  That was -- most of that contact came from Bob,
25 although we were getting inquiries from all over the country

## Page 64

1 from site people who were in charge of Heritage sites
2 saying, you know, you've got to get going here, it's going
3 to snow. And service providers for Heritage who were
4 calling and saying, we've been doing this work for years,
5 and we've been notified by Heritage that you have the
6 contract; well, that's not entirely true, we don't actually
7 have a signed contract; yeah, but we've got to get going.
8 That kind of thing.
9    Q.  The statements that you attributed to Bob
10 Prendergast, were those made to you or Mr. Vernon?
11    A.  To Mr. Vernon.
12    Q.  So you don't have personal knowledge of those
13 aside from what Mr. Vernon has told you?
14    A.  That's accurate.
15    Q.  There was a provision in the contract, Exhibit
16 A -- and I know I'm whipsawing you back and forth between
17 documents. Keep that schedule out, though, because I'm
18 going to come right back to it.
19    A.  That particular page?
20    Q.  Yeah, I'll be coming back to that. If you take a
21 look in the contract, there's a provision in here talking
22 about providing signed subcontractor agreements to Heritage
23 on or before October 31, 2004. I believe it's Paragraph 4.
24 It would be the second sentence. "Contractor shall deliver
25 copies of the signed subcontracts for each property to owner

## Page 65

1  prior to October 31, 2004." Do you know whether that was
2  done?
3      A.  We were making a concerted effort to -- my
4  understanding was we were making a concerted effort to
5  comply with that time frame. However, it was my
6  understanding that it was also understood between Jeff and
7  Bob Prendergast that that was an unrealistic expectation,
8  given the fact that the contract was signed on October 3rd.
9  And while we were making progress towards that prior to the
10 actual contract signing, we were going to have to work
11 towards filling higher percentage snow markets first.
12     Q.  To your knowledge, prior to October 31, 2004, or
13 at any time prior to the termination of the Heritage
14 contract by Heritage, had any subcontracts been provided to
15 Heritage?
16     A.  I don't know.
17     Q.  If that happened, you have no knowledge of it.
18     A.  That's correct.
19     Q.  And any discussions regarding flexibility on that
20 date, you weren't privy to any discussions with the Heritage
21 individuals?
22     A.  Not firsthand experience, that's correct.
23     Q.  Going back to Exhibit 6. It's fair to say, is it
24 not, that for each of the entries here that specify hours by
25 an individual at a specific rate and then a corresponding

## Page 66

1  amount, none of those amounts were actually spent by SMG,
2  were they?
3          In other words, you guys didn't write a check in
4  these amounts to anyone or pay anyone. You weren't paid an
5  additional $22,500, Mr. Vernon wasn't paid $33,000, Linda,
6  whoever that is, where it lists phone calls, office
7  administration, $1,080 at the top of Page 3, she wasn't paid
8  $1,080, was she?
9      A.  I had stated previously that the amounts there are
10 amounts that we would have charged a customer if we were
11 doing it by the hour.
12     Q.  I just want to make sure I'm clear and the record
13 is clear, that none of these amounts here were actually
14 expended by Allin.
15         MR. MARKHAM:  You mean -- let me make sure I
16         understand it. Obviously, all these people were
17         paid something.
18         MR. LANZILLO:  Right.
19         MR. MARKHAM:  When you say they weren't paid
20         $1,000; they were paid $1,000 because they get a
21         salary and they get paid every week. So I'm
22         just -- I'm having a hard time understanding
23         exactly what it is you're asking.
24     Q.  Other than what these people otherwise would have
25 been paid as part of their normal employment

## Page 67

1  responsibilities, they weren't paid anything on top of that
2  which corresponds to this schedule, were they?
3      A.  No.
4      Q.  And to the best of your knowledge, none of the
5  hours listed here were determined based upon an
6  administrative assistant consulting any business records.
7  This was -- it came from some other source; is that correct?
8      A.  As I previously stated, it would have come from
9  the individual or their supervisor who asked the individual
10 how much time they spent.
11     Q.  That was basically your instructions to the
12 administrative assistant?
13     A.  Yes. Because I know we don't keep time locks
14 locks for different projects in a fashion which you have
15 asked me.
16     Q.  On the fourth page of Exhibit 6 there's a list of
17 expenses. Flight to Fort Lauderdale, John Allin; flight to
18 Fort Lauderdale, Jeff Vernon; ground transportation; hotel.
19 Would that have been in connection with the presentation
20 that you made, or at least some of these in connection with
21 the presentation that you made to Heritage at their property
22 managers' meeting?
23     A.  Yes.
24     Q.  These dates are separated by approximately one
25 month. Which of the four entries here relates to that

## Page 68

1  particular meeting?
2      A.  It would have been the February 22nd date. 1/21
3  would have been the date we paid for the expense.
4      Q.  I see. Didn't you regard these expenses as
5  marketing expenses at the time?
6      A.  I don't know the answer to that.
7      Q.  In other words, if two months down the road
8  Heritage said, you know, we've found what we think is a
9  better deal or we've decided to keep this in-house, these
10 are amounts for which you would not have expected to receive
11 compensation.
12     A.  That's correct.
13     Q.  The next page, I assume, is a summary that would
14 match up with other schedules. I don't know why it's in
15 this particular order. This is the way it was produced to
16 me. Do you have any knowledge of the content of this page
17 of Exhibit 6?
18     A.  No.
19     Q.  On Page 6 of Exhibit 6 --
20     A.  Show me the page.
21     Q.  At the top of the page it's -- upper left-hand
22 corner it says, "Expense, JV travel expense."
23     A.  I'm on that page.
24     Q.  All right. And then it has -- it says, "Brian
25 Marshal, travel expenses." Are there any expenses for

## Page 69

1    Mr. Marshal?

2        A.    I don't know.

3        Q.    "Peggy Allin, dash, interviews." Did Mrs. Allin

4    travel to these locations?  Is that the point of this

5    schedule?

6        A.    That's correct.

7        Q.    Legal counsel at the bottom of the page is empty.

8    There's nothing there for legal counsel.  Then supplies,

9    labels, envelopes and the like.  Do you know how those

10   were -- how those amounts were determined?

11       A.    Those would have been direct expenses that we

12   incurred in sending out of the RFP to the service providers.

13   That's noted on the right-hand side.

14       Q.    Were those tracked or are those estimates?

15       A.    Those would have been tracked.

16       Q.    On the next page, appears to be an accounting of

17   time for you and for Mr. Vernon.  For yourself individually

18   on 2/18/2004, which, again, is several months before the

19   contract.  It says, "Preparation of presentation in

20   Florida."  I assume that's the same presentation we

21   discussed earlier at the property managers meeting?

22       A.    That's correct.

23       Q.    And you put down ten hours?

24       A.    Correct.

25       Q.    Was that an estimate?

## Page 70

1        A.    Yes.

2        Q.    And then the next entry, it shows 2/22 through

3    2/24/04, "Trip to present SMG to Heritage."  Is that a fair

4    characterization of the purpose of the trip?

5        A.    No.  And I did not review this before you got it.

6    And, quite frankly, that kind of charges you for our sleep

7    time, which is not kosher.

8        Q.    I mean, that does include every hour you were on

9    the trip.

10       A.    Yeah.  And my instructions to my administrative

11   assistant was to put together the hours that had been

12   expended.  Those hours should have been, to be fair, not

13   included.

14       Q.    The same thing for Mr. Vernon.  20 hours for prep,

15   48 hours for the trip itself?

16       A.    To be fair, yes.

17             (Discussion held off the record.)

18       Q.    Where did your administrative assistant get these

19   numbers, though?

20       A.    She would have gotten them from me and from Jeff.

21       Q.    Your numbers, are these estimates?

22       A.    Yes.

23       Q.    And the next page, the seventh page of the

24   exhibit, there's several entries for -- and it's just

25   generically phone calls.  It says, ops audit, 24 hours at

## Page 71

1    $45 an hour.  To your knowledge, there's no further detail

2    as to who was called, when they were called, the amount of

3    each call, anything like that, is there?

4        A.    That's correct.

5             MR. MARKHAM:  So it's clear, Rich, I think this

6        may be the eighth page of this exhibit.

7             MR. LANZILLO:  Thank you.

8        A.    The one that says sites entered in the upper

9    left-hand corner?

10       Q.    That's it.

11       A.    Make sure we're all talking about the same one.

12       Q.    And I think we discussed this earlier.  To your

13   knowledge, in terms of the time reflected here that --

14   corresponding to specific individuals, to your knowledge,

15   there's no other records that would more specifically

16   document what was done, when it was done, and the amount of

17   time devoted; is that fair?

18       A.    Yes, sir.

19       Q.    That will save us some time.  And you personally

20   did not discuss the activities or the times referenced here

21   with any of the individuals listed, did you?

22       A.    That's correct.

23       Q.    Did Mrs. Allin participate in the compilation of

24   this document, to your knowledge?

25       A.    I don't know.

## Page 72

1        Q.    On the next page -- strike that.  Actually, let's

2    skip a couple of pages until you get to the page of

3    Exhibit 6 that has printing only on the left third of the

4    page.  And the words at the top of the page begin, "Data

5    enter some of the 110 sites into," and then below that

6    there's a date, 10/20/2004.  PAMS, appears to be four hours.

7    And below that, "Calls to prospective bidders."  Do you see

8    that?

9        A.    I have that page.

10       Q.    Do you have any knowledge concerning the

11   activities described here, who performed them, how this

12   information was compiled, other than by your administrative

13   assistant?

14       A.    I do not.

15       Q.    In the narrative here where it says 10/19/04

16   through 11/11/04, it says 24 -- apparently 24 hours on the

17   RPF package.  And below that there's an entry.  Let me just

18   read it.  "Calls to and from prospective bidders re:

19   confirmation of SPs to receive RFP packets, calls to SP to

20   confirm receipt of RFP package, site specific questions re:

21   scope of work, follow-up calls, regarding Symbiot not

22   responsible for contract."  Do you see that?

23       A.    I do.

24       Q.    First of all, what's the reference to SP, if you

25   know?

## Page 73

1  A. Service provider.
2  Q. And then follow-up calls regarding Symbiot not
3  responsible for contract. Do you know what that's --
4  A. I do not.
5  Q. -- referring to?
6  A. Yes, I do. Once the contract was cancelled, we
7  continued to receive calls from service providers who were
8  still under the impression that we had the contract by that
9  point in time, we were part of Symbiot, or that we were
10  going to be part of Symbiot. And we had to answer those
11  calls.
12  Q. PAMS, do you know what that -- it's all caps. Is
13  that an acronym, someone's name?
14  A. It is.
15  Q. What is it?
16  A. It is the name of the provider account manager
17  system. It is a computer software program.
18  Q. The provider account management software, what
19  does that document? What does that record?
20  A. We had a software program where each site would be
21  entered into the account management software. So if a
22  service provider or a site manager were to call about that
23  particular site, we would log in the time of the call and
24  the nature of the call and the action that was required, if
25  any. And then what action was performed. It's so we can

## Page 74

1  keep an accurate accounting of what takes place on the site.
2  That all has to be entered into the system and get
3  it set up so that we can track what is going on at each
4  particular site as it pertains to inquiries or calls that we
5  get from or to a provider or the site manager or customer.
6  Q. Does the PAMS system include any entries relative
7  to Heritage? In other words, was there any input, to your
8  knowledge, regarding the Heritage sites?
9  A. I don't know specifically. But it generally would
10  not have been activated until it snowed.
11  Q. Okay. And there had been no snow removal services
12  provided at any of those sites as of November 4, to your
13  knowledge; is that correct?
14  A. Correct.
15  Q. On the last page of Exhibit 6, I did want to ask
16  you a quick question. Again, this appears to be a type of
17  summary?
18  A. Which page are we on?
19  Q. The very last page.
20  A. The one that says dates, hours, reason at the top.
21  Q. Yeah.
22  A. Okay.
23  Q. Do you know to whom these entries relate? I mean,
24  we've got dates, hours, reason, June 17, '04. 4.0.
25  Presumably, that's a reference to hours. "Search Internet

## Page 75

1  for local newspapers in various cities needed, contacting
2  newspapers to gather info placing ads. Presenting pricing
3  to JA for approval to place ads."
4  A. Based on the content?
5  Q. Um-hum.
6  A. I believe this would be Peggy Allin's log.
7  Q. As far as who is doing the service here -- or
8  strike that -- who is engaging in the activity described
9  here, do you know who -- is it all Peggy Allin, to your
10  knowledge, or can you tell?
11  A. That's a question that you'll probably have to ask
12  her, because I can't definitively say one way or the other.
13  Q. You have no personal knowledge of the information
14  reflected on this schedule; is that fair?
15  A. It says here I had dinner with the new employees
16  at the Colony Restaurant, third from the bottom. And I do
17  remember that. I don't know what the $3 refers to.
18  Q. Actually, I would guess that's three hours.
19  A. Three hours, right.
20  Q. Other than that, is there anything else on here
21  concerning what you have personal knowledge?
22  A. I can't say that there is. Other than those items
23  that she says were reviewed with me. I can't specifically
24  state that I remember that date and what that was.
25  Q. Other than the detail such that it is that is

## Page 76

1  provided in Exhibit 6, are you aware of any other
2  documentation or means whereby I can determine whether the
3  hours listed here for these various employees in schedule
4  six, whether those hours were performed before or after the
5  contract date with Heritage in October of 2004?
6  A. I do not.
7  Q. And I take it from your earlier testimony, and
8  correct me if I'm wrong, that you did not participate in any
9  face-to-face or conversational negotiations concerning the
10  content of the contract that we've marked as Exhibit A, your
11  contract with Heritage.
12  A. Face to face with whom?
13  Q. Anyone from Heritage.
14  A. That's correct.
15  Q. You did make some changes, I understand, which are
16  noted in the agreement itself. If you have a copy there,
17  maybe we can go through them quickly. There's handwriting
18  on Page 3, the lower right-hand corner. Is that your
19  handwriting?
20  A. It is.
21  Q. The first set of changes, the first changes appear
22  to be on Page 5. A line is crossed out, and there's
23  initials. Is that your modification?
24  A. It is.
25  Q. Page 7 appears to be dated with your initials as

## Page 77

1  well. And then there's a change on Page 8. Is that your
2  handwriting for that change as well?
3      A.  It is.
4          (J. Allin Deposition Exhibit 7 marked for
5          identification.)
6      Q.  Mr. Allin, I'm showing you now what I've marked as
7  your Deposition Exhibit 7. This is entitled Snow Removal
8  and Ice Management Services Master Agreement. Do you
9  recognize this document?
10     A.  I do.
11     Q.  Is this a document prepared by or on behalf of
12 SMG?
13     A.  Yes.
14     Q.  Would this be the form of the agreement that's
15 referenced in -- I believe it's Paragraph 4 of the agreement
16 between Heritage and you. That's the part of the agreement,
17 the Heritage agreement, that discusses the providing of
18 executed subcontracts to Heritage by SMG on or before
19 October 31, 2004. Is this the form of the document that
20 would have been or should have been provided under the
21 agreement?
22     A.  I can't specifically recall what that refers to.
23     Q.  Is this the standard form of subcontract that SMG
24 utilized for snow removal services with its service
25 providers?

## Page 78

1      A.  Yes.
2      Q.  Prior to its execution, did you read the Heritage
3  agreement in its entirety?
4      A.  Yes.
5      Q.  And as of the execution of that agreement, you had
6  a letter of intent with Symbiot for the sale of the snow
7  removal part of your business, correct?
8      A.  Yes.
9      Q.  Did you understand, pursuant to Paragraph 13 of
10 the Heritage agreement, that the agreement was not
11 assignable without Heritage's express consent in its sole
12 discretion?
13     A.  Yes.
14     Q.  When you proceeded with the final agreement with
15 Symbiot to sell the snow removal part of your business to
16 Symbiot, did you understand that you were executing a
17 restrictive covenant which would preclude you from servicing
18 the Heritage agreement after you sold that part of the snow
19 removal business to Symbiot?
20     A.  I don't understand the question.
21     Q.  You knew, didn't you, that once you signed that
22 agreement with Symbiot, that John Allin, doing business as
23 Allin and Companies and Snow Management Group, would no
24 longer have the right or the ability to provide the services
25 you had contracted to provide to Heritage.

## Page 79

1      A.  Correct.
2          MR. MARKHAM:  To make it clear too. I mean, his
3      testimony has been that the closing of the Symbiot
4      deal came well after this contract and after the
5      termination of this contract.
6      Q.  The closing occurred on November 15, right?
7      A.  November 22nd.
8      Q.  When was the agreement with Symbiot signed?
9      A.  It was in October. I just don't recall exact dates.
10     Q.  So when you signed the agreement with Symbiot, you
11 understood you were signing an agreement that would render
12 it impossible for you to perform under your contract with
13 Heritage.
14     A.  I would take some issue with that. But for me
15 personally, to do it on my own?
16     Q.  Yes.
17     A.  Yes.
18     Q.  Let me show you what will be the final exhibit
19 we'll mark.
20         (J. Allin Deposition Exhibit 8 marked for
21         Identification.)
22     Q.  Mr. Allin, let me show what you we've marked as
23 your Deposition Exhibit 8. And correct me if I'm wrong.
24 This is a letter dated November 3, 2004, which I believe was
25 faxed to you on November 4, 2004 from Heritage. And this

## Page 80

1  was the notice terminating the contract?
2      A.  If I might make a slight correction. This was not
3  faxed to us.
4      Q.  Okay. How did you receive this? Via overnight
5  mail, I see.
6      A.  That's correct.
7      Q.  It's dated November 3. Was it received by you on
8  November 4?
9      A.  4 or 5, I don't recall the exact date.
10     Q.  You do recall receiving this notice?
11     A.  I do.
12         MR. LANZILLO:  Give me one minute. I would just
13     like to talk to Kristina real quick.
14         (Recess held from 11:20 a.m. to 11:25 a.m.)
15         MR. LANZILLO:  I am happy to say that I was able
16     to oblige your schedule, including the 15-minute
17     buffer. So those are all the questions I have.
18         MR. MARKHAM:  I don't have any questions, and
19     we'll have him read it.
20
21         (Deposition concluded at 11:26 p.m.)
22
23
24
25

**A**

AAA 49:6 52:5
ability 56:6
    78:24
able 12:16 13:12
    17:1 33:25
    55:25 63:22
    80:15
abreast 34:15
absolutely 62:18
accept 35:1,2,5,7
    35:11 50:22
accepted 35:9
accommodation
    34:10
accompanied
    44:9
account 37:6,11
    37:21,24 61:25
    73:16,18,21
accountant 22:3
    22:19
accounting 22:3
    22:6,8 23:4,5
    69:16 74:1
accounts 41:17
    41:21
accurate 13:25
    14:3 23:6
    33:16,19 34:6
    34:7 39:25
    41:22 45:15
    55:19,23 64:14
    74:1
achieve 36:22
acquire 24:15,20
    31:3
acquired 6:18
    31:21 50:20
    56:4
acquiring 32:10
    54:23
acquisition 6:18
    13:18 29:21
acronym 73:13
action 49:3
    73:24,25

activated 74:10
activities 13:2
    59:12 71:20
    72:11
activity 75:8
actual 23:8,12
    24:8 32:14
    47:7,17 65:10
add 17:4 21:22
addition 25:18
    42:8
additional 15:2
    15:25 18:23
    25:18 50:21
    66:5
address 4:1,2
    8:7,10 15:6
    40:4 48:25
addressee 50:7
    51:6
addressing
    50:18 55:9
administration
    66:7
administrative
    52:16,18,20
    54:3 58:2,6,13
    58:14 67:6,12
    70:10,18 72:12
ads 75:2,3
advice 46:20
advise 40:13
advising 50:16
    63:1
ago 32:17 58:12
agreed 29:19
    39:10
agreement 11:3
    11:4 17:3
    21:10,16 29:20
    30:5 31:24
    35:25 40:4
    41:8 46:25
    47:8 55:12
    76:16 77:8,14
    77:15,16,17,21
    78:3,5,10,10

78:14,18,22
    79:8,10,11
agreements
    42:17 64:22
Albuquerque
    61:6
Allentown 61:9
Allin 1:6,6,9 2:3
    2:7,8,9,10,11
    2:12,13,14 3:7
    4:2,4,6,9,15,16
    6:12,13,15,17
    6:24 7:7,14 8:1
    8:4,5 10:11
    12:18 13:17
    18:9 20:17
    21:4,24 22:2
    26:19,25 30:3
    32:17 38:8
    39:6 47:18,20
    48:14 49:16,22
    50:13,18,20
    51:2,6,16 52:7
    52:9 53:20
    55:17,25 56:1
    60:18 62:20
    66:14 67:17
    69:3,3 71:23
    75:9 77:4,6
    78:22,23 79:20
    79:22
Allin's 75:6
allow 24:14 31:3
all-inclusive
    16:20,25
amount 10:24
    29:25 36:7
    57:1 66:1 71:2
    71:16
amounts 66:1,4
    66:9,10,13
    68:10 69:10
analysis 54:24
Angus 1:17
annual 38:17
anonymously
    51:19

answer 14:5
    15:10 52:25
    68:6 73:10
anticipated
    18:15 30:25
    32:2
anticipating
    18:11
anybody 34:16
    63:19
apart 33:21
apologize 41:3
apparent 30:23
apparently
    16:12 48:1
    51:7 72:16
appear 76:21
appears 20:20
    20:21 49:19
    50:4 52:12
    69:16 72:6
    74:16 76:25
Appreciate
    49:10
approached
    43:24
approval 75:3
approximately
    15:8 19:25
    21:9 27:24
    31:25 67:24
April 6:23 49:12
arbitration 49:7
    52:5
area 4:16 9:17
    9:24 12:24
    19:4 27:5
areas 19:6 24:7
    25:23 55:7
arisen 15:7
arrangement
    31:21 34:21
    36:16 45:25
    56:7
arrangements
    34:24
arrearage 34:23

arrearages
    48:24
arrears 31:18,19
arrived 48:11
articles 29:2
ascertain 21:19
    58:10
aside 64:13
asked 33:2 35:5
    41:3 57:20
    67:9,15
asking 3:8 4:14
    12:9 22:5
    66:23
aspect 7:10 16:1
    16:8
aspects 7:13
    15:21
aspirational
    37:2
asserted 52:4
assessment
    32:19
asset 30:4,9 41:8
assets 6:4 16:15
    30:6 38:4,10
    38:13 41:18
    51:12 55:16,16
assignable 78:11
assigned 39:8,10
    39:16
assignment 39:9
    39:10,11 58:2
assist 10:4 33:23
    34:9,11
assistance 55:1
assistant 52:17
    52:18,21 58:13
    58:15 67:6,12
    70:11,18 72:13
assistants 58:3,6
associated 42:1
assume 3:23
    16:14 27:1,17
    34:24 35:25
    36:6 39:1
    40:25 41:17

43:3,12 68:13
69:20
assumed 39:8
assumption
27:20
attempting 3:16
attend 44:4
attention 52:24
Attorney 12:19
12:21
attorneys 12:10
attributed 64:9
ATVs 23:23
audit 70:25
auditor 22:3
August 63:18
author 51:7
authored 48:1
48:21
avenues 50:17
aware 13:4 38:3
47:5 50:10
76:1
A-L-L-I-N 4:2
a.m 1:10 80:14
80:14

**B**
back 21:6 24:5
24:20 34:3
47:22 56:10,21
58:1 63:18
64:16,18,20
65:23
bad 62:9,11
balance 7:20
17:9
bank 36:4 37:18
41:21
banking 37:23
38:1
based 16:12,13
16:18 19:2
24:15,24 26:21
33:15 35:20
50:22 54:13
61:2,4 67:5

75:4
basic 3:12 14:13
basically 60:2
67:11
basis 3:9 47:16
54:1 57:23
60:9 61:20
62:14
becoming 54:23
began 33:1
47:10
beginning 63:10
behalf 27:22
43:16 44:2
50:13 77:11
believe 18:20
19:2 20:9,12
20:14 21:21
25:14 26:17
35:4 53:10
62:16 64:23
75:6 77:15
79:24
best 16:21 17:10
27:24 29:18
67:4
better 8:5 68:9
beyond 36:12
bidders 72:7,18
bill 54:1
Bish 22:10,14
bit 3:18 60:14
blades 25:6
blocked 50:8
board 25:22
45:6
Bob 33:23 34:4
34:11 44:22
45:18 46:22
47:17 55:1
62:4 63:24
64:9 65:7
Boston 1:18
bottom 62:12
69:7 75:16
box 23:22
brand 19:7,8

break 3:19
breakdown 7:13
Brian 61:25
68:24
bring 45:5
broader 63:7,8
brooms 23:25
brought 24:5
Bruce 39:22
Bryan 18:5 19:2
19:5 62:6,12
budgeting 56:25
buffer 80:17
building 14:5
29:6
built 7:11
bulk 24:1
business 4:23
5:20 6:3,12,13
6:15,25 7:7,10
7:14,22 8:1,6,9
8:25 9:11,15
11:25 15:22
16:1,8 19:7,13
19:15 21:20
22:6 23:4,5
24:10 26:14
27:14 28:5
30:7,15,20
31:4 32:3,12
32:13 33:24
34:20 37:9
38:5,11 39:21
41:18 42:2
44:25 45:2,5
45:20 49:21
54:9 55:6,6,22
55:25,25 56:2
62:20 67:6
78:7,15,19,22
buy 26:7 45:6
buyer 30:14
31:9,16 34:14
buyers 32:19
buyout 40:23

**C**

CA 1:5
call 13:23 14:4
14:10,11,11,16
14:19,22 15:5
15:9,11,14,15
23:9 48:4 71:3
73:22,23,24
callback 15:3
called 59:18
71:2,2
calling 55:5 64:4
calls 14:17 15:2
66:6 70:25
72:7,18,19,21
73:2,7,11 74:4
cancellation
40:13
cancelled 73:6
capacity 55:18
56:5
capital 30:25
31:4,8 33:15
34:1,14
capitalized 31:1
caps 73:12
cards 53:17
Carol 1:9,25
3:11
Carol's 3:18
carrier 42:21,23
case 1:5 12:3
20:16 43:9
52:12
cases 10:5
Casey 59:6
60:23
cash 30:22 33:16
36:9 50:21
54:14,18
cause 33:10
54:15
cease 6:15 11:12
11:13 28:23
58:21
center 13:23
14:4,11,12,16
14:18 15:9,11

15:15,15
center's 14:22
Centrus 33:23
34:4,8,9,11
49:21 50:11,16
51:5
cents 35:5,7,11
CEO 33:22
certain 9:16,18
15:12 29:23
30:6 36:7
46:12 54:24
55:9,10,12 62:18
certainly 37:18
certificate 42:13
CFO 39:25 40:1
change 22:9
36:21 77:1,2
changed 15:19
22:8
changes 21:4
76:15,21,21
characterizati...
70:4
charge 8:16
34:11 60:8
61:21 64:1
charged 66:10
charges 70:6
check 66:3
checking 37:6
37:11,21,24
Chet 61:18,19
61:23
Chicago 16:24
Chicago-land
19:4
circumstance
11:15
circumstances
29:15
cities 19:3 75:1
City 29:5 37:25
38:2
claim 52:4
clarification
49:10

clauses 39:9
clear 3:12 21:21
    49:6 66:12,13
    71:5 79:2
clearing 23:24
    61:12
Cleveland 12:24
    32:24
client 14:10
clients 27:4
close 10:4 28:4
closed 41:8
closing 6:9 30:10
    36:11 37:10
    40:1,3 79:3,6
Cohen 33:23
    34:5 49:23
    51:8
Cohen's 34:11
    55:1
Colony 75:16
column 60:16
come 12:21
    14:11,17 31:21
    47:22 64:18
    67:8
comes 20:14
coming 64:20
comma 56:24,25
commence 47:8
    49:3
commencing
    1:10
comment 37:1
    45:16
comments 46:13
commission
    10:18,19,21
    11:1 18:19
    57:14 62:14
commissions
    10:23
commitment
    45:10,12,17
common 24:7
Commonwealth
    1:10

Companies 1:6
    6:13,16,17,24
    7:7,14 8:2,4,5
    10:12 13:18
    18:9 30:4 39:6
    50:13,18,20
    51:6 53:21
    55:17 56:1
    60:18 78:23
Companies/Sn...
    22:2 49:22
company 5:5
    8:21 11:7
    19:11,12,12
    23:1 32:9,24
    34:1 42:21
    50:23 53:4
    56:4 63:2
company's 38:8
    50:22
compensated
    18:18,19
compensation
    10:15 68:11
compete 56:3
compilation
    48:17 52:10
    71:23
compiled 72:12
Complaint
    20:12
completion
    40:14
comply 65:5
computer 13:11
    73:17
concentrate
    33:24
concern 54:15
concerned 54:13
concerning
    26:14 72:10
    75:21 76:9
concerted 65:3,4
conclude 13:25
    33:16
concluded 80:21

conditions 29:24
conduct 6:12
    11:25
confirm 72:20
confirmation
    72:19
Connecticut
    8:10,11 11:20
    11:21 16:13,23
    35:21 60:24,24
    60:25 61:1
connection 31:7
    67:19,20
consent 39:18
    78:11
consented 39:17
consider 49:8
considerable
    55:2
considerably
    29:8
consolidating
    45:6
consulting 67:6
contact 11:22
    14:12 28:8
    43:15,17,20,22
    44:1 45:11
    46:21 47:15
    58:8 63:24
contacted 57:20
    63:20
contacting 75:1
contacts 39:20
    47:15
contemplated
    40:25
contemplating
    40:2
content 68:16
    75:4 76:10
continue 19:23
    30:24 31:2
    33:24
continued 25:25
    73:7
contract 17:5,12

18:8,14,18
    19:24 20:9,9
    20:18,21 21:7
    24:16,21,25
    25:9,20,24
    26:22 31:17
    40:5,17,18,19
    40:22 41:1,15
    45:1,7,8,22
    46:10 47:17,21
    48:9 54:8
    55:20 56:6
    57:21 58:9
    62:15,17 63:1
    63:4,12,17
    64:6,7,15,21
    65:8,10,14
    69:19 72:22
    73:3,6,8 76:5
    76:10,11 79:4
    79:5,12 80:1
contracted
    54:12 78:25
contracting 6:18
    7:9,16 9:1
    15:22
contraction 29:3
Contractor
    64:24
contractors 27:1
    34:6
contracts 24:22
    39:5 40:20
    54:25
contractually
    56:3
conversational
    76:9
conversations
    32:4 33:2
coordinator
    61:8
copies 64:25
copy 20:17
    76:16
corner 68:22
    71:9 76:18

corporate 4:11
    5:21 6:2,25
correct 4:7 5:23
    6:5,6,11 7:3,9
    7:11,25 8:23
    9:12 10:12,14
    11:8,11 13:14
    15:23 18:1,6
    18:10 19:13,14
    20:4,7,17
    21:11 24:20
    26:10,13 27:2
    27:3,23 30:1
    33:6 34:4
    36:13 43:6
    45:22,23 46:1
    47:2 48:23
    49:15,23 50:10
    56:9 59:20,23
    62:16 65:18,22
    67:7 68:12
    69:6,22,24
    71:4,22 74:13
    74:14 76:8,14
    78:7 79:1,23
    80:6
correction 80:2
correctly 14:23
    21:3
corresponding
    65:25 71:14
corresponds
    67:2
corrupted 12:13
    13:10
costs 58:10
counsel 58:11
    60:12 69:7,8
country 27:13
    63:25
couple 3:12 35:9
    35:24 50:17
    72:2
course 11:12
    15:20 33:8
    57:21
court 1:1 3:11

covenant 78:17
cover 63:7
coverage 42:21
    42:24 43:7,8
covered 9:25
    51:6 63:9
covering 61:2
covers 63:8
Craig 1:20 4:12
create 50:20
created 55:2
creditors 34:10
    50:13,16,22,25
crossed 76:22
culture 29:18
current 32:1
    54:18
currently 4:19
    52:5
custodian 26:18
customer 14:8
    14:10 24:6
    54:1,17 60:8
    66:10 74:5
customers 14:7
    15:2 18:12
    27:4,10,16
    39:10 54:24
    55:14

D

D 2:1 25:6
Dartmouth 1:18
dash 56:21,24
    57:2 69:3
Data 72:4
date 20:10 31:16
    41:12 54:19
    65:20 68:2,3
    72:6 75:24
    76:5 80:9
dated 20:10,18
    20:21,22 49:11
    49:20 51:5
    76:25 79:24
    80:7
dates 21:14

67:24 74:20,24
    79:9
Dave 17:15,25
    19:1,4 21:22
    61:8,9 62:6,12
David 56:15
day 58:23
deal 33:21 36:10
    44:24 68:9
    79:4
dealings 46:11
    57:21
dealt 39:22
debt 33:18 36:1
    36:1,4,4,6
    50:18,22,24
debts 31:11,13
    32:1
decade 27:20
December 29:7
    29:16
decide 30:19
decided 31:23
    68:9
decision 63:13
deck 30:8
decks 7:11,17,22
declined 35:11
decrease 14:2
Defendant 1:7
    1:19
defended 42:20
definitive 28:15
definitively
    75:12
Delaware 61:3
deliver 64:24
denial 43:7
denied 42:24
Dennis 22:23
deny 42:21
department
    28:16
departure 11:16
depending 10:6
    13:19,22 15:16
depends 4:16

depleted 37:15
deposition 1:9
    2:7,8,9,10,11
    2:12,13,14
    3:19 4:7,18
    12:3,6 47:18
    47:23 48:14,16
    49:16 51:2,16
    51:20 52:7,10
    59:16 77:4,7
    79:20,23 80:21
Des 19:5
described 72:11
    75:8
design 32:8
designee 4:12
detail 59:24 71:1
    75:25
determine 9:21
    76:2
determined
    10:16 60:5
    67:5 69:10
determining
    55:2
develop 46:18
development
    62:20
devoted 7:15,22
    15:9 71:17
different 7:13
    20:11 28:7
    32:5,6 61:16
    61:23 67:14
dime 43:9
dinner 44:14
    75:15
diplomatic
    52:25
direct 2:4 3:4
    10:8 11:9 28:8
    46:10 58:10
    61:20 69:11
directed 48:2
direction 36:21
directly 4:11,13
    12:19,20 33:13

46:22 47:1
disclosed 40:21
    40:22
discovery 52:12
discretion 78:12
discuss 55:11,13
    71:20
discussed 12:3
    69:21 71:12
discusses 77:17
discussing 20:3
discussion 6:1
    12:5,6,7 36:25
    40:16 62:6
    70:17
discussions
    32:18 40:9
    41:4 65:19,20
dispatch 15:6
dispatching 14:7
dispute 43:8
DISTRICT 1:1
    1:1
divisions 8:5
document 20:13
    46:20 47:22,24
    48:19,23 49:11
    71:16,24 73:19
    77:9,11,19
documentation
    12:9,16 76:2
documents
    17:16,19 46:12
    46:19 48:17
    52:11,14,15
    64:17
Dodges 25:6
doing 6:12 22:23
    25:10,25 34:18
    45:20 54:7
    55:25 56:8
    60:9 64:4
    66:11 75:7
    78:22
dollar 35:6
door 37:16
downsized 29:8

Dragon 4:22,24
    5:2,13,16,19
    10:22,24
draw 10:19,20
    10:22,24
drive 4:3 12:13
    13:11 61:6
Duane 17:13,16
    19:1,4 59:17
    62:6,12
due 31:11
duly 3:2
Dziuban 19:4
    21:22,24 56:15
    56:20 59:16
D-Z-I-U-B-A-N
    17:25
d/b/a 1:6

E

E 2:1
earlier 20:15
    33:14 59:15
    69:21 71:12
    76:7
earn-out 36:16
    36:22
earn-outs 37:1
case 23:9
easier 3:18
east 1:21 27:14
educate 32:6
    44:21 61:11
educated 44:24
Edwards 28:17
    49:14
effect 33:10
effort 27:22 31:2
    65:3,4
efforts 30:17
eighth 1:21 71:6
either 3:22 6:3
    19:15 20:14
    29:24 31:3
    40:9 47:10
    54:23 56:14
Elderkin 1:21
employed 4:19

4:21,22 5:12
5:18,20 8:19
13:17 53:11
employee 11:9
11:14 14:1
employees 8:12
10:11,13 15:9
15:19,25 16:4
16:13,18 17:2
17:4,11 18:17
19:23 20:2,5
21:6 25:15,17
27:1 53:16,21
62:13 75:15
76:3
employment
11:3,4 19:9
21:14,20 29:7
29:16,20 46:6
58:22 66:25
empty 69:7
encompass
14:18
endeavors 29:19
ended 58:22
engage 31:2
33:23
engaged 32:7
engaging 75:8
engineering 32:7
England 57:10
ensure 3:11
55:10
enter 48:9 72:5
entered 31:17
56:7 62:14
71:8 73:21
74:2
entirely 64:6
entirety 78:3
entities 32:5
33:2
entitled 77:7
entity 5:8 6:19
6:20,25 7:5
32:9 51:13
52:4

entries 58:25
59:20 65:24
67:25 70:24
74:6,23
entry 57:4 70:2
72:17
envelopes 69:9
equipment 5:1
23:17,20,23
24:1,2,12,15
24:23,24 25:5
26:21 56:6
61:23
equity 5:5,8
50:25 54:23
Erie 1:5,11,16
1:22 4:3 8:3
22:17 24:2,5
25:10 28:9,12
28:18 29:2,11
58:17 61:13
Esq 1:14,17,20
essentially 23:21
30:1 46:17
Essex 8:10,11
estate 38:14,14
38:16
estimate 7:14
69:25
estimates 69:14
70:21
Euclid 4:22
everybody 44:23
54:7
exact 19:3 21:14
79:9 80:9
exactly 53:10
66:23
Examination 2:4
3:4
example 18:13
56:19 59:5
exceed 38:23
exceptions 53:24
excuse 16:10
40:21
executed 17:2

41:7 49:13
77:18
executing 78:16
execution 17:12
20:8 21:7,16
46:10,25 47:17
55:12 78:2,5
exhibit 2:7,8,9
2:10,11,12,13
2:14 20:12,14
47:18,21,23
48:14,17,21
49:11,16,18,19
51:2,4,16,20
52:7,10 56:10
56:19 59:22,25
62:19 64:15
65:23 67:16
68:17,19 70:24
71:6 72:3
74:15 76:1,10
77:4,7 79:18
79:20,23
exhibits 2:6
20:19
exist 19:20,22
45:13
existing 17:4
34:2 39:5
62:13
expectation 65:7
expected 68:10
expedientially
30:21
expended 66:14
70:12
expense 68:3,22
68:22
expenses 38:23
52:13 67:17
68:4,5,25,25
69:11
experience
65:22
experiencing
30:25 31:6
exposure 43:12

express 78:11
expression 48:8
expressly 56:7
extent 9:16
e-mails 46:22
_____
       F
_____
face 76:12,12
face-to-face 76:9
fact 21:18 62:2
65:8
fair 3:24 12:25
23:10 27:8
32:19 33:15
55:16 65:23
70:3,12,16
71:17 75:14
fairly 10:4 16:4
32:18 59:1
fall 31:17,19
33:4
fallen 31:24 46:7
falling 14:9
33:12
falsifying 42:12
familiar 22:11
far 7:13 9:25
10:6 12:15
13:1 54:2
59:24 75:7
fashion 18:21
67:14
faxed 79:25 80:3
February 30:18
30:18 31:15
44:8 68:2
fellow 18:13
felt 29:17
Ferguson 1:25
field 9:5,6,7,13
10:3 25:1
28:10 57:9
60:22,23 61:1
figured 37:3
filed 20:15 35:15
49:4 53:13
filling 65:11

final 78:14 79:18
financial 31:6
38:1
find 58:9
fine 49:10
finish 3:15,17
5:7
firm 12:22 22:6
22:9,15,17,19
22:24 32:8
33:20 54:6
firms 22:8,22
23:3
first 3:1,14
43:15,16,20
44:1 45:11,17
51:24 56:18
57:3 58:13
59:20,25 65:11
72:24 76:21,21
firsthand 65:22
five 15:15
fixed 56:19
flexibility 65:19
flight 67:17,17
Florida 27:17
44:3 69:20
flow 30:22 33:17
54:14,18
fluctuate 13:19
focused 27:14
folks 15:20 17:5
60:18
follow 56:25
followed 19:17
following 14:23
21:9 29:20
follows 3:2
follow-up 72:21
73:2
form 50:12
77:14,19,23
formality 45:5
formally 29:1
36:19 38:10
Fort 44:3 46:9
46:24 47:4

67:17,18
**forth** 36:23
64:16
**forward** 33:23
36:14 54:9
**forwarded**
46:13
**found** 68:8
**foundational**
58:1
**four** 67:25 72:6
**fourth** 67:16
**frame** 22:7 65:5
**frankly** 70:6
**front** 45:18
**fronts** 34:12,13
**fruition** 31:22
**full** 4:1 17:17
35:2 60:16
**function** 9:6
14:22 61:19
**funds** 34:5 37:10
**further** 71:1

### G

**Gallagher** 61:8
61:9
**game** 46:23
**gather** 75:2
**generally** 11:20
14:14,16 53:23
53:24 74:9
**generating**
13:11 52:15
**generically**
70:25
**geographic** 9:23
27:12
**getting** 34:14
63:25
**give** 7:14 12:16
16:21 17:14,17
17:23 28:15
58:2 80:12
**given** 12:20 28:1
65:8
**gladly** 35:9

**Glover** 39:22,23
**Glovers** 40:10
**go** 10:6 28:20
37:5,15 58:24
76:17
**goals** 36:22
**going** 3:8 21:6
23:9 24:22
31:23 33:23
36:14 40:18
44:24 48:18
55:24 56:10
62:1 63:21,22
64:2,2,7,18
65:10,23 73:10
74:3
**good** 24:4 62:9
**goodness** 63:18
**Gornall** 1:11,15
**gotten** 70:20
**grew** 16:7
**gross** 38:19
**ground** 3:12
67:18
**Group** 5:20 6:4
6:4 7:19 23:9
29:1 30:3 31:7
38:11,18 39:7
43:15 44:16,21
49:21,23 50:11
50:19 51:5,7
51:12 56:1
78:23
**Group's** 22:2
38:9
**grow** 16:6 22:23
55:7
**growing** 30:21
30:22
**grown** 16:9
**growth** 30:24
31:2 33:15
**guess** 17:22
19:12 43:9
75:18
**guessing** 27:6
**guys** 38:18 66:3

### H

**H** 3:1
**Haataja** 17:22
56:10 59:16,16
**hand** 33:11
**handed** 49:19
**handled** 39:7
61:14
**hands** 35:12
**handwriting**
20:25 76:17,19
77:2
**happen** 14:15,16
42:14 46:15
55:4
**happened** 14:14
25:8 35:10
44:11 65:17
**happy** 80:15
**hard** 12:13
13:10 66:22
**hear** 3:21
**heard** 3:24
22:16 45:17,17
47:16
**held** 6:1 36:25
70:17 80:14
**Heritage** 1:3,17
3:8 12:5,8 13:2
17:3,12 18:8
18:13,14,15,18
18:25 19:8,24
20:1,18 24:16
24:21,23,25
25:9,18,19,24
26:22 27:4
31:17 37:4
40:5,7,10,16
40:22 41:15
43:16 44:2,13
44:14,17 45:6
45:8,12,14,22
46:2,11,16
47:1,3,8,15
48:2,3 51:19
51:25 53:12,16
54:8,12 55:11

55:20 57:21,22
58:9 62:1,3,5
62:15,17 63:3
63:10,14,15
64:1,3,5,22
65:13,14,15,20
67:21 68:8
70:3 74:7,8
76:5,11,13
77:16,17,18
78:2,10,18,25
79:13,25
**Heritage's** 21:10
37:12,14 45:2
48:8 53:18
78:11
**higher** 65:11
**hire** 9:18 63:11
63:16
**hired** 17:9 18:11
18:14,17 20:8
21:7,8,15
25:15,17 53:14
62:17 63:14,19
**hires** 25:23
59:15 60:14
**hiring** 9:20,22
10:1 40:2
**hold** 5:24
**holder** 5:8
**Holdings** 32:24
**Holdnack** 1:9,25
1:25
**home** 4:2 61:7
**hope** 36:15
37:20,22
**hotel** 67:18
**hour** 57:15 60:5
66:11 70:8
71:1
**hourly** 10:16
18:19 60:3,9
**hours** 15:11
56:19 57:2,17
59:1,7,25
62:20 63:6
65:24 67:5

69:23 70:11,12
70:14,15,25
72:6,16 74:20
74:24,25 75:18
75:19 76:3,4
**housed** 28:9
**Hrovat** 59:6
61:1
**Humes** 26:8,9
**hundreds** 27:8,9
27:10
**H-A-A-T-A-J-A**
17:24

### I

**Ice** 77:8
**idea** 45:6 53:18
**identification**
47:19 48:15
49:17 51:3,17
52:8 77:5
79:21
**identified** 47:23
62:8
**identities** 15:19
**identity** 57:3
**IM** 57:19
**immediate** 18:24
**immediately**
9:24
**implying** 33:10
**important** 3:14
**importantly**
3:20
**impossible** 36:22
79:12
**impression**
32:17 73:8
**incentives** 18:22
**incentivized**
18:21
**incidents** 42:25
**include** 28:10
31:13 70:8
74:6
**included** 7:8
70:13

including 7:18
  8:4 80:16
Incorporated
  49:21
incorrect 21:13
increase 14:1
incurred 69:12
independent
  27:1
individual 4:17
  10:4 18:3
  65:25 67:9,9
individually
  38:6 69:17
individuals
  13:17 18:7,10
  19:1,10,23
  32:5 44:12,15
  46:11 59:4,8
  59:13,23 60:3
  60:15 61:6
  62:5,11,17
  63:13 65:21
  71:14,21
industry 32:7
info 75:2
information
  4:14 13:12
  46:19 72:12
  75:13
infusion 34:1,14
initial 45:16
  52:16
initially 12:22
  42:24
initials 76:23,25
initiated 42:25
input 58:8 74:7
inquiries 63:25
  74:4
inquiry 4:17
insist 63:10
insisting 63:16
installation 7:12
instances 9:18
institutions 38:2
instructions

58:5 60:6,7,10
  67:11 70:10
insurance 42:13
  42:18,20 63:2
insurance-rela...
  42:9,19
intent 32:11,15
  41:7,11 48:4,9
  51:11 78:6
interact 47:1
  61:10
interacted 61:20
interacting 28:6
  62:25
interaction
  44:12 62:4
  63:2
interest 7:4
interested 32:9
  33:3 54:22
interface 46:16
Internet 10:7
interview 9:18
interviewing
  9:22 10:1
interviews 69:3
intricacy 10:7
Investment 1:17
investor 34:15
invited 44:4,15
  44:20
involved 9:4,14
  9:22 28:8 47:7
in-depth 54:24
in-house 68:9
Iowa 16:24
irrigation 7:12
  7:16,22 30:8
issue 15:7 42:23
  79:14
issued 19:18
issues 39:12 55:3
  55:9
items 75:22

_____
          J
_____
J 2:7,8,9,10,11

2:12,13,14 3:1
  47:18 48:14
  49:16 51:2,16
  52:7 59:6,6
  62:20 77:4
  79:20
JA 75:3
January 1:10
Jason 60:25
Jeff 44:10 46:13
  49:14 62:25
  65:6 67:18
  70:20
Jeffrey 8:14
  48:1
Jersey 10:6
  16:22 26:2
  61:2,4,5
Jessie 60:23
job 3:18 9:3,17
  61:9,22
John 1:6,9 2:3
  4:2 6:12 21:3
  55:25 67:17
  78:22
joined 6:2
joining 5:18
JUDGE 1:6
Julie 52:22 53:4
  58:12
June 47:11
  74:24
justify 27:21
JV 68:22

_____
          K
_____
Kahkwa 22:12
Karioty 35:17
  35:18 52:3
keep 3:13 14:20
  34:15 53:16,22
  54:6 57:11
  64:17 67:13
  68:9 74:1
keeping 25:21
Kelly 1:21
kept 21:22 26:2

kind 37:3 60:14
  64:8 70:6
knew 45:21
  54:25 78:21
Knight 22:25
  23:4
know 3:20 11:15
  12:17,20 13:3
  13:5 15:19
  17:16 19:3,19
  20:10 21:14,18
  22:15,16 27:10
  32:14 35:12,23
  37:13,17 41:3
  41:12,23 43:20
  43:23,24,25
  46:4 48:6 50:5
  50:6 52:1 53:3
  56:12,14,17
  57:3,18 60:18
  64:2,16 65:1
  65:16 67:13
  68:6,8,14 69:2
  69:9 71:25
  72:25 73:3,12
  74:9,23 75:9
  75:17
knowledge
  12:25 13:7
  51:24 56:11,16
  59:10,11 60:1
  64:12 65:12,17
  67:4 68:16
  71:1,13,14,24
  72:10 74:8,13
  75:10,13,21
known 7:19
Knox 1:11,15
kosher 70:7
Kramer 22:10
  22:13 23:3
Kristina 1:17
  80:13

_____
          L
_____
L 1:17 3:1,1
  49:23 51:8

labels 69:9
lack 8:5
Lake 29:5,12,18
land 19:17
landscape 6:18
  7:8,15,20 8:25
  15:22 30:8
  42:1
landscaping
  38:13
language 39:11
Lanzillo 1:14
  2:4 3:5,7 4:9
  17:7,23 66:18
  71:7 80:12,15
large 23:22 54:9
larger 22:22
late 8:20 46:22
Lauderdale 44:3
  46:9,25 47:4
  67:17,18
law 12:22 54:6
lawns 7:12
laws 19:17
lawsuit 3:8,10
  42:25 49:8
  53:13
lawsuits 42:3,20
lawyer 36:11
  49:9
leaf 59:22
leased 38:16
leave 53:4
left 6:17 12:4
  24:21 28:25
  41:21 42:16
  43:7 72:3
left-hand 56:24
  68:21 71:9
leg 62:2
legal 69:7,8
letter 32:11,14
  41:7,11 48:1,3
  48:4 49:11,20
  50:11,15 51:5
  51:7,8,11 78:6
  79:24

letterhead 49:20
let's 72:1
liabilities 30:6
   41:24
liability 34:25
Linda 66:5
line 57:1 76:22
Lisa 28:17 49:14
list 16:19 67:16
listed 59:4,13,19
   59:23,25 60:15
   67:5 71:21
   76:3
listing 40:20
lists 66:6
little 20:11 60:13
lived 10:3 19:3
   60:24,25
lives 61:9
living 11:20,21
LLC 4:22,24
   6:25
local 75:1
locale 14:10
located 8:10
   24:5
location 8:11
locations 14:8
   16:14,19 24:3
   24:4 61:23
   69:4
locks 67:13,14
log 73:23 75:6
long 5:12,15,24
   8:19 21:24
   49:5
longer 78:24
look 30:19 49:18
   64:21
looked 38:20
looking 30:14
   31:8,16 45:2
looks 56:20 57:1
   59:5
lose 43:8
loss 38:25 42:17
lost 25:19

lot 35:13 62:2
lower 61:3 76:18
lucrative 27:17

**M**
MA 1:18
mail 80:5
maintain 8:5
   18:23 21:20
   53:21 54:4
   56:10,15
maintained
   61:22
maintaining
   28:13
maintenance
   7:12
majority 5:6,8
making 55:1
   65:3,4,9
management 1:3
   6:4,4 7:19 8:9
   17:3 20:19
   22:2 23:9 29:1
   30:3 31:7 38:8
   38:11,18 39:6
   43:15 44:16,21
   49:22,22 50:19
   51:7,12 56:1
   73:18,21 77:8
   78:23
manager 10:3
   56:20,24 57:9
   60:23,24 61:1
   61:2,25 73:16
   73:22 74:5
managerial
   25:19
managers 9:5,6
   9:7 25:1 28:10
   44:5,21 67:22
   69:21
manufactures
   4:25
mark 39:23
   48:16 79:19
marked 20:14

47:18,20,21
48:14 49:11,16
51:2,4,16,19
52:7,10 76:10
77:4,6 79:20
79:22
market 27:18
marketing 9:4
   27:22 68:5
markets 4:25
   15:17 25:17
   65:11
Markham 1:20
   4:13 12:19,21
   17:6 43:5 49:6
   66:15,19 71:5
   79:2 80:18
married 4:4
Marshal 61:25
   68:25 69:1
Martin 1:21
Mary 58:16,17
Massachusetts
   16:22 18:13
   26:2
Master 77:8
match 68:14
material 36:20
materially 40:14
materials 46:2
Matt 39:22
matter 58:2
matters 23:6
McLaughlin 1:6
   1:11,15
mean 4:13 17:6
   27:15 34:2,2
   39:1 53:2,7
   66:15 70:8
   74:23 79:2
meaning 23:23
means 50:7 76:2
measure 61:6
mechanized
   23:25 24:12
meeting 44:3,5,7
   44:22 46:3,9

67:22 68:1
   69:21
melter 32:8
melting 4:25
member 5:4
mentioned 9:4
   14:4 49:2
   59:15
merger 16:9
meshing 29:17
Messina 1:21
methodologies
   61:11
Michael 60:22
midAtlantic
   61:3
middle 29:13
midway 56:23
Mike 49:14 57:7
   57:8
million 31:25
   33:5 36:8
   38:22 39:2
mind 3:13
Minnaugh 22:25
Minneapolis
   16:24 19:5
minor 24:1
minute 16:15
   54:6 80:12
misinterpreted
   32:16
misinterpreting
   56:21
Mississippi
   27:15,16
misspoke 53:20
mistake 53:20
   60:7
mixed 62:14
model 23:16
   24:10
modification
   76:23
Moines 19:5
moment 58:12
   59:22

moments 32:17
Monday 1:10
money 37:5
monitor 14:23
month 13:16
   63:5 67:25
months 5:25
   14:1 15:14
   45:1 68:7
   69:18
motion 20:15
moving 23:17
muddle 25:21
multiple 54:22

**N**
N 2:1 3:1,1
name 3:7 4:1
   6:20 17:17,17
   17:25 18:4
   22:15 32:22
   38:6,7,8,9,9
   39:6 47:16
   52:23 53:1,3
   58:14 73:13,16
names 39:6
   60:17 62:10
narrative 72:15
narrow 28:4
National 37:25
   38:2
nature 4:23 7:7
   12:7 13:24
   14:17 30:2
   36:4 73:24
near 63:1
need 3:13,19,21
   21:21 30:25
   31:1,5 33:14
   63:21
needed 14:8
   39:18 46:20
   75:1
negotiated 45:24
negotiating
   30:11 33:1
   34:9 36:24

negotiation 63:1
negotiations
  32:23 33:8,11
  40:23 46:11
  47:7 76:9
new 10:6 16:22
  16:23 19:7,8
  24:15,24 25:15
  25:23 26:2,3,4
  54:17 57:10
  59:15 60:14,25
  61:2,3,4,5
  75:15
newspapers
  75:1,2
nonbinding 48:4
  48:8
normal 66:25
northeast 60:23
Notary 1:9
notation 62:19
note 51:18
noted 69:13
  76:16
notice 4:11,12
  4:18 29:25
  51:18,25 80:1
  80:10
notices 4:10
notified 39:11
  64:5
November 6:9
  8:22 21:10
  30:10 41:9
  74:12 79:6,7
  79:24,25 80:7
  80:8
number 13:19
  16:9 27:7,25
  28:7 32:4,6
  34:12 42:14
  44:14 57:18
  60:2
numbers 15:23
  15:24 59:3,7
  70:19,21

O

O 3:1
obligated 56:3
oblige 80:16
obliterated 50:7
obstacles 61:16
obtain 45:2
obviously 36:18
  66:16
occasions 42:15
occur 6:22 30:9
  33:7 44:7
  63:17
occurred 43:22
  43:23 79:6
October 20:9,10
  20:18,22,23
  21:8 49:20
  50:11 51:5
  63:5 64:23
  65:1,8,12 76:5
  77:19 79:9
offer 44:16
office 9:13 12:22
  52:24 54:3
  66:6
offices 1:11
Oh 40:11 42:14
  53:5 63:18
Ohio 4:22 6:19
  32:24 33:1,9
  33:21,22
Okay 4:19 9:25
  11:9 19:1
  27:12 28:3
  45:21 46:24
  50:9 52:20
  55:15 60:20
  74:11,22 80:4
older 26:5
Olympic 30:22
once 10:22 25:19
  73:6 78:21
ones 17:1
one-month 63:6
operate 37:9
operating 36:21

operation 8:2
  31:7 38:23
operational 9:10
  9:12 55:9
operations 5:22
  6:3 29:11
ops 70:25
options 50:17
order 30:23 31:1
  55:10 61:11
  68:15
organization
  29:2
original 31:23
  32:2 52:20
outbound 15:5
outcome 43:8
outside 21:17
overlapped 4:15
overnight 80:4
oversaw 9:5
overseeing 9:8
Overwhelmin...
  35:8
owed 10:23
  35:22 39:2
  48:24 50:18
owned 23:18,18
  38:4
owner 5:4,15
  64:25
ownership 7:4
O2 42:23

P

PA 1:11,16,22
package 72:17
  72:20
packets 72:19
page 20:23,23
  21:1 56:18,23
  59:2,20,23,25
  60:15 62:19,22
  64:19 66:7
  67:16 68:13,16
  68:19,20,21,23
  69:7,16 70:23

70:23 71:6
  72:1,2,4,4,9
  74:15,18,19
  76:18,22,25
  77:1
pages 48:18 72:2
paid 10:17,22
  18:20 19:10
  32:1 37:4
  54:14 57:13
  66:4,5,7,17,19
  66:20,21,25
  67:1 68:3
PAMS 72:6
  73:12 74:6
Pancura 61:13
paperwork
  26:15
Paragraph
  64:23 77:15
  78:9
parent 32:9
Park 32:24 33:1
  33:8,21,22
part 5:15 8:24
  18:15 29:1
  36:9,19 37:7
  38:4,11 39:7
  39:21 40:19,22
  41:18,24 52:11
  55:22 66:25
  73:9,10 77:16
  78:7,15,18
partially 43:7
participate
  71:23 76:8
particular 14:9
  15:6 27:12
  42:17 60:2
  64:19 68:1,15
  73:23 74:4
parties 20:11
  33:3 54:22
partner 31:3,8
partners 54:23
  61:10,15
partnership

6:25
party 29:24
passed 52:18
pay 34:5 52:24
  66:4
paying 25:21
  31:11 57:15
payment 29:25
  34:21 35:3
  37:12,15
payout 36:14
  50:22
Peggy 4:4 26:19
  69:3 75:6,9
Peggy's 38:9
pending 42:3
  43:5,6,8
Pennsylvania
  1:1,10
people 14:5
  15:15 26:2
  28:7 32:6
  44:23 45:5,19
  45:19 58:8
  63:11,16,20
  64:1 66:16,24
percent 5:11
  7:19,24 23:15
  24:8 26:24
  54:11
percentage 5:10
  11:1 54:8
  65:11
perform 56:6
  63:22 79:12
performance
  14:24 36:18
  50:23
performed
  14:20 23:13
  24:9 59:24
  72:11 73:25
  76:4
period 20:6 22:1
  50:23 52:17
  53:7 63:7,8,9
person 15:14

18:2 28:16
29:9 57:3
**personal** 13:6
22:19 23:5
59:11 64:12
75:13,21
**personally** 23:18
44:1 71:19
79:15
**pertains** 74:4
**per-hour** 54:1
**phone** 66:6
70:25
**phones** 14:6
**phonetic** 35:17
**pickup-type**
25:4
**pitch** 44:19,20
**place** 6:7 8:1,9
31:22 34:16
37:10 63:6,11
63:12 74:1
75:3
**places** 8:6
**placing** 75:2
**Plaintiff** 1:4,13
**planning** 49:21
**played** 19:21
**pleadings** 20:15
**please** 16:21
17:18
**plowed** 14:19
**plows** 23:22,22
23:22,24 25:2
**plus** 10:19 57:14
**point** 11:10
27:19 31:24
33:5,17,20
34:17 39:1,15
41:8 45:21
50:1 69:4 73:9
**policy** 53:18
**portfolio** 18:16
18:25
**portion** 7:21
9:14 24:4 31:4
31:18,20 32:12

42:1 54:9
**portions** 30:15
**position** 5:2,5,24
8:15
**positions** 60:17
**positive** 35:8
**possibility** 50:19
**possible** 21:15
21:17 50:17
**potential** 32:19
32:22 34:14
**Power** 23:25
**precisely** 19:10
**preclude** 78:17
**precluded** 56:8
**precursor** 34:18
**prediction** 15:17
**predominantly**
27:14
**Prendergast**
44:22 45:18
46:22 47:17
64:10 65:7
**prep** 70:14
**preparation**
58:6 69:19
**prepare** 58:3
59:11
**prepared** 77:11
**present** 70:3
**presentation**
44:15,18 45:3
67:19,21 69:19
69:20
**presented** 52:9
**Presenting** 75:2
**president** 5:3,12
5:21 6:2 8:17
**Presumably**
74:25
**pretty** 37:16
62:9
**prevented** 13:11
**previously** 19:6
20:13 25:16
26:1 47:20,21
54:5 66:9 67:8

**pricing** 62:3
75:2
**primarily** 16:1
**principal** 8:1
14:22 29:11
39:20 47:15
53:8
**principally** 4:15
4:17 8:24
**printing** 72:3
**prior** 5:18 13:18
16:5,9,14,15
18:7 21:15
22:9,9 27:4
30:15 32:11
40:3,17 41:8
47:4 54:13
55:12 65:1,9
65:12,13 78:2
**privy** 65:20
**probably** 27:17
27:21 29:8
41:16 54:11
75:11
**problem** 42:11
**problems** 31:6
33:25 34:2,18
39:12,19 54:13
**procedural** 55:9
**proceeded** 78:14
**proceeds** 37:7
37:14
**process** 9:22
36:23
**produced** 68:15
**producing** 61:14
**production** 8:16
61:8,14,21
**profit** 50:23
**profitability**
55:10
**profitable** 39:4
54:25
**program** 73:17
73:20
**progress** 55:2
65:9

**project** 30:22
**projects** 67:14
**promotional**
46:2
**prompted** 30:19
**properly** 31:1
61:11
**property** 1:17
44:5,21 64:25
67:21 69:21
**proposing** 50:16
**proprietor** 7:19
30:3
**proprietorship**
6:24 7:1,2
10:13
**prospective** 72:7
72:18
**provide** 12:15
13:13 31:4
78:24,25
**provided** 13:6
18:8 62:3
65:14 74:12
76:1 77:20
**provider** 14:12
15:6 34:10
35:14 73:1,16
73:18,22 74:5
**providers** 14:6,7
31:25 33:5,12
33:18 34:15,25
35:2,4,7,10
36:2,7 49:12
50:2,12 54:14
54:19 61:10,20
63:21 64:3
69:12 73:7
77:25
**providers/sub–**
39:2
**providing** 64:22
77:17
**provision** 64:15
64:21
**Public** 1:9
**purchase** 24:18

25:13 26:15
30:5,7,9 32:12
41:8 51:12
**purchased** 11:6
24:19,24 25:2
25:14 26:21
30:6
**purchaser** 30:20
31:23 32:2
**purchasers**
32:22
**purportedly**
13:8
**purpose** 70:4
**pursuant** 4:10
42:16 78:9
**pursued** 29:18
**pushers** 23:21
24:11,13,19,20
**put** 57:20 58:10
63:11 69:23
70:11
**putting** 62:2
**P.C** 1:11,15
**p.m** 80:21

---
**Q**
---
**question** 3:15,17
3:21,23,23
29:9 43:10
74:16 75:11
78:20
**questions** 3:9,10
35:24 52:13
72:20 80:17,18
**quick** 74:16
80:13
**quickly** 37:16
76:17
**quite** 70:6

---
**R**
---
**raise** 33:14
**Ralph** 61:1,4,5
**range** 9:25 13:21
16:4,6
**ranks** 14:1

rapidly 37:14
rate 56:19 60:3,9
  65:25
rates 60:6,8
read 17:19 29:2
  72:18 78:2
  80:19
reading 17:16
  21:3
reads 59:21 60:4
real 38:14,14,16
  80:13
really 10:12
Realty 1:3 3:8
  17:3 20:18
reason 74:20,24
reasonable 16:2
  27:20
reasons 34:8
recall 11:2 17:1
  18:4 26:23
  28:12 46:21
  47:5 52:23
  60:17 77:22
  79:9 80:9,10
receipt 37:12
  72:20
receivable 41:18
receive 41:17
  60:10 68:10
  72:19 73:7
  80:4
received 11:1
  37:15 48:5
  52:11 80:7
receiving 80:10
Recess 80:14
recognize 47:24
  77:9
recognizing 47:6
  51:23 59:10
recollection
  16:21 17:10
  27:24 47:10
  53:1
recommended
  33:22,22

reconcile 10:23
record 6:1 14:20
  17:17 20:13
  36:25 66:12
  70:17 73:19
records 13:1,4,7
  19:9,13,15,20
  21:20 26:14,18
  37:18,21 38:21
  53:17,22 54:4
  56:11,16 57:11
  59:12 67:6
  71:15
recruiting 28:6
  28:13
red 21:4
redacted 50:4,6
reducing 55:5
refer 10:11
reference 51:14
  72:24 74:25
referenced
  57:17 71:20
  77:15
referring 20:2
  73:5
refers 51:11
  75:17 77:22
reflected 71:13
  75:14
reflecting 59:12
regard 12:1 68:4
regarding 3:9
  12:7 30:12
  40:10 51:11
  52:14 58:6
  65:19 72:21
  73:2 74:8
regardless 63:11
region 9:9,23
  27:12 60:23
regional 10:3
  56:20,24 57:9
  60:22 61:2
regions 9:7
  28:11
regular 47:16

relate 74:23
related 30:7
  33:13
relates 48:23
  57:4 67:25
relationships
  28:13
relative 13:2
  74:6
relocate 24:23
remain 21:24
  22:19
remained 41:24
remember 22:16
  75:17,24
removal 7:8,16
  7:24 8:24 9:8
  15:21 16:1,8
  23:8,12,17
  24:9 26:25
  27:5 34:20
  38:18 55:16,18
  56:2 74:11
  77:7,24 78:7
  78:15,19
render 79:11
renew 24:22
renewed 54:25
renewing 55:6
rent/keep 24:7
repeat 3:22
rephrase 3:22
replacement
  25:16
report 14:19
Reported 1:25
reporter 3:11
Reporting 1:25
reports 14:6
represent 3:7
  62:24
representative
  45:14
requests 14:6
required 15:2
  25:18 35:2,5
  53:16,21 54:4

57:11 73:24
reshuffling 29:3
residence 9:24
resign 11:15,17
resolve 43:2
respond 3:16,23
response 3:17
  35:8
responses 3:10
responsibilities
  9:3,13,17 10:2
  14:25 15:1
  18:12 29:4
  67:1
responsibility
  9:23 10:5 41:1
  46:6,7 53:8
responsible 9:2
  9:8 15:21 28:5
  28:13,16 52:15
  62:1 72:22
  73:3
Restaurant
  75:16
restrictive 78:17
result 62:17
retain 33:20
  55:17 56:5
retained 12:22
  34:4,8
revenues 38:17
  38:24
review 11:2 48:7
  70:5
reviewed 40:2
  46:12 75:23
reviews 56:25
RFP 69:12 72:19
  72:20
Rich 3:7 71:5
Richard 1:14
Rieder 61:14,18
  61:21
right 4:9 21:6
  22:7 23:8 29:9
  29:24 46:18
  53:12 60:16

62:8 64:18
66:18 68:24
75:19 78:24
79:6
right-hand
  56:18 58:24
  69:13 76:18
RM 57:2
road 68:7
Robert 49:23
  51:8
Rohe 18:5 56:13
  59:16
room 4:7 14:5
roughly 7:24
  37:4 61:3
round 60:2
routine 14:13
RPF 72:17
RPR 1:9,25
Rudy 61:13,18
  61:21
rules 3:13 19:21
run 60:15
Russell 58:16
R-O-H-E 18:5
  56:13

————————
          S
————————
salaried 62:13
salaries 25:21
salary 10:16,19
  18:19,20 57:14
  62:14 66:21
sale 6:7 16:5,10
  16:14,14 39:21
  55:15 78:6
sales 8:16 9:4,5
  9:11 44:18,20
salt 23:22,24
  25:2,6 29:4,12
  29:18
Santoro 61:4
sat 25:10
save 71:19
saw 48:6
saying 64:2,4

says 21:3,5
  48:10 56:20,24
  68:22,24 69:19
  70:25 71:8
  72:15,16 74:20
  75:15,23
Schaffner 22:25
  23:3
schedule 59:4
  64:17 67:2
  69:5 75:14
  76:3 80:16
schedules 52:13
  58:3,7 59:13
  68:14
scope 10:6 46:5
  72:21
SEAN 1:6
Search 74:25
season 42:24
  49:13
seasons 24:6
second 50:21
  58:14 60:16
  64:24
secure 18:23
secured 36:4
see 11:9 14:22
  24:15 43:6
  48:10 56:19,23
  57:1 58:25
  59:19 62:21
  68:4 72:7,22
  80:5
seeing 51:23
seen 13:7 47:25
  48:19 49:18,25
  50:1 51:8,20
sell 78:15
sells 4:25
send 46:2
sending 50:11
  69:12
Sennett 1:11,15
sent 50:2,3,16
  51:25 52:1
sentence 64:24

separated 52:19
  67:24
September
  30:13,15 41:5
  41:13
series 3:9
serious 32:18,23
seriousness 53:1
service 14:6,7,12
  14:20 15:3,3,5
  31:25 33:5,12
  33:17,18 34:5
  34:10,15,25
  35:2,4,7,10,14
  36:2,7 39:2
  49:12 50:2,12
  54:14,18 61:10
  61:10,15,20
  63:20 64:3
  69:12 73:1,7
  73:22 75:7
  77:24
serviced 55:21
services 7:8
  14:24 18:8
  74:11 77:8,24
  78:24
servicing 78:17
set 36:23 74:3
  76:21
seventh 70:23
severely 29:8
severity 15:16
share 46:19
sheets 53:17
  61:14,15
Shore 4:3
short 20:5 52:17
  53:7,7 58:14
short-termer
  53:6
show 19:15
  37:18 48:16,18
  51:4,18 68:20
  79:18,22
showed 20:13
  38:25

showing 19:10
  47:22 77:6
shown 48:4
shows 70:2
sic 15:10
side 9:10,11
  15:21 56:18,24
  58:24 69:13
sidewalks 23:24
signature 20:10
  20:22,25
signed 17:6,8,11
  41:11 49:14,23
  63:4 64:7,22
  64:25 65:8
  78:21 79:8,10
significant 31:18
  31:20 55:18
signing 17:9
  65:10 79:11
silent 40:7
sir 32:21 71:18
site 10:7 14:19
  15:6 56:25
  61:7 64:1
  72:20 73:20,22
  73:23 74:1,4,5
sites 9:9,19,20
  18:23 19:7,8,8
  24:6,23 25:18
  27:9,11 55:10
  61:10,12,17,22
  64:1 71:8 72:5
  74:8,12
situated 24:2
situation 34:16
six 13:16 25:14
  26:3,4 76:4
skid 23:21 24:11
skip 72:2
sleep 70:6
slight 80:2
slip-and-fall
  42:9
small 7:21
Smallwood 57:2
  57:7,8 59:5

60:21,22
smart 52:25
SMG 23:9,12,17
  32:10 36:19
  39:21 45:14
  46:2 47:3,8
  49:12 53:21
  54:23 55:21
  66:1 70:3
  77:12,18,23
SMG's 38:5
  55:15
Smith 22:10,13
  23:3
snow 4:22,23,25
  5:2,13,15,18
  6:3,4 7:8,16,19
  7:20,24 8:9,24
  9:2,8 14:9
  15:17,21 16:1
  16:8 23:8,9,12
  23:17,21 24:8
  24:11,13 26:24
  27:5,19 29:1
  30:3,7 31:7
  32:6,8 34:20
  38:8,11,18,18
  39:6 43:15
  44:16,21 50:18
  51:7,12 55:16
  55:18 56:1,2
  61:15 64:3
  65:11 74:11
  77:7,24 78:6
  78:15,18,23
snowed 74:10
snowing 21:17
snow-related
  42:25
software 73:17
  73:18,20,21
sold 6:5 8:20
  21:25 25:11
  26:20 34:20
  38:5 55:22
  56:1 78:18
sole 7:1,2,18

78:11
solely 18:14
  23:13
solicit 50:21
somebody 52:22
someone's 73:13
Soon 43:4
sorry 5:7 48:2
sort 42:11
sounds 18:6 39:3
  54:16
source 67:7
South 4:3
SP 72:19,24
special 25:5
specialized
  23:23
specific 9:8
  65:25 71:14
  72:20
specifically
  43:23 48:6
  57:25 71:15
  74:9 75:23
  77:22
specified 9:7
specify 65:24
spelling 17:22
spent 62:25 63:3
  66:1 67:10
spread 24:3,4
spreaders 23:23
  23:24 25:2,7
spreadsheets
  52:12
spring 8:20
SPs 56:24 72:19
stacked 61:16
staff 17:10 54:3
staffing 15:13
  25:19
standard 25:4
  77:23
start 30:11,17
started 31:8,16
  63:18
state 4:1 22:24

75:24
**stated** 25:17
  26:1 66:9 67:8
**statement** 34:4
**statements** 64:9
**states** 1:1 27:19
  49:13
**stationed** 28:10
**stay** 11:6 38:14
  43:13 54:18
**stayed** 43:14
**steers** 23:21
  24:12
**Steve** 39:22
**stood** 44:23
  45:18
**stop** 61:7
**stored** 24:6
**strategic** 30:14
  31:9,16 61:25
**Street** 1:11,15
  1:18,21 8:3,6
**strictly** 63:14
**strike** 48:2 72:1
  75:8
**strikes** 38:21
**structure** 35:25
  62:3
**stuff** 29:4
**subcontract**
  77:23
**subcontracting**
  9:14
**subcontractor**
  10:1 24:14
  42:16 64:22
**subcontractors**
  9:19,20 14:24
  23:13,16 24:9
  24:13 26:24
  27:25 28:6,8
  28:14 31:13,18
  31:20 34:22,22
  42:12,12 48:24
  49:2
**subcontracts**
  64:25 65:14

**77:18**
**submit** 58:11
**substantial**
  27:21 54:17
**substantially**
  55:15
**successor** 22:13
**sue** 35:14
**sufficient** 33:17
  34:5
**suggestions**
  46:14
**suit** 35:15
**suits** 42:10,22
**Suleski** 49:14
**summary** 21:13
  68:13 74:17
**summer** 11:14
  14:2
**supervisor** 10:9
  61:19 67:9
**supplied** 12:12
  13:8 59:4,8
**supplies** 69:8
**supply** 12:10
  24:11
**support** 50:21
**sure** 22:5 55:3
  61:22 66:12,15
  71:11
**surmise** 57:23
**surmising** 57:19
**surrounding**
  9:24 11:16
  29:15
**suspect** 52:1,2
**sustain** 30:24
**swap** 50:24
**sweat** 50:24
**swell** 15:24
**sworn** 3:2
**Symbiot** 5:20
  6:2,5,17 11:6
  11:10,14,16
  12:4 13:18
  16:6,16 21:25
  25:11 26:12,21

28:20,23 29:16
  29:17,21,24
  30:4,11 32:11
  34:21,24 35:25
  36:6,19,20
  37:7 38:5,12
  39:7,20 40:4
  40:21,22,25
  41:4,17,19,22
  41:25 42:4
  43:12 49:4
  51:14 52:19
  55:11,13,16,21
  55:22 56:2,4,7
  58:19,21 72:21
  73:2,9,10 78:6
  78:15,16,19,22
  79:3,8,10
**Symbiot's** 29:2
**system** 73:17
  74:2,6

—— **T** ——
**table** 4:6
**take** 6:7 7:21
  15:2 16:8
  24:19 29:23
  44:18 45:11
  49:18 56:21
  63:6 64:20
  76:7 79:14
**taken** 1:9 3:10
  31:22 35:12
**takes** 74:1
**talk** 3:14 80:13
**talked** 58:12
  60:13,13
**talking** 10:12
  11:12 64:21
  71:11
**tangible** 38:10
**taxes** 22:23
**tell** 3:21 12:11
  13:15 34:3
  40:12 44:11
  49:18 50:3
  60:16 61:15

**75:10**
**temps** 13:23
**ten** 69:23
**Tenth** 1:11,15
**term** 8:5
**terminable**
  29:23
**terminate** 29:25
  63:13
**terminated**
  11:15 19:24,25
  21:9,22 25:24
  25:24 39:14
  63:5
**terminating**
  80:1
**termination**
  20:1 21:10
  25:9 40:17
  65:13 79:5
**terms** 10:20
  45:24 47:7
  57:13 71:13
**Terrance** 59:6
  60:25
**Terry** 61:13,19
  61:23
**testified** 3:2
**testifying** 4:10
**testimony** 21:8
  32:16,20 76:7
  79:3
**Thank** 71:7
**thing** 21:22
  28:15 64:8
  70:14
**things** 13:23
  36:4 46:18
  48:25
**think** 4:13 9:3
  19:5 22:24
  33:13 44:8
  53:5 68:8 71:5
  71:12
**third** 18:2,3
  50:24 62:19
  72:3 75:16

**thought** 13:12
  25:20 31:20
**thousands** 27:11
**threatening**
  34:17
**three** 16:22,23
  16:23 17:9,11
  18:17 19:1
  20:2 21:6
  59:20 60:14
  63:13 75:18,19
**Three-quarter**
  25:6
**three-quarters**
  62:21
**tied** 36:18
**Till** 8:22
**time** 3:15,20 6:3
  11:22 13:1,4,7
  13:19 14:15,15
  16:6,7 17:2,5,6
  17:8 20:6 22:1
  22:7 26:23
  31:15,22 32:1
  32:7 34:3,17
  37:12 40:1
  42:4 45:9,17
  48:5,8 50:15
  50:24 51:24
  52:17 53:7,12
  53:17,17,21,22
  53:25,25 54:4
  54:15,17 55:7
  56:11,15 57:11
  57:20 58:9,14
  58:22 59:12
  60:12 62:14,25
  63:3,6,7,8,9,10
  63:15 65:5,13
  66:22 67:10,13
  68:5 69:17
  70:7 71:13,17
  71:19 73:9,23
**times** 15:12
  71:20
**title** 8:18 39:24
**titled** 38:6,7,7,8

38:9
**today** 3:9 4:7,10
  11:19 12:6
  22:20 51:21,24
**told** 13:10 44:23
  57:24,25 64:13
**ton** 25:6
**top** 66:7 67:1
  68:21 72:4
  74:20
**total** 10:5
**town** 22:11
**track** 54:6 74:3
**tracked** 69:14
  69:15
**traded** 26:3
**trading** 26:5
**traditionally**
  24:14
**transaction** 6:7
  16:16 28:21
  30:2,12 37:8
  39:8,12,21
  40:3,15 41:25
  42:4 49:4
  55:18
**transcript** 3:12
**transferred** 29:4
  29:12 37:7
  38:12
**transitioning**
  29:14
**transmitted**
  12:18
**transportation**
  67:18
**travel** 68:22,25
  69:4
**trick** 19:19
**trip** 44:9,11 70:3
  70:4,9,15
**trucks** 23:22
  25:1,2,4,8,13
  25:16 26:3,3,4
  26:5,11,15,20
**true** 64:6
**Trust** 1:17

**trying** 19:19
  32:5 55:7
**tune** 33:4
**turn** 40:19
**turnaround**
  49:22
**two** 16:22,23,23
  35:13 46:21
  48:18 68:7
**type** 30:24 36:16
  42:9,19 53:17
  74:16
**types** 23:20
**typical** 16:5
**typically** 15:13
  37:1

――――――――
**U**
**ultimately** 38:5
  40:15 49:3
  62:1
**Um-hum** 17:7
  75:5
**understand** 3:21
  7:8 13:5 17:19
  22:5 48:7
  51:13,19 66:16
  76:15 78:9,16
  78:20
**understanding**
  11:17 12:13
  28:24 29:10
  43:21 44:6
  45:4 47:9,14
  59:3,7 65:4,6
  66:22
**understood** 3:24
  45:13 48:11,12
  50:15 65:6
  79:11
**unidentified**
  51:13
**uninsured** 42:17
  43:7
**United** 1:1 49:12
**unmerciful**
  63:19

**unprofitable**
  55:5,6
**unrealistic** 65:7
**upper** 68:21
  71:8
**use** 24:13 32:8
  60:6 61:12
**utilize** 60:8
**utilized** 77:24

――――――――
**V**
**validating** 62:3
**various** 9:19
  14:6 15:17
  16:19 28:11
  42:24 58:8
  75:1 76:3
**vary** 15:16
**venture** 31:3,8
**verbal** 45:10,12
**Vernon** 8:14,19
  9:21 11:13,13
  11:23 12:4
  13:1,8,10
  16:12 43:19,19
  44:10 46:13,15
  46:15 47:6
  48:2,3 49:14
  64:10,11,13
  66:5 67:18
  69:17 70:14
**Vernon's** 8:15
  10:8,15 46:5
  47:15
**versus** 7:16,16
  7:16
**vice** 5:21 6:2
  8:17
**vicinity** 18:24
  19:5 38:21
**visit** 61:9
**voice** 46:12
**vs** 1:5

――――――――
**W**
**wages** 19:16,16
**wait** 3:15,16 5:7

**walk-behind**
  23:25
**want** 44:24
  53:25 62:7
  66:12 74:15
**wanted** 32:8
  61:12
**wasn't** 44:20
  55:8 66:5,7
**Waterford** 26:9
**way** 48:11,12
  55:20,24 59:21
  60:4 62:22
  68:15 75:12
**Webb** 39:23
  40:10
**Webb's** 39:24
**week** 5:14,17
  11:24 19:25
  21:9 53:5,8
  66:21
**weeks** 13:16
**went** 36:11
  41:19,21
**weren't** 57:15
  65:20 66:4,19
  67:1
**west** 1:11,15 8:3
  27:16
**WESTERN** 1:1
**we'll** 47:22
  48:16 59:22
  79:19 80:19
**we're** 21:21
  36:23 44:23
  45:19 54:5
  71:11
**we've** 37:3 42:14
  47:23 49:11
  51:4 52:9
  60:13,13 62:6
  62:8 64:4,5,7
  68:8,9 74:24
  76:10 79:22
**whipsawing**
  64:16
**wife** 7:4

**Wilson** 39:22
  40:9
**winter** 14:1
  15:14,17,25
  24:6 30:23
  49:13
**witness** 48:18
**women** 52:24
**words** 17:3 26:4
  30:4 54:15
  55:24 66:3
  68:7 72:4 74:7
**work** 7:15,18,20
  8:24 9:19 10:7
  22:3 23:5 24:9
  25:20,25 26:25
  28:20 30:8
  47:3 52:16
  53:9 58:19,21
  60:9 62:2 64:4
  65:10 72:21
**worked** 23:4
  52:17 58:13
  60:24 61:1,4
  61:13,18,23
**working** 13:23
  15:25 28:23,24
  28:25 62:13
**workout** 33:20
**wouldn't** 10:5
  27:6
**write** 66:3
**written** 11:4
  12:15 36:8
  45:23 63:12,17
**wrong** 76:8
  79:23
**W-2** 19:16,17

――――――――
**X**
**X** 2:1

――――――――
**Y**
**Yardmaster**
  6:21
**yeah** 17:21 18:3
  22:23 35:19

40:18 42:5
48:20 64:7,20
70:10 74:21
**year** 10:22,25
13:20 15:12,20
25:14 28:1
38:23 39:3
44:24
**years** 16:5,9
38:17 64:4
**York** 16:23
60:25 61:3

---
**Z**

**Zelgowski** 61:18

---
**$**

**$1,000** 66:20,20
**$1,080** 66:7,8
**$15** 38:22
**$22,500** 62:20
66:5
**$225** 62:21
**$3** 75:17
**$3,800** 57:1
**$3.6** 33:5,17
**$33,000** 66:5
**$340,000** 37:4
**$340,482** 37:4
**$4** 36:8
**$45** 71:1
**$50,000** 36:11
**$95** 57:2,15 60:5

---
**0**

**02116** 1:18
**03** 30:23 39:4
42:23
**04** 6:10 8:22
21:8 30:10,13
30:15,18,23
38:25 39:4
44:8 47:12
74:24
**04-333** 1:5
**05** 6:23

---
**1**

**1** 2:7 47:18,23
59:2,23 60:15
**1,000** 28:2
**1/21** 68:2
**10** 7:19 59:1,6
**10th** 22:24
**10/19/04** 72:15
**10/20/2004** 72:6
**10/4/04** 21:4
**100** 59:1,1,2,2,2
59:2,6 62:20
**1099** 19:16
**11/11/04** 72:16
**11:20** 80:14
**11:25** 80:14
**11:26** 80:21
**110** 72:5
**12** 20:18,22
**12th** 20:10
**120** 1:11,15
**13** 5:25 78:9
**131** 1:18
**1406** 8:3
**15** 41:9 49:12
54:11 79:6
**15th** 6:23 29:7
29:16
**15-minute** 80:16
**150** 1:21
**16501** 1:11,16,22
**16502** 8:3
**16505** 4:3
**17** 74:24

---
**2**

**2** 2:8 48:14,17
48:21 49:11,20
50:11
**2/18/2004** 69:18
**2/22** 70:2
**2/24/04** 70:3
**20** 5:11 54:11
70:14
**200** 28:2 59:2
**2002** 8:20
**2004** 20:18,22,23
21:10 31:15

41:9 49:12,20
50:11 51:5
63:5 64:23
65:1,12 76:5
77:19 79:24,25
**2005** 11:14
**2006** 1:10
**21** 51:5
**21st** 8:3,6
**22nd** 6:9 30:10
68:2 79:7
**23** 1:10
**2319** 4:2
**24** 15:11 70:25
72:16,16
**25** 59:1

---
**3**

**3** 2:4,9 49:16,18
49:19 66:7
76:18 79:24
80:7
**3rd** 65:8
**3.6** 31:25 39:2
**30** 13:22 15:8,18
16:4 45:18
**31** 64:23 65:1,12
77:19
**35** 45:18

---
**4**

**4** 2:10 20:23
21:8,10 51:2,4
63:5 64:23
74:12 77:15
79:25 80:8,9
**4.0** 74:24
**40** 57:2,17 59:1
59:2,5
**47** 2:7
**48** 2:8 70:15
**49** 2:9

---
**5**

**5** 2:11 51:16,20
76:22 80:9
**50** 27:19
**51** 2:10,11

**52** 2:12
**52,000** 10:25

---
**6**

**6** 2:12 52:7,10
56:10,19 59:25
62:19 65:23
67:16 68:17,19
68:19 72:3
74:15 76:1

---
**7**

**7** 2:13 76:25
77:4,7
**712** 22:12
**75** 13:22 15:8,18
15:24 16:4
35:5,7,11
**77** 2:13
**79** 2:14

---
**8**

**8** 2:14 20:23
59:1,6 77:1
79:20,23
**80** 59:2

---
**9**

**9:02** 1:10
**90** 7:24
**99** 23:15 24:8
26:24